# 26-1886

## United States Court of Appeals
## for the Second Circuit

CARTER COE, by and through his parent and next friend
CAROLINE COE; REED COE, by and through his parent and
next friend RILEY COE; NICOLE COE, by and through her
parent and next friend NORMAN COE; KARL KOE, on behalf
of themselves and all similarly situated; and JAY DOE,
on behalf of themselves and all similarly situated,

*Plaintiffs-Appellees*,

- against -

TODD BLANCHE, Acting United States
Attorney General, in his official capacity; and
UNITED STATES DEPARTMENT OF JUSTICE;

*Defendants-Appellants,*

(caption continued on inside cover)

On Appeal from the United States District Court
for the Southern District of New York

### BRIEF FOR AMICUS CURIAE CITY OF NEW YORK

RICHARD DEARING
DEVIN SLACK
GEOFFREY CURFMAN
CHLOÉ K. MOON
   *of Counsel*

August 3, 2026

STEVEN BANKS
*Corporation Counsel*
*of the City of New York*
100 Church Street
New York, New York 10007
212-356-2611
cmoon@law.nyc.gov

(caption continued from outside cover)

NYU LANGONE HEALTH SYSTEM; NYU LANGONE HOSPITALS;
and NYU LANGONE GROSSMAN SCHOOL OF MEDICINE,
a Division of New York University,

*Defendants.*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...............................................................ii

PRELIMINARY STATEMENT AND
INTEREST OF AMICUS CURIAE ...................................................1

ARGUMENT

    BOTH THE EQUITIES AND PUBLIC INTEREST WEIGH
    AGAINST STAYING THE PRELIMINARY INJUNCTION ....4

    A. The City is deeply invested in ensuring safety and
    welfare of its residents and, in particular, its
    transgender youth. .........................................................4

    B. Disclosure of health information pursuant to subpoenas
    will chill transgender patients from receiving the care
    they need and deserve. ....................................................8

CONCLUSION .................................................................................12

CERTIFICATE OF COMPLIANCE ...............................................13

i

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Doe v. City of N.Y.*,
  15 F.3d 264 (2d Cir. 1994) ............................................................. 9

*Nken v. Holder*,
  556 U.S. 418 (2009) ....................................................................... 4

*O'Connor v. Pierson*,
  426 F.3d 187 (2d Cir. 2005) ......................................................... 9

*Powell v. Schriver*,
  175 F.3d 107 (2d Cir. 1999) ....................................................... 11

**Statutes**

N.Y. City Admin. Code § 8-107 ........................................................ 5

**Other Authorities**

Azeen Ghoravshi, *Report Reveals Sharp Rise in
  Transgender Young People in the U.S.*, N.Y. TIMES
  (June 10, 2022), available at
  https://tinyurl.com/4vr3ehyf ....................................................... 5

Emily Baumgartner, *Gender Surgeries Nearly Tripled
  From 2016 Through 2019, Study Finds*, N.Y. TIMES
  (Aug. 23, 2023), available at
  https://tinyurl.com/mpdetz58 ...................................................... 7

Israel T. Agaku, et al., *Concern about security and privacy,
  and perceived control over collection and use of health
  information are related to withholding of health
  information from healthcare providers,* J. AM. MED.
  INFORMATICS ASS'N (2014), available at
  https://tinyurl.com/29twyv4j ..................................................... 10

ii

TABLE OF AUTHORITIES (cont'd)

Page(s)

Jack Walker, *City-run gender-affirming care clinic for trans patients coming to New York City*, THE ADVOCATE (June 8, 2026), available at https://perma.cc/HVD4-FAM2 ...................................................................... 8

Jason D. Wright et al., *National Estimates of Gender-Affirming Surgery in the US*, JAMA, Netw Open, 2023;6;(8):e2330348 (Aug. 23, 2023), available at https://tinyurl.com/2n3wan3h ....................................................... 7

Matthew J. DePuccio, et al., *Patients' Perceptions About Medical Record Privacy and Security: Implications for Withholding of Information During the COVID-19 Pandemic*, J. GEN. INTERNAL MED. (July 2020), available at https://perma.cc/777N-LSH3 .................................................. 10

Mount Sinai, *Mount Sinai Center Is World Leader in Transgender Health Care*, available at https://tinyurl.com/3mnnf99p ....................................................... 7

N.Y. City Comm'n on Human Rights, *Legal Enforcement Guidance on Discrimination on the Basis of Gender Identity or Expression* (Feb. 15, 2019), available at https://perma.cc/ALZ8-QZGE....................................................... 5

N.Y. City Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students*, available at https://perma.cc/GYR9-DBH5 .................................................. 6

N.Y. City Health, *Epi Data Brief No. 138* (Nov. 2023), available at https://perma.cc/V57L-FUDJ ...................................... 6

