# No. 26-1886

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

Carter Coe, by and through his parent and next friend Caroline Coe, Reed Roe, by and through his parents and next friend Riley Roe, Nicole Noe, by and through his parents and next friend Norman Noe, Karl Koe, on behalf of themselves and all similarly situated, Jay Doe, on behalf of themselves and all similarly situated,

Plaintiffs-Appellees,

v.

Todd Blanche, United States Attorney General, in his official capacity, United States Department of Justice,

Defendants-Appellants,

NYU Langone Health System, NYU Langone Hospitals, NYU Grossman School of Medicine, a division of New York University,

Defendants.

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR APPELLANTS TODD BLANCHE AND U.S. DEPARTMENT OF JUSTICE**

BRETT A. SHUMATE
*Assistant Attorney General*

JORDAN C. CAMPBELL
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
SARAH WELCH
JOHN BAILEY
BRANTLEY MAYERS
*Attorneys*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3180*

# TABLE OF CONTENTS


INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

PERTINENT STATUTES .......... 3

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE .......... 4

A. Factual Background .......... 4

B. Prior Proceedings .......... 8

SUMMARY OF ARGUMENT .......... 11

STANDARD OF REVIEW .......... 17

ARGUMENT .......... 17

I. The Injunction Is Indefensible .......... 17

A. Plaintiffs chose the wrong procedural vehicle and the wrong court. .......... 18

B. The District Court Grossly Misapplied Substantive Due Process Principles. .......... 32

C. The Fourth Amendment does not prohibit subpoenas for medical records. .......... 46

D. The injunction cannot run against private defendants. .......... 51

II. The Remaining Injunction Factors Overwhelmingly Weigh Against an Injunction. .......... 53

CONCLUSION .......... 56

CERTIFICATE OF COMPLIANCE .......... 57

ADDENDUM

## TABLE OF AUTHORITIES

### Cases

*Abbott v. Perez*,
585 U.S. 579 (2018) .......... 31

*Am. Acad. of Pediatrics v. Uthmeier*,
2026 WL 1971202 (7th Cir. July 8, 2026) .......... 25, 53

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) .......... 26, 27

*Becker v. Kroll*,
494 F.3d 904 (10th Cir. 2007) .......... 39

*Blair v. United States*,
250 U.S. 273 (1919) .......... 34

*Branzburg v. Hayes*,
408 U.S. 665 (1972) .......... 21

*Brown v. United States*,
359 U.S. 41 (1959) .......... 20

*Carpenter v. United States*,
585 U.S. 296 (2018) .......... 10, 49, 50

*Chatrie v. United States*,
609 U.S. ___, 2026 WL 1855568 (June 29, 2026) .......... 49, 50

*Chicago Headline Club v. Noem*,
168 F.4th 1033 (7th Cir. 2026) .......... 53

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992) .......... 55

*Cisco Sys., Inc. v. Doe I*,
146 S. Ct. 1882 (2026) .......... 27

*City of N.Y. v. Henriquez*,
98 F.4th 402 (2d Cir. 2024) .......... 17

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......................................................................30

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) .................................................................14, 39, 40, 41

*Cobbledick v. United States*,
309 U.S. 323 (1940) ...................................................................20, 54

*Collins v. City of Harker Heights*,
503 U.S. 115 (1992).......................................................................32

*De Beers Consol. Mines, Ltd. v. United States*,
325 U.S. 212 (1945) .......................................................................52

*Dickinson v. Trump*,
174 F.4th 634 (9th Cir. 2026)...........................................................53

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ...............................................................36, 37, 38

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
441 U.S. 221 (1979).....................................................................22, 23

*Edmonson v. Leesville Concrete Co.*,
500 U.S. 614 (1991) ...................................................................16, 52

*EEOC v. Trs. of Univ. of Penn.*,
827 F. Supp. 3d 554 (E.D. Pa. 2026).................................................44

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ..........................................................................26

*Ferguson v. City of Charleston*,
532 U.S. 67 (2001).........................................................................50

*Fraternal Order of Police, Lodge No. 5 v. Philadelphia*,
812 F.2d 105 (3d Cir. 1987) .............................................................44

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999)....................................................................28, 29

*Hancock v. Cnty. of Rensselaer*,
882 F.3d 58 (2d Cir. 2018).............................................................36, 44

*Hilao v. Est. of Marcos*,
95 F.3d 848 (9th Cir. 1996) .................................................................. 27

*In re Doe*,
711 F.2d 1187 (2d Cir. 1983) ................................................................ 45

*In re Grand Jury Proceedings*,
801 F.2d 1164 (9th Cir. 1986) ........................................................ 35, 41, 43

*In re Grand Jury Subpoena No. 16-03-217*,
875 F.3d 1179 (9th Cir. 2017) ........................................................... 16, 53

*In re Pantojas*,
628 F.2d 701 (1st Cir. 1980) .................................................................. 20

*In re Sealed Case*,
794 F.2d 749 (D.C. Cir. 1986) ............................................................... 53

*In re Subpoena Duces Tecum*,
228 F.3d 341 (4th Cir. 2000) ............................................................. 41, 55

*Kerns v. Bader*,
663 F.3d 1173 (10th Cir. 2011) ............................................................... 50

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) .................................................................. 39

*Levine v. United States*,
362 U.S. 610 (1960) ............................................................................... 19

*Maryland v. King*,
567 U.S. 1301 (2012) ............................................................................. 52

*NASA v. Nelson*,
562 U.S. 134 (2011) ............................................................................... 36

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ............................................................................ 29

*New Jersey v. T.L.O*,
469 U.S. 325 (1985) ................................................................................ 51

*New York Times Co. v. Gonzales*,
382 F. Supp. 2d 457 (S.D.N.Y. 2005) ..................................................... 25

*New York Times Co. v. Gonzales*,
459 F.3d 160 (2d Cir. 2006) .......... 25, 26

*Ohio v. Robinette*,
519 U.S. 33 (1996) .......... 51

*Oklahoma Press Pub. Co. v. Walling*,
327 U.S. 186 (1946) .......... 28, 46

*Paul P. v. Farmer*,
92 F. Supp. 2d 410 (D.N.J. 2000) .......... 44

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999) .......... 36

*QueerDoc, PLLC v. Department of Justice*,
-- F.4th --, 2026 WL 2359440 (9th Cir. Aug. 14, 2026) .......... 42, 43

*Reno v. Flores*,
507 U.S. 292 (1993) .......... 39

*Samia v. United States*,
599 U.S. 635 (2023) .......... 54

*Schachter v. Whalen*,
581 F.2d 35 (2d Cir. 1978) .......... 33

*Schlesinger v. Reservists Committee to Stop the War*,
418 U.S. 208 (1974) .......... 31

*See v. City of Seattle*,
387 U.S. 541 (1967) .......... 46

*Smith v. Maryland*,
442 U.S. 735 (1979) .......... 15, 47, 48

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 30, 42

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 28, 53

*United States v. (Under Seal)*,
714 F.2d 347 (4th Cir. 1983) .......... 20

*United States v. Beaufils*,
160 F.4th 1147 (11th Cir. 2025) .......................................................... 41

*United States v. Calandra*,
414 U.S. 338 (1974) ........................................................................ *passim*

*United States v. Davis*,
702 F.2d 418 (2d Cir. 1983) .............................................................. 47

*United States v. Dionisio*,
410 U.S. 1 (1973)........................................................................24, 34, 46

*United States v. Doe*,
457 F.2d 895 (2d Cir. 1972)...........................................................33, 46

*United States v. Felder*,
993 F.3d 57 (2d Cir. 2021) ................................................................ 47

*United States v. Harry*,
130 F.4th 342 (2d Cir. 2025)..........................................................48, 49

*United States v. Hayes*,
794 F.2d 1348 (9th Cir. 1986) ........................................................... 41

*United States v. James*,
151 F.4th 28 (2d Cir. 2025) ................................................................. 6

*United States v. McGovern*,
60 F.2d 880 (2d Cir. 1932)............................................................. 32, 33

*United States v. Miller*,
425 U.S. 435 (1976) ..................................................................15, 47, 48

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ............................................................................46

*United States v. R. Enters., Inc.*,
498 U.S. 293 (1991)........................................................................ *passim*

*United States v. Skrmetti*,
605 U.S. 495 (2025) ........................................................................ 4, 5, 39

*United States v. Williams*,
504 U.S. 36 (1992) .............................................................................. 21

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) .................................................................... 6

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*,
454 U.S. 464 (1982) .................................................................... 31

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. and Gulf Coast Dist. of the ILA; AFL-CIO*,
751 F.2d 721 (5th Cir. 1985) .................................................................... 54

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .................................................................... 14, 36, 37, 38

*Whalen v. Roe*,
429 U.S. 589 (1977) .................................................................... 45

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................... 17

*World Pro. Ass'n for Transgender Health v. FTC*,
No. 26-cv-532, 2026 WL 1999008 (D.D.C. July 10, 2026) .................................... 25

*Z.A. v. Lucile Salter Packard Children's Hosp. at Stanford*,
No. 5:26-cv-4998, (N.D. Cal. June 6, 2026) .................................... 16, 52

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .................................................................... 27

**Statutes**

5 U.S.C. § 552a .................................................................... 44

5 U.S.C. § 552a(i) .................................................................... 44

18 U.S.C. § 1035 .................................................................... 6

18 U.S.C. § 1347 .................................................................... 6

18 U.S.C. § 3282(a) .................................................................... 54

18 U.S.C. § 3486 .................................................................... 31

21 U.S.C. § 352(f) .................................................................... 6

**Rules**

Fed. R. App. P. 4(a)(1)(B) .......... 3
Fed. R. Civ. P. 45(d)(3) .......... 22
Fed. R. Civ. P. 65(d)(1)(A) .......... 51
Fed. R. Crim. P. 6 .......... 18
Fed. R. Crim. P. 6(e) .......... 9
Fed. R. Crim. P. 6(e)(2)(E) .......... 21
Fed. R. Crim. P. 6(e)(2)(F) .......... 21
Fed. R. Crim. P. 6(e)(3)(E) .......... 23
Fed. R. Crim. P. 6(e)(3)(F) .......... 23
Fed. R. Crim. P. 6(e)(7) .......... 44
Fed. R. Crim. P. 17 .......... 18, 34, 43
Fed. R. Crim. P. 17(a) .......... 20
Fed. R. Crim. P. 17(c)(2) .......... 20

**Regulations**

21 C.F.R. § 208.128 .......... 6
45 C.F.R. § 164.520 .......... 45, 48

## INTRODUCTION

Plaintiffs are several minor patients of NYU Langone Hospitals and their parents. They assert that a grand jury in the Northern District of Texas issued a subpoena to NYU Langone seeking communications with pharmaceutical companies regarding cross-sex hormones and puberty blockers, internal communications regarding billing practices for certain treatments, medical and billing records, and other related documents.