N.Y. City Health, *Epi Data Brief No. 145* (Mar. 2025), available at https://perma.cc/MVR3-KX89 ............................... 5, 6

Nat'l Acad. Scis., Eng'g & Med., *Understanding the Well-Being of LGBTQI+ Populations*, Ch. 12 (Patterson, Sepúlveda & White eds., 2020), available at https://perma.cc/FLN8-RPAG....................................................... 7

# TABLE OF AUTHORITIES (cont'd)

Page(s)

NYU Langone Health, *Transgender Health*, available at
   https://perma.cc/RS58-2HB5........................................................ 7

Roger Hsieh, *Improving HIPAA Enforcement and
   Protecting Patient Privacy in a Digital Healthcare
   Environment*, 46 LOY. U. CHI. L.J. 175 (2014) ......................... 10, 11

*Statement from NYCCHR Commissioner Annabel Palma
   Opposing Proposed Federal Rule Targeting
   Transgender Care* (Jan. 20, 2026), available at
   https://perma.cc/KW6M-KXU6 ..................................................... 9

UCLA School of Law, Williams Institute, *LGBT Adults in
   Large US Metropolitan Areas* (Mar. 2021), available at
   https://perma.cc/5GNU-DKGX...................................................... 5

## PRELIMINARY STATEMENT
## AND INTEREST OF AMICUS CURIAE[1]

From the earliest days of the current administration, the federal government has openly engaged in a campaign to end gender-affirming care. While that campaign has taken many forms, this case involves the government's efforts to weaponize subpoenas for medical records, with the goal of deterring people from seeking gender-affirming care and discouraging healthcare providers from offering such care. After courts across the country turned back the federal government's efforts to advance its campaign through administrative subpoenas, the federal government has evidently shifted to criminal grand jury subpoenas. The government now asks this Court to effectively shut the door to meaningful judicial review of its conduct, and to do so on a stay motion.

The motion should be denied. The government invites this Court to turn a blind eye to the reality of its concerted attack on transgender rights—one directed by the President himself in his second week in office. The City of New York, in contrast, is committed to supporting the trans community, and it will protect their rights, defend their humanity, and stand beside them. For the community, gender-affirming care is

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

essential—and it is the very thing the federal government seeks to eliminate through measures like the subpoena practices challenged here.

The City submits this amicus brief in opposition to the government's motion to stay the district court's preliminary injunction, which temporarily stops the government from wielding grand jury subpoenas to force an unknown number of hospital systems to disclose highly sensitive medical records of patients who have sought gender-affirming care. The City writes here to underscore how the government's subpoena practices strike at the heart of bedrock privacy interests that are safeguarded by law and critical to preserving the free exchange of information between patients and healthcare providers.

Few things are more personal than medical records, which is why they are carefully shielded from unnecessary disclosure by a wide variety of federal and state laws. When a patient's personal health information is disclosed without consent, it gives rise to a profound and visceral sense of violation. Sadly, considering the government's subpoena practices alongside its larger campaign against gender-affirming care, it would seem that fostering that sense of violation is part of the point.

The district court's preliminary injunction prevents these harms while the parties litigate the merits—which the parties can do as expeditiously as they wish. Meanwhile, the stay that the government asks this

Court to grant would effectively put an end to the litigation, giving the government final relief by forcing disclosure of the medical records at issue. That step, once done, cannot be undone. The equities and the public interest weigh strongly against a stay of the preliminary injunction, which protects plaintiffs and their families while litigation is ongoing.

The importance of gender-affirming care to members of the New York City community cannot be overstated. With a long history of activism for rights protecting gender minorities, the City is home to one of the largest transgender populations in the country, including many transgender minors and young adults. These residents face a wide range of healthcare challenges that uniquely affect their community. The City has a strong interest in ensuring they have access to appropriate medical care. Subpoenas like those here will have a chilling effect on patients seeking treatment, and their very issuance may have already shaken patients' confidence in the privacy of their medical records. Actual disclosure, what the government seeks to force through a motion for a stay pending appeal, would be much worse—it would be irreversible for the patients affected and deeply harmful for the broader community.

ARGUMENT

BOTH THE EQUITIES AND PUBLIC
INTEREST WEIGH AGAINST STAYING
THE PRELIMINARY INJUNCTION

In determining whether to stay a preliminary injunction, this court decides, among other factors, whether relief is in the public interest and is consistent with the balance of the equities. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009). These factors point in the same direction, and they strongly counsel against granting a stay of the preliminary injunction, considering the dire consequences disclosure would carry for the health and well-being of New York City residents.

A. The City is deeply invested in ensuring safety and welfare of its residents and, in particular, its transgender youth.