Consistent with grand jury secrecy rules, the government cannot disclose the existence or nature of any grand jury subpoenas, but the government publicly disclosed last year that it is investigating matters including whether healthcare providers have committed healthcare billing fraud or made unlawful false statements, and whether manufacturers and distributors of puberty blockers and cross-sex hormones violated the Food, Drug, and Cosmetic Act (FDCA) by distributing drugs intending that they be used off-label. Pursuant to that investigation, three hospitals have thus far agreed to pay substantial penalties to resolve potential liability for allegations that they submitted false bills to secure insurance coverage for sex-rejecting procedures on minors.

Rather than moving to quash or otherwise seeking relief in the Northern District of Texas, plaintiffs asked the Southern District of New

York to enjoin the government from seeking or obtaining records in response to any present or future grand jury or administrative subpoenas. The district court also extended its relief by certifying a class of patients who received gender-related medical interventions from New York City hospitals as minors.

That order is an unprecedented arrogation of authority that this Court should promptly correct. Just as the Northern District of Texas cannot superintend grand juries in the Southern District of New York, so the Southern District of New York cannot superintend grand juries in the Northern District of Texas. The basic principles governing grand jury proceedings dictate that if plaintiffs seek to challenge a subpoena, they must seek to quash before the issuing court. By the same token, a district court cannot invade Executive Branch prerogatives by telling the Executive Branch which offenses or entities it may investigate. Orders like the one entered here have no historical precedent, would create law-free zones where private actors may violate the law with impunity, and irreparably harm the government's and the public's interests in enforcing laws protecting the public and the public fisc. Even beyond those threshold considerations, on the merits, the district court's novel expansion of

substantive due process, curtailing of the third-party doctrine, and unreasoned injunction against private defendants fare no better.

The preliminary injunction should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's subject matter jurisdiction under 28 U.S.C. §§ 1331, 1346, 1361, and 1367(a). JA 23. On July 6, 2026, the district court entered a preliminary injunction. JA 214-19. On July 10, 2026, the government filed a timely notice of appeal. JA 220-22; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE ISSUES

1. Whether the district court exceeded its constitutional and equitable authority by purporting to prevent compliance with present or future grand jury subpoenas issued in other jurisdictions.

2. Whether federal grand jury subpoenas may be challenged in collateral civil actions outside the issuing court, bypassing the Federal Rules of Criminal Procedure.

3. Whether plaintiffs are likely to establish a novel and expansive Fifth Amendment substantive-due-process right to prevent compliance with subpoenas directed to a third party for medical and billing records.

4. Whether plaintiffs are likely to establish that the third-party doctrine does not apply to medical and billing records held by a third-party entity and regularly disclosed by that entity to others.

## STATEMENT OF THE CASE

### A. Factual Background

For over a year, the Department of Justice has been investigating potential violations of federal law in connection with the provision of certain prescription drugs to minors with gender dysphoria. These include prescription drugs that suppress the production of sex hormones to delay puberty (common referred to as "puberty blockers") and cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and rather than the individual's biological sex. *See United States v. Skrmetti*, 605 U.S. 495, 503-04 (2025) (describing use of these drugs). Although these drugs are approved by the Food and Drug Administration (FDA) for some uses, the FDA has not determined that any of these drugs

are safe or effective for treating gender dysphoria or approved them for such use or to treat any other psychiatric disorder.

The use of these drugs in the treatment of gender dysphoria in minors is highly controversial—the subject of "fierce scientific and policy debates." *Skrmetti*, 605 U.S. at 525. As the Supreme Court recently explained, "health authorities in a number of European countries have raised significant concerns regarding the potential harms associated with using puberty blockers and hormones to treat transgender minors," and "more than 20 States have enacted laws banning the provision of sex transition treatments to minors." *Id.* at 504-05. The United States Department of Health and Human Services (HHS) has likewise found, after reviewing the available evidence, that these interventions in minors are associated with serious potential harms—including infertility and sterility, impaired bone density development, cardiovascular and metabolic disease, and psychiatric conditions. Admiral Brian Christine, Assistant Sec'y for Health, U.S. HHS, *Evidence-Based Care for Children and Adolescents with Gender Dysphoria* 1 (Dec. 18, 2025), https://perma.cc/ZH22-R5GH (HHS Statement). In sum, "[c]urrent evidence does not support claims that puberty blockers, cross-sex hormones, and surgeries are safe and effective treatments for pediatric gender dysphoria." *Id.* at 3.

Although federal law does not prohibit doctors from prescribing drugs for off-label purposes, various federal statutes prohibit defrauding or obtaining money by false pretenses from programs like Medicare or Medicaid or from private health care benefit programs. *See, e.g.*, 18 U.S.C. §§ 1035, 1347. For example, a physician may violate the False Claims Act by submitting claims for reimbursement that contain misleading "payment" or "other [billing] codes." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 189-90 (2016); *see, e.g.*, *United States v. James*, 151 F.4th 28, 35-36 (2d Cir. 2025) (health care fraud conviction for bills that "add[ed] certain codes to claims forms for more complex procedures than had actually been performed or for procedures that had not been performed at all" and "falsely represented to insurance companies that component[s]" of a single "procedure[] were performed separately"). And the FDCA extensively regulates pharmaceutical companies. For example, drug manufacturers and distributors can violate the FDCA by shipping drugs in interstate commerce intending that they be used off-label, with that intent frequently evidenced by promoting the drugs for off-label uses. 21 U.S.C. § 352(f); 21 C.F.R. § 208.128.

In April 2025, then-Attorney General Bondi directed the Department to prioritize investigations of "medical providers and pharmaceutical

companies that mislead the public about the long-term side effects of chemical and surgical mutilation." Memorandum from the Att'y Gen., Off. of the Att'y Gen., for Select Component Heads 4 (Apr. 22, 2025), https://perma.cc/N345-R8QL (Bondi Memo). The Bondi Memo directed the Department to "undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making" "false claims about the on- or off-label use of puberty blockers, sex hormones," and similar drugs. *Id.* It separately directed the Department to prioritize investigations under the False Claims Act "of false claims submitted to federal health care programs for any non-covered services" related to gender-related medical interventions in minors. *Id.*

In June 2025, Assistant Attorney General for the Civil Division Brett Shumate issued a memorandum directing his staff to "prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with" the Bondi Memo. Memorandum from Brett A. Shumate, Assistant Att'y Gen., U.S. Dep't of Just., to Civ. Div. Emps. 2-3 (June 11, 2025), https://perma.cc/AMR2-U7W3 (Shumate Memo).

In connection with its public investigation, the government has issued various administrative subpoenas under 18 U.S.C. § 3486 (a provision of

the Health Insurance Portability and Accountability Act), including a since-withdrawn administrative subpoena to NYU Langone. The Department has thus far announced resolutions of criminal liability with three hospitals for allegations that they submitted false bills to obtain insurance coverage for gender-related medical interventions for minors.[1]

**B. Prior Proceedings**

Plaintiffs are patients and former patients who received gender-related treatments at NYU Langone (and, in one case, another hospital in New York City) while they were minors, along with several of their parents, proceeding pseudonymously. JA 24-25. Defendants are Attorney General Todd Blanche and the Department of Justice (referred to as the government or the Department) and NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine (referred to as NYU defendants). According to plaintiffs' and NYU defendants' public filings, a grand jury subpoena bearing the seal of the Northern District of Texas commanded NYU defendants to produce documents before a federal grand jury in Fort Worth, Texas. JA 44-46; JA 69-80. The asserted

[1] Press Release, U.S. Dep't of Justice (August 5, 2026), https://perma.cc/D4MX-8TD8; Press Release, U.S. Dep't of Justice (June 5, 2026), https://perma.cc/7MPN-4AQK; Press Release, U.S. Dep't of Justice (May 15, 2026), https://perma.cc/S4NQ-X6FN.

subpoena purportedly required production by June 10, 2026, and sought communications with pharmaceutical companies regarding cross-sex hormones and puberty blockers, internal communications regarding billing practices for certain treatments, medical and billing records, and other related documents. JA 69-80. Due to grand-jury secrecy requirements, the government may not confirm or deny the existence or contents of a subpoena or the nature of any grand jury investigation. *See* Fed. R. Crim. P. 6(e).

On June 2, plaintiffs filed this lawsuit in the Southern District of New York and moved for a temporary restraining order against NYU defendants (to prevent them from disclosing medical or billing records) and the government (to prevent the government from receiving medical or billing records). JA 21; ECF 8. Plaintiffs also sought certification of a class of "individuals who received any medical treatment for gender dysphoria" at "a healthcare institution located in New York City" while they were minors, and a subclass of those individuals treated "at NYU Langone Hospitals or any other NYU entity." ECF 17 at 4; *see* ECF 8.

The district court granted the motions in an oral ruling, entering a temporary restraining order against both NYU defendants and the government, in favor of a provisionally certified class and subclass. JA 210-

13; *see* JA 244. The district court concluded that plaintiffs would likely succeed on Fourth and Fifth Amendment claims against the government. JA 257-70. The court did not assess plaintiffs' likelihood of success against NYU defendants.

As to the Fifth Amendment claim, the district court concluded that plaintiffs successfully identified "two distinct informational privacy rights": "medical information" and "information relating to one's transgender status." JA 262. The district court concluded that a subpoena seeking plaintiffs' medical and billing records would "shock the conscience" because the information the government sought could not be relevant to any conceivable violation of federal law; grand jury secrecy did not constitute an adequate safeguard; and the plaintiffs' interest in privacy would outweigh the government's interest even if the government had any legitimate interest in the information. JA 263-66.

As to the Fourth Amendment claim, the district court concluded that the government cannot obtain medical or billing records via a subpoena because the third-party doctrine does not apply to such records, in light of the Supreme Court's decision in *Carpenter v. United States*, 585 U.S. 296 (2018). In the district court's view, such records contain "precisely the kinds of privacies of life contemplated in *Carpenter*." JA 269.