Dating to events such as the Stonewall Inn uprising and one of the country's first Pride parades, New York City has long been an epicenter of the movement demanding equal rights based on sexual orientation and gender identity. The City has responded to that movement in part by passing laws that are among the country's most protective for members of the LGBTQIA+ community,[2] designed to make the City an

---

[2] *See* N.Y. City Admin. Code § 8-107; N.Y. City Comm'n on Human Rights, *Legal Enforcement Guidance on Discrimination on the Basis of Gender Identity or Expression* (Feb. 15, 2019), available at https://perma.cc/ALZ8-QZGE.

inviting environment in which to live, work, build families, and seek other means of fulfillment.

And the City has, in turn, welcomed an increasingly large LGBTQIA+ population, including those who are transgender. As of 2021, the New York City metro area had the largest population of LGBT residents in the nation, at over 700,000,[3] and by 2023, more than 150,000 adults living in the City identified as transgender specifically, with a higher percentage concentrated among those ages 18 through 24.[4] Consistent with that distribution, data covering New York State show that 3% of its teenage population identify as transgender, higher than any other state.[5]

As is true across the country, the City's transgender population faces healthcare challenges specific to their community that often stem from mistreatment and stigmatization, producing a wide range of health disparities affecting our residents and transgender youth in particular. For example, in 2023, more than 20% of the City's transgender adult population was estimated to suffer from serious psychological distress,

---

[3] UCLA School of Law, Williams Institute, *LGBT Adults in Large US Metropolitan Areas* (Mar. 2021), available at https://perma.cc/5GNU-DKGX.

[4] N.Y. City Health, *Epi Data Brief No. 145* at 1 (Mar. 2025), available at https://perma.cc/MVR3-KX89.

[5] Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, N.Y. TIMES (June 10, 2022), available at https://tinyurl.com/4vr3ehyf.

compared to less than 10% of those who identified as cisgender.[6] For the City's younger transgender population, these challenges are often even more acute. In 2021, for instance, more than 70% of New York City high school students who identified as transgender reported feeling sadness or hopelessness, more than double the rate of students who did not identify as transgender.[7] Partly as a response to the higher risks of marginalization and victimization transgender youth often face, the New York City Department of Education instituted guidelines designed to affirm their identities, protect their privacy, and police discrimination in order to foster a more inclusive environment in City schools.[8]

In addition to non-medical measures like these, gender-affirming care is a form of intervention on which transgender City residents depend to address the myriad healthcare challenges they face. Growing evidence shows that gender-affirming treatments are medically necessary as a means of reducing distress and promoting wellbeing.[9] And evidence

---

[6] N.Y. City Health, *Epi Data Brief No. 145* at 2 (Mar. 2025), available at https://perma.cc/MVR3-KX89.

[7] N.Y. City Health, *Epi Data Brief No. 138* at 2 (Nov. 2023), available at https://perma.cc/V57L-FUDJ.

[8] N.Y. City Dep't of Educ., *Guidelines to Support Transgender and Gender Expansive Students*, available at https://perma.cc/GYR9-DBH5.

[9] Nat'l Acad. Scis., Eng'g & Med., *Understanding the Well-Being of LGBTQI+ Populations*, Ch. 12 (Patterson, Sepúlveda & White eds., 2020), available at https://perma.cc/FLN8-RPAG.

supports affirming interventions for adolescents in particular, with studies showing they can benefit from improved psychological functioning and reductions in gender dysphoria.[10]

These developments in medical evidence have coincided with rising national demand for gender-affirming procedures that has been no less pronounced in New York City,[11] where hospitals now offer gender-affirming care covering a wide range of healthcare needs.[12] And, to keep pace with the increasing need for care serving our transgender population, the City recently committed to opening its own transgender healthcare clinic.[13]

The City thus has a strong interest in ensuring access to the types of gender-affirming care that have been proven to improve health outcomes for our transgender population. These are members of our community who participate in all facets of daily life here—as family members, students, employers, employees, and much more. When they are

---

[10] *See id.*

[11] Emily Baumgartner, *Gender Surgeries Nearly Tripled From 2016 Through 2019, Study Finds*, N.Y. TIMES (Aug. 23, 2023), available at https://tinyurl.com/mpdetz58; Jason D. Wright et al., *National Estimates of Gender-Affirming Surgery in the US*, JAMA Netw Open, 2023;6;(8):e2330348 (Aug. 23, 2023), available at https://tinyurl.com/2n3wan3h.

[12] *See, e.g.*, NYU Langone Health, *Transgender Health*, available at https://perma.cc/RS58-2HB5; Mount Sinai, *Mount Sinai Center Is World Leader in Transgender Health Care*, available at https://tinyurl.com/3mnnf99p.

[13] Jack Walker, *City-run gender-affirming care clinic for trans patients coming to New York City*, THE ADVOCATE (June 8, 2026), available at https://perma.cc/HVD4-FAM2.

7

unable to access care sufficient to meet their needs, they will suffer, as will their loved ones and the City more broadly.