The parties agreed to treat the temporary restraining order briefing as briefing on a preliminary injunction, and the district court adopted its oral reasoning as the basis for a preliminary injunction in favor of the same provisionally certified class and subclass. JA 214-19.

Specifically, the preliminary injunction bars DOJ defendants from "[s]eeking, receiving, using, retaining, or disseminating" plaintiffs' or class members' "identifying or sensitive health information" via existing or future "substantially similar administrative or grand jury subpoenas as part of the U.S. Department of Justice's claimed investigations into healthcare offenses related to gender-affirming medical care." JA 217-18. NYU defendants are enjoined from "[d]isclosing or producing" any such information in response to any such process. JA 218.

The government appealed and moved for a stay pending appeal. JA 220-22; ECF 81. The district court denied the government's stay motion on July 17, 2026. JA 223-24. The government's motion for a stay pending appeal in this Court remains pending. NYU defendants have not noticed an appeal.

## SUMMARY OF ARGUMENT

The district court's unprecedented injunction is both legally and equitably indefensible and should be reversed.

**I.A.** At the outset, plaintiffs chose the wrong procedural vehicle and the wrong court. A federal grand jury is an arm of the court in which it sits, and the Federal Rules of Criminal Procedure therefore assign responsibility for supervising and enforcing grand jury subpoenas to the issuing court. Rule 17 requires objections to the asserted grand jury subpoena to be raised through a prompt motion to quash before the court supervising the grand jury. Respecting that allocation of authority is critical because grand jury investigations are secret, nationwide in scope, and vulnerable to disruption and delay. A non-supervising court lacks both the investigative context and the authority needed to assess another court's grand jury process, while the government cannot freely disclose investigative details in order to defend that process in collateral litigation. Allowing such challenges would delay grand jury investigations and the enforcement of federal criminal law, invite conflicting rulings, and permit precisely the sort of "litigious interference with grand jury proceedings" that the Supreme Court has consistently rejected. *United States v. Calandra*, 414 U.S. 338, 350 (1974).

Plaintiffs cannot evade Rule 17 by recasting quashal as an injunction against the government's receipt of subpoenaed evidence. Courts may not invoke equity to circumvent a remedial framework established by federal law, particularly where the prescribed mechanism provides the plaintiff

with an avenue for judicial review and collateral adjudication would be unworkable. Nor do district courts possess freewheeling equitable authority to enjoin grand jury process supervised and enforced by a coordinate federal court. Such injunctions lack any historical pedigree and thus exceed the bounds of federal court's equitable power. The district court's attempt to justify its order as addressing broader investigative efforts only magnifies the intrusive nature of the court's unprecedented injunction. Plaintiffs cannot end-run Rule 17 by packaging an impermissible challenge to an existing grand jury subpoena together with objections to hypothetical future process.

**B.** In any event, the asserted grand jury subpoena does not raise any constitutional concern, let alone one that could justify the preliminary injunction issued below.

**1.** Substantive due process does not imbue third parties with a right to prevent their medical or billing records from being used in a grand jury investigation. That theory is incompatible with a functioning grand jury system, in which federal prosecutors frequently must seek and handle highly sensitive evidence. And it is foreclosed by precedent rejecting a constitutional right to privacy before a grand jury. Plaintiffs' asserted substantive due process right of privacy in medical records as against grand

jury process directed at a third party is not "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation omitted); indeed, plaintiffs identify no court that endorsed such a novel and expansive theory of substantive due process before the decision below.

Even if such a right existed, the district court's substantive due process analysis was independently erroneous. A routine use of grand jury subpoenas to obtain sensitive evidence in a criminal investigation bears no resemblance to the extreme official misconduct necessary to establish a substantive due process violation. And the court could not perform the required "exact analysis of circumstances," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998), including because grand jury secrecy restricted the government's ability to disclose an investigative theory or supporting facts. For related and independent reasons, the district court's analysis of the privacy balance was plainly erroneous too. Medical records maintained by third parties are routinely disclosed for law-enforcement purposes, and grand jury secrecy provides substantial protection for patients' privacy interests. The district court erroneously discounted the government's and the public's compelling interest in investigating possible violations of

federal law because of its mistaken view that the records were necessarily irrelevant.

**2.** The district court's Fourth Amendment analysis was also legally flawed. The third-party doctrine applies to medical and billing records, which are papers held by a third-party business—just like the documents at issue in archetypal third-party doctrine cases like *Smith* and *Miller*. *Smith v. Maryland*, 442 U.S. 735 (1979); *United States v. Miller*, 425 U.S. 435 (1976). They are unlike the novel technologies the Supreme Court has faced in recent decisions about the third-party doctrine, where law enforcement surveils locations or individuals through cell phone data that cannot fairly be said to be knowingly or voluntarily disclosed to cell phone companies. Medical and billing records are generated by specific, known interactions, and they are created with the patient's knowledge that they exist and will be disclosed to others—including in response to law enforcement subpoenas. That is a core case for application of the third-party doctrine.

**3.** Last, the preliminary injunction against NYU defendants cannot possibly be upheld on appeal. The district court never concluded that plaintiffs would likely succeed on any claim that NYU defendants would violate any law if they complied with a grand jury or other subpoena. To the extent the preliminary injunction against NYU defendants rests on the

same reasoning applicable to the government, that reasoning would fail as to NYU defendants for the reasons already explained and for the additional reason that NYU defendants have never been shown to be federal government actors capable of violating the Fourth or Fifth Amendments. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991); Order, *Z.A. v. Lucile Salter Packard Children's Hosp. at Stanford*, No. 5:26-cv-4998, ECF No. 40 at 9-15 (N.D. Cal. June 6, 2026) ("*Stanford*") (rejecting such an argument, in a similar case).

**II.** The equities also decisively favor the government. The injunction indefinitely prevents the government from obtaining an entire category of relevant evidence for its investigation through any grand jury or other subpoena—regardless of the offense under investigation, the strength of the evidence, or the necessity for the records. That intrusion irreparably harms the government and the public's "compelling interest in the grand jury's investigation into possible violations of federal law." *In re Grand Jury Subpoena No. 16-03-217*, 875 F.3d 1179, 1191 (9th Cir. 2017). Plaintiffs' asserted privacy interests, by contrast, would be substantially protected by grand jury secrecy and other legal safeguards.

## STANDARD OF REVIEW

A "district court's decision to grant a preliminary injunction" is reviewed "for abuse of discretion." *City of N.Y. v. Henriquez*, 98 F.4th 402, 411 (2d Cir. 2024). "A district court abuses its discretion when (1) its decision rests upon an error of law or a clearly erroneous factual finding, or (2) its decision otherwise cannot be located within the range of permissible decisions." *Id.* This Court "examine[s] the district court's legal judgments de novo, in no way constrained by the district court's determination." *Id.*

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I. The Injunction Is Indefensible

Plaintiffs are unlikely to succeed on their challenge to grand jury process that they assert was issued by the Northern District of Texas. District courts have no equitable authority to interfere with a sister federal court's grand jury process, and plaintiffs lack an equitable cause of action to seek such unprecedented and intrusive relief. Even apart from those threshold defects, the notion that substantive due process principles can

limit compliance with an otherwise lawful grand jury subpoena is foreign to our constitutional tradition and foreclosed by circuit precedent.

### A. Plaintiffs chose the wrong procedural vehicle and the wrong court.

At the threshold, plaintiffs lack a cause of action to seek an injunction that functions as quashal of an asserted grand jury subpoena, and the district court had no equitable power to interfere with any grand jury process issued under the authority of a federal court in Texas. Neither plaintiffs nor the district court pointed to *any* prior case in which one federal court has purported to interfere with a grand jury investigation supervised by another federal district court. And that is no surprise: even aside from the absence of any historical tradition allowing such equitable interference with another court's process, the Federal Rules of Criminal Procedure establish a unified and comprehensive framework governing the issuance, enforcement, and challenge of grand jury subpoenas. *See* Fed. R. Crim. P. 17; *see also id.* R. 6. Under that framework and consistent with longstanding, settled practice, a challenge to a grand jury subpoena belongs before the court supervising the grand jury, through a motion to quash or modify the subpoena.

Plaintiffs may not bypass that framework through collateral civil litigation in which they recast quashal as an injunction against a subpoena

recipient's delivery or the government's receipt of subpoenaed evidence. Nor may district courts assert freewheeling equitable authority to disable grand jury process issued by a sister federal court that exercises supervision and enforcement jurisdiction over such subpoenas. The novel procedure approved by the district court would create a procedural morass in which grand juries across the country could be paralyzed by litigation brought in multiple jurisdictions across the country—jurisdictions that lack visibility into the grand jury's investigation and have no means to compel the production of secret grand-jury information that would enable them to conduct any coherent analysis of a challenge to such a subpoena. Given the constitutional role and responsibility of the grand jury, the Supreme Court has consistently "reaffirmed [its] disinclination to allow litigious interference with grand jury proceedings." *Calandra*, 414 U.S. at 350. Plaintiffs' choice to sue in the wrong court and through the wrong procedural vehicle means their claim has no chance of success.

**1.** A federal grand jury "is an arm of the court" in which it sits. *Levine v. United States*, 362 U.S. 610, 617 (1960). "The Constitution itself makes the grand jury a part of the judicial process," and the grand jury serves "under general instructions from the court to which it is attached and to which, from time to time, it reports its findings." *Id.* (quoting

*Cobbledick v. United States*, 309 U.S. 323, 327 (1940)). Indeed, as "an appendage of the court," a grand jury is "powerless to perform its investigative function without the court's aid"—it cannot "itself" compel evidence or testimony. *Brown v. United States,* 359 U.S. 41, 49 (1959). Rather, it is the supervising "court's process which summons the witness to attend and give testimony, and it is the court which must compel a witness to testify if, after appearing, he refuses to do so." *Id.*

The corollary is that "[t]he power to quash a subpoena exists in the district court of the district where the grand jury sits by reason of its inherent authority to prevent misuse of its own process." *United States v. (Under Seal)*, 714 F.2d 347, 350 (4th Cir. 1983); *see, e.g.*, *In re Pantojas*, 628 F.2d 701, 705 (1st Cir. 1980) ("The practical responsibility for controlling grand jury excesses lies with the district court, on which the grand jury must rely for subpoena and contempt procedures."). Consistent with that principle, the Federal Rules of Criminal Procedure expressly channel objections to grand jury process to the issuing court. A grand jury subpoena must "state the court's name" and "include the seal of the court." Fed. R. Crim. P. 17(a). And "[o]n motion made promptly, *the court* may quash or modify the subpoena if compliance would be unreasonable or oppressive." *Id.* R. 17(c)(2) (emphasis added). In context, "the court" with

exclusive authority to quash or modify grand jury process is the court named on the subpoena—the same court that supervises the grand jury and exercises authority over its proceedings, including deciding any requests for disclosure under Rule 6(e). *See id.* R. 6(e)(2)(E), (F) ("A petition to disclose a grand-jury matter under Rule 6(e)(3)(E)(i) must be filed in the district where the grand jury convened.").