> B. Disclosure of health information pursuant to subpoenas will chill transgender patients from receiving the care they need and deserve.

The disclosure of sensitive health information pursuant to subpoenas such as those at issue here has far-reaching downstream effects on the City and its residents. The City is deeply invested in ensuring that all of its residents have access to appropriate medical care, as explained above. The City's transgender and gender nonconforming residents—especially minors and young adults—already face serious health and safety risks.[14] The release of their private information will only heighten those risks by chilling patients from seeking and accessing appropriate medical care.

Courts have long recognized that the protection of medical information is paramount. Medical information in general "is information of the most intimate kind." *O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005). As this Court has stated, "there are few matters that are quite so personal as the status of one's health, and few matters the dissemination

---

[14] *See, e.g.*, *Statement from NYCCHR Commissioner Annabel Palma Opposing Proposed Federal Rule Targeting Transgender Care* (Jan. 20, 2026), available at https://perma.cc/KW6M-KXU6.

of which one would prefer to maintain greater control over." *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994). Indeed, there is little more revealing information than one's medical records.

This Court's assessment of the deeply sensitive nature of medical records as a general matter applies with particular force to the records at issue here. As the district court found, the information sought through these subpoenas includes not only each patient's transgender identity and "detailed sensitive records of the gender-affirming care" they received, but also far broader records of their familial history, mental health treatment, problems in school, and psychological development (S.D.N.Y. ECF No. 77 at 4). The subpoenas also seek records spanning six years, which for many of the minor plaintiffs represents a substantial portion of their lives (*id.* at 4-5). And, as the district court emphasized, based on representations at the hearing, the court had little confidence that information obtained through these grand jury subpoenas would remain private, due in no small part to the government's indication that it could use the records to prosecute the parents or even the minors themselves (*id.* at 28-29).

These subpoenas thus present a serious barrier for an already vulnerable group of City residents. The possibility that private medical information may be released makes patients less likely to share relevant

medical information with their providers[15] and less likely to seek medical care in the first place.[16] Even a perception of decreased privacy can cause negative health outcomes and lead to worse treatment.[17]

For transgender minors and young adults, the prospect of publicly released medical information is all the more threatening given the "excruciatingly private and intimate nature" of their records. *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). Transgender patients will be less likely to seek medical care, whether it be for gender-affirming treatment or any other kind of medical treatment, with the possibility that their medical information may be released publicly. As plaintiffs explain, and the district court found, the information sought by the subpoenas contain intimate and sensitive details about minors' medical treatment related to not just gender-affirming care but far-reaching aspects of their private lives (Pls.' Mem. at 19-21).

The disclosure of any medical records would erode patients' trust in doctors and prevent them from receiving the best possible care

---

[15] Matthew J. DePuccio, et al., *Patients' Perceptions About Medical Record Privacy and Security: Implications for Withholding of Information During the COVID-19 Pandemic*, J. GEN. INTERNAL MED. (July 2020), available at https://perma.cc/777N-LSH3.

[16] Roger Hsieh, *Improving HIPAA Enforcement and Protecting Patient Privacy in a Digital Healthcare Environment*, 46 LOY. U. CHI. L.J. 175, 177 (2014).

[17] Israel T. Agaku, et al., *Concern about security and privacy, and perceived control over collection and use of health information are related to withholding of health information from healthcare providers*, J. AM. MED. INFORMATICS ASS'N (2014), available at https://tinyurl.com/29twyv4j.

10

outcomes. But the release of information that the subpoenas here seek places transgender patients at further risk because it relates to medical decisions about gender-affirming care for transgender minors and young adults—vulnerable populations seeking highly personal and specialized care—where the information could be used to harass or discriminate against the patient.[18] *See Powell*, 175 F.3d at 111 (recognizing that transgender status may expose one to "discrimination or intolerance"), citing *Doe*, 15 F.3d at 267 (the disclosure of certain medical information "potentially exposes [one] to discrimination and intolerance, further necessitating the extension of the right to confidentiality over such information").

Without maintaining the status quo preserved by the preliminary injunction, transgender patients' information could be released, without their consent, and chill them and others like them from seeking care in the future when they need it. That outcome would be devastating for transgender individuals, especially transgender minors; for their families; and for their communities across the City of New York.

---

[18] Hsieh, *supra* n.17.

11

CONCLUSION

This Court should deny the government's request for a stay of the preliminary injunction.

Dated:  New York, New York
       August 3, 2026

Respectfully submitted,

STEVEN BANKS
*Corporation Counsel*
*of the City of New York*

By: _____
CHLOÉ K. MOON
Assistant Corporation Counsel

100 Church Street
New York, New York 10007
212-356-2611
cmoon@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
GEOFFREY CURFMAN
CHLOÉ K. MOON
   *of Counsel*

12

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 2,368 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
CHLOE K. MOON