That allocation of authority reflects long-settled practice. The Supreme Court has repeatedly explained that "[g]rand juries are subject to judicial control and subpoenas to motions to quash." *Branzburg v. Hayes*, 408 U.S. 665, 708 (1972). Although a "grand jury subpoena issued through normal channels" is presumed reasonable in light of the grand jury's broad investigative authority, *United States v. R. Enters., Inc.*, 498 U.S. 293, 298-301 (1991), the supervising "court will refuse to lend its assistance when the compulsion the grand jury seeks would override rights accorded by the Constitution," *United States v. Williams*, 504 U.S. 36, 48 (1992). And, as explained, Rule 17 requires that such objections be presented to the court responsible for the investigation—not to any far-flung district in which the subpoena recipient, documents, or persons mentioned in those documents happen to be located.

**2.** The district court's contrary approach is completely unworkable. Apart from intruding upon the issuing court's supervisory authority, permitting a separate federal district court to entertain collateral challenges to a subpoena issued by a grand jury sitting in another district would delay and disrupt the orderly administration of federal criminal investigations and unnecessarily risk inconsistent rulings among federal courts. Because Rule 17(e) authorizes nationwide service, permitting collateral challenges in any district in which an interested person happens to be located would permit different courts—without access to the same information or responsibility for the grand jury's investigation—to issue conflicting rulings about the same grand jury proceeding. Rule 17 avoids that disorder and delay by channeling disputes to the one court responsible for the investigation. The contrast with Civil Rule 45 confirms the point: whereas Civil Rule 45 expressly assigns certain subpoena disputes to "the court for the district where compliance is required," Fed. R. Civ. P. 45(d)(3), Criminal Rule 17 contains no comparable provision contemplating collateral review in the district where documents are located.

The historic tradition of grand jury secrecy, now enshrined in Rule 6(e), makes that channeling a "practical necessity." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 221, 225 (1979). Rule 6(e) generally prohibits

government attorneys from disclosing matters occurring before the grand jury without authorization from the supervising court. *See* Fed. R. Crim. P. 6(e)(3)(E)(i), (F). And "the policies underlying" grand jury secrecy also "dictate that the grand jury's supervisory court participate in reviewing such [disclosure] requests, as it is in the best position to determine the continuing need for grand jury secrecy." *Douglas Oil*, 441 U.S. at 225. On the other hand, a non-supervising court lacks the information needed to evaluate a subpoena's relevance, the government's need, or delay's consequences. It is effectively asked to restrain an investigation whose relevant details and scope neither the plaintiffs nor the court know—and which the government cannot freely reveal. By contrast, the supervising court does not face that disability; it may evaluate objections against the full investigative context and even authorize appropriate disclosures to the objecting party. *See R. Enters.*, 498 U.S. at 302.

More broadly, the Supreme Court has repeatedly "reaffirmed [its] disinclination to allow litigious interference with grand jury proceedings." *Calandra*, 414 U.S. at 350. It has declined to adopt "[a]ny holding that would saddle a grand jury with minitrials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *R. Enters.*,

498 U.S. at 298-99 (quoting *United States v. Dionisio*, 410 U.S. 1, 16 (1973)). Yet the "probable result" of subjecting a single grand jury investigation to emergency litigation across multiple districts "would be protracted interruption of grand jury proceedings," which "would unduly interfere with the effective and expeditious discharge of the grand jury's duties." *Calandra*, 414 U.S. at 434, 349-50. "[R]equiring the Government to explain in too much detail the particular reasons underlying a subpoena" in such a collateral proceeding "threatens to compromise 'the indispensable secrecy of grand jury proceedings.'" *R. Enters.*, 498 U.S. at 299 (citation omitted). This explains why the Criminal Rules expressly route challenges to grand jury process to the issuing court, which "will be able to craft appropriate procedures that balance the interests of the subpoena recipient against the strong governmental interests in maintaining secrecy, preserving investigatory flexibility, and avoiding procedural delays." *Id.* at 302.

Given those compelling interests (and the Supreme Court's unusually clear guidance in this area), it is unsurprising that plaintiffs have identified *no* injunctions barring compliance with an out-of-district grand jury subpoena or investigation, prior to this litigation. Indeed, other courts have continued to properly reject efforts to collaterally attack and intrude on

lawful investigations or enforcement actions in other districts. *See Am. Acad. of Pediatrics v. Uthmeier*, 2026 WL 1971202 (7th Cir. July 8, 2026) (en banc) (staying injunction against state enforcement action regarding groups that advocate for gender-related medical interventions for minors); *World Pro. Ass'n for Transgender Health v. FTC*, No. 26-cv-532, 2026 WL 1999008 (D.D.C. July 10, 2026) (denying anti-suit injunction against enforcement action).

**3.** Plaintiffs cannot circumvent Rule 17 by resorting to other procedural devices. Below, plaintiffs and the district court invoked *New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006), which considered the propriety of a declaratory judgment in the context of an anticipated grand jury subpoena. *Times* does not support the district court's injunction. There, the Second Circuit considered a newspaper's request for a declaratory judgment that its phone records in the possession of third parties should be shielded from any grand jury subpoenas in connection with a specific incident based on common-law or First Amendment privilege. *Id.* at 162. The district court had entered a declaratory judgment for the newspaper, emphasizing that the declaratory judgment the newspaper sought was not "tantamount to a permanent injunction." *New York Times Co. v. Gonzales*, 382 F. Supp. 2d 457, 480 (S.D.N.Y. 2005).

Given that posture, the only threshold issues the Second Circuit considered were specific to declaratory judgments. *Times*, 459 F.3d at 166-67. Nothing in *Times* endorses an *injunction* against a grand jury subpoena that plaintiffs here allege has *already* issued from another district court. *See id.* at 167 (emphasizing that it was "unknown whether subpoenas have been issued" and that "a motion to quash is not available if the subpoena has not been issued"). Indeed, even the district court acknowledged that *Times* "may not be directly on point." JA 259.

Nor may plaintiffs "circumvent" Rule 17 by "invoking [a court's] equitable powers." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 328 (2015); *see Elgin v. Dep't of Treasury*, 567 U.S. 1, 8 (2012) (remedial scheme channels claims to that scheme, precluding district court jurisdiction, "even though they are constitutional claims for equitable relief"). In *Armstrong,* Medicaid providers sought to enjoin state officials from setting reimbursement rates that allegedly violated the Medicaid Act. The Supreme Court held that providers had no cause of action in equity, explaining that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." 575 U.S. at 327. The Medicaid Act implicitly foreclosed equitable enforcement because Congress had provided a specific enforcement

mechanism (authorizing the Secretary of HHS to withhold federal funds) and because equitable enforcement would be "judicially unadministrable." *Id.* at 328.

The same principles foreclose plaintiffs' attempt to evade Rule 17. "[T]he Federal Rules have the force of statute," *Hilao v. Est. of Marcos*, 95 F.3d 848, 852 (9th Cir. 1996), and Rule 17 "express[ly] provi[des]," *Armstrong*, 575 U.S. at 328, a mechanism for obtaining relief from extant grand jury process: a prompt motion to quash presented to the supervising court. Indeed, the Supreme Court's more recent "cases have stressed that if Congress has created 'an alternative remedial structure,' then '*that alone*' precludes the creation of a cause of action." *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1891 (2026) (emphasis in original) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017)). That reasoning applies with particular force here, where, unlike *Armstrong*, Rule 17 provides a means of seeking relief from a federal court.

In any event, even if Rule 17's remedy were not alone sufficient to foreclose a duplicative equitable cause of action, "it does so when combined with the judicially unadministrable nature" of collateral challenges to grand jury process. *Armstrong*, 575 U.S. at 328. As explained already, the defining features of grand jury investigations (including secrecy, centralized

supervision, and nationwide service of process) make collateral adjudication incompatible with a functional grand jury system.

Nor is there any equitable history or tradition recognizing freestanding constitutional causes of action to enjoin grand jury process. Again, prior to last month, no other federal court appears to have entertained a request for a coercive injunction aimed at a coordinate federal court's grand jury process. This is not surprising. A federal court's equity power "is not freewheeling." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). Federal equitable remedies must remain within "the bounds of a federal court's equitable authority under the Judiciary Act," *id.* at 847, which include "only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception," *id.* Relief lacking a "historical pedigree"—like the district court's novel injunction—falls outside those bounds. *Id.* Especially when "there is absolutely nothing new about" efforts to resist investigative process, and the specific mechanism of Rule 17 "was developed to" govern such efforts, it is significant that "an equitable power to restrict" a sister court's process "was not." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999); *cf. Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 202-03 (1946) (litigation over subpoenas "has brought forth some of the stoutest and most

effective instances of resistance to excess of governmental authority"). Courts in such circumstances cannot take it upon themselves to newly "craft a 'nuclear weapon' of the law" like the power to enjoin a sister court's grand jury investigation. *Grupo Mexicano*, 527 U.S. at 322.

**4.** The district court reasoned that because plaintiffs challenged a broader "serial effort" to obtain their information, a Rule 17 proceeding would not provide complete relief against hypothetical future process. JA 260-61. That does not solve plaintiffs' Rule 17 problem, and it instead introduces new problems.

A plaintiff cannot end-run Rule 17 by packaging an impermissible request for relief from grand jury process together with a request for relief from other previously issued or hypothetical future process. If an order forbidding Action A is foreclosed, that limit cannot be evaded simply by entering an order forbidding "Action A or Action B." *See, e.g.*, *Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660-61 (2025) (staying injunction in part); *id.* at 2661-62 (Barrett, J., concurring) (plaintiffs may not "end-run" channeling regime "simply by packaging" legally distinct claims together). Whether or not the district court's order also interfered with other investigative steps, it undoubtedly sought to functionally quash or modify a grand jury subpoena. That was, after all, the goal: Plaintiffs

have candidly told this Court that "the NYU subpoena's return date" was the reason for "the urgency of" the proceedings below. Stay Opp. at 5 n.2. The district court said the same thing. JA 261 (identifying "an imminent risk that [plaintiffs'] identifying and sensitive health information will be disclosed today because of the subpoena").

Further, plaintiffs lack standing to challenge hypothetical future subpoenas because they provide no evidence that the government will imminently seek to obtain their information through future subpoenas. To establish standing, a plaintiff must allege a "threatened injury" that is "certainly impending," and "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). Yet the district court's analysis identified only one concrete and imminent injury: the court concluded that "plaintiffs here face an imminent risk that their identifying and sensitive health information will be disclosed today because of the subpoena." JA 261. Without evidence of a certainly impending threat of future investigative efforts beyond an asserted grand jury subpoena, plaintiffs lack standing to request an injunction against such hypothetical efforts, and there is no Article III dispute to justify the balance of the injunction. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[P]laintiffs must demonstrate standing

. . . for each form of relief that they seek."). It is no answer, and no ground for evading the ordinary rules of standing, to claim that plaintiffs may not learn of hypothetical future subpoenas prior to a third party's compliance with the subpoenas. Concerns that a plaintiff would not learn of hypothetical future actions did not create standing in *Clapper*. And relaxing the standing requirements because plaintiffs or others might not be able to meet them is impermissible. *See Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 489 (1982) ("The assumption that if [plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." (quoting *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 227 (1974))).

Even if plaintiffs somehow had standing to challenge all future process, such a remedy is, if anything, even more unprecedented and unjustified than an order targeting a single alleged grand jury subpoena. Plaintiffs also cannot possibly show on the merits that every conceivable future attempt by the government to obtain patient records would be unlawful. The privacy balancing plaintiffs invoke is inherently fact-specific and cannot be conducted in advance, and hypothetical future investigations may be subject to their own frameworks for motions to quash. *E.g.*, 18 U.S.C. § 3486.

In the end, plaintiffs sought and obtained an order that functions just like quashal or modification of a sister federal court's grand jury process. *Cf. Abbott v. Perez*, 585 U.S. 579, 595 (2018) (functional assessment of remedy to prevent judicial "manipulation"). The government is likely to show that the district court exceeded its authority.

### B. The District Court Grossly Misapplied Substantive Due Process Principles.

Even aside from this threshold defect, plaintiffs' Fifth Amendment theory depends on a second unprecedented proposition: that a right to informational privacy permits third parties to control evidence sought by an otherwise lawful grand jury subpoena. That is wrong from start to finish. And even if this were an open question, the district court's analysis is erroneous on its own terms.

**1.** Courts must "exercise the utmost care whenever . . . asked to break new ground" in the "field" of substantive due process. *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). This Court should not break any new ground here, when this Court, the Supreme Court, and other circuits have previously rejected attempts to assert a privacy right in the grand jury context.

The Supreme Court has made plain that a witness "of course" has "no right of privacy before the grand jury." *Calandra*, 414 U.S. at 353. This

Court has likewise rejected a claimed "right to privacy in [one's] own affairs" to avoid grand jury testimony as an "ill-advised notion." *United States v. McGovern*, 60 F.2d 880, 889 (2d Cir. 1932). It is "not for" a subpoena recipient or another third party "to determine what the grand jury ought to know," even if that invades a witness's or third party's desire to "keep his knowledge to himself." *Id.* And the Court has further emphasized that "[i]t is too plain to demand extended argument that a 'reasonable expectation of privacy' does not relieve of the requirement of appearance before a grand jury or other properly constituted tribunal." *United States v. Doe*, 457 F.2d 895, 897 (2d Cir. 1972). The Court has thus permitted enforcement of a subpoena for "the medical records of all patients" of a particular physician who were "treated with" two particular drugs, concluding that such a subpoena does "not violate the patients' constitutional rights." *Schachter v. Whalen*, 581 F.2d 35, 37 (2d Cir. 1978). In reaching that conclusion, this Court rejected the plaintiff patients' argument that "disclosure to the [state government] of the patients' identities and their confidential medical records" would "invade[] the patients' right of privacy" and "discriminate[] against the patients because they suffer from certain diseases, hold certain beliefs, and desire to receive certain forms of medical treatment." *Id.* at 36.

The Court's frank recognition that privacy interests do not overcome grand jury obligations accords with the Supreme Court's treatment of the issue. The "historically grounded obligation of every person to appear and give his evidence before the grand jury" is "'a part of the necessary contribution of the individual to the welfare of the public'" and "'necessary to the administration of justice.'" *Dionisio*, 410 U.S. at 9-10 (quoting *Blair v. United States*, 250 U.S. 273, 281 (1919)). Thus, absent a "recognized privilege," "every man owes his testimony," and a grand jury is entitled even to "responses [that] might prove embarrassing or result in an unwelcome disclosure of . . . personal affairs." *Calandra*, 414 U.S. at 353.

That tradition follows from the nature of grand jury proceedings. Grand jury proceedings are conducted in secret. Thus, "when the grand jury seeks the production of personal or confidential information, grand jury secrecy affords substantial protection for the [individual's] privacy and dignity interests." Fed. R. Crim. P. 17 advisory committee's note to 2008 amendment (explaining why judicial approval and victim notification requirements applicable to third-party subpoenas directed at crime victims do not apply to grand jury subpoenas). On the other hand, subjecting grand jury subpoenas to a "multifactor" balancing test would impermissibly (and predictably) "invite procedural delays and detours while courts

evaluate the relevancy and admissibility of documents sought by a particular subpoena." *R. Enters.*, 498 U.S. at 298. That approach, particularly when undertaken by a non-supervising court, would improperly "compromise the indispensable secrecy of grand jury proceedings" by "[r]equiring the government to explain in too much detail the particular reasons underlying a subpoena." *Id.* at 299.

Providing further support, the Ninth Circuit has expressly rejected a privacy right in substantively identical circumstances. That court considered a grand jury investigation into "illegal dispensation of anabolic steroids, androgenic hormones and other such drugs" by a physician believed to treat "many professional athletes." *In re Grand Jury Proceedings*, 801 F.2d 1164, 1166 (9th Cir. 1986). The physician was held in contempt for resisting a grand jury subpoena for patient and prescription records on the ground that disclosure would violate "his patients' . . . constitutional right to privacy in the records sought by the subpoena." *Id.* at 1167. The Ninth Circuit rejected that argument and affirmed, explaining that "[t]here is no general right to privacy before the grand jury," and, in any event, "a person possesses no reasonable expectation that his medical history will remain completely confidential." *Id.* at 1169. Plaintiffs and the district court have still cited no court recognizing a substantive-due-process

right to privacy before a grand jury—prior to last month—and the government is aware of none.

**2.** Against these precedents, the district court nonetheless held that plaintiffs established a substantive-due-process right to the privacy of their medical and billing records in the grand jury context. Although this Court has recognized a constitutional interest in privacy of certain information, *see, e.g.*, *Hancock v. Cnty. of Rensselaer*, 882 F.3d 58, 67 (2d Cir. 2018); *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999), as discussed, no court appears to have applied informational-privacy principles to limit compliance with a grand jury subpoena. Even assuming that some "informational privacy" interest "of constitutional significance" exists, *NASA v. Nelson*, 562 U.S. 134, 146-47 (2011), courts may not recognize new applications of substantive due process by describing the asserted liberty interest "at a high level of generality," such as a generalized interest in "privacy," "autonomy," or bodily integrity. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 254-57 (2022). Instead, a plaintiff must provide "a careful description of the asserted fundamental liberty interest" and proof that the asserted interest is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it were]

sacrificed." *Glucksberg*, 521 U.S. at 721 (internal quotation marks omitted). This inquiry requires "a careful analysis of the history of the right at issue." *Dobbs*, 597 U.S. at 238.

For example, in *Glucksberg*, the Supreme Court surveyed more than 700 years of "the Anglo-American common-law tradition," including Blackstone's Commentaries, laws of "the early American Colonies," state statutes, state court decisions, and multiple treatises. 521 U.S. at 711-12. Similarly, in *Dobbs*, the Supreme Court considered "eminent common-law authorities (Blackstone, Coke, Hale, and the like)," "English cases dating all the way back to the 13th century," "[m]anuals for justices of the peace printed in the Colonies in the 18th century," early colonial cases, and state statutes. 597 U.S. at 242-49. "Historical inquiries of this nature are essential whenever [courts] are asked to recognize a new component of the 'liberty' protected by the Due Process Clause because the term 'liberty' alone provides little guidance." *Id.* at 239. When courts "ignore[] the appropriate limits imposed by respect for the teachings of history," they "fall[] into . . . freewheeling judicial policymaking." *Id.* at 240 (alteration and quotation marks omitted).

The district court engaged in nothing like the requisite analysis in announcing a new fundamental right. The district court concluded that

plaintiffs successfully identified "two distinct informational privacy rights: First, medical information; and second, information relating to one's transgender status." JA 262. That loose formulation frames the analysis at an impermissibly "high level of generality," *Dobbs*, 597 U.S. at 254, and falls far short of the required "careful description," *Glucksberg*, 521 U.S. at 721. Properly described, the right plaintiffs assert is a right to privacy in medical and billing records as against grand jury process directed at a third party.

Neither plaintiffs nor the district court identify any history or tradition supporting a fundamental right to informational privacy against asserted grand jury process directed at third parties. Just like the parties who failed to establish a fundamental right to abortion in *Dobbs*, plaintiffs and the district court identified "no state constitutional provision, no statute, no judicial decision, no learned treatise" recognizing such a right. 597 U.S. at 251. And given that federal prosecutors constantly obtain and handle intensely private information in the context of grand jury investigations (such as when investigating crimes involving sexual violence or child exploitation), any deeply-rooted privacy rights against grand jury subpoenas would have long since emerged. That alone should be dispositive of plaintiffs' claim. At a minimum, "[t]he mere novelty of such a

claim is reason enough to doubt that 'substantive due process' sustains it." *Reno v. Flores*, 507 U.S. 292, 303 (1993); *see L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023) ("[S]eek[ing] to extend the constitutional guarantees to new territory . . . suggest[s] that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing."), *aff'd*, *Skrmetti*, 605 U.S. 495.

**3.** Even if plaintiffs' proposed novel fundamental right exists, the district court further erred in concluding that the alleged issuance of a grand jury subpoena would amount to an abuse of power that "shocks the conscience" so as to support a due process claim. *Lewis*, 523 U.S. at 846; *see id.* at 847 n.8. This uniquely demanding standard can be met "in only the most extreme circumstances" and thus "typically involv[es] some violation of physical liberty or personal physical integrity." *Becker v. Kroll*, 494 F.3d 904, 923 (10th Cir. 2007); *see also Lewis*, 523 U.S. at 849 ("conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level"). The routine use of grand jury subpoenas to obtain sensitive evidence in criminal investigations bears no resemblance to the extreme abuses that satisfy this standard. Indeed, that prosecutors frequently seek sensitive evidence through grand jury process is strong

evidence that their alleged use is not conscience shocking (and that third parties have no fundamental right to veto such process).

In any event, the Supreme Court "demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850. That requirement reflects the context-dependent nature of the inquiry: conduct that "shocks in one environment may not be so patently egregious in another." *Id.*

The district court did not conduct such an analysis. In a collateral attack of this kind, the government—constrained by Rule 6(e)—could not confirm or deny the existence of a grand jury subpoena, let alone provide a detailed explanation of relevance, need, and the like for any grand jury subpoena. Nor, of course, could any other party. That just emphasizes why collateral attacks on alleged grand jury process are incompatible with the "exact analysis of circumstances" *Lewis* requires. In an ordinary Rule 17 proceeding, plaintiffs would bear the burden of showing that "there is no reasonable possibility" that the requested records would produce information relevant to the investigation. *R. Enters.*, 498 U.S. at 301 (court erred by "plac[ing] an initial burden on the Government"). But plaintiffs could not possibly meet that burden here. And even a successful showing that a subpoena would be properly quashed under Rule 17 would not suffice

to show an "abuse of power" that is "conscience shocking." *Lewis*, 523 U.S. at 849-50.

Instead of presentation by the parties that could be possible in ordinary Rule 17 proceedings, the district court resorted to speculation about why a grand jury might theoretically seek disclosure of medical and billing records. The court concluded: "I cannot conceive of a crime that would require the breadth of disclosure sought in the subpoena, identifying and sensitive medical information for an entire class of people for a six-year period." JA 265.

Even if that could substitute for an "exact analysis," the district court's conclusion was wrong. The government frequently uses patient medical and billing records—often in large quantities—to investigate, charge, and prove healthcare-related crimes. *See, e.g.*, *In re Grand Jury Proceedings*, 801 F.2d at 1166 (affirming contempt order for failure to produce patient charts and explaining that "hormones are regulated . . . under the [FDCA]"); *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986) ("over 10,000 patient files"); *United States v. Beaufils*, 160 F.4th 1147, 1154-57, 1161, 1163-66 (11th Cir. 2025) (hundreds of medical records, to prosecute healthcare fraud, false statements related to health care matters, and aggravated identity theft); *In re Subpoena Duces Tecum*, 228

F.3d 341, 345, 350 (4th Cir. 2000) ("more than 15,000 patient files," to investigate "any of 13 federal statutory offenses"); *see also QueerDoc, PLLC v. Department of Justice*, -- F.4th --, 2026 WL 2359440, at *10 (9th Cir. Aug. 14, 2026) (approving use of similar administrative subpoena to obtain patient medical records as "relevant to potential FDCA violations"). Indeed, such records are often the central piece of evidence in healthcare-related prosecutions.

The district court also said that "the context surrounding this subpoena" made it difficult "to understand the precise nature of the government's interest and how any legitimate government interest would be served by the disclosure now sought." JA 265. Consulting "context" should have made it easier to understand how medical and billing records could be relevant a legitimate government interest. *See supra* pp. 6-8 (describing public disclosure of investigations and resolutions). If the district court meant instead to reference policy statements by the President and Executive Branch officials generally expressing opposition to medicalized gender-related interventions for minors, such statements do not suggest illegitimacy of any law enforcement actions. Under Article II, the Executive Branch possesses authority to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the

law." *Ramirez*, 594 U.S. at 429. The judiciary has no power to transmute statements of policy into immunity from investigation or prosecution for relevant industries or practices—otherwise, an administration that advocates for gun control measures could not heighten enforcement of existing regulations against firearm dealers, and an administration that opposes sports gambling could not enforce tax laws against sports gambling operations and related businesses. That would make little sense—indeed, it would be "clearly wrong," as the Ninth Circuit recently explained at length in reversing the quashal of one of the administrative subpoenas that plaintiffs and the district court invoked. *QueerDoc*2026 WL 2359440, at *15; *see id.* at *12-15. Such "reasoning would require subordinate executive officers either to act independently of and contrary to the President's policies or to refrain from acting altogether" in a particular area when the President has announced a policy view relevant to that area. *Id.* at *15.

The rest of the district court's balancing analysis fares no better. The court concluded that grand jury secrecy does not represent an adequate safeguard for information because Rule 6(e) "contains numerous exceptions permitting [i]nter and intra governmental dissemination of this information." JA 264. But as discussed already, "grand jury secrecy affords substantial protection for the [individual's] privacy and dignity interests."

Fed. R. Crim. P. 17 advisory committee's note to 2008 amendment; *see In re Grand Jury Proceedings*, 801 F.2d at 1169. Other statutes likewise strictly limit the government's use and disclosure of information, including the Privacy Act, 5 U.S.C. § 552a. And government personnel can face strict penalties for violating these privacy protections. *See id.* § 552a(i); Fed. R. Crim. P. 6(e)(7) (knowing violation punishable by contempt of court). Courts have concluded that far less strict safeguards favor the government in this sort of balancing. *See Fraternal Order of Police, Lodge No. 5 v. Philadelphia*, 812 F.2d 105, 118 (3d Cir. 1987) ("Safeguards against disclosure of private material have been held to be adequate when there exists a statutory penalty for unauthorized disclosures."); *Paul P. v. Farmer*, 92 F. Supp. 2d 410, 413-14 (D.N.J. 2000) (discussing cases); *EEOC v. Trs. of Univ. of Penn.*, 827 F. Supp. 3d 554, 573-74 (E.D. Pa. 2026) (approving of federal government safeguards). And "if a breach of privacy takes a form courts have previously approved," such as in various circumstances contemplated by Rule 6(e), such a disclosure does not provide a "ground for constitutional challenge." *Hancock*, 882 F.3d at 66.

The district court's balancing analysis also overstated the strength of plaintiffs' privacy interests, concluding that "even were the government to articulate a cognizable and legitimate interest in the information it seeks, it

would not overcome plaintiffs' strong privacy interest" in their records, JA 265, which contain "medical assessments, diagnoses, informed consent records, and revelation of plaintiffs' transgender status," JA 263-64. Such records were created and are maintained by third parties, and they are routinely disclosed to others—including to the government for law-enforcement purposes—as NYU defendants' own privacy notice makes clear. ECF 46-1, 46-2 (notifying patients of numerous situations in which patients' protected health information may be disclosed, including "in response to a court or administrative order," "a subpoena," or "to law enforcement"); *see* 45 C.F.R. § 164.520 (requiring such notices). Indeed, this Court has held that New York physicians' medical records have a "public aspect," for purposes of production pursuant to federal grand jury subpoena, because they are required to be kept by New York law, and "the purpose of the New York law which requires that patient files be kept" is "to investigate licensed physicians suspected of medical misconduct." *In re Doe*, 711 F.2d 1187, 1191-93 (2d Cir. 1983).

As explained, prosecutions of healthcare crimes frequently depend on review and use of these records, and "disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical

practice," *Whalen v. Roe*, 429 U.S. 589, 602 (1977). And plaintiffs and the district court identify no distinction between the kinds of information in these records and the kinds of information in other medical records the government routinely obtains and handles, let alone other kinds of highly sensitive information that are regularly obtained and handled by the government in prosecuting other federal crimes.

### C. The Fourth Amendment does not prohibit subpoenas for medical records.

The district court separately concluded that plaintiffs are likely to succeed on their Fourth Amendment claim that a subpoena seeking medical records is an unreasonable search that violates the Fourth Amendment, because the third-party doctrine does not apply to medical records. Plaintiffs' Fourth Amendment claim is not likely to succeed.

A subpoena can run afoul of the Fourth Amendment if its terms are not "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See v. City of Seattle*, 387 U.S. 541, 544 (1967); *see also Dionisio*, 410 U.S. at 11 ("The Fourth Amendment provides protection against a grand jury subpoena duces tecum too sweeping in its terms to be regarded as reasonable." (internal quotation marks omitted)). These are "rather minimal limitations." *See*, 387 U.S. at 545; *see, e.g.*, *Okla. Press*, 327 U.S.

at 208-10; *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950); *Doe*, 457 F.2d at 898 ("No preliminary showing of need or relevancy is required before a person may be subpoenaed to appear before a grand jury."); *United States v. Davis*, 702 F.2d 418, 422 (2d Cir. 1983) ("Wide latitude in gathering evidence is vital to the grand jury's investigative function.").

Plaintiffs' Fourth Amendment claim fails because the third-party doctrine applies. The third-party doctrine "deems a person to have 'no legitimate expectation of privacy in information he voluntarily turns over to third parties.'" *United States v. Felder*, 993 F.3d 57, 75 (2d Cir. 2021) (quoting *Smith*, 442 U.S. at 743-44); *see also Miller*, 425 U.S. at 440-43. The doctrine's classic application is to documents containing personal information about an identifiable individual that are held by a third-party business. For example, in *Smith*, a defendant lacked a reasonable expectation of privacy in the telephone numbers that he dialed because "[t]elephone users . . . typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes." 442 U.S. at 743.

Precisely the same is true of patients' medical records (which record observations, assessments, diagnostic information, and treatments by medical professionals) and billing records (which record payer information, codes representing services and diagnoses, charges, and the like). Patients "typically know that they must convey" information to doctors and insurers, that this information is "record[ed]," and that their providers keep and disclose these records "for a variety of legitimate business purposes." *Id.* Indeed, healthcare institutions are required to tell patients that they will use and disclose their information to others, and NYU Langone's lengthy privacy disclosure warns of many kinds of disclosure, including disclosure for law enforcement purposes. *See* ECF 46-1, 46-2; 45 C.F.R. § 164.520. And if medical and billing records convey personal information about an individual, that is no distinction. The dissent in *Smith* warned that the telephone records sought would "reveal the most intimate details of a person's life." *Smith*, 442 U.S. at 748 (Stewart, J., dissenting). And the dissent in *Miller* said the bank records sought would "reveal[] many aspects of" the depositor's "personal affairs, opinions, habits and associations" and would "prove[] a virtual[ly] current biography." *Miller*, 425 U.S. at 451 (Brennan, J., dissenting). Yet the third-party doctrine applied.

Recently, the Supreme Court has grappled with how to apply the third-party doctrine "[w]hen modern technology enhances law enforcement's traditional surveillance capabilities[.]" *United States v. Harry*, 130 F.4th 342, 349 (2d Cir. 2025). Two decisions in that line of cases have considered retrospective collection of location information via cell phones. *See Carpenter v. United States*, 585 U.S. 296 (2018); *Chatrie v. United States*, 609 U.S. __, 2026 WL 1855568 (June 29, 2026). Neither decision disturbs the application of the third-party doctrine to medical and billing records. *Carpenter* "expressly cautioned" that it was "'narrow'" and did not "'call into question conventional surveillance techniques and tools,'" *Harry*, 130 F.4th at 350, so it could hardly reach even further to disrupt the application of the third-party doctrine to other, non-surveillance records. And *Chatrie* considered records that, like in *Carpenter*, involved retrospective location information collected from cell phones.

Moreover, unlike the distinctive questions raised by new surveillance techniques possible only because of new technology, medical and billing records fall squarely within *Smith* and *Miller*, as documents generated individually by specific, known interactions with a third-party business and with the patient's knowledge that they are being created and will be disclosed to others.

The district court was also wrong to conclude that medical and billing records are as revealing as the records at issue in *Carpenter* and *Chatrie*. In those cases, records were generated continuously and automatically, at a rate of more than 100 records per day in *Carpenter* and more than 700 in *Chatrie*. *Chatrie*, 2026 WL 1855568, at *11. Such detailed records could permit "near perfect surveillance" of any individual, *id.* (quoting *Carpenter*, 585 U.S. at 311-12), creating an "all-encompassing record" of the individual's movements, *Carpenter*, 585 U.S. at 311. Medical records, and certainly billing records that merely reflect requests for reimbursement to yet another business, cannot begin to approach that picture.

The rest of the cases the district court invoked do not change that conclusion. *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), did not involve a subpoena at all. Instead, it involved drug tests that were administered, and the results of which were disclosed, to law enforcement under a policy collaboratively developed by a hospital and local government. *Id.* at 70-73. The Supreme Court's conclusion that drug tests administered by the hospital in order to generate evidence for law enforcement "were indisputably searches within the meaning of the Fourth Amendment" bears no relationship to this case. *Id.* at 76. Indeed, the Supreme Court did not decide whether the third-party doctrine applies to

preexisting medical records like those at issue here. *See Kerns v. Bader*, 663 F.3d 1173, 1185 (10th Cir. 2011) (Gorsuch, J.) (explaining that *Ferguson* "expressly *left open* whether disclosure of preexisting medical records held by the hospital would also be a search implicating the Fourth Amendment."). And the other cases the district court invoked are even farther afield. *See* JA 266-67 (citing, *e.g.*, *Ohio v. Robinette*, 519 U.S. 33 (1996); *New Jersey v. T.L.O*, 469 U.S. 325 (1985)).

### D. The injunction cannot run against private defendants.

The district court also erred, for the same and additional reasons, in entering relief running against NYU defendants. The district court's only assessment of the likelihood of success of any claim against NYU defendants was its conclusion that plaintiffs were not likely to succeed on their state-law claims. JA 270. The court thus failed to "state the reasons why" it issued an injunction running against NYU defendants. Fed. R. Civ. P. 65(d)(1)(A).

At the outset, the injunction against NYU defendants fails for the same reasons as the injunction against the government. If plaintiffs' Fourth and Fifth Amendment claims are unlikely to succeed against the government, they fail as to NYU defendants for the same reasons.

Regardless, the injunction against NYU defendants fails for the additional reason that the district court never assessed whether plaintiffs were likely to succeed in making the additional, necessary threshold showing that NYU defendants can be treated as a government actor for constitutional purposes. "The Constitution's protections . . . apply in general only to action by the government." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991). Neither plaintiffs nor the district court have articulated a theory for how NYU defendants could be equated to the government. Indeed, another court considering a similar claim readily rejected it. Order, *Stanford*, at 9-15. Nor have plaintiffs or the district court explained how NYU defendants could properly be subject to a preliminary injunction if plaintiffs lack likely success on any claim against NYU defendants. They cannot: Preliminary relief is "appropriate" only when it is "*of the same character* as that which may be granted finally." *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945). If plaintiffs lack a prospect of obtaining a final judgment against NYU defendants, they cannot obtain a preliminary injunction running against NYU defendants, either.

## II. The Remaining Injunction Factors Overwhelmingly Weigh Against an Injunction.

The injunction should also be vacated because the remaining equitable factors decisively favor the government. The preliminary injunction irreparably harms the government and public by directly and indefinitely prohibiting the government from obtaining relevant evidence to further its investigation through any investigative subpoenas, to investigate any crime—no matter how strong the evidence of wrongdoing, how necessary the information, or whether the subject of the investigation is a pharmaceutical company, hospital, or otherwise. JA 217-18 (prohibiting use of any present or future "substantially similar administrative or grand jury subpoenas" to obtain class members' information "as part of the U.S. Department of Justice's claimed investigations into health care offenses related to gender-affirming medical care"); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers); *Uthmeier*, 2026 WL 1971202.

That harm is compounded in this context. By "prevent[ing] the Government from enforcing its policies against nonparties," the injunction "transgresses the separation of powers by 'effectively establish[ing] the district court as the supervisor'" of the investigation. *Dickinson v. Trump*, 174 F.4th 634, 648-49 (9th Cir. 2026) (first quoting *CASA*, 606 U.S. at 859; then quoting *Chicago Headline Club v. Noem*, 168 F.4th 1033, 1037 (7th

Cir. 2026)). And because the district court lacks equitable authority to enjoin grand jury process allegedly issued by a sister federal court, "the Government is likely to suffer irreparable harm from the [court's] entry of [an] injunction[] that likely exceed[s] the [court's] authority." *CASA*, 606 U.S. at 860.

These harms cannot be repaired by a favorable later judgment. In this context, indefinite delay concretely and irreversibly harms the government and the public's "compelling interest in the grand jury's investigation into possible violations of federal law." *In re Grand Jury Subpoena*, No. 16-03-217, 875 F.3d at 1191; *accord, e.g.*, *In re Sealed Case*, 794 F.2d 749, 751 n.3 (D.C. Cir. 1986) (per curiam) (recognizing "weighty public interest in the orderly functioning of grand juries and the judicial process"); *see also Samia v. United States*, 599 U.S. 635, 655 (2023) (emphasizing "society's compelling interest in finding, convicting, and punishing those who violate the law").

In the meantime, personnel depart, records are lost or destroyed, statutes of limitations run, and witnesses' memories fade. *See, e.g.*, 18 U.S.C. § 3282(a) (default five-year statute of limitations for federal crimes). And a grand jury is itself a temporary investigative body. *See Cobbledick*, 309 U.S. at 327 ("The duration of its life, frequently short, is limited by

statute."). It is thus "no less important to safeguard against undue interruption the inquiry instituted by a grand jury than to protect from delay the progress of the trial after an indictment." *Id.* Indeed, "'protracted interruption of grand jury proceedings'" "might be fatal to the enforcement of the criminal law." *Calandra*, 414 U.S. at 350. Vacating the injunction will both alleviate those harms and reinforce "the principle of comity" between "courts of coordinate jurisdiction and equal rank." *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. And Gulf Coast Dist. of the ILA; AFL-CIO*, 751 F.2d 721, 728 (5th Cir. 1985).

On the other side of the balance, plaintiffs' asserted privacy interests do not outweigh those interests. For the reasons explained already, to the extent plaintiffs retain privacy interests in records held by hospitals in this context, grand jury secrecy provides substantial protection for plaintiffs' privacy interests. More fundamentally, the government's interest in finding, convicting, and punishing those violate the law far "outweighs the privacy rights of those whose [medical] records" are sought via subpoena. *In re Subpoena Duces Tecum*, 228 F.3d at 351. And any records disclosed to the government in the interim could be returned if plaintiffs were to ultimately prevail on appeal. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13-15 (1992). No principle of law or equity supports an

injunction that indefinitely prohibits the Department from seeking or receiving an entire category of relevant evidence.

## CONCLUSION

For these reasons, the district court's preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
JORDAN C. CAMPBELL
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
*/s/ Sarah Welch*
SARAH WELCH
BRANTLEY MAYERS
JOHN BAILEY
*Attorneys*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3180*

August 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,500 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ Sarah Welch*
SARAH WELCH

# ADDENDUM

## TABLE OF CONTENTS

Federal Rule of Criminal Procedure 6 .......................................................... A1

Federal Rule of Criminal Procedure 17 ........................................................ A6

## Federal Rule of Criminal Procedure 6

## Rule 6. The Grand Jury

(a) SUMMONING A GRAND JURY.

(1) *In General*. When the public interest so requires, the court must order that one or more grand juries be summoned. A grand jury must have 16 to 23 members, and the court must order that enough legally qualified persons be summoned to meet this requirement.

(2) *Alternate Jurors*. When a grand jury is selected, the court may also select alternate jurors. Alternate jurors must have the same qualifications and be selected in the same manner as any other juror. Alternate jurors replace jurors in the same sequence in which the alternates were selected. An alternate juror who replaces a juror is subject to the same challenges, takes the same oath, and has the same authority as the other jurors.

(b) OBJECTION TO THE GRAND JURY OR TO A GRAND JUROR.

(1) *Challenges*. Either the government or a defendant may challenge the grand jury on the ground that it was not lawfully drawn, summoned, or selected, and may challenge an individual juror on the ground that the juror is not legally qualified.

(2) *Motion to Dismiss an Indictment*. A party may move to dismiss the indictment based on an objection to the grand jury or on an individual juror's lack of legal qualification, unless the court has previously ruled on the same objection under Rule 6(b)(1). The motion to dismiss is governed by 28 U.S.C. §1867 (e). The court must not dismiss the indictment on the ground that a grand juror was not legally qualified if the record shows that at least 12 qualified jurors concurred in the indictment.

(c) FOREPERSON AND DEPUTY FOREPERSON. The court will appoint one juror as the foreperson and another as the deputy foreperson. In the foreperson's absence, the deputy foreperson will act as the foreperson. The foreperson may administer oaths and affirmations and will sign all indictments. The foreperson—or another juror designated by the foreperson—will record the number of jurors concurring in every indictment and will file the record with the clerk, but the record may not be made public unless the court so orders.

(d) WHO MAY BE PRESENT.

(1) *While the Grand Jury Is in Session*. The following persons may be present while the grand jury is in session: attorneys for the government,

the witness being questioned, interpreters when needed, and a court reporter or an operator of a recording device.

(2) *During Deliberations and Voting*. No person other than the jurors, and any interpreter needed to assist a hearing-impaired or speech-impaired juror, may be present while the grand jury is deliberating or voting.

(e) RECORDING AND DISCLOSING THE PROCEEDINGS.

(1) *Recording the Proceedings*. Except while the grand jury is deliberating or voting, all proceedings must be recorded by a court reporter or by a suitable recording device. But the validity of a prosecution is not affected by the unintentional failure to make a recording. Unless the court orders otherwise, an attorney for the government will retain control of the recording, the reporter's notes, and any transcript prepared from those notes.

(2) *Secrecy*.

(A) No obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B).

(B) Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury:

(i) a grand juror;

(ii) an interpreter;

(iii) a court reporter;

(iv) an operator of a recording device;

(v) a person who transcribes recorded testimony;

(vi) an attorney for the government; or

(vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii).

(3) *Exceptions*.

(A) Disclosure of a grand-jury matter—other than the grand jury's deliberations or any grand juror's vote—may be made to:

(i) an attorney for the government for use in performing that attorney's duty;

(ii) any government personnel—including those of a state, state subdivision, Indian tribe, or foreign government—that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law; or

(iii) a person authorized by 18 U.S.C. §3322.

(B) A person to whom information is disclosed under Rule 6(e)(3)(A)(ii) may use that information only to assist an attorney for the government in performing that attorney's duty to enforce federal criminal law. An attorney for the government must promptly provide the court that impaneled the grand jury with the names of all persons to whom a disclosure has been made, and must certify that the attorney has advised those persons of their obligation of secrecy under this rule.

(C) An attorney for the government may disclose any grand-jury matter to another federal grand jury.

(D) An attorney for the government may disclose any grand-jury matter involving foreign intelligence, counterintelligence (as defined in 50 U.S.C. 3003), or foreign intelligence information (as defined in Rule 6(e)(3)(D)(iii)) to any federal law enforcement, intelligence, protective, immigration, national defense, or national security official to assist the official receiving the information in the performance of that official's duties. An attorney for the government may also disclose any grand-jury matter involving, within the United States or elsewhere, a threat of attack or other grave hostile acts of a foreign power or its agent, a threat of domestic or international sabotage or terrorism, or clandestine intelligence gathering activities by an intelligence service or network of a foreign power or by its agent, to any appropriate federal, state, state subdivision, Indian tribal, or foreign government official, for the purpose of preventing or responding to such threat or activities.

(i) Any official who receives information under Rule 6(e)(3)(D) may use the information only as necessary in the conduct of that person's official duties subject to any limitations on the unauthorized disclosure of such information. Any state, state subdivision, Indian tribal, or foreign government official who receives information under Rule 6(e)(3)(D) may use the information only in a manner consistent with any guidelines issued by the Attorney General and the Director of National Intelligence.

(ii) Within a reasonable time after disclosure is made underRule 6(e)(3)(D), an attorney for the government must file, under seal, a notice with the court in the district where the grand jury convened stating that such information was disclosed and the departments, agencies, or entities to which the disclosure was made.

(iii) As used in Rule 6(e)(3)(D), the term "foreign intelligence information" means:

(a) information, whether or not it concerns a United States person, that relates to the ability of the United States to protect against—

• actual or potential attack or other grave hostile acts of a foreign power or its agent;

• sabotage or international terrorism by a foreign power or its agent; or

• clandestine intelligence activities by an intelligence service or network of a foreign power or by its agent; or

(b) information, whether or not it concerns a United States person, with respect to a foreign power or foreign territory that relates to—

• the national defense or the security of the United States; or

• the conduct of the foreign affairs of the United States.

(E) The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter:

(i) preliminarily to or in connection with a judicial proceeding;

(ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury;

(iii) at the request of the government, when sought by a foreign court or prosecutor for use in an official criminal investigation;

(iv) at the request of the government if it shows that the matter may disclose a violation of State, Indian tribal, or foreign criminal law, as long as the disclosure is to an appropriate state, state-subdivision, Indian tribal, or foreign government official for the purpose of enforcing that law; or

(v) at the request of the government if it shows that the matter may disclose a violation of military criminal law under the Uniform Code of Military Justice, as long as the disclosure is to an appropriate military official for the purpose of enforcing that law.

(F) A petition to disclose a grand-jury matter under Rule 6(e)(3)(E)(i) must be filed in the district where the grand jury convened. Unless the hearing is ex parte—as it may be when the government is the petitioner—the petitioner must serve the petition on, and the court must afford a reasonable opportunity to appear and be heard to:

(i) an attorney for the government;

(ii) the parties to the judicial proceeding; and

(iii) any other person whom the court may designate.

(G) If the petition to disclose arises out of a judicial proceeding in another district, the petitioned court must transfer the petition to the other court unless the petitioned court can reasonably determine whether disclosure is proper. If the petitioned court decides to transfer, it must send to the transferee court the material sought to be disclosed, if feasible, and a written evaluation of the need for continued grand-jury secrecy. The transferee court must afford those persons identified in Rule 6(e)(3)(F) a reasonable opportunity to appear and be heard.

(4) *Sealed Indictment*. The magistrate judge to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial. The clerk must then seal the indictment, and no person may disclose the indictment's existence except as necessary to issue or execute a warrant or summons.

(5) *Closed Hearing*. Subject to any right to an open hearing in a contempt proceeding, the court must close any hearing to the extent necessary to prevent disclosure of a matter occurring before a grand jury.

(6) *Sealed Records*. Records, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury.

(7) *Contempt*. A knowing violation of Rule 6, or of any guidelines jointly issued by the Attorney General and the Director of National Intelligence under Rule 6, may be punished as a contempt of court.

(f) INDICTMENT AND RETURN. A grand jury may indict only if at least 12 jurors concur. The grand jury—or its foreperson or deputy foreperson—must return the indictment to a magistrate judge in open court. To avoid unnecessary cost or delay, the magistrate judge may take the return by video teleconference from the court where the grand jury sits. If a complaint or information is pending against the defendant and 12 jurors do not concur in the indictment, the foreperson must promptly and in writing report the lack of concurrence to the magistrate judge.

(g) DISCHARGING THE GRAND JURY. A grand jury must serve until the court discharges it, but it may serve more than 18 months only if the court, having determined that an extension is in the public interest, extends the grand jury's service. An extension may be granted for no more than 6 months, except as otherwise provided by statute.

(h) EXCUSING A JUROR. At any time, for good cause, the court may excuse a juror either temporarily or permanently, and if permanently, the court may impanel an alternate juror in place of the excused juror.

(i) "INDIAN TRIBE" DEFINED. "Indian tribe" means an Indian tribe recognized by the Secretary of the Interior on a list published in the Federal Register under 25 U.S.C. §479a–1.

## Federal Rule of Criminal Procedure 17

## Rule 17. Subpoena

(a) CONTENT. A subpoena must state the court's name and the title of the proceeding, include the seal of the court, and command the witness to attend and testify at the time and place the subpoena specifies. The clerk must issue a blank subpoena—signed and sealed—to the party requesting it, and that party must fill in the blanks before the subpoena is served.

(b) DEFENDANT UNABLE TO PAY. Upon a defendant's ex parte application, the court must order that a subpoena be issued for a named witness if the defendant shows an inability to pay the witness's fees and the necessity of the witness's presence for an adequate defense. If the court orders a subpoena to be issued, the process costs and witness fees will be paid in the same manner as those paid for witnesses the government subpoenas.

(c) PRODUCING DOCUMENTS AND OBJECTS.

(1) *In General.* A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated

items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

(2) *Quashing or Modifying the Subpoena*. On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

(3) *Subpoena for Personal or Confidential Information About a Victim*. After a complaint, indictment, or information is filed, a subpoena requiring the production of personal or confidential information about a victim may be served on a third party only by court order. Before entering the order and unless there are exceptional circumstances, the court must require giving notice to the victim so that the victim can move to quash or modify the subpoena or otherwise object.

(d) SERVICE. A marshal, a deputy marshal, or any nonparty who is at least 18 years old may serve a subpoena. The server must deliver a copy of the subpoena to the witness and must tender to the witness one day's witness-attendance fee and the legal mileage allowance. The server need not tender the attendance fee or mileage allowance when the United States, a federal officer, or a federal agency has requested the subpoena.

(e) PLACE OF SERVICE.

(1) *In the United States*. A subpoena requiring a witness to attend a hearing or trial may be served at any place within the United States.

(2) *In a Foreign Country*. If the witness is in a foreign country, 28 U.S.C. §1783 governs the subpoena's service.

(f) ISSUING A DEPOSITION SUBPOENA.

(1) *Issuance*. A court order to take a deposition authorizes the clerk in the district where the deposition is to be taken to issue a subpoena for any witness named or described in the order.

(2) *Place*. After considering the convenience of the witness and the parties, the court may order—and the subpoena may require—the witness to appear anywhere the court designates.

(g) CONTEMPT. The court (other than a magistrate judge) may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by a federal court in that district. A magistrate judge may hold in contempt a witness who, without adequate excuse, disobeys a subpoena issued by that magistrate judge as provided in 28 U.S.C. §636(e).

(h) INFORMATION NOT SUBJECT TO A SUBPOENA. No party may subpoena a statement of a witness or of a prospective witness under this rule. Rule 26.2 governs the production of the statement.