# No. 26-1886

**IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Carter Coe, by and through his parent and next friend Caroline Coe, Reed Roe, by and through his parents and next friend Riley Roe, Nicole Noe, by and through his parents and next friend Norman Noe, Karl Koe, on behalf of themselves and all similarly situated, Jay Doe, on behalf of themselves and all similarly situated,

Plaintiffs-Appellees,

v.

Todd Blanche, United States Attorney General, in his official capacity, United States Department of Justice,

Defendants-Appellants,

NYU Langone Health System, NYU Langone Hospitals, NYU Grossman School of Medicine, a division of New York University,

Defendants.

On Appeal from the United States District Court for the Southern District of New York

**JOINT APPENDIX (pp. 1–278)**

Robert Hodgson
Gabriella Larios
Anya Weinstock
**New York Civil Liberties Union Foundation**
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
*Attorneys for Appellees*

BRETT A. SHUMATE
*Assistant Attorney General*
JORDAN C. CAMPBELL
*Deputy Assistant Attorney General*
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-3180
*Attorneys for Appellants*

*Additional counsel inside cover*

Chase B. Strangio
Shana Knizhnik
**American Civil Liberties Union Foundation**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: 212-549-2500

Elizabeth Gill
Adrienne Spiegel
**American Civil Liberties Union Foundation**
425 California Street, Suite 700
San Francisco, California 94104
Telephone: 415-343-0779

Omar Gonzalez-Pagan
Karen L. Loewy
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585

Nora Huppert
**Lambda Legal Defense and Education Fund, Inc.**
3656 N. Halsted St.
Chicago, Illinois 60613
Telephone: 312-605-3233

A.D. Sean Lewis
**Lambda Legal Defense and Education Fund, Inc.**
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
Telephone: 213-382-7600

Joshua S. Margolin
**Selendy Gay PLLC**
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000

*Attorneys for Appellees*

BRAD HINSHELWOOD
SARAH WELCH
JOHN BAILEY
BRANTLEY MAYERS
Attorneys
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

*Attorneys for Appellants*

## TABLE OF CONTENTS


| | Filing | Page |
|---|---|---|
| | Docket Report | JA 1 |
| ECF 1 | Complaint (June 2, 2026) | JA 21 |
| ECF 10 | Decl. of Caroline Coe (June 2, 2026) | JA 95 |
| ECF 11 | Decl. of Riley Roe (June 2, 2026) | JA 99 |
| ECF 12 | Decl. of Norman Noe (June 2, 2026) | JA 103 |
| ECF 13 | Decl. of Karl Koe (June 2, 2026) | JA 106 |
| ECF 14 | Decl. of Jay Doe (June 2, 2026) | JA 109 |
| ECF 15 | Decl. of Karen Loewy (June 2, 2026) | JA 113 |
| ECF 21 | Joint Letter and Stipulation (June 4, 2026) | JA 173 |
| ECF 45 | Decl. of Zachary A. Cunha (June 15, 2026) | JA 176 |
| ECF 63 | Joint Letter and Stipulation (June 23, 2026) | JA 207 |
| ECF 65 | Order (June 24, 2026) | JA 210 |
| ECF 71 | Order (July 6, 2026) | JA 214 |
| ECF 79 | Notice of Interlocutory Appeal (July 10, 2026) | JA 220 |
| ECF 83 | Order (July 17, 2026) | JA 223 |
| | Transcript of Hearing on June 23, 2026 | JA 225 |
| | Transcript of Oral Ruling on June 24, 2026 | JA 244 |

APPEAL,ECF

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:26-cv-04641-KPF**

Coe et al v. Blanche et al
Assigned to: Judge Katherine Polk Failla
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 06/02/2026
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Carter Coe**
*By and through his parents and next friend Caroline Coe*

represented by

**Gabriella Larios**
New York Civil Liberties Union
125 Broad Street, 19 Floor
New York, NY 10004
212-607-3354
Email: glarios@nyclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez-Pagan**
Lambda Legal Defense and Education Fund, Inc
120 Wall Street, 19th Floor
New York, NY 10005
(212)-809-8585
Fax: (212)-809-0055
Email: ogonzalez-pagan@lambdalegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**A.D. Sean Lewis**
800 S Figueroa St Ste 1260
Los Angeles, CA 90017
312-810-4880
Email: alewis@lambdalegal.org
*ATTORNEY TO BE NOTICED*

**Adrienne Spiegel**
American Civil Liberties Union Foundation
425 California Street
Suite 700
San Francisco, CA 94104
415-343-1237
Email: a.spiegel@aclu.org
*ATTORNEY TO BE NOTICED*

**Anne Weinstock**
New York Civil Liberties Union
125 Broad St
Fl. 19

New York, NY 10004
212-607-3395
Email: aweinstock@nyclu.org
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
New York
125 Broad St.
Ste 18th Fl.
New York
New York, NY 10004
212-284-7320
Email: cstrangio@aclu.org
*ATTORNEY TO BE NOTICED*

**Elizabeth Gill**
ACLU Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
415-621-2493
Email: egill@aclunc.org
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
Lambda Legal Defense & Education Fund,
Inc.
815 16th St. NW, Suite 4140
Washington, DC 20006
202-804-6245
Email: kloewy@lambdalegal.org
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
Lambda Legal Defense and Education Fund,
Inc.
3656 N. Halsted St.
Chicago, IL 60613
847-345-2094
Email: nhuppert@lambdalegal.org
*ATTORNEY TO BE NOTICED*

**Robert Andrew Hodgson**
New York Civil Liberties Union
125 Broad St. 19th Floor
New York, NY 10004
(212)-607-3317
Email: rhodgson@nyclu.org
*ATTORNEY TO BE NOTICED*

**Shana Knizhnik**
American Civil Liberties Union Foundation
125 Broad Street
18th Floor
New York, NY 10004

917-716-0609
Email: sknizhnik@aclu.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Reed Roe**
*By and through his parents and next friend Riley Roe*

represented by

**Gabriella Larios**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez-Pagan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**A.D. Sean Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adrienne Spiegel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anne Weinstock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Gill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Andrew Hodgson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shana Knizhnik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nicole Noe**
*By and through his parents and next friend*

represented by

**Gabriella Larios**
(See above for address)

*Norman Noe*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez-Pagan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**A.D. Sean Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adrienne Spiegel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anne Weinstock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Gill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Andrew Hodgson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shana Knizhnik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Karl Koe**
*on behalf of themselves and all similarly situated*

represented by **Gabriella Larios**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez-Pagan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**A.D. Sean Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adrienne Spiegel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anne Weinstock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Gill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Andrew Hodgson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shana Knizhnik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jay Doe**
*on behlf of themselves and all similarly situated*

represented by **Gabriella Larios**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omar Gonzalez-Pagan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**A.D. Sean Lewis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Adrienne Spiegel**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Anne Weinstock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chase Strangio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Gill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Loewy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Huppert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Andrew Hodgson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shana Knizhnik**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Todd Blanche**
*In his official capacity as Acting Attorney General of the United States*

represented by **Eugene O'Halloran**
DOJ-Civ
Enforcement and Affirmative
450 5th Street NW
Washington DC, DC 20001
202-598-7976
Email: eugene.o'halloran2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**John Bailey**
DOJ-Civ
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave NW
Ste 3618
Washington, DC 20530
202-514-6993
Email: john.bailey@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Luke Miller**

Post Office Box 386
Washington, DC 20044-0386
202-598-7479
Email: luke.miller2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
DOJ-Civ
Civil Division
950 Pennsylvania Ave.
Ste 3612
Washington, DC 22202
202-514-3180
Email: sarah.e.welch@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of Justice** represented by

**Eugene O'Halloran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Luke Miller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NYU Langone Health System** represented by

**Timothy Sini**
Nixon Peabody LLP
275 Broadhollow Road
Melville, NY 11747
516-832-7655
Fax: 516-832-7555
Email: tsini@nixonpeabody.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zachary A. Cunha**
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
401-454-1025
Fax: 401-454-1030
Email: zcunha@nixonpeabody.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lindsay Maleson**
Nixon Peabody LLP
275 Broadhollow Road
Suite 300
Melville, NY 11747
516-832-7627
Fax: 877-683-1633
Email: lmaleson@nixonpeabody.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**NYU Langone Hospitals** represented by **Timothy Sini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zachary A. Cunha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lindsay Maleson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NYU Grossman School of Medicine**
*a division of New York University* represented by **Timothy Sini**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zachary A. Cunha**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lindsay Maleson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**States of New York, Massachusetts, AZ, CA, CO, CT, DE, IL, ME, MD, MI, MN, NV, NJ, NM, OR, RI, VT, VA, and WA, and DC** represented by **Mark Stephen Grube**
NYS Office of the Attorney General
28 Liberty Street
New York, NY 10005
212-416-8028
Fax: 212-416-8962
Email: Mark.Grube@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **CITY OF NEW YORK**<br>*City of New York* | represented by | **Jamison Michael Isaac Davies**<br>New York City Law Department (100 Church)<br>100 Church Street<br>New York, NY 10007<br>212-356-1000<br>Fax: 212-356-2509<br>Email: jdavies@law.nyc.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 06/02/2026 | 1 | COMPLAINT against Todd Blanche, NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals, U.S. Department of Justice. (Filing Fee $ 405.00, Receipt Number 49418)Document filed by Nicole Noe, Reed Roe, Carter Coe, Karl Koe, Jay Doe..(gp) (vf). (Entered: 06/02/2026) |
| 06/02/2026 | 2 | CIVIL COVER SHEET filed..(gp) (vf). (Entered: 06/02/2026) |
| 06/02/2026 | | Magistrate Judge Sarah L. Cave is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (gp) (Entered: 06/02/2026) |
| 06/02/2026 | | Case Designated ECF. (gp) (Entered: 06/02/2026) |
| 06/02/2026 | 3 | NOTICE OF APPEARANCE by Robert Andrew Hodgson on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Hodgson, Robert) (Entered: 06/02/2026) |
| 06/02/2026 | 4 | NOTICE OF APPEARANCE by Karen Loewy on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Loewy, Karen) (Entered: 06/02/2026) |
| 06/02/2026 | 5 | NOTICE OF APPEARANCE by Chase Strangio on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Strangio, Chase) (Entered: 06/02/2026) |
| 06/02/2026 | 6 | NOTICE OF APPEARANCE by Omar Gonzalez-Pagan on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | 7 | LETTER addressed to Judge Jeannette A. Vargas from Omar Gonzalez-Pagan on behalf of Plaintiffs dated 06/02/2026 re: Rule 5.L Letter Regarding Application for Temporary Restraining Order. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | | ORDER GRANTING REDACTED COMPLAINT FILED IN 1:26-MC-256..(gp) (Entered: 06/02/2026) |
| 06/02/2026 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney Gabriella Larios for noncompliance with Section 14.2 of the S.D.N.Y. Electronic Case Filing Rules & Instructions. E-MAIL the PDF for Document 1 Complaint, 2 Civil Cover Sheet to: caseopenings@nysd.uscourts.gov. (gp)** (Entered: 06/02/2026) |

| | | |
|---|---|---|
| 06/02/2026 | 8 | PROPOSED ORDER TO SHOW CAUSE WITH EMERGENCY RELIEF. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Proposed Order Proposed Temporary Restraining Order and Provisional Class Certification). (Gonzalez-Pagan, Omar) **Proposed Order to Show Cause to be reviewed by Clerk's Office staff.** (Entered: 06/02/2026) |
| 06/02/2026 | 9 | MEMORANDUM OF LAW in Support re: 8 Proposed Order to Show Cause With Emergency Relief, . Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | 10 | DECLARATION of Caroline Coe in Support re: 9 Memorandum of Law in Support, 8 Proposed Order to Show Cause With Emergency Relief,. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | 11 | DECLARATION of Riley Roe in Support re: 9 Memorandum of Law in Support, 8 Proposed Order to Show Cause With Emergency Relief,. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | 12 | DECLARATION of Norman Noe in Support re: 9 Memorandum of Law in Support, 8 Proposed Order to Show Cause With Emergency Relief,. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | 13 | DECLARATION of Karl Koe in Support re: 9 Memorandum of Law in Support, 8 Proposed Order to Show Cause With Emergency Relief,. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | 14 | DECLARATION of Jay Doe in Support re: 9 Memorandum of Law in Support, 8 Proposed Order to Show Cause With Emergency Relief,. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | 15 | DECLARATION of Karen Loewy in Support re: 8 Proposed Order to Show Cause With Emergency Relief, 9 Memorandum of Law in Support. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Exhibit E - EO 1468, # 2 Exhibit F - EO 1487, # 3 Exhibit G - Civil Subpoena to Rhode Island Hospital, # 4 Exhibit H - Excerpts of Dist. of Rhode Island Hearing, # 5 Exhibit I - Texas AG 05-15-2026 Press Release, # 6 Exhibit J - DOJ 05-15-2026 Press Release).(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | 16 | MOTION to Certify Class . Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Proposed Order Proposed Order for Class Certification). (Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/02/2026 | 17 | MEMORANDUM OF LAW in Support re: 16 MOTION to Certify Class . . Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Affidavit Declaration of Omar Gonzalez-Pagan, # 2 Affidavit Declaration of Chase Strangio, # 3 Affidavit Declaration of Robert Hodgson).(Gonzalez-Pagan, Omar) (Entered: 06/02/2026) |
| 06/03/2026 | 18 | ORDER re: 16 MOTION to Certify Class . filed by Karl Koe, Nicole Noe, Reed Roe, Jay Doe, Carter Coe. The Court adopts the briefing schedule proposed at ECF No. 7. Defendants' opposition to Plaintiffs' motion for emergency relief and provisional class certification is due by Friday, June 5, 2026, at noon. Plaintiffs' Reply, if any, is due by Saturday, June 6, 2026. Counsel for all parties shall appear for a conference with the Court with respect to these motions on Wednesday, June 10, 2026, at 2:30 PM in Courtroom 11B, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007. Additionally, the Court ORDERS the parties to meet and confer with respect to the following questions: as further set forth in this Order. By noon on June 9, 2026, the parties should submit a joint letter setting forth the parties' agreement on these questions, or, if no |

| | | |
|---|---|---|
| | | agreement is reached, their respective positions on each of these questions. The joint letter should address each of these questions separately, in subparts set forth under the reproduced question. ( Responses due by 6/5/2026, Replies due by 6/6/2026., Motion Hearing set for 6/10/2026 at 02:30 PM in Courtroom 11B, 500 Pearl Street, New York, NY 10007 before Judge Jeannette A. Vargas.) (Signed by Judge Jeannette A. Vargas on 6/3/2026) (sgz) (Entered: 06/03/2026) |
| 06/03/2026 | 19 | SEALED DOCUMENT placed in vault..(jus) (Entered: 06/03/2026) |
| 06/03/2026 | | *****NOTICE TO COURT REGARDING PROPOSED ORDER TO SHOW CAUSE WITH EMERGENCY RELIEF. Document No. 8 Proposed Order to Show Cause With Emergency Relief, was reviewed and approved as to form.(tp)** (Entered: 06/03/2026) |
| 06/04/2026 | 20 | NOTICE OF APPEARANCE by Anya Weinstock on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Weinstock, Anya) (Entered: 06/04/2026) |
| 06/04/2026 | 21 | JOINT LETTER MOTION for Extension of Time *and to Adjourn Court Conference Scheduled for June 10, 2026* addressed to Judge Jeannette A. Vargas from Omar Gonzalez-Pagan dated 06/04/2026. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/04/2026) |
| 06/04/2026 | 22 | MOTION for Nora Huppert to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-32949846. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Affidavit Affidavit of Nora Huppert, # 2 Proposed Order proposed order, # 3 Exhibit Certificate of Standing California, # 4 Exhibit Certificate of Standing Illinois).(Huppert, Nora) (Entered: 06/04/2026) |
| 06/04/2026 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 22 MOTION for Nora Huppert to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-32949846. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 06/04/2026) |
| 06/04/2026 | 23 | ORDER granting 21 Letter Motion for Extension of Time. The Court adopts the proposed briefing schedule at page two of this motion with small adjustments noted below. The TRO hearing previously scheduled for June 10, 2026, at 2:30 p.m. is adjourned to June 22, 2026, at 2:30 p.m. Defendants' opposition to Plaintiffs' motion for emergency relief and provisional class certification is due by Monday, June 15, 2026, at noon. Plaintiffs' Reply, if any, is due by Thursday, June 18, 2026, at noon. The parties' joint letter, as described in EC No. 18. s all be submitted by June 18, 2026. The Clerk of Court is directed to terminate ECF No. 21. SO ORDERED. (Signed by Judge Jeannette A. Vargas on 6/4/2026) (ar) (Entered: 06/04/2026) |
| 06/04/2026 | 24 | MOTION for A.D. Sean Lewis to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-32950571. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Affidavit Affidavit of A.D. Sean Lewis, # 2 Proposed Order Proposed Order, # 3 Exhibit Certificate of Standing California).(Lewis, A.D.) (Entered: 06/04/2026) |
| 06/04/2026 | | Set/Reset Deadlines: (Responses due by 6/15/2026, Replies due by 6/18/2026.), Set/Reset Hearings: (Status Conference set for 6/22/2026 at 02:30 PM before Judge Jeannette A. Vargas.) (ar) (Entered: 06/04/2026) |
| 06/05/2026 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 24 MOTION for A.D. Sean Lewis to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-32950571. Motion and supporting papers to be reviewed by** |

| | | |
|---|---|---|
| | | **Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bc)** (Entered: 06/05/2026) |
| 06/05/2026 | 25 | ORDER FOR ADMISSION PRO HAC VICE granting 22 Motion for Nora Huppert to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice inn the above captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of the Court, including the Rules governing discipline of attorneys. (Signed by Judge Jeannette A. Vargas on 6/5/2026) (sgz) Transmission to Attorney Services/Help Desk. (Entered: 06/05/2026) |
| 06/05/2026 | 26 | ORDER FOR ADMISSION PRO HAC VICE granting 24 Motion for A.D. Sean Lewis to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice inn theabove captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of the Court, including the Rules governing discipline of attorneys. (Signed by Judge Jeannette A. Vargas on 6/5/2026) (sgz) Transmission to Attorney Services/Help Desk. (Entered: 06/05/2026) |
| 06/05/2026 | 27 | REQUEST FOR ISSUANCE OF SUMMONS as to Todd Blanche, U.S. Department of Justice, re: 1 Complaint,. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Larios, Gabriella) (Entered: 06/05/2026) |
| 06/05/2026 | 28 | REQUEST FOR ISSUANCE OF SUMMONS as to NYU Langone Health System, NYU Langone Hospitals, NYU Grossman School of Medicine, re: 1 Complaint,. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe..(Larios, Gabriella) (Entered: 06/05/2026) |
| 06/08/2026 | 29 | NOTICE OF APPEARANCE by Nora Huppert on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Huppert, Nora) (Entered: 06/08/2026) |
| 06/08/2026 | 30 | NOTICE OF APPEARANCE by A.D. Sean Lewis on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Lewis, A.D.) (Entered: 06/08/2026) |
| 06/08/2026 | 31 | ELECTRONIC SUMMONS ISSUED as to NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals..(jgo) (Entered: 06/08/2026) |
| 06/08/2026 | 32 | ELECTRONIC SUMMONS ISSUED as to Todd Blanche, U.S. Department of Justice.. (jgo) (Entered: 06/08/2026) |
| 06/09/2026 | 33 | Amicus Curiae APPEARANCE entered by Mark Stephen Grube on behalf of States of New York, Massachusetts, AZ, CA, CO, CT, DE, IL, ME, MD, MI, MN, NV, NJ, NM, OR, RI, VT, VA, and WA, and DC..(Grube, Mark) (Entered: 06/09/2026) |
| 06/09/2026 | 34 | MOTION for Leave to File Amicus Curiae Brief . Document filed by States of New York, Massachusetts, AZ, CA, CO, CT, DE, IL, ME, MD, MI, MN, NV, NJ, NM, OR, RI, VT, VA, and WA, and DC. (Attachments: # 1 Exhibit Memorandum in Support of Motion for Leave to File Amicus Curiae Brief, # 2 Exhibit Proposed Amicus Curiae Brief).(Grube, Mark) (Entered: 06/09/2026) |
| 06/10/2026 | 35 | MEMO ENDORSEMENT granting 34 Motion for Leave to File Document. ENDORSEMENT: "[D]istrict courts have broad inherent authority to permit or deny an appearance as amicus curiae in a case." Goldstein v. Hochul, No. 22-CV-08300 (VS B ), 2022 WL 22915988, at *l (S.D.N.Y. Oct. 19, 2022) (citation omitted). Because the states have established in their accompanying memorandum, ECF No. 34, Ex. 1, that they possess "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide," id. (citation omitted), their motion for leave to file as aimici curiae in this matter is GRANTED.The Clerk of Court is directed to |

| | | |
|---|---|---|
| | | terminate ECF No. 34. (Signed by Judge Jeannette A. Vargas on 6/10/2026) (sgz) (Entered: 06/10/2026) |
| 06/11/2026 | 36 | BRIEF *of Amici Curiae*. Document filed by States of New York, Massachusetts, AZ, CA, CO, CT, DE, IL, ME, MD, MI, MN, NV, NJ, NM, OR, RI, VT, VA, and WA, and DC.. (Grube, Mark) (Entered: 06/11/2026) |
| 06/12/2026 | 37 | CERTIFICATE OF SERVICE. Todd Blanche served on 6/10/2026, answer due 7/1/2026; U.S. Department of Justice served on 6/10/2026, answer due 7/1/2026. Service was made by Email, Mail. Document filed by Nicole Noe; Reed Roe; Carter Coe; Karl Koe; Jay Doe., SUMMONS RETURNED EXECUTED. Todd Blanche served on 6/10/2026, answer due 7/1/2026; U.S. Department of Justice served on 6/10/2026, answer due 7/1/2026. Service was made by Email, Mail. Document filed by Nicole Noe; Reed Roe; Carter Coe; Karl Koe; Jay Doe..(Larios, Gabriella) (Entered: 06/12/2026) |
| 06/12/2026 | 38 | CERTIFICATE OF SERVICE of Summons and Complaint,. NYU Langone Hospitals served on 6/12/2026, answer due 7/6/2026; NYU Langone Health System served on 6/12/2026, answer due 7/6/2026; NYU Grossman School of Medicine served on 6/12/2026, answer due 7/6/2026. Service was made by Email, Mail. Document filed by Nicole Noe; Reed Roe; Carter Coe; Karl Koe; Jay Doe., SUMMONS RETURNED EXECUTED Summons and Complaint, served. NYU Langone Hospitals served on 6/12/2026, answer due 7/6/2026; NYU Langone Health System served on 6/12/2026, answer due 7/6/2026; NYU Grossman School of Medicine served on 6/12/2026, answer due 7/6/2026. Service was made by Email, Mail. Document filed by Nicole Noe; Reed Roe; Carter Coe; Karl Koe; Jay Doe..(Gonzalez-Pagan, Omar) (Entered: 06/12/2026) |
| 06/12/2026 | 39 | Amicus Curiae APPEARANCE entered by Jamison Michael Isaac Davies on behalf of CITY OF NEW YORK..(Davies, Jamison) (Entered: 06/12/2026) |
| 06/12/2026 | 40 | FIRST MOTION to File Amicus Brief . Document filed by CITY OF NEW YORK. (Attachments: # 1 Exhibit Proposed Amicus Brief).(Davies, Jamison) (Entered: 06/12/2026) |
| 06/15/2026 | 41 | NOTICE OF APPEARANCE by Zachary A. Cunha on behalf of NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals..(Cunha, Zachary) (Entered: 06/15/2026) |
| 06/15/2026 | 42 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent New York University for NYU Grossman School of Medicine, NYU Langone Health System. Document filed by NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals..(Cunha, Zachary) (Entered: 06/15/2026) |
| 06/15/2026 | 43 | MEMORANDUM OF LAW re: 8 Proposed Order to Show Cause With Emergency Relief, *NYU Defendants Memorandum In Response To Plaintiffs Motion For A Temporary Restraining Order*. Document filed by NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals..(Cunha, Zachary) (Entered: 06/15/2026) |
| 06/15/2026 | 44 | NOTICE OF APPEARANCE by John Bailey on behalf of Todd Blanche, U.S. Department of Justice..(Bailey, John) (Entered: 06/15/2026) |
| 06/15/2026 | 45 | DECLARATION of Zachary A. Cunha re: 43 Memorandum of Law, . Document filed by NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals. (Attachments: # 1 Exhibit A- Administrative Subpoena0).(Cunha, Zachary) (Entered: 06/15/2026) |
| 06/15/2026 | 46 | MEMORANDUM OF LAW in Opposition re: 16 MOTION to Certify Class . *& Motion for TRO*. Document filed by Todd Blanche, U.S. Department of Justice. (Attachments: # 1 Exhibit A - NYU NPP, # 2 Exhibit B - Sinai NPP).(Bailey, John) (Entered: 06/15/2026) |

| | | |
|---|---|---|
| 06/16/2026 | 47 | ORDER granting 40 Letter Motion to File Amicus Brief. "[D]istrict courts have broad inherent authority to permit or deny an appearance as amicus curiae in a case." Goldstein v. Hochul, No. 22-CV-08300 (VSB), 2022 WL 22915988, at *I (S.D.N.Y. Oct. 19, 2022) (citation omitted). Because the City of New York has established in its accompanying memorandum that it possesses a "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide," id. (citation omitted), its motion for leave to file as amicus curiae in this matter is GRANTED. The Clerk of Court is directed to terminate ECF No. 40. (Signed by Judge Jeannette A. Vargas on 6/15/2026) (rro) (Entered: 06/16/2026) |
| 06/16/2026 | 48 | FINAL BRIEF re: 47 Order on Motion to File Amicus Brief,,, . Document filed by CITY OF NEW YORK..(Davies, Jamison) (Entered: 06/16/2026) |
| 06/17/2026 | 49 | LETTER MOTION for Oral Argument *seeking permission for two of Plaintiffs' counsel to split argument at the TRO hearing scheduled for June 22, 2026,* addressed to Judge Jeannette A. Vargas from Robert Hodgson dated June 17, 2026. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Hodgson, Robert) (Entered: 06/17/2026) |
| 06/17/2026 | 50 | ORDER granting 49 Letter Motion. Counsel for plaintiffs are permitted to split argument between two attorneys as outlined in their letter. (HEREBY ORDERED by Judge Jeannette A. Vargas)(Text Only Order) (Vargas, Jeannette) (Entered: 06/17/2026) |
| 06/17/2026 | 51 | NOTICE OF APPEARANCE by Shana Knizhnik on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Knizhnik, Shana) (Entered: 06/17/2026) |
| 06/18/2026 | 52 | REPLY MEMORANDUM OF LAW in Support re: 8 Proposed Order to Show Cause With Emergency Relief, *for a Temporary Restraining Order and Provisional Class Certification*. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/18/2026) |
| 06/18/2026 | 53 | LETTER addressed to Judge Jeannette A. Vargas from JOINT LETTER dated June 18, 2026 re: JOINT LETTER PURSUANT TO ECF 18 AND ECF 23. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Hodgson, Robert) (Entered: 06/18/2026) |
| 06/18/2026 | 54 | NOTICE OF APPEARANCE by Sarah Welch on behalf of Todd Blanche, U.S. Department of Justice..(Welch, Sarah) (Entered: 06/18/2026) |
| 06/18/2026 | 55 | LETTER addressed to Judge Jeannette A. Vargas from Gabriella Larios dated 06/18/2026 re: Inquiry as to Remote Public Access to June 22 Hearing. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Larios, Gabriella) (Entered: 06/18/2026) |
| 06/18/2026 | 56 | NOTICE OF APPEARANCE by Luke Miller on behalf of Todd Blanche, U.S. Department of Justice..(Miller, Luke) (Entered: 06/18/2026) |
| 06/18/2026 | 57 | MEMO ENDORSEMENT on re: 55 Letter filed by Karl Koe, Nicole Noe, Reed Roe, Jay Doe, Carter Coe. ENDORSEMENT: While the Court recognizes the basis for Plaintiffs' request, there will not be a remote access line for this proceeding. SO ORDERED. (Signed by Judge Jeannette A. Vargas on 6/18/2026) (ar) (Entered: 06/18/2026) |
| 06/19/2026 | 58 | NOTICE OF APPEARANCE by Timothy Sini on behalf of NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals..(Sini, Timothy) (Entered: 06/19/2026) |
| 06/21/2026 | 59 | ORDER. With the apologies of the Court, due to unforeseen circumstances, the TRO hearing scheduled for June 22, 2026, at 2:30 pm must be adjourned to another date. A new scheduling order will be entered shortly. (HEREBY ORDERED by Judge Jeannette A. Vargas) (Text Only Order) (Vargas, Jeannette) (Entered: 06/21/2026) |

| | | |
|---|---|---|
| 06/22/2026 | | NOTICE OF CASE REASSIGNMENT to Judge J. Paul Oetken. Judge Jeannette A. Vargas is no longer assigned to the case. (vba) (Entered: 06/22/2026) |
| 06/22/2026 | | NOTICE OF CASE REASSIGNMENT to Judge Katherine Polk Failla. Judge J. Paul Oetken is no longer assigned to the case. (vba) (Entered: 06/22/2026) |
| 06/22/2026 | 60 | LETTER addressed to Judge Katherine Polk Failla from Omar Gonzalez-Pagan on behalf of Plaintiffs dated 06/22/2026 re: pending proposed order to show cause for a temporary restraining order and provisional class certification. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/22/2026) |
| 06/22/2026 | | NOTICE of Hearing: This case has been assigned to this Court for all purposes. It is hereby ORDERED that counsel for all parties appear for a hearing on Plaintiffs' motion for emergency relief and provisional class certification, tomorrow, June 23, 2026, at 2:30 p.m., in Courtroom 618, 40 Foley SquareNew York, NY 10007. (Show Cause Hearing set for 6/23/2026 at 02:30 PM in Courtroom 618, 40 Centre Street, New York, NY 10007 before Judge Katherine Polk Failla.) ***No PDF is attached to this entry. (tn) (Entered: 06/22/2026) |
| 06/22/2026 | 61 | MOTION for Lindsay R. Maleson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-33028067. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals. (Attachments: # 1 Affidavit of Lindsay R. Maleson in Support of Motion for Admission Pro Hac Vice, # 2 Exhibit A: Certificate of Good Standing, # 3 Proposed Order Proposed Order).(Maleson, Lindsay) (Entered: 06/22/2026) |
| 06/22/2026 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 61 MOTION for Lindsay R. Maleson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-33028067. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 06/22/2026) |
| 06/23/2026 | 62 | NOTICE OF APPEARANCE by Eugene O'Halloran on behalf of Todd Blanche, U.S. Department of Justice..(O'Halloran, Eugene) (Entered: 06/23/2026) |
| 06/23/2026 | | Minute Entry for proceedings held before Judge Katherine Polk Failla: TRO Hearing held on 6/23/2026. Attorneys Omar Gonzalez-Pagan, Chase Strangio, Robert Andrew Hodgson, and Shana Knizhinik, representing Plaintiffs present. Attorneys Luke Miller and Sarah Welch representing DOJ defendants present. Attorneys Zachary A. Cunha, Timothy Sini, and Lindsay Maleson, representing NYU Defendants present. The Court will issue its ruling tomorrow at 11:00 a.m. The oral decision will be held remotely. **A public audio-only line will be available at (855) 244-8681, access code 2315 780 7370. ***The recording and/or re-broadcasting of the conference is strictly prohibited***. A link for the parties will be sent separately, before the conference.** (Court Reporter Martha Martin) (tn) (Entered: 06/23/2026) |
| 06/23/2026 | 63 | JOINT LETTER addressed to Judge Katherine Polk Failla from Omar Gonzalez-Pagan on behalf of all parties dated 06/23/2026 re: Updated Stipulation. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/23/2026) |
| 06/23/2026 | 64 | ORDER GRANTING ADMISSION PRO HAC VICE granting 61 Motion for Lindsay R. Maleson to Appear Pro Hac Vice. The Clerk of Court is directed to terminate the pending motion at docket entry 61. (Signed by Judge Katherine Polk Failla on 6/23/2026) (rro) Transmission to Attorney Services/Help Desk. (Entered: 06/24/2026) |

| | | |
|---|---|---|
| 06/24/2026 | 65 | TEMPORARY RESTRAINING ORDER AND PROVISIONAL CLASS CERTIFICATION granting 16 Motion to Certify Class: Plaintiffs' Motion for Temporary Restraining Order and Provisional Class Certification are GRANTED as further set forth. Plaintiffs have sufficiently provisionally demonstrated that the proposed Class and NYU Subclass adhere to the Federal Rules of Civil Procedure, and such classes are hereby provisionally certified. DOJ Defendants, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are RESTRAINED and ENJOINED from: Seeking, receiving, using, retaining, or disseminating any identifying or sensitive health information of Plaintiffs and members of the Class through the Subpoenas at issue or substantially similar administrative or grand jury subpoenas as part of the U.S Department of Justices claimed investigations into health care offenses related to gender-affirming medical care. NYU Defendants, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are RESTRAINED and ENJOINED from: disclosing or producing any identifying or sensitive health information of Plaintiffs and members of the NYU Subclass to the DOJ Defendants in response to the Subpoena at issue or any substantially similar administrative or grand jury subpoenas as part of the U.S. Department of Justices claimed investigations into healthcare offenses related to gender-affirming medical care. The security requirement is hereby waived because Defendants will not suffer any costs from the preliminary injunction, plaintiffs are suing the government to vindicate constitutional rights, and imposing a security requirement would pose a hardship for Plaintiffs. (Signed by Judge Katherine Polk Failla on 6/24/2026) (tn) (Entered: 06/24/2026) |
| 06/24/2026 | | Minute Entry for proceedings held before Judge Katherine Polk Failla: Telephone Conference held on 6/24/2026. Attorneys Chase Strangio and Omar Gonzalez-Pagan representing Plaintiffs present. Attorneys Luke Miller and Sarah Welch representing DOJ defendants present. Attorneys Zachary A. Cunha, Timothy Sini, and Linday Maleson, representing NYU defendants present. For the reasons stated on the record, Plaintiff's motion for a temporary restraining order and provisional class certification is GRANTED. By end of day Friday, June 26, 2026, the parties shall file a joint status letter, including if appropriate, proposed discovery deadlines, further motion practice, or supplemental briefing deadlines. (Court Reporter Martha Martin) (tn) (Entered: 06/24/2026) |
| 06/26/2026 | 66 | JOINT LETTER addressed to Judge Katherine Polk Failla from Omar Gonzalez-Pagan on behalf of all parties dated 06/26/2026 re: Joint Status Letter per June 24, 2026 Court Order. Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gonzalez-Pagan, Omar) (Entered: 06/26/2026) |
| 06/30/2026 | 67 | MEMO ENDORSEMENT on re: 66 Letter, filed by Karl Koe, Nicole Noe, Reed Roe, Jay Doe, Carter Coe. ENDORSEMENT: The Court has received the parties' above-joint letter. The parties are hereby ORDERED to appear for a telephone conference regarding next steps on July 6, 2026, at 10:00 a.m. The dial-in information is as follows: At the scheduled time, the parties shall call (855) 244-8681 and enter access code 2315 780 7370. ( Telephone Conference set for 7/6/2026 at 10:00 AM before Judge Katherine Polk Failla.) (Signed by Judge Katherine Polk Failla on 6/29/2026) (rro) (Entered: 06/30/2026) |
| 07/02/2026 | 68 | CONSENT LETTER MOTION for Extension of Time to File Answer *on behalf of the NYULH defendants to and including August 10, 2026* addressed to Judge Katherine Polk Failla from Zachary A. Cunha dated July 2, 2026. Document filed by NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals..(Cunha, Zachary) (Entered: 07/02/2026) |
| 07/06/2026 | 69 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Elizabeth Olmsted Gill to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-33090934. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed |

| | | |
|---|---|---|
| | | by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Affidavit Notarized Affidavit of Elizabeth Gill, # 2 Exhibit Certificate of Good Standing California, # 3 Proposed Order PHV Proposed Order).(Gill, Elizabeth) Modified on 7/6/2026 (bc). (Entered: 07/06/2026) |
| 07/06/2026 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 69 MOTION for Elizabeth Olmsted Gill to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-33090934. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): Wrong Judges initials and Name on all documents;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (bc)** (Entered: 07/06/2026) |
| 07/06/2026 | 70 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Elizabeth Olmsted Gill to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Affidavit Notarized Affidavit of Elizabeth Gill, # 2 Exhibit Certificate of Good Standing California, # 3 Proposed Order PHV Proposed Order).(Gill, Elizabeth) Modified on 7/6/2026 (bc). (Entered: 07/06/2026) |
| 07/06/2026 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 70 MOTION for Elizabeth Olmsted Gill to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): Wrong Judges initials in case numbers on all documents;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (bc)** (Entered: 07/06/2026) |
| 07/06/2026 | 71 | PRELIMINARY INJUNCTION ORDER AND EXTENSION OF PROVISIONAL CLASS CERTIFICATION: Upon a renewed review of the whole record, including the parties' submissions regarding Plaintiffs' Proposed Order to Show Cause for a Temporary Restraining Order and Provisional Class Certification and the parties' arguments during the hearing held on June 23, 2026, and having otherwise been fully advised, the Court finds, for all the reasons described on the record in its oral decision on June 24, 2026, there is good cause to GRANT the preliminary injunction and extend provisional class certification, and HEREBY ORDERS and ADJUDGES as follows: i. Plaintiffs' Motion for a Preliminary Injunction is GRANTED because Plaintiffs have demonstrated that they will suffer irreparable harm if the Court does not issue relief; that they are substantially likely to prevail on their claims that DOJ Defendants' actions demanding identifying and sensitive health information of Plaintiffs and the Class run afoul of constitutional protections for their informational privacy and against unreasonable searches and seizures; that NYU Defendants' compelled disclosure of Plaintiffs' and the NYU Subclass's identifying and sensitive health information should be enjoined to maintain the status quo and prevent irreparable harm; that the balance of equities and public interest tip in favor of a temporary restraining order; and that preliminary relief is an appropriate and necessary remedy. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). In addition, Plaintiffs have sufficiently demonstrated on a provisional basis that the proposed Class and NYU Subclass adhere to the Federal Rules of Civil Procedure, and such classes continue to be provisionally certified. ii. Preliminary relief is appropriate on a class-wide basis for the following Class and NYU Subclass: As further set forth herein. iii. DOJ Defendants, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are RESTRAINED and ENJOINED from: As further set forth herein. iv. NYU Defendants, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation |

| | | |
|---|---|---|
| | | with them, are RESTRAINED and ENJOINED from: As further set forth herein. v. It is further ORDERED that the security requirement is hereby waived because Defendants will not suffer any costs from the preliminary injunction, Plaintiffs are suing the Government to vindicate constitutional rights, and imposing a security requirement would pose a hardship for Plaintiffs. See Fed. R. Civ. P. 65(c); see also Pharm. Soc. of State of N.Y., Inc. v. N.Y. State Dep't of Soc. Servs., 50 F.3d 1168, 1174 (2d Cir. 1995); Widakuswara v. Lake, 773 F. Supp. 3d 46 (S.D.N.Y. 2025). In addition, the deadline for NYU Defendants to respond to Plaintiffs' Complaint is hereby ADJOURNED to August 10, 2026. The Clerk of Court is directed to terminate the pending motion at docket entry 68. SO ORDERED. In addition, the deadline for NYU Defendants to respond to Plaintiffs Complaint is hereby ADJOURNED to August 10, 2026.The Clerk of Court is directed to terminate the pending motion at docket entry 68.SO ORDERED. NYU Grossman School of Medicine answer due 8/10/2026; NYU Langone Health System answer due 8/10/2026; NYU Langone Hospitals answer due 8/10/2026., Motions terminated: 68 CONSENT LETTER MOTION for Extension of Time to File Answer *on behalf of the NYULH defendants to and including August 10, 2026* addressed to Judge Katherine Polk Failla from Zachary A. Cunha dated July 2, 2026. filed by NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals. (Signed by Judge Katherine Polk Failla on 7/6/2026) (jjc) (Entered: 07/06/2026) |
| 07/06/2026 | | Minute Entry for proceedings held before Judge Katherine Polk Failla: Telephone Conference held on 7/6/2026. Attorneys Chase Strangio, Omar Gonzalez-Pagan, and Robert Andrew Hodgson representing Plaintiffs present. Attorneys Luke Miller and Sarah Welch representing DOJ defendants present. Attorneys Zachary A. Cunha, Timothy Sini, and Linday Maleson, representing NYU defendants present. (Court Reporter recorded) (tn) (Entered: 08/07/2026) |
| 07/08/2026 | 72 | MOTION for Elizabeth Olmsted Gill to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Affidavit Notarized Affidavit, # 3 Proposed Order Proposed Order).(Gill, Elizabeth) (Entered: 07/08/2026) |
| 07/08/2026 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 72 MOTION for Elizabeth Olmsted Gill to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 07/08/2026) |
| 07/09/2026 | 73 | ORDER FOR ADMISSION PRO HAC VICE granting 72 Motion for Elizabeth Gill to Appear Pro Hac Vice. The Clerk of Court is directed to terminate the pending motion at docket entry 72. (Signed by Judge Katherine Polk Failla on 7/9/2026) (vfr) Transmission to Attorney Services/Help Desk. (Entered: 07/09/2026) |
| 07/09/2026 | 74 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** NOTICE OF APPEAL from 71 Preliminary Injunction,,,,,,,,,,,,,,, Set Deadlines,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,. Document filed by Todd Blanche, U.S. Department of Justice. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(O'Halloran, Eugene) Modified on 7/10/2026 (nd). (Entered: 07/09/2026) |
| 07/09/2026 | 75 | TRANSCRIPT of Proceedings re: conference held on 6/23/2026 before Judge Katherine Polk Failla. Court Reporter/Transcriber: Martha Martin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/30/2026. Redacted Transcript Deadline set for 8/10/2026. Release of Transcript Restriction set for 10/7/2026..(Moya, Goretti) (Entered: 07/09/2026) |

| | | |
|---|---|---|
| 07/09/2026 | 76 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 6/23/26 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 07/09/2026) |
| 07/09/2026 | 77 | TRANSCRIPT of Proceedings re: conference held on 6/24/2026 before Judge Katherine Polk Failla. Court Reporter/Transcriber: Martha Martin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/30/2026. Redacted Transcript Deadline set for 8/10/2026. Release of Transcript Restriction set for 10/7/2026..(Moya, Goretti) (Entered: 07/09/2026) |
| 07/09/2026 | 78 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 6/24/26 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 07/09/2026) |
| 07/10/2026 | | *****NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Eugene O'Halloran to RE-FILE Document No. 74 Notice of Appeal,.. The filing is deficient for the following reason(s): the appeal was not signed; the wrong event type was used to file the appeal. Re-file the appeal using the event type Notice of Interlocutory Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (nd)** (Entered: 07/10/2026) |
| 07/10/2026 | 79 | NOTICE OF INTERLOCUTORY APPEAL from 71 Preliminary Injunction,,,,,,,,,,,,,,, Set Deadlines,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,. Document filed by Todd Blanche, U.S. Department of Justice. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(O'Halloran, Eugene) (Entered: 07/10/2026) |
| 07/10/2026 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 79 Notice of Interlocutory Appeal,..(nd) (Entered: 07/10/2026) |
| 07/10/2026 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 79 Notice of Interlocutory Appeal, filed by U.S. Department of Justice, Todd Blanche were transmitted to the U.S. Court of Appeals..(nd) (Entered: 07/10/2026) |
| 07/16/2026 | 80 | LETTER MOTION to Stay *Answer Deadline* addressed to Judge Katherine Polk Failla from United States Department of Justice dated 07/16/2026. Document filed by U.S. Department of Justice..(Miller, Luke) (Entered: 07/16/2026) |
| 07/16/2026 | 81 | MOTION to Stay re: 71 Preliminary Injunction,,,,,,,,,,,,,,, Set Deadlines,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,, . Document filed by Todd Blanche, U.S. Department of Justice..(Welch, Sarah) (Entered: 07/16/2026) |
| 07/16/2026 | 82 | MEMORANDUM OF LAW in Support re: 81 MOTION to Stay re: 71 Preliminary Injunction,,,,,,,,,,,,,,, Set Deadlines,,,,,,,,,,,,,,, Terminate Motions,,,,,,,,,,,,,,, . . Document filed by Todd Blanche, U.S. Department of Justice..(Welch, Sarah) (Entered: 07/16/2026) |
| 07/17/2026 | 83 | ORDER granting 80 Letter Motion to Stay answer deadline while an interlocutory appeal is pending; denying 81 Letter Motion to Stay: The motion for a stay of the response deadline is GRANTED in light of the interlocutory appeal. The motion to stay the preliminary injunction pending appeal is DENIED. What the DOJ Defendants seek is a |

| | | |
|---|---|---|
| | | complete subversion of the Court's decision to grant the preliminary injunction in the first place. Allowing a stay of the preliminary injunction at this time would upend the status quo and lead to the very irreparable harm that the preliminary injunction was designed to prevent. This the Court will not do. The Clerk of Court is directed to terminate the pending motions at docket entries 80 and 81. (Signed by Judge Katherine Polk Failla on 7/17/2026) (tn) (Entered: 07/17/2026) |
| 07/17/2026 | 84 | CONSENT LETTER MOTION to Stay *Answer Deadline as to NYULH Defendants* addressed to Judge Katherine Polk Failla from Zachary A. Cunha dated July 17, 2026. Document filed by NYU Grossman School of Medicine, NYU Langone Health System, NYU Langone Hospitals..(Cunha, Zachary) (Entered: 07/17/2026) |
| 07/21/2026 | 85 | ORDER granting 84 Letter Motion to Stay. The NYU Defendants' above-motion for a stay of the response deadline is GRANTED in light of the interlocutory appeal. The Clerk of Court is directed to terminate the pending motion at docket entry 84. (Signed by Judge Katherine Polk Failla on 7/20/2026) (rro) (Entered: 07/21/2026) |
| 07/22/2026 | 86 | NOTICE OF APPEARANCE by Elizabeth Gill on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Gill, Elizabeth) (Entered: 07/22/2026) |
| 07/22/2026 | 87 | MOTION for Adrienne Spiegel to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-33177306. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Affidavit of Adrienne Spiegel, # 3 Proposed Order Proposed Order).(Spiegel, Adrienne) (Entered: 07/22/2026) |
| 07/23/2026 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 87 MOTION for Adrienne Spiegel to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-33177306. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bc)** (Entered: 07/23/2026) |
| 07/23/2026 | 88 | ORDER FOR ADMISSION PRO HAC VICE granting 87 Motion for Adrienne Spiegel to Appear Pro Hac Vice. The Clerk of Court is directed to terminate the pending motion at docket entry 87.. (Signed by Judge Katherine Polk Failla on 7/23/2026) (rro) (Entered: 07/23/2026) |
| 08/03/2026 | 89 | NOTICE OF APPEARANCE by Adrienne Spiegel on behalf of Carter Coe, Jay Doe, Karl Koe, Nicole Noe, Reed Roe..(Spiegel, Adrienne) (Entered: 08/03/2026) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARTER COE, by and through his parent and next friend, CAROLINE COE; REED ROE, by and through his parent and next friend, RILEY ROE; NICOLE NOE, by and through her parent, NORMAN NOE; KARL KOE; and JAY DOE, *on behalf of themselves and all similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; NYU LANGONE HEALTH SYSTEM; NYU LANGONE HOSPITALS; and NYU GROSSMAN SCHOOL OF MEDICINE, A DIVISION OF NEW YORK UNIVERSITY,<br><br>*Defendants*. | Case No.<br><br>**CLASS ACTION** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. On May 7, 2026, NYU Langone Hospitals was one of several institutions to receive a federal grand jury subpoena from the U.S. Attorney's Office for the Northern District of Texas (hereafter "the Subpoenas"). The Subpoenas are part and parcel of the efforts by the current federal administration ("the Administration") to "end" gender-affirming medical care for transgender people, which is part of a larger set of attacks on transgender people across the country.

2. Plaintiffs—and the similarly situated members of the proposed class—are minors, their parents, and young adults unwittingly caught in the crosshairs of that attack simply because they received medically necessary gender-affirming medical care here in New York City, near their

homes in the New York City area, and with the expectation that their private medical records would remain private.

3. Of particular concern to Plaintiffs, the Subpoenas seek the identifying and detailed sensitive health information of all transgender persons who received medical care as treatment for their gender dysphoria while they were minors, as well as the identity of their parents. Through the Subpoenas, DOJ seeks to gravely and unjustifiably invade the privacy of Plaintiffs in violation of their rights under Fourth and Fifth Amendments to the Constitution of the United States. For NYU, compliance with the Subpoenas would also violate well-established state law prohibiting a breach of the statutory physician-patient privilege.

4. The Subpoenas at issue here were not issued for a proper purpose or on a clean slate but as part of the Administration's systematic campaign to exclude transgender people from public life and to "end" the gender-affirming medical care that enables many transgender people to live authentically as themselves. The U.S. Department of Justice ("DOJ") previously issued civil administrative subpoenas to healthcare institutions across the country that have lawfully provided this care demanding the identities and sensitive health information of every transgender patient who received gender-affirming medical care as a minor.

5. Federal district courts across the country limited DOJ's ability to obtain such information, quashing or limiting multiple of the civil subpoenas, finding that the civil subpoenas were issued for an improper purpose or violated the rights of the patients whose information they sought.

6. Faced with this wall of resistance to its discriminatory and improper aims, DOJ has now shifted tactics, purportedly moving the locus of its "investigation" to the Northern District of

Texas and relying on grand jury subpoenas to obtain the same information it was prohibited from obtaining through other means by multiple courts.

7. DOJ's aims are not to impartially enforce the law—no federal law prohibits the provision of gender-affirming medical care to minors, which the U.S. Supreme Court has determined is for the states to regulate—but rather to effectuate the Administration's policy priorities to "end" the gender-affirming medical care, even if coercion is necessary.

8. The Subpoenas represent a gross overreach of governmental power, founded on an improper purpose to "end" gender-affirming medical care and cast transgender persons into the shadows.

9. Because Plaintiffs are at imminent risk of having their rights under the United States Constitution and New York State law violated, this Court's intervention is necessary.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States and the United States Constitution; 28 U.S.C. § 1346, as a civil action against the United States founded upon the Constitution, an Act of Congress, or an executive regulation; and 28 U.S.C. § 1361, as an action to compel an officer or agency to perform a duty owed to plaintiffs.

11. This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims at issue that they form part of the same case or controversy and derive from a common nucleus of operative fact.

12. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), (c)(2), and (e)(1). Plaintiffs Carter Coe and Caroline Coe, Reed Roe and Riley Roe, Karl Koe, and Jay Doe and Defendants NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a Division of New York University, are residents of this district; Defendants Blanche and DOJ are an officer of the United States sued in his official capacity and an agency of the United States, respectively; and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the Southern District of New York.

## PARTIES

### A. Plaintiffs

14. Plaintiff **Carter Coe**, by and through his parent and next friend, **Caroline Coe**, is a transgender minor. Caroline Coe and Carter Coe live in the Bronx, New York. Carter Coe received gender-affirming medical care at NYU Langone within the time range set out in the Subpoenas. That care included puberty blocking medication to treat gender dysphoria.

15. Plaintiff **Reed Roe**, by and through his parent and next friend, **Riley Roe**, is a transgender minor. Riley Roe and Reed Roe live in Poughkeepsie, New York. Reed Roe received gender-affirming medical care at NYU Langone within the time range set out in the Subpoenas. That care included puberty blocking medication and hormone therapy to treat gender dysphoria.

16. Plaintiff **Nicole Noe**, by and through her parent, **Norman Noe**, is a transgender minor. Norman Noe and Nicole Noe live in Brooklyn, New York. Nicole Noe received gender-affirming medical care at NYU Langone within the time range set out in the Subpoenas. That care included puberty blocking medications and estrogen to treat gender dysphoria.

17. Plaintiff **Karl Koe** is a transgender person living in New York, New York. Karl Koe received gender-affirming chest masculinization surgery through NYU Langone within the time

range set out in the Subpoenas. As a minor, Karl Koe also received testosterone to treat gender dysphoria, also within that time range, through Mount Sinai Health System.

18. Plaintiff **Jay Doe** is a transgender person living in New York, New York. Jay received birth control medication for menstrual suppression to treat gender dysphoria at NYU Langone within the time range set out in the Subpoenas.

19. Plaintiffs Carter Coe, Reed Roe, and Nicole Noe are collectively referred to as the **Minor Plaintiffs**. Their parents, Caroline Coe, Norman Noe, and Riley Roe, respectively, are collectively referred to as the **Parent Plaintiffs**.

20. Plaintiffs Karl Koe and Jay Doe are collectively referred to as the **Adult Plaintiffs**.

### B. Defendants

21. Defendant **Todd Blanche** is the Acting Attorney General of the United States. He is sued in his official capacity. Attorney General Blanche is responsible for all aspects of the operation and management of the U.S. Department of Justice ("DOJ"), including implementing and fulfilling DOJ's duties under the U.S. Constitution and statutory law. As such, Attorney General Blache supervises and directs the administration and operation of the United States Attorneys' Offices. *See* 28 C.F.R. § 0.5.

22. Defendant **United States Department of Justice** is a cabinet agency within the executive branch of the United States government. 28 U.S.C. § 501. DOJ has several divisions, including the Civil and Criminal Divisions. DOJ also directs and oversees United States Attorneys' Offices, including the U.S. Attorney's Office for the Northern District of Texas.

23. Defendants DOJ and Acting Attorney General Blache are collectively referred to as **DOJ** or the **DOJ Defendants**.

24. Defendants **NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a Division of New York University**, are medical care providers and corporations, organized and existing under the laws of New York, with their principal place of business in Manhattan, New York. Through their provision of professional medical services to patients, including Plaintiffs, they have established a physician-patient relationship with their patients pursuant to New York Civil Practice Law and Rules 4504(a) ("CPLR 4504(a)").

25. Defendants NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a Division of New York University, are collectively referred to as **NYU** or the **NYU Defendants**.

## FACTUAL BACKGROUND AND ALLEGATIONS

### A. Gender Identity and Transgender People

26. "Gender identity" refers to a person's internal sense of belonging to a particular gender.

27. "Birth-assigned sex" refers to the sex individuals are assigned at birth, typically based on their external genitalia.[1]

28. Most people are cisgender, meaning that their gender identity matches their birth-assigned sex.

29. Transgender people have a gender identity that differs from their birth-assigned sex. A transgender boy is someone with a birth-assigned sex of female who has a male gender identity. A transgender girl is someone birth-assigned sex of male who has a female gender identity.

---

[1] The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because there are many biological sex characteristics, and they do not always align with each other. Intersex individuals, for example, have reproductive anatomy that does not align with binary male and female classifications.

**B. Gender Dysphoria and Its Medical Treatment**

30. Gender dysphoria is a serious medical condition marked by clinically significant distress arising from the incongruence between a person's gender identity and their birth-assigned sex.

31. The American Psychiatric Association codifies gender dysphoria as a diagnosis in the *Diagnostic and Statistical Manual of Mental Disorders, 5th edition, Text Revision* ("DSM-5-TR").[2]

32. To be diagnosed with gender dysphoria, the "incongruence" between one's gender identity and birth-assigned sex must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

33. Gender dysphoria is highly treatable and can be ameliorated through medical treatment. The medical treatment of gender dysphoria is often referred to as "gender-affirming medical care."

34. Physicians, including those at NYU Hospitals and other hospitals in New York City, who provide gender-affirming medical care "are informed by expert evidence-based guidelines."[3] These guidelines provide a framework for the safe and effective treatment of gender dysphoria, including for adolescents, and are evidence-based, well-researched, and based on widely accepted clinical practices.

35. Under these guidelines, health professionals perform a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns, and

---

[2] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 511 (5th ed., Text Rev. 2022).

[3] Nat'l Acad. Scis., Eng'g & Med., *Understanding the Well-Being of LGBTQI+ Populations* 361 (Patterson, Sepúlveda & White eds., 2020).

after the onset of puberty and depending on the particular clinical needs of each patient, treatment might include pubertal suppression and/or hormone therapy. Surgery is rare in minors, but some older adolescents are treated with chest surgery when medically indicated.

36. As is typical with all healthcare, treatment for gender dysphoria depends on the individualized benefits and risks involved, as well as each patient's personal characteristics and developmental status.

37. Medical treatment for gender dysphoria aims to reduce, or even eliminate, the clinically significant distress associated with gender dysphoria by aligning a transgender person's body with their gender identity and thus allowing them to live in a manner consistent with such identity.

38. As with all medications, transgender patients—and, in the case of adolescent patients, their parents—are counseled on the potential risks associated with care. Also, as with all medications, treatment is only initiated where patients (and, in the case of adolescent patients, their parents) are properly informed and consent to the care.

Medical treatment recommended for and provided to transgender adolescents with gender dysphoria is effective. Gender-affirming medical care can substantially reduce lifelong gender dysphoria and eliminate the medical need for some surgeries or other medical interventions later in life. And transgender adolescents' mental health outcomes consistently improve after receiving gender-affirming medical treatment. In many instances, this medical care is lifesaving.

39. Gender-affirming medical care is also safe and supported by robust evidence comparable to the evidence of efficacy supporting other medical treatments, especially those in pediatrics. The medical interventions used to treat gender dysphoria are also used to treat other conditions in both adolescents and adults. These medical interventions carry the same risks when

prescribed for gender dysphoria as when prescribed for other conditions and diagnoses. And the risks accompanying these interventions are comparable to those associated with many other medical interventions to which parents routinely consent on behalf of their children.

40. If left untreated, gender dysphoria can result in, inter alia, clinically significant levels of anxiety or depression, post-traumatic stress disorder, eating disorders, substance abuse, self-harm, and suicidality, as well as other negative physical and mental health consequences.

### C. The Administration's Attacks on Transgender People and Gender-Affirming Medical Care

41. From its very first day, the Administration began a broad-based systematic campaign attacking transgender people based on a mandate to eradicate "gender ideology," the Administration's derogatory term for acknowledging the existence of transgender people. *See* Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("Gender EO").

42. The following week, the President established as "the policy of the United States that it will not fund, sponsor, promote, assist, or support" gender-affirming medical care for minors, and proclaimed that the Administration "will rigorously enforce all laws that prohibit or limit" such care, declaring it to be a "stain on our Nation's history," and that "it must end." *See* Exec. Order No. 14187, *Protecting Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, § 1 (Jan. 28, 2025) ("Denial-of-Care EO").

43. A series of sweeping implementation efforts followed, including not only by the U.S. Departments of Health and Social Services ("HHS") and the U.S. Federal Trade Commission ("FTC"), but also by the U.S. Department Justice ("DOJ"), culminating in the issuance of civil investigative demands and subpoenas to over twenty hospitals and the grand jury subpoena at issue in this case propounded upon NYU Langone Hospitals.

44. On January 20, 2025, President Trump issued the Gender EO, a cross-cutting effort to reverse existing protections and deny recognition of transgender people's existence. *See*, *e.g.*, Gender EO § 2 (declaring "the policy of the United States to recognize two sexes, male and female;" rejecting that a person might have a gender identity different from their birth-assigned sex as a "false claim").

45. The Gender EO mandated all agencies to interpret sex-based terms to encompass only the Administration's preferred definition of "biological sex" (i.e., birth-assigned sex), including with regard to government-issued identification documents and personnel records, § 3(c), (d); rescinded provisions of prior executive orders combating discrimination against LGBTQ people, § 7(b); barred federal funding from being "used to promote gender ideology," § 3(g); mandated housing in accordance with a person's birth-assigned sex in federal prisons and federally-funded shelters, § 4; and directed federal agencies to rescind guidance, forms, and policies acknowledging the existence of transgender people, §§ 3(e), 7(c).

46. Additional Executive Orders followed, with the Administration using the power of the purse to enforce its erasure of transgender people and its refusal to recognize any form of discrimination based on transgender status; targeting gender-affirming medical care for transgender adolescents through the Denial-of-Care EO; excluding transgender people from military service; threatening federal funding for schools that recognize and affirm transgender students' identities; and barring transgender athletes from school sports. *See*, *e.g.*, Exec. Order No. 14151, *Ending Radical and Wasteful DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025); Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("Military Ban EO"); Exec. Order

No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025); Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) ("Sports Ban EO").

47. These Executive Orders employ dehumanizing, inaccurate rhetoric to cast transgender people, gender-affirming medical care, and transgender-inclusive policies as an existential threat to "the validity of the entire American system," Gender EO § 1, as antonymic with "an honorable, truthful, and disciplined lifestyle," lacking "humility and selflessness," Military Ban EO § 1, and as a source of "endangerment, humiliation, and silencing of women and girls," Sports Ban EO § 1.

48. Federal agencies took immediate action to carry out the Gender and Denial-of-Care EOs' campaign against transgender people and gender-affirming medical care.

49. For example, within days of the Gender EO, Secretary of State Rubio ordered staff at the U.S. Department of State to suspend any passport application where the applicant is seeking to change their sex designation from the definition provided in the Gender EO.

50. Contemporaneously, the Bureau of Prisons ("BOP") initiated transfers of transgender women to men's prisons and paused access to gender-affirming medical care.[4]

51. The Office of Personnel Management instructed federal agencies to "take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology."[5]

---

[4] *See*, *e.g.*, Bureau of Prisons, *Management of Inmates with Gender Dysphoria*, No. 5260.01 (Feb. 19, 2026), https://tinyurl.com/3cwbfxxh.

[5] U.S. Off. of Pers. Mgmt., *Initial Guidance Regarding President Trump's Executive Order Defending Women* 1 (Jan. 29, 2025), https://tinyurl.com/243c49d6 [https://perma.cc/M2HN-SRLY].

52. The Office of Management and Budget also promised to stop the use of federal funds to promote "transgenderism."[6]

53. Within days, agencies from the National Park Service to the Centers for Disease Control removed references to transgender people from government websites.[7]

54. Similarly, the National Institutes of Health terminated hundreds of research grants relating to LGBTQ+ people because the research related to "transgender issues" and, according to the Administration, "research based on gender identity … do[es] nothing to enhance the health of many Americans" and "ignore[s] biological realities."[8]

55. The President has characterized gender-affirming medical care for adolescents as "barbaric," referring to "the sinister threat of gender ideology" as "one of the most prevalent forms of child abuse facing our country today."[9]

56. In December 2025, HHS Secretary Kennedy went further and sought by fiat to unilaterally establish that *any* provision of gender-affirming medical care for minors is *per se* below the standard of care.[10] The same day, HHS published proposed rules (1) barring Medicaid and Children's Health Insurance Program funds from paying for gender-affirming medical care,[11]

---

[6] Matthew J. Vaeth, Off. of Mgmt. & Budget, M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* 1 (Jan. 27, 2025), https://tinyurl.com/3zpchy7r [https://perma.cc/6UM5-XBV8].

[7] *See*, *e.g.*, Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025), https://tinyurl.com/3pj27pap [https://perma.cc/6UM5-XBV8]; Ilan H. Meyer & Lauren J. Bouton, The Williams Inst., *Impact of Executive Orders on Access to Federal Data* (Feb. 2025), https://tinyurl.com/2c9a4d4y [https://perma.cc/3P6M-XKJA].

[8] Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health, 795 F.Supp.3d 678, 688, 696-97 (D. Md. 2025).

[9] The White House, *National Child Abuse Prevention Month, 2025* (Apr. 3, 2025), https://tinyurl.com/42swzwe5 [https://perma.cc/3ZCX-X7ZL].

[10] *See* Declaration of HHS Secretary Re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents (Dec. 18, 2025) ("Kennedy Declaration"), https://tinyurl.com/3hdneup7 [https://perma.cc/8QML-W6RB].

[11] Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children, 90 Fed. Reg. 59441-01 (proposed Dec. 19, 2025) (to be codified at 42 C.F.R. pt. 441, 457).

(2) prohibiting hospitals from providing gender-affirming medical care as a condition of participation in Medicare and Medicaid,[12] and (3) excluding gender dysphoria from disability-based antidiscrimination protections.[13]

57. HHS's General Counsel also publicized his referrals of children's hospitals providing gender-affirming medical care to HHS's Office of Inspector General "for failing to meet 'recognized standards of health care,' citing Kennedy's declaration."[14]

58. Within days, reaffirming "this administration's priority to end all sex-rejecting procedures on minors," HHS sent letters to medical organizations, requesting that they end their "promot[ion]" of gender-affirming medical care and "revise [its] medical guidelines and guidance that advise medical professionals to provide these procedures to minors."[15]

59. HHS further threatened that if they did not do so, HHS "will use all authority under the law . . . to aggressively pursue any medical organization that participates in" gender-affirming medical care for youth.[16]

60. Administration officials have publicly celebrated that "more than 30 hospitals and hospital systems . . . have announced they are no longer performing sex-mutilating and sex-

---

[12] Medicare and Medicaid Programs; Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children, 90 Fed. Reg. 59463-01 (proposed Dec. 19, 2025) (to be codified at 42 C.F.R. pt. 482).

[13] Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 90 Fed. Reg. 59478-01 (proposed Dec. 19, 2025) (to be codified at 45 C.F.R. pt. 84).

[14] Orion Rummler, *Three hospitals are under investigation for providing gender-affirming care to trans youth*, The 19th (Jan. 7, 2026), https://tinyurl.com/3muuawv7.

[15] Ex. 14 - Dec. 30, 2025, Letter from James O'Neill, Deputy Secretary of Health and Human Servs., to Kate Fryer, Chief Executive Officer, Endocrine Society, at 1, *Endocrine Soc'y v. Fed. Trade Comm'n*, No. CV 26-532 (JEB) (D.D.C. May 7, 2026), Dkt. No. 9-17, https://tinyurl.com/2czkkp42.

[16] *Id.* at 2.

rejecting procedures for minors," and then continued to publicly refer non-compliant hospital groups for investigation by the HHS Office of Inspector General.[17]

61. The Kennedy Declaration has since been found unlawful, both procedurally and substantively, with a federal district court noting that in issuing the declaration, HHS Secretary Kennedy exhibited an "unserious regard for the rule of law" that, "tragically, … is one of a long list of examples of how a leader's wanton disregard for the rule of law causes very real harm to very real people," and noting that in so doing HHS Secretary Kennedy had "act[ed] with cruelty."[18]

62. That court also held that "[t]he Kennedy Declaration exceeded Defendants' statutory authority, flouted applicable notice and comment rulemaking procedures, and impeded [States'] rights to regulate the medical profession and their discretion to design their own statutorily-compliant Medicaid plans."[19]

63. In addition, the Federal Trade Commission ("FTC") has similarly issued sweeping civil investigative demands ("CIDs") to non-profit medical organizations engaged in medical research and education, merely because they acknowledge transgender people's existence and express support for gender-affirming medical care.[20]

64. A federal district court has since found that these medical organizations are likely to succeed on the merits of their claims that the CIDs—akin to administrative subpoenas—

---

[17] *See* HHS General Counsel Mike Stuart (@HHSGCMikeStuart), X (Feb. 3, 2026, at 5:25 PM CT), https://tinyurl.com/y7943fu6 [https://perma.cc/Y3TW-EXXH]; *see also* The White House, *President Trump Promised to End Child Sexual Mutilation – and He Delivered* (July 25, 2025), https://tinyurl.com/yxc3bkvv [https://perma.cc/E8AX-5UHC]; The White House, *President Trump Is Delivering on His Commitment to Protect Our Kids* (Feb. 3, 2025), https://tinyurl.com/8kpj5akd [https://perma.cc/QNG5-WQBQ].

[18] *Oregon v. Kennedy*, No. 6:25-CV-02409-MTK, 2026 WL 1048354, at *1 (D. Or. Apr. 18, 2026).

[19] *Id.* at *16-17.

[20] *See, e.g.*, *Endocrine Soc'y v. Fed. Trade Comm'n*, No. CV 26-512 (JEB), 2026 WL 1257289 (D.D.C. May 7, 2026); *World Pro. Ass'n for Transgender Health v. Fed. Trade Comm'n*, No. CV 26-532 (JEB), 2026 WL 1257321 (D.D.C. May 7, 2026); *see also* Vittoria Elliott, *The FTC Is Ramping Up to Target Transgender Rights*, Wired (Apr. 24, 2026), https://tinyurl.com/3z6uc9mx [https://perma.cc/5HU8-8J6Z].

constitute First Amendment retaliation, finding that retaliatory animus was the but-for cause for their issuance based on both "[t]he breadth and vigor of Government action levied against proponents of the view that there can be an incongruence between an individual's sex and gender identity," and the "sorely wanting" evidence of any "plausible" non-retaliatory motive by the government, even taking the agency's own "explanation at face value."[21]

### D. DOJ's Role in the Attacks on Transgender People and Gender-Affirming Medical Care

65. The Denial-of-Care EO imposed specific obligations on DOJ to explore legal avenues for limiting or ending the provision of gender-affirming medical care.

66. Then-Attorney General Pam Bondi diligently took on these mandates, with federal law enforcement entities publicly pronouncing their intent to target transgender people and medical care providers.

67. On April 22, 2025, Attorney General Bondi issued a Memorandum to the Department (hereafter the "Bondi Memo") characterizing gender-affirming medical care as "a radical ideological agenda"; an "infect[ion visited upon] an entire generation"; the work of "politically captured profiteers"; "barbaric practice[s]" that "maim and steriliz[e] children"; and as "genital mutilation."[22]

68. The Bondi Memo directed "the Civil Division . . . to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of

---

[21] *Endocrine Soc'y*, 2026 WL 1257289, at *9-14.

[22] Off. of Att'y Gen., *Memorandum: Preventing the Mutilation of American Children* (Apr. 22, 2025), https://tinyurl.com/y6xcv8jk [https://perma.cc/CG7Z-8HRA] ("Bondi Memo"). A copy of the Bondi Memo is attached hereto as **Exhibit C**.

puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"[23]

69. On June 2, 2025, the Federal Bureau of Investigations ("FBI") posted on X.com the following: "Help the FBI protect children. As the Attorney General has made clear, we will protect our children and hold accountable those who mutilate them under the guise of gender-affirming care. Report tips of any hospitals, clinics, or practitioners performing these surgical procedures on children at 1-800-CALL-FBI or http://tips.fbi.gov."[24]

70. On June 11, 2025, the Civil Division of DOJ announced it would follow through on the directives set for in the Denial-of-Care EO and the Bondi Memo, with Assistant Attorney General Brett Shumate issuing a memorandum committing to prioritizing these investigations.[25]

**E. DOJ Issues Civil Administrative Subpoenas to Healthcare Institutions**

71. Soon after the Shumate Memo, DOJ issued civil administrative subpoenas, under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), to more than twenty healthcare institutions across the country whose care for their patients includes gender-affirming medical care.[26]

72. Upon information and belief, these administrative subpoenas are related to the same "investigation" for which the Subpoenas at issue here were issued and are substantially identical to the Subpoenas at issue here.

---

23 *See id*.

24 FBI (@FBI), X (June 2, 2025), https://tinyurl.com/5966hpdc [https://perma.cc/6WRE-RZRG].

25 Off. of Assistant Att'y Gen., *Memorandum: Civil Division Enforcement Priorities* (June 11, 2025), https://tinyurl.com/3bvnxxxj [https://perma.cc/V6R6-SSKB] ("Shumate Memo"). A copy of the Shumate Memo is attached hereto as **Exhibit D**.

26 See U.S. Dep't of Justice, Press Release No. 25-717, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://tinyurl.com/cpp2byvj [https://perma.cc/H66N-9QY8]; Jo Yurcaba, *DOJ subpoenas more than 20 doctors and clinics that provide trans care to minors*, NBC News (July 10, 2025), https://tinyurl.com/5fa2d853 [https://perma.cc/3C7G-S3MA].

73. Multiple entities that received these administrative subpoenas, or families of patients at some of these entities, filed motions seeking to quash or limit the subpoenas. *See*, *e.g.*, *In re Admin. Subpoenas to Children's Hospitals*, No. 1:26-cv-01834 (D. Md.); *In re: 2025 Subpoena to Children's Nat'l Hospital*, No. 1:25-cv-03780 (D. Md.); *In re 2025 Children's Hospital of Los Angeles Subpoena*, No. 2:25-cv-11183 (C.D. Cal.); *In re Dep't of Justice Admin. Subpoena No. 25-1431-030*, No. 1:25-mc-00063 (D. Colo.); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069 (W.D. Pa.); *In re Subpoena No. 25-1431-014*, No. 2:25-mc-00039 (E.D. Pa.); *In re Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324 (D. Mass.); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041 (W.D. Wash.); *QueerDoc PLLC v. U.S. Dep't of Justice*, No. 2:25-mc-00042 (W.D. Wash.).

74. Prior to April 30, 2026, each of the courts that considered these motions quashed the administrative subpoenas or limited the ability of DOJ to obtain identifying and sensitive health information.[27]

75. On September 3, 2025, in a case involving Seattle Children's Hospital, the federal district court in the Western District of Washington set aside the administrative subpoena to that hospital while noting that the true purpose was "to pressure hospitals into ending gender-related care for minors."[28]

---

[27] *See In re: 2025 Subpoena to Children's Nat'l Hospital*, No. 1:25-cv-03780, 2026 WL 160792 (D. Md. Jan. 21, 2026); *In re Dep't of Justice Admin. Subpoena No. 25-1431-030*, No. 1:25-mc-00063, 2026 WL 33398 (D. Colo. Jan. 5, 2026), *appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026); *In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025), *judgment entered*, No. 2:25-MC-01069, 2026 WL 570419 (W.D. Pa. Mar. 2, 2026), *appeal docketed*, No. 26-1401 (3d Cir. Mar. 4, 2026); *In re Subpoena No. 25-1431-014*, 810 F.Supp.3d 555, 583 (E.D. Pa. 2025); *In re Admin. Subpoena No. 25-1431-019*, 800 F.Supp.3d 229 (D. Mass. 2025), *appeal docketed*, No. 25-2092 (1st Cir. Nov. 14, 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025); *QueerDoc PLLC v. U.S. Dep't of Justice*, 807 F.Supp.3d 1295, 1303 (W.D. Wash. 2025), *appeal docketed*, No. 25-7384 (9th Cir. Nov. 24, 2025).

[28] *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151 at *11.

76. On September 9, 2025, in a case involving Boston Children's Hospital, the federal district court in District of Massachusetts quashed another administrative subpoena, stating that subpoena's "true purpose" was to interfere with "Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care."[29]

77. On November 21, 2025, in a case involving Children's Hospital of Philadelphia, the district court for the Eastern District of Pennsylvania struck three requests contained in the administrative subpoena that sought patient-identifying information or sensitive health information. Like the Subpoena at issue here, these requests sought documents: (1) identifying the names, addresses, and social security numbers of its minor patients prescribed puberty blockers and hormone therapy and their families' identifying information; (2) the minor patient's medical treatment records including diagnoses; and, (3) describing each minor patient's informed consent process, patient intake, parent or guardian authorization, and use of medicine not approved by the Food and Drug Administration. The district court in the Eastern District of Pennsylvania found that DOJ's asserted concerns in support of the subpoena "describe policy disagreements about the propriety of medical care," and did not serve as a legitimate basis for a subpoena.[30]

78. On December 24, 2025, in a case involving UPMC Children's Hospital of Pittsburgh, the federal district court in the Western District of Pennsylvania quashed the same three provisions of the administrative subpoena at issue in that case that sought patient-identifying information or sensitive health information. In doing so, the court stated that it was joining other

---

[29] *In re Admin. Subpoena No. 25-1431-019*, 800 F.Supp.3d at 239.

[30] *In re Subpoena No. 25-1431-014*, 810 F.Supp.3d at 583.

courts "in finding that the government's demand for deeply private and personal patient information carries more than a whiff of ill-intent."[31]

79. On January 5, 2026, in a case involving Children's Hospital of Colorado, a federal magistrate judge in the District of Colorado recommended that the motion to quash the administrative subpoena to the hospital in that case be granted. In doing so, the court observed that "government's aim is not actually to investigate FDCA violations, but to use the FDCA as a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations.'"[32]

80. On January 21, 2026, in a case involving Children's National Hospital in Washington, DC, a district court in Maryland concluded that the administrative subpoena to the hospital "appears to have no purpose other than to intimidate and harass the Hospital and Movants, and those similarly situated," that "[t]he Government seeks to fulfill its policy agenda through compliance born of fear," and that "the Subpoena is the classic impermissible fishing expedition."[33]

81. Upon information and belief, having encountered unanimity from the courts in finding that the administrative subpoenas directed at hospitals were issued for an improper purpose and inappropriately sought patient-identifying information pertaining to transgender minors, DOJ shifted tactics to obtain the same information.

82. On April 30, 2026, DOJ for the first time moved to enforce an administrative subpoena, filing its motion regarding the subpoena sent to Rhode Island Hospital in the U.S.

---

31 *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *2.

32 *In re Dep't of Justice Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *7.

33 *In Re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *9.

District Court for the Northern District of Texas.[34] DOJ did so notwithstanding that it was still in active communications with counsel for Rhode Island Hospital as to the scope and parameters of the information to be produced in response to the administrative subpoena.[35] It also did so notwithstanding that neither the attorneys who issued the subpoena or were involved in those communications nor Rhode Island Hospital had any connection to the Northern District of Texas.

83. Within hours of the filing of DOJ's motion, and without notice having been given to or any response received from Rhode Island Hospital or any other party, the district court in the Northern District of Texas granted DOJ's motion to enforce.[36]

84. On May 4, 2026, the Rhode Island Child Advocate, as representative of the interests of transgender minors in the state's custody and care, moved to quash the administrative subpoena propounded upon Rhode Island Hospital in the U.S. District Court for the District of Rhode Island.[37]

85. On May 11, 2026, the night before the hearing in the proceedings in Rhode Island was set to take place, it was revealed that a grand jury in the Northern District of Texas had issued grand jury subpoenas to at least one healthcare entity seeking the same information that DOJ was seeking through the civil administrative subpoenas that courts had found lacked a proper purpose.[38]

86. Upon information and belief, the DOJ Defendants have sought to employ grand jury subpoenas in a venue where the care at issue has been banned by the state, before a perceived

---

[34] Pet. for Enforcement of Admin. Subpoena, *In Re: Administrative Subpoena 25-1431-032*, No. 4-26MC-006-0 (N.D. Tex. Apr. 30, 2026) (ECF No. 1).

[35] Emergency Motion to Stay Pending Appeal, *In Re: Administrative Subpoena 25-1431-032*, No. 4-26MC-006-0 (ECF No. 8).

[36] Order, *In Re: Administrative Subpoena 25-1431-032*, No. 4-26MC-006-0 (ECF No. 2).

[37] Emergency Motion to Quash Subpoena Duces Tecum, *In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.*, No. CV 1:26-MC-0007-MSM-AEM, 2026 WL 1392565 (D.R.I. May 14, 2026) (ECF No. 1).

[38] Joseph Goldstein, *N.Y.C. Hospital Is Subpoenaed Over Trans Youth Health Care*, NY Times (May 12, 2026), https://tinyurl.com/2psr8r9v.

more favorable audience, as an end-run to the quashals and limitations that numerous courts across the country have deemed necessary, and which have hampered DOJ's ability to use civil administrative subpoenas to chill the provision of gender-affirming medical care and seek the identities of transgender adolescents, their families, and their sensitive health information.

87. On May 13, 2026, the district court in District of Rhode Island enjoined DOJ from seeking, receiving, using, retaining, or disseminating any patient-identifying information or sensitive health information produced by Rhode Island Hospital in response to the administrative subpoena at issue there, including any other materials that identify, or reasonably permit the identification of, Rhode Island's children. In doing so, the court found that the subpoena was issued for an improper purpose, and that it demands the production of records that cannot be obtained consistent with the constitutional privacy rights of Rhode Island children.[39]

88. During the hearing in Rhode Island, counsel for DOJ represented that the investigation began in Washington, D.C. and could not specify when the investigations were transferred to the Northern District of Texas. However, upon information and belief, each of the DOJ attorneys involved at the time that the so-called investigations started and the administrative subpoenas were issued was from DOJ headquarters in Washington, DC. The District of Rhode Island court concluded that DOJ's actions in the Northern District of Texas amounted to forum shopping "in an obvious effort to shield its recent investigative tactics—previously rejected by every other court to review them—from this Court's review, in favor of a distant forum that DOJ deems friendly to its political positions."

---

[39] *In re Admin. Subpoena 25-1431-032 to RI Hosp.*, 2026 WL 1329792.

**F. NYU's Provision of Gender-Affirming Medical Care to Transgender Adolescents**

89. Recognizing the safety and efficacy of medical treatment for gender dysphoria, NYU offered gender-affirming medical care as treatment for a transgender adolescent's gender dysphoria for many years. That is until February 2026 when NYU stopped providing these necessary health services in response to some of the Administration's coercive actions.[40]

90. In 2012, NYU established an LGBTQ Advisory Council, to further NYU Langone's commitment to delivering quality care to each LGBTQ patient and to reduce disparities that exist in these populations.[41]

91. For several years, NYU established and maintained a Transgender Youth Health Program through which it provided comprehensive gender-affirming medical and psychosocial services for transgender youth. Until February 2026, this included medical services such as gender-affirming hormones, pubertal suppression, surgical services, fertility preservation, and voice therapy, in addition to psychological and social support services.

92. Following the issuance of the Gender and Denial-of-Care EOs, NYU paused its provision of medical services as treatment for gender dysphoria for transgender young people.

93. When the provisions of the executive orders that directly threatened NYU's federal funding based on its provision of gender-affirming medical care to transgender minors were enjoined, NYU resumed providing the healthcare it had long provided to its adolescent transgender patients.

94. In February 2026, in response to declarations and proposed rules by the Administration that threatened NYU's eligibility for federal funding and to participate in the

---

[40] Joseph Goldstein, *Manhattan Hospital Ends Medical Treatment for Transgender Youth*, N.Y. Times (Feb. 17, 2026), https://tinyurl.com/ysxr7jmp.

[41] *NYU Langone Medical Center Achieves the Gold Standard of Equality in Healthcare*, NYU Langone Health., https://tinyurl.com/3remvfrf [https://perma.cc/J2XN-EB64] (last visited May 31, 2026).

Medicaid, Medicare, and CHIP programs, NYU preemptively ceased providing health services to transgender minors as treatment for gender dysphoria that it provides to other minors, such as puberty-delaying medication or hormone therapy.

95. On February 25, 2026, the Office of the New York Attorney General sent a letter to NYU Langone noting that "NYU Langone's change in policy is self-imposed; there has been no change in federal law to require the cessation of medically necessary transgender healthcare," and that "[t]he threat of federal funds being withheld or rescinded because of the provision of gender-affirming care does not excuse providers' and medical institutions' existing duties and obligations under New York law," which "prohibit[s] discrimination based on a patient's membership in a protected class, including sex, gender identity, and disability, and remain in full effect."

96. Thereafter, on or about March 10, 2026, Mehmet Oz, administrator of the Centers for Medicare and Medicaid Services, sent a letter to New York Attorney General Letitia James where he proclaimed that his "office stands behind NYU's decision" and derided medical treatment for gender dysphoria by proclaiming, "Our children are not guinea pigs."[42]

97. A week later, on March 18, Deputy Attorney General Blanche sent another letter to New York Attorney General James where he noted that DOJ officials were in contact with representatives of NYU Langone and proclaimed that DOJ "will take all necessary actions to defend the hospital's decision to cease offering [gender-affirming] procedures."

98. To date, notwithstanding that the Kennedy Declaration has been set aside as unlawful by a federal district court and that no rule conditions federal funding on the provision of gender-affirming medical care to minors, NYU has refused to resume providing medical care as treatment for a transgender minor's gender dysphoria.

---

[42] Carl Campanile, *Dr. Oz rips AG James, defends NYU Langone decision to ax transgender treatment for kids*, New York Post (Mar. 11, 2026), https://tinyurl.com/3fn7cn8u [https://perma.cc/4P3Y-25CM].

### G. DOJ Issues Grand Jury Subpoena to NYU Langone and, Upon Information and Belief, Other Hospitals in New York City

99. On May 7, 2026, NYU Langone Hospitals received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas ("the Subpoena"). A copy of the subpoena is attached hereto as **Exhibit A**.[43]

100. The Subpoena directs NYU to produce seventeen broad categories of records, from January 1, 2020, through May 5, 2026, by 9:00am on June 10, 2026.

101. Among other documents, the Subpoena commands the production of "[d]ocuments sufficient to identify each patient who underwent Sex-Rejecting Procedures."

102. For each patient identified, the Subpoena further demands the production of all "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each patient . . . from initial consultation to the most recent treatment provided."

103. In addition, the Subpoena directs the production of "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified . . . , including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones."

104. The Subpoena defines "Sex-Rejecting Procedures" as follows:

> "Sex-Rejecting Procedures" means any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or

---

[43] Plaintiffs use the term "the Subpoenas" to refer to the Subpoena issued to NYU as well as any other similar subpoena issued to a healthcare institution in New York City.

> other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures. An intervention or treatment is considered a Sex-Rejecting Procedure based on its intended purpose and expected physiological or functional effect, and not on the terminology or classification used by a health care provider or facility.

105. The Subpoena defines the term "puberty blockers" to mean "any gonadotropin-releasing hormone ('GnRH') agonists or related drugs (e.g., leuprolide, triptorelin) used to delay the onset of puberty."

106. The Subpoena further defines the term "hormones" to mean "testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as 'gender affirming hormone therapy' ('GAHT') or transgender hormone therapy used to induce cross-sex characteristics," and states that "[t]his includes hormone-blocking drugs, such as spironolactone, used to suppress naturally-occurring hormones for the facilitation of GAHT."

107. On May 11, 2026, pursuant to New York State's Shield Law, N.Y. Exec. L. § 837-x, NYU made public that it had received the Subpoena through a public notice on its website. A copy of the public notice by NYU is attached hereto as **Exhibit B**.

108. Upon information and belief, NYU also provided virtually identical notices to the public notice to affected patients, including Plaintiffs and members of the proposed Class, through MyChart, an online portal that allows patients to manage their health information and communicate directly with their healthcare providers.[44]

109. Though the Subpoena was purportedly issued pursuant to the authority of a grand jury in the Northern District of Texas, it requests that materials responsive to it be made available in electronic format to Special Agent Bradley Cooper in the Kansas City Field Office of the FDA Office of Criminal Investigations.

---

[44] *See* S. Baum, *NYU Langone First Known Hospital to Face Federal Criminal Subpoena Over Trans Youth Care*, Erin in the Morning (May 11, 2026), https://tinyurl.com/mpdr3pey [https://perma.cc/R7E8-CDHY].

110. The Subpoena further notes that DOJ has purportedly considered the predicate requirements of 45 C.F.R. § 164.512 (f)(1(ii)(C)(1)-(3), under HIPAA, and determined that "[d]e-identified information could not reasonably be used in its stead."

111. Had NYU not posted a notice of receipt of the Subpoena from the Northern District of Texas, Plaintiffs would not have known that their personal identifying and sensitive health information was at risk of being coercively disclosed to the DOJ.

112. Upon information and belief, NYU would not disclose the patient-identifying information and sensitive health information of Plaintiffs and putative members of the Class but for being compelled to do so by the DOJ Defendants.

113. NYU has not obtained consent from any Plaintiff—or, upon information and belief, from any member of the proposed Class—to disclose the patient-identifying information and sensitive health information of Plaintiffs and putative members of the Class to the DOJ Defendants.

114. While Plaintiffs do not have confirmation as to whether substantially similar information as that requested by the Subpoena to NYU is being sought from other health institutions in New York City, upon information and belief, DOJ has sent virtually identical federal grand jury subpoenas to other healthcare institutions in New York City, including Mount Sinai Health System.

115. Upon information and belief, New York healthcare institutions including Mount Sinai Health System would not disclose the patient-identifying information and sensitive health information of Plaintiffs and putative members of the Class but for being compelled to do so by the DOJ Defendants.

### H. The Current DOJ Has Abandoned Any Notion of Regularity in Its Investigations and Grand Jury Proceedings

116. Under the current Administration, DOJ has abandoned any notion of independence or good faith, such that it cannot benefit from a presumption of regularity.

117. Under Defendant Blanche, "the pace of investigations against Mr. Trump's perceived enemies has accelerated."[45] This includes investigations targeted at transgender people and those who support them.

118. There are myriad examples of how DOJ and the Administration have used the levers of power to go after those that purportedly have wronged the President or who have defied the Administration's policies.

119. For example, as a district court in Tennessee found, under Defendant Blanche's direction, DOJ engaged in a malicious prosecution based on a "tainted investigation" initiated based on Defendant Blanche's "vindictive motive."[46]

120. Similarly, as a district court in the District of Columbia held, DOJ opened an investigation into then-Chair of the Federal Reserve Jerome Powell and issued grand jury subpoenas "for an improper purpose."[47] As the court found, "[a] mountain of evidence suggests that the Government served the[] subpoenas on the Board to pressure its Chair into voting for lower interest rates or resigning."[48] In doing so, the court observed that, at least under this Administration, DOJ and U.S. Attorneys' Offices are doing the President's bidding, noting that one U.S. Attorney was "pushed out for refusing to prosecute the President's opponents."[49]

---

45 Glenn Thrush, *Trump's Fund Shows Blanche Choosing Loyalty Over Pushing Back*, N.Y. Times (May 21, 2026), https://tinyurl.com/bdhdzuea.

46 *United States v. Abrego García*, No. 3:25-CR-00115, 2026 WL 1454303 (M.D. Tenn. May 22, 2026).

47 *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. MC 26-12 (JEB), 2026 WL 710202, at *9 (D.D.C. Mar. 13, 2026), *reconsideration denied*, No. MC 26-12 (JEB), 2026 WL 1224046 (D.D.C. Apr. 3, 2026).

48 *Id.* at *13.

49 *Id.* at *9.

121. DOJ's use of its prosecutorial powers to go after perceived opponents of the President or effectuate the Administration's policy priorities is not the exception, it is the rule. For example, DOJ has launched (often repeatedly) grand jury investigations and sought indictments against former FBI Director James Comey, New York Attorney General Letitia James, and Democratic U.S. Senators, among others.[50]

122. DOJ has also sought the identities of those aligned with those perceived to oppose the Administration's policy priorities. For example, in relation to its prosecution of journalist Don Lemon for his coverage of a protest in Minnesota, DOJ sought a warrant for the "subscriber information in any form kept" for Mr. Lemon's internet-based news show, "The Don Lemon Show." Among the information sought by the warrant was the names of subscribers, the mailing addresses, residential addresses, business addresses, and email addresses of subscribers, the telephone numbers of subscribers, and the Internet Protocol addresses from which the "Don Lemon Show" was accessed. The court denied the warrant, in part, because "subscriber information is not needed to prove or disprove the commission of a crime – indeed, it is hard to see how such information could be relevant evidence of the commission of a crime."[51]

123. The aforementioned request for the identities of those not being investigated of a crime but who presumptively may not align with the Administration's policy priorities is consistent with the Subpoenas' request for the identifying and sensitive health information of Plaintiffs and members of the proposed Class.

124. The abuses by DOJ under the Administration are not limited to whom they target, but are also illustrated by DOJ's misconduct in grand jury and court proceedings.

---

[50] *See* Protect Democracy, *Tracking retaliatory use of arrests, prosecutions, and investigations by the Trump administration* (May 21, 2026), https://tinyurl.com/sfdpyt68 [https://perma.cc/58QR-38W6] (collecting examples).

[51] Order Denying Search Warrant Applications, *In re. Search Warrants*, Nos. 26-mj-205, 26-mj-206, 26-mj-207, 26-mj-208, 26-mj-209 (D. Minn. Feb. 24, 2026), at 4-5, https://tinyurl.com/bdzzkpwn.

125. A federal district court in Illinois recently observed that DOJ has engaged in "prosecutorial vouching" in grand jury proceedings, in which its prosecutors put their "personal credibility and trustworthiness on the line in support of the charges," and engaged in "improper prosecutorial communications of a substantive nature with the grand jurors outside of the grand jury room."[52]

126. In Wyoming, a panel of three federal judges threw out nine indictments after an examination of the grand jury proceedings revealed misconduct by DOJ's attorneys.[53]

127. Under DOJ leadership from the Administration, prosecutors have lied and withheld critical information from courts, with one federal district court noting that there has been "a serious breakdown in the ethical codes."[54]

128. DOJ has also stacked the deck in their own favor in some cases by removing from the panel some grand jurors who had voted against them when considering an earlier version of the charges.[55]

129. And reminiscent of the DOJ's shift in tactics here after encountering resistance in the courts, as a district court in the District of Oregon observed, federal "agencies under the current administration have a significant and troubling history of evading or flouting prior court orders."[56]

130. Indeed, even in relation to the purported investigations at issue in this case, DOJ has already been found to have engaged in misconduct. For example, in its decision involving the

---

52 Hannah Meisel, *'Broadview 6' trial canceled as prosecutors acknowledge misconduct before grand jury*, Capitol News Illinois (May 21, 2026), https://tinyurl.com/2mdzw392 [https://perma.cc/5AF3-9DAY].

53 *E.g.*, Order Dismissing Indictment, *United States v. Benito Coon*, No. 1:26-cr-00039 (D. Wyo. May 15, 2026) (ECF 49), https://tinyurl.com/4ztsr2wn [https://perma.cc/P3V5-CUPA].

54 *E.g.*, Kyle Cheney and Josh Gerstein, Judge mulls contempt over DHS' 'patently false' allegation in deportation case, Politico (May 4, 2026), https://tinyurl.com/3mb84t6n.

55 Alan Feuer, *As Trump Politicizes Justice Dept., Prosecutors Struggle With Grand Juries*, N.Y. Times (May 26, 2026), https://tinyurl.com/msme29t9.

56 *Oregon*, 2026 WL 1048354, at *19 (collecting examples).

administrative subpoena to Rhode Island Hospital for the same information being requested by the Subpoenas here, the federal district court in Rhode Island found as follows:

> As citizens, we trust that federal prosecutors, when wielding this awesome power against a state, a company, or certainly against vulnerable children, will play fair and be honest with its counterparts and the judiciary.
>
> DOJ has proven unworthy of this trust at every point in this case. It has misrepresented and withheld information to both this Court and the United States District Court for the Northern District of Texas … . It did so in an obvious effort to shield its recent investigative tactics—previously rejected by every other court to review them—from this Court's review, in favor of a distant forum that DOJ deems friendly to its political positions. Its representatives have, under oath, misrepresented salient facts. It has misled the parties with whom it was negotiating in Rhode Island, who have now been placed in an untenable and unprecedented procedural position.[57]

That court also noted that this "appalling," "reckless disregard for the duty of candor owed to a federal court" was not the first time the team of DOJ lawyers counseling cases regarding the administrative subpoenas, "in their crusade to obtain transgender children's medical records, acted in ways that appear to deviate from the norms of professional conduct expected of attorneys representing the United States."[58]

### I. DOJ Has Admitted Patient-Identifying Records of Transgender Adolescents Are Not Necessary for Its Investigations Related to Gender-Affirming Medical Care

131. DOJ has already conceded in multiple instances related to its subpoenas to providers of gender-affirming medical care that it does not need patient-identifying information or patients' sensitive health information.

132. For example, DOJ entered into a settlement agreement in a challenge to an administrative subpoena sent to Children's Hospital of Los Angeles wherein it noted that it had

---

[57] *In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.*, 2026 WL 1392565, at *1.

[58] *Id*. at *2, n.5 (citing *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 582 (E.D. Pa. 2025) (responding to inconsistency in a DOJ attorney's declaration with a reminder that "sworn declarations filed in federal court must reflect verified facts, not speculation recast as fact"); *QueerDoc, PLLC*, 807 F. Supp. 3d at 1303, n.2 (describing DOJ's misuse of a praecipe as reflecting "a fundamental misunderstanding—or deliberate misuse—of court procedure")).

agreed that the hospital could "redact any patient identifying information in records that are produced in response" to the subpoena and that it would provide advanced notice of at least four weeks to the plaintiffs in that case should the government "issue a new subpoena to any entity or person that requests documents or items related to the provision of gender related care by Children's Hospital Los Angeles that contains patient-identifying information."[59]

133. DOJ has represented in the case involving the administrative subpoena to UPMC Children's Hospital of Pittsburgh that the subpoena would be fully satisfied by production of only de-identified records, so that no individual patient could be identified to the Government.[60]

134. DOJ made similar representations to the district court in Rhode Island with regards to the administrative subpoena to Rhode Island Hospital. During the May 12, 2026 hearing in Rhode Island, when asked by the court whether "anonymized data is fine; you don't need the actual identifiable data" for *this* investigation, DOJ represented to the court "it has been [its] practice to … of offering anonymized data request or an anonymized data production to recipients." DOJ also stated that "pursuant to [its] approach" regarding other subpoenas relating to this purported investigation, it "would accept anonymized patient data."

**J. Compliance with the Subpoenas Would Cause Significant Harm to Plaintiffs**

135. The threatened disclosure of their identifying and sensitive health information invades the Plaintiffs' sense of privacy and undermines their confidence that their information will stay between them and their medical providers.

136. Plaintiffs' medical records, now subject to collection and disclosure pursuant to the Subpoenas, contain an enormous amount of confidential identifying, personal, and sensitive health

---

59 Settlement Agreement, *In Re 2025 Children's Hospital of Los Angeles Subpoena*, No. 2:25-cv-11183-MWC-JDE (C.D. Cal. Jan. 22, 2026) (ECF 25-1), https://tinyurl.com/rdrrfsuh [https://perma.cc/Y6S9-LLD9].

60 Motion to File Supplemental Brief, In Re: 2025 UPMC Subpoena, No. 2:25-mc-1069-CB (W.D. Pa. Dec. 16, 2025) (ECF 47), https://tinyurl.com/jtznaauv [https://perma.cc/U3XG-LMDH].

information, including, but not limited to, their names, basic biographical details, family histories, medical histories, details regarding the treatment of their gender dysphoria, letters of support regarding such treatment, other diagnoses, mental health assessments and diagnostic testing, laboratory test results, health risk factors, and information totally unrelated to their gender dysphoria (herein collectively referred to as "sensitive health information").

137. Each of the Plaintiffs is horrified at the possible invasion of their privacy in their personal and medical information, to which they do not consent.

138. The threat of disclosure also interferes in the private relationship between patients and their medical providers, and erodes the trust the Plaintiffs placed in their providers, including those at NYU Langone. This interference also impairs the Plaintiffs' trust in seeking out or obtaining medical care, which may result in delayed care and adverse health consequences.

139. For example, Caroline Coe expended significant time and energy looking for a medical provider with a specific background and felt grateful to find such a provider at NYU Langone but now feels that her choice in provider is being punished, and disclosure threatens to destroy the atmosphere of trust with their medical provider.

140. For Plaintiffs, like Karl Koe, the threat of disclosure seems intended to intimidate patients and make gender-affirming medical care even more difficult to obtain. Indeed, trust in the ability to have frank and open conversations with their healthcare providers is shaken by the Subpoenas such that Plaintiffs worry that the true goal of collection and disclosure of their identifying and sensitive health information is to make families more apprehensive about seeking out gender-affirming medical care.

141. The threat of collection and disclosure of Plaintiffs' identifying and sensitive health information also leaves Plaintiffs concerned about violence, harassment, and intimidation that may

result on account of the disclosure of such information, including their transgender status and other health conditions. If private identifying and sensitive health information is obtained by the Administration, shared with others, or released to the public, Plaintiffs worry about vigilantism or harassment that may result from those who oppose gender-affirming medical care, including those in the Administration or who work with it, and it heightens Plaintiffs' fear of being targeted for their transgender status. Such fears have already limited some of the Plaintiffs' travel, for example.

142. These fears are especially heightened because Plaintiffs are aware of the rhetoric used by the Administration, including the DOJ Defendants, demonizing transgender people and gender-affirming medical care. Plaintiffs cannot and do not trust the Administration, including DOJ, with their medical information, especially since the government has expressed such vitriol and disdain for transgender people.

143. Given the Administration's targeting and intimidation of providers of gender-affirming medical care, Plaintiffs fear that their names may go on a list and that they will be investigated simply for receiving medical care that they need.

144. Plaintiffs feel that the true purpose of threatening disclosure is to intimidate patients out of pursuing gender-affirming medical care, making it harder for them to access the care that they need, and are concerned about the Administration's efforts to target gender-affirming medical care. These fears have caused distress and anxiety such that they have affected their ability to concentrate in school or work and led to loss of sleep.

145. Minor Plaintiffs, in particular, are so concerned with the disclosure of their transgender status and private health information to the government and to the public that their mental health has suffered and they are experiencing severe distress and anxiety.

## CLASS ALLEGATIONS

146. Plaintiffs, on behalf of themselves and all similarly situated individuals, bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

147. **Class Definition.** The proposed Class under Federal Rule of Civil Procedure 23(b)(2) for which Plaintiffs seek certification is defined as:

> All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at a healthcare institution located in New York City, including NYU Langone Hospitals (and any other NYU entity) and Mount Sinai Health System.

148. **Subclass Definition.** Plaintiffs also propose and seek certification of a subclass (the "NYU Subclass") under Federal Rule of Civil Procedure 23(b)(2) defined as follows:

> All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at NYU Langone Hospitals or any other NYU entity.

149. **Impracticability of joinder of all Class Members.** The proposed class and subclass are expected to be sufficiently numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, well over forty minor patients sought gender-affirming medical care from New York City-based hospitals, including over forty patients at NYU Langone alone, during the relevant time period. The nature of this action also impacts the ability of claimants to institute individual suits given the confidentiality concerns at its center and putative class members' fears of being targeted by DOJ Defendants.

150. **Class Representatives.** Plaintiffs Carter Coe, by and through his parent and next friend, Caroline Coe; Reed Roe, by and through his parent and next friend, Riley Roe; Nicole Noe, by and through her parent, Norman Noe; Karl Koe; and Jay Doe are members of the proposed class and subclass. Each Plaintiff is willing to serve as a class representative and act on behalf of others similarly situated to themselves. Each has committed to looking out for the interests of all class members and is unaware of any conflict they may have with any proposed class members.

151. **Common Questions of Law and Fact.** This action requires a determination of whether the information sought by the Subpoenas violates the Class's rights under the United States Constitution, and whether compliance with the Subpoena by NYU constitutes a breach of physician-patient confidentiality under New York law as to the NYU Subclass. Adjudication of these issues will in turn determine whether DOJ may seek the Class members' identifying and sensitive health information or be enjoined from requesting or receiving such information through the Subpoenas, and whether or to what extent NYU must comply with the Subpoena.

152. **Separate suits would create risk of varying conduct requirements.** The prosecution of separate actions by proposed class members against DOJ and/or NYU would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct. Certification is therefore proper under Federal Rule of Civil Procedure 23(b)(1).

153. **Defendants' actions rest on grounds generally applicable to the relevant class and the resulting legal violations can be remedied by unified relief.** By seeking, collecting, and/or disclosing the same identifying and sensitive health information for each class member, Defendants act on grounds generally applicable to the relevant class, rendering declaratory relief

appropriate respecting the entirety of the class for the particular claim. Certification is therefore proper under Federal Rule of Civil Procedure 23(b)(2).

154. **Venue:** This action can be most efficiently prosecuted as a class action in the Southern District of New York, where Plaintiffs Carter Coe and Caroline Coe, Reed Roe and Riley Roe, Karl Koe, and Jay Doe reside, Plaintiffs and putative Class members received care, the NYU Defendants and other healthcare entities in New York City that may have received Subpoenas reside and do business, and the records at issue are kept.

155. **Class Counsel.** Plaintiffs have retained experienced and competent class counsel. Plaintiffs are represented by the American Civil Liberties Union Foundation ("ACLU"), Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal"), and the New York Civil Liberties Union Foundation ("NYCLU"). The ACLU, Lambda Legal, and NYCLU have extensive federal court experience litigating on behalf of LGBTQ people, including regarding transgender people's access to healthcare, and have served as class counsel and putative class counsel in multiple cases.

## CLAIM FOR RELIEF

### Count I – Violation of the Fifth Amendment – Right to Informational Privacy (Plaintiffs and the Class Against the DOJ Defendants)

156. Plaintiffs hereby incorporate by reference and reallege all preceding paragraphs of this Complaint as though fully set forth herein.

157. Plaintiffs state this cause of action on behalf of themselves and members of the proposed class for purposes of seeking declaratory and injunctive relief.

158. The Fifth Amendment to the United States Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V.

159. The substantive protections of the Due Process Clause, as well as other constitutional provisions, give rise to a right to privacy, protecting information that is highly

personal and intimate, which includes personal health and medical information as well as information relating to a person's transgender status.

160. The Subpoenas seek the disclosure of the transgender status of Plaintiffs and members of the proposed Class by seeking the identities and other identifying health information in relation to their treatment of gender dysphoria. By doing so, the DOJ Defendants violate the right to privacy of Plaintiffs and members of the proposed Class by causing disclosure of their transgender status and by depriving them of significant control over the circumstances around such disclosure.

161. The Subpoenas unreasonably seek the identifying and sensitive health information of Plaintiffs and members of the proposed Class by seeking disclosure of the comprehensive and intimate details of Plaintiffs' medical and psychological conditions, medications, treatments, procedures, family relationships, counseling, diagnoses, and confidential communications they had with their treating health professionals reflected in the demanded medical records. By doing so, the DOJ Defendants violate the right to privacy of Plaintiffs and members of the proposed Class by causing disclosure of information related to their health and medical care, including but not limited to their gender dysphoria and any related conditions, and by depriving them of significant control over the circumstances around such disclosure.

162. There is no compelling, or even important or legitimate, interest in the government ascertaining the transgender status and the identifying and sensitive health information of Plaintiffs and members of the proposed Class.

163. The interests of Plaintiffs and members of the proposed Class in protecting the identifying and sensitive health information sought by the Subpoenas significantly outweigh any interest by the DOJ Defendants in seeking, receiving, using, retaining, or disseminating such

information as part of its claimed investigations into healthcare offenses related to gender-affirming medical care.

164. The nature of the identifying and sensitive health information of Plaintiffs and members of the proposed Class sought by the Subpoenas is so private and deeply personal that it is protected by the Fifth Amendment's right to informational privacy.

165. The collection and nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class would expose them to stigma, discrimination, harassment, and even violence as a result of their transgender status and other health information, such as mental health diagnoses.

166. The collection and nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class would erode the healthcare provider-patient relationship and dissuade Plaintiffs and members of the proposed Class from seeking the healthcare they need, which negatively impact their health and wellbeing.

167. The potential for harm in the collection and nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class sought by the Subpoenas is so private that it outweighs any interest by the DOJ Defendants in seeking, receiving, using, retaining, or disseminating such information as part of its claimed investigations into healthcare offenses related to gender-affirming medical care.

168. There are no safeguards to protect against the nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class produce in response to the Subpoenas that will prevent the harm flowing from disclosure to DOJ. Nor are there any safeguards that would protect against the nonconsensual disclosure of the identifying and sensitive health information of Plaintiffs and members of the proposed Class to

entities within and outside the Administration that may target Plaintiffs and members of the proposed Class or further seek to effectuate the Administration's efforts to "end" gender-affirming medical care.

169. The DOJ Defendants further issued the Subpoena for the improper purpose of seeking to end gender-affirming medical care that states like New York have chosen to provide and protect through intimidation and abuse of the federal criminal process.

170. The DOJ Defendants issued the Subpoenas for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are not legitimate governmental interests under any standard of review.

171. The Subpoenas' request for the identifying and sensitive health information of Plaintiffs and members of the Class is so arbitrary that it shocks the conscience.

172. Plaintiffs are entitled to a declaration that the Subpoenas' request for their identifying and sensitive health information violates the right to informational privacy under the Due Process Clause of the Fifth Amendment.

173. Plaintiffs and members of the proposed Class are further entitled to preliminary and permanent injunctive relief preventing the DOJ Defendants from seeking, receiving, using, retaining, or disseminating any identifying or sensitive health information of Plaintiffs and members of the proposed Class through the Subpoenas at issue or substantially similar administrative or grand jury subpoenas issued as part of DOJ's claimed investigations into health care offenses related to gender-affirming medical care.

**Count II – Violation of the Fourth Amendment**
**(Plaintiffs and the Class Against the DOJ Defendants)**

174. Plaintiffs hereby incorporate by reference and reallege paragraphs 1–155 of this Complaint as though fully set forth herein.

175. Plaintiffs state this cause of action on behalf of themselves and members of the proposed class for purposes of seeking declaratory and injunctive relief.

176. The Fourth Amendment to the United States Constitution commands that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

177. The Fourth Amendment provides protection against unreasonable and oppressive governmental intrusions on individuals' legitimate expectations of privacy.

178. A grand jury subpoena *duces tecum* that requires the compulsory production of information to which individuals have a legitimate expectation of privacy falls within the scope of the Fourth Amendment's protections and therefore must be reasonable.

179. Although the Supreme Court has held that individuals ordinarily lack privacy interests under the Fourth Amendment when they voluntarily turn information over to third parties, it has clarified that this limitation on the Fourth Amendment's protections is not categorical; rather, the nature, comprehensiveness, and level of intimacy of the information sought by the government must all be considered in determining whether an individual has retained a reasonable expectation of privacy in it. *See generally Carpenter v. United States*, 585 U.S. 296 (2018).

180. The Subpoenas demand the disclosure of vast quantities of sensitive health information of Plaintiffs and members of the proposed Class, including all "documents relating to

the clinical indications, diagnoses, or assessments that formed the basis" for their ongoing treatment for gender dysphoria. Though in the hands of third parties like the NYU Defendants or other New York City-based providers, the comprehensive and intimate details of Plaintiffs' medical and psychological conditions, medications, treatments, procedures, family relationships, counseling, diagnoses, and confidential communications they had with their treating health professionals reflected in the demanded medical records and other documents form a "detailed chronicle" of each Plaintiff's deeply personal health and medical history. This highly intimate and sensitive medical information is paradigmatically the sort of private information the Fourth Amendment is meant to protect from unwarranted government encroachment.

181. Plaintiffs and members of the proposed Class thus have an objectively reasonable and legitimate expectation of privacy in the highly sensitive medical and mental health information DOJ Defendants seek via the Subpoenas, despite it being in the possession of NYU Defendants or other New York City-based healthcare institutions, including Mount Sinai Health System. The expectation is likewise one that society readily and robustly recognizes as objectively reasonable as demonstrated through a host of overlapping safeguards, including New York State's Shield Law, New York State's statutory doctor- and psychotherapist-patient privileges, federal patient privacy laws including HIPAA, as well as the Federal Rules of Criminal Procedure and federal crime victims' rights statutes.

182. Plaintiffs have subjectively demonstrated their expectation of privacy by disclosing this confidential and privileged information to NYU Langone and other New York City-based healthcare institutions solely for the purpose of receiving medical treatment and subject to those existing legal safeguards. It is further demonstrated by their seeking to vindicate their rights to privacy through this legal action.

183. The DOJ Defendants' seeking of the identifying and private sensitive health information of Plaintiffs and members of the proposed Class through the Subpoenas fails the Fourth Amendment's test for reasonableness. Any intrusions into such significant privacy interests must be tethered to and balanced against a legitimate investigatory need or other government interest, rather than generalized probing instituted in bad faith or out of an intent to harass.

184. The DOJ Defendants do not seek the disclosure of the identifying and private sensitive health information of Plaintiffs and members of the proposed Class based on any legitimate investigatory need. No such need exists. Rather, the Subpoenas are merely the latest escalation of the Administration's systemic attacks on transgender people and medical treatment for gender dysphoria.

185. DOJ's investigations are intended not to ferret out illegal activity, but are designed to engage in fishing expeditions to intimidate and harass both the providers and recipients of gender-affirming medical care, which is widely accepted and remains lawful and protected in New York. The government's lack of legitimate purpose and abuse of the grand jury process here overcome any presumption of reasonableness that would normally be afforded to a grand jury subpoena.

186. By unreasonably violating the legitimate expectation of privacy of Plaintiffs and members of the proposed Class in their sensitive private health information and communications, the DOJ Defendants violate the Fourth Amendment rights of Plaintiffs and members of the proposed Class. This ongoing and imminent injury—the irreversible exposure of the most intimate details of their bodies and inner lives—is not remediable through compensatory damages.

187. Plaintiffs are entitled to a declaration that the DOJ Defendants' unreasonable demand for identifying and sensitive health information, to which Plaintiffs and members of the

proposed Class have a reasonable and legitimate expectation of privacy and for which Defendants have no legitimate investigatory need, violates the right against unreasonable searches and seizures of the Fourth Amendment.

188. Plaintiffs and members of the proposed Class are further entitled to preliminary and permanent injunctive relief preventing the DOJ Defendants from continuing to engage in suspicionless intrusions into the identifying and sensitive health information of Plaintiffs and members of the proposed Class, to which they have a reasonable and legitimate expectation of privacy.

**Count III – Breach of Physician-Patient Confidentiality**
**(Plaintiffs and the NYU Subclass Against the NYU Defendants)**

189. Plaintiffs hereby incorporate by reference and reallege paragraphs 1–155 of this Complaint as though fully set forth herein.

190. Plaintiffs state this cause of action on behalf of themselves and members of the proposed NYU Subclass for purposes of seeking declaratory and injunctive relief.

191. Under New York law, there is a well-established cause of action for breach of physician-patient confidentiality prohibiting institutional medical providers from violating the statutory privilege established by New York CPLR 4504(a), which generally shields from disclosure "any information . . . acquired in attending a patient in a professional capacity" without consent. *Chanko v. Am. Broad. Companies Inc.*, 49 N.E.3d 1171, 1176 (N.Y. 2016).

192. The NYU Subclass's records here fall squarely within that privilege, and they have not consented to any disclosure.

193. By complying with those portions of the Subpoenas seeking the identities and other personally identifying health information of members of the NYU Subclass, NYU will imminently violate that privilege in violation of state law.

194. By complying with those portions of the Subpoenas seeking records or any other information relating to the nature of any treatment or diagnosis—including but not limited to their gender dysphoria and any related conditions—in a form that includes or would reveal the identity of any class member, NYU will imminently violate that privilege in violation of state law.

195. The imminent threat of the disclosure of information protected by the statutory privilege has caused, and will continue to cause, the NYU Subclass significant distress and ongoing injury—including through the irreversible exposure of the most intimate details of their bodies and inner lives.

196. There is no legitimate justification for the government ascertaining the transgender status and the identifying and sensitive health information of the NYU Subclass in violation of the statutory privilege.

197. In fact, the DOJ Defendants issued the Subpoena to NYU for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are interests specifically at odds with New York's statutory scheme. *See* CPLR 4504(a); N.Y. Exec. L. § 837-x (defining "gender-affirming care" as a "legally protected health care activity"); N.Y. Gen. Bus. L. § 394-I(2)(a) (restricting compliance with "any investigation or proceeding that seeks to impose civil or criminal liability, professional sanctions, or any other legal consequences upon a person or entity for any legally protected health activity").

198. As established by Counts I and II, federal law does not require—and in fact the Constitution prohibits—compliance with those parts of the Subpoena seeking disclosure of the NYU Subclass's identities, or records or any other information relating to the nature of any treatment or diagnosis.

199. The NYU Subclass is therefore entitled to a declaration that NYU disclosing their identities in response to the Subpoena—or disclosing records or any other information relating to the nature of any treatment or diagnosis—would constitute a breach of physician-patient confidentiality under New York law.

200. The NYU Subclass is further entitled to preliminary and permanent injunctive relief preventing NYU from disclosing their identities in response to the Subpoena—or disclosing records or any other information relating to the nature of any treatment or diagnosis—in violation of New York law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

A. Declare that the instant Subpoenas' and any other substantially similar administrative or grand jury subpoena's request for the identifying and sensitive health information of Plaintiffs and members of the Class as part of the Department of Justice's claimed investigations into healthcare offenses related to gender-affirming medical care violates the rights of Plaintiffs and members of the Class to confidentiality and informational privacy under the Fifth Amendment and to be free from unreasonable searches and seizures under the Fourth Amendment;

B. Declare that disclosure by the NYU Defendants of the identities, medical records, or any other identifying information relating to the nature of any treatment or diagnosis of Plaintiffs and members of the NYU Subclass in response to the Subpoena or any substantially similar administrative or grand jury subpoena as part of the Department of Justice's claimed investigations into healthcare offenses related to gender-affirming

medical care would constitute a breach of physician-patient confidentiality under New York law;

C. Preliminary and permanent injunctive relief preventing the DOJ Defendants from seeking, receiving, using, retaining, or disseminating any identifying or sensitive health information of Plaintiffs and members of the proposed Class through the Subpoenas at issue or any substantially similar administrative or grand jury subpoenas as part of the Department of Justice's claimed investigations into healthcare offenses related to gender-affirming medical care;

D. Preliminary and permanent injunctive relief preventing the NYU Defendants from disclosing or producing any identifying or sensitive health information of Plaintiffs and members of the proposed Class to the DOJ Defendants in response to the Subpoena at issue or any substantially similar administrative or grand jury subpoenas as part of the Department of Justice's claimed investigations into healthcare offenses related to gender-affirming medical care;

E. Certify classes as set forth in this Complaint and enter class-wide declaratory and injunctive relief as described above;

F. Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

G. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

H. Grant any other and further relief that this Court may deem just and proper.

Dated: June 1, 2026

Respectfully submitted,

/s/ Omar Gonzalez-Pagan

Robert Hodgson
Gabriella Larios
Anya Weinstock
**New York Civil Liberties Union Foundation**
125 Broad Street, 19th Floor
New York, New York 10004
Telephone: 212-607-3300
rhodgson@nyclu.org
glarios@nyclu.org
aweinstock@nyclu.org

Chase B. Strangio
Shana Knizhnik*
**American Civil Liberties Union Foundation**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
cstrangio@aclu.org
sknizhnik@aclu.org

Elizabeth Gill*
**American Civil Liberties Union Foundation**
425 California Street, Suite 700
San Francisco, California 94104
Telephone: 415-343-0779
egill@aclu.org

* Motions for admission *pro hac vice* forthcoming

Omar Gonzalez-Pagan
Karen L. Loewy
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org

Nora Huppert*
**Lambda Legal Defense and Education Fund, Inc.**
3656 N. Halsted Street
Chicago, Illinois 60613
Telephone: 312-605-3233
Facsimile: 855-535-2236
nhuppert@lambdalegal.org

A.D. Sean Lewis*
**Lambda Legal Defense and Education Fund, Inc.**
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
Telephone: 213-382-7600
Facsimile: 855-535-2236
alewis@lambdalegal.org

*Attorneys for Plaintiffs*

# Exhibit A

.AO110 (Rev. 12/89) Subpoena to Testify Before Grand Jury

# UNITED STATES DISTRICT COURT

## Northern District of Texas

TO:
NYU Langone Hospitals
Attn: Custodian of Records
530 First Avenue
HCC-15
New York, NY 10016

**SUBPOENA TO TESTIFY BEFORE GRAND JURY**

SUBPOENA FOR:
☐ PERSON ☑ DOCUMENT(S) OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM / DATE AND TIME |
|---|---|
| 501 W 10th St.<br>Fort Worth, TX 76102-6882 | Grand Jury Room<br>DATE AND TIME: 6/10/2026 9:00 am |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*

PLEASE SEE ATTACHMENT

☐ *Please see additional information on reverse.*

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| Karen Mitchell<br>(By) Deputy Clerk | 5/6/2026 |

| | NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY |
|---|---|
| This subpoena is issued on application of the United States of America | Ethan Womble<br>Assistant United States Attorney<br>801 Cherry St., Suite 1700<br>Fort Worth, TX 76102-6882<br>(817) 252-5200 |

* If not applicable, enter "none".

R26 TXN 53130

AO110 (Rev. 12/89) Subpoena to Testify Before Grand Jury

| RETURN OF SERVICE (1) | | |
|---|---|---|
| RECEIVED BY SERVER | DATE | PLACE |
| SERVED | DATE | PLACE |
| SERVED ON (PRINT NAME) | | |
| SERVED BY (PRINT NAME) | | TITLE |

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL 0.00 |

DECLARATION OF SERVER (2)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ____________________
DATE

____________________
SIGNATURE OF SERVER

____________________
ADDRESS OF SERVER

ADDITIONAL INFORMATION

(1) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.

(2) "Fees and mileage need not be tendered to the witness upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)".

Print Save As... Reset

## ATTACHMENT A

**ATTACHMENT TO THE GRAND JURY SUBPOENA ISSUED TO**

NYU Langone Hospitals
530 First Avenue
HCC-15
New York, NY 10016

## I. DEFINITIONS

1. "You," "Your Company," and "the Company" means:

   a. NYU Langone Hospitals, a New York nonprofit corporation, whose principal place of business is located at 430 East 34th Street, New York, New York, without regard to any name under which it has done business;

   b. All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, the Transgender Youth Health Program at Hassenfeld Children's Hospital at NYU Langone; and

   c. Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2. "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3. "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

   a. All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

   b. Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes,

telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c. Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d. Any electronic files saved as a backup, including metadata;

e. Any deleted but recoverable electronic files, including metadata;

f. Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g. Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h. All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4. "Relevant Time Period" means **January 1, 2020, through May 5, 2026**. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5. "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6. "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7. "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

8. "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any

records or logs reflecting the time, date, participants, and content of such communications.

9. "Sex-Rejecting Procedures" means any medical, surgical, pharmaceutical, or clinical intervention provided to an individual under eighteen years of age that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's biological sex. These include, for example, puberty suppression, hormone administration, surgical intervention, voice modification interventions, or other medical or clinical services that are functionally integral to, preparatory for, or undertaken in furtherance of such interventions or procedures. An intervention or treatment is considered a Sex-Rejecting Procedure based on its intended purpose and expected physiological or functional effect, and not on the terminology or classification used by a health care provider or facility.

10. "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11. "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics. This includes hormone-blocking drugs, such as spironolactone, used to suppress naturally-occurring hormones for the facilitation of GAHT.

12. "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. DOCUMENTS TO BE PRODUCED

For the Relevant Time Period, please provide in electronic format:

1. Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) those who held authority to perform or order Sex-Rejecting Procedures; (b) those who conducted clinical evaluations related to Sex-Rejecting Procedures; (c) those who engaged in billing or coding activities related to Sex-Rejecting Procedures; and (d) any individual within such person's supervisory or reporting chain.

2. All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving Sex-Rejecting Procedures.

3. All documents that show or relate to any use of diagnosis codes for minors undergoing Sex-Rejecting Procedures other than codes specifically identifying

transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, vocal disorders, medication management, etc.).

4. All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for Sex-Rejecting Procedures.

5. All communications with public or private health care benefit programs or plans regarding the use of ICD codes for Sex-Rejecting Procedures, including any inquiries, denials, or appeals related to claims for such procedures or treatment.

6. Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for Sex-Rejecting Procedures.

7. All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in Sex-Rejecting Procedures for minors.

8. All documents relating to communications between any pharmaceutical manufacturer of puberty blockers or hormones and any of the individuals identified in response to specification 1, *supra*, regardless of whether the document or communication is facially related to Sex-Rejecting Procedures for minors.

9. All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for use in or associated with Sex-Rejecting Procedures or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

10. All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for Sex-Rejecting Procedures or for the treatment of gender dysphoria, including so-called “scientific exchange” materials.

11. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

12. Documents sufficient to identify each patient who underwent Sex-Rejecting Procedures.

13. For each such patient identified in Subpoena specification 12, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or hormones, and all documents relating to the Sex-Rejecting Procedures care provided

to each patient identified in Subpoena specification 12 from initial consultation to the most recent treatment provided.

14. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 12, *supra*, including any disclosures about off-label use (*i.e.,* uses not approved by the United States Food and Drug Administration) and potential risks of puberty blockers and/or hormones.

15. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety and effectiveness of Sex-Rejecting Procedures for treatment of gender dysphoria, including the use of puberty blockers or hormones.

16. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to Sex-Rejecting Procedures.

17. All communications with the World Professional Association for Transgender Health ("WPATH") or any of its members relating to Sex-Rejecting Procedures, including but not limited to communications regarding the safety and efficacy or Sex-Rejecting Procedures, the Standards of Care 8, and billing guidance for Sex-Rejecting Procedures

## III. FORM OF PRODUCTION

We request materials responsive to the above be made available in electronic format. Please forward the documents directly to the individual listed below on or before the return date of this subpoena:

**Special Agent Bradley Cooper**
**FDA Office of Criminal Investigations**
**Kansas City Field Office**
**(913) 396-2129**
**bradley.cooper@fda.hhs.gov**

**HIPAA STATEMENT**

The U.S. Department of Justice (the "DOJ") is familiar with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the regulations providing guidance in the application of that statute.

The DOJ has considered the predicate requirements of 45 C.F.R., § 164.512 (f)(1(ii)(C)(1)-(3) and represents that

- The information requested in this grand jury subpoena attachment is relevant and material to a legitimate law enforcement inquiry;
- The request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and
- De-identified information could not reasonably be used in its stead.

The documents and records requested in this grand jury subpoena attachment requires you to produce are sought by the DOJ in its capacity as a health oversight agency, and this information is necessary to further health oversight activities. *See* 45 C.F.R. §§ 164.512(d) and 164.501. The information sought is the minimum necessary to accomplish the intended purpose of the subpoena. *See* 45 C.F.R. § 164.502(b)(1).

**PRIVILEGE LOG**

This grand jury subpoena is not intended to call for the production of any material that is subject to a valid claim of attorney-client or other privilege recognized by the federal courts of the United States. To the extent you or some other party may seek to assert a claim of privilege, work product protection, or other legal claim to preclude production of material called for in this subpoena, a privilege log must be produced. Such a privilege log shall set forth:

a. each document by date, transmittal detail (if any);
b. type of document;
c. author(s) and location (e.g., name of company, firm etc.);
d. recipient(s) and location (e.g., name of company, firm etc.);
e. general subject matter;
f. number of pages;
g. paragraph of the subpoena to which the document is responsive;
h. indicated or known circulation, including the names and titles of all persons to whom the document, or a copy thereof, or any part thereof, was shown; and
i. the privilege asserted with respect to each such document in sufficient detail to facilitate a determination by a reviewing party or court to assess the validity of the claim of privilege.

Failure to produce such a log with sufficient detail to allow a reviewing party or court to assess whether such a claim is valid may result in waiver of any such claim.

**NOTICE REGARDING LIABILITY FOR OBSTRUCTION OF JUSTICE**

- **18 U.S.C. § 1001 in relevant part provides –**

  (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

  (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
  (2) makes any materially false, fictitious, or fraudulent statement or representation; or
  (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

  shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

- **18 U.S.C. § 1503 in relevant part provides –**

  (a) Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

- **18 U.S.C. § 1512 in relevant part provides –**

  (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an official proceeding;
(2) cause or induce any person to—
(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
(D) be absent from an official proceeding to which such person has been summoned by legal process; or
(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

(c) Whoever corruptly—
(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
shall be fined under this title or imprisoned not more than 20 years, or both.

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—
(1) attending or testifying in an official proceeding;
(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;
(3) arresting or seeking the arrest of another person in connection with a Federal offense; or
(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;
or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

. . .

(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

- **18 U.S.C. § 1519 provides –**

  Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

- **18 U.S.C. § 1623(a) in relevant part provides –**

  (a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS**
**<u>PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)</u>**

Pursuant to Federal Rules of Evidence 803(6) and 902(11) regarding certified domestic records of regularly conducted activity, I hereby certify:

1. I am employed by ________________________________________ ("the Business") and my official title is ______________________. I am a person designated by the Business as a custodian of records with the authority to make this certificate.

2. I state that each of the records attached hereto is the original record, or a true duplicate of the original record, in the custody of the Business, and that I am the custodian of the attached records, consisting of _____ total pages.

3. I further certify that all records attached to this certificate were made at or near the time of the occurrence of the matters set forth, by or from information transmitted by, a person with knowledge of those matters.

4. I further certify that that all records attached to this certificate were kept in the course of the regularly conducted activity of the Business.

5. I further certify that it is the regular practice of the Business to make and retain each record attached to this certificate.

6. I further state that this certificate is intended to satisfy the requirements of Rule 902(11) of the FEDERAL RULES OF EVIDENCE.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Date: __________________

______________________________
Signature

______________________________
Print Name

# Exhibit B

Close

We use cookies and similar tools to give you the best website experience. By using our site, you accept our Websites Privacy Policy.

# Information for NYU Langone Health Patients

On May 7, 2026, NYU Langone Hospitals ("NYULH") was one of several institutions that received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas. Among other requests, the subpoena directs NYULH to provide information pertaining to patients under the age of 18 who received gender affirming care at NYULH between 2020-2026, as well as the names of NYULH providers and others who were involved in offering such care at NYULH in that timeframe.

You can view the subpoena here.

Pursuant to the New York State Shield Law, any entity in New York State that receives a request for information regarding legally protected health activity, such as the provision of reproductive health care or gender-affirming care, must make a reasonable attempt to notify the individuals to whom that request pertains at least 30 days before complying with or providing information in response to the request. More information about the Shield Law is available here.

We understand that these developments may be concerning to our patients, providers, and others. Please know that NYU Langone takes the privacy of your protected health information very seriously and we are evaluating our response to the subpoena. We will post updates at this website.

For any questions or concerns please email TYHPsubpoena@nyulangone.org.

# Exhibit C

**Office of the Attorney General**
**Washington, D. C. 20530**

April 22, 2025

MEMORANDUM FOR SELECT COMPONENT HEADS

FROM: THE ATTORNEY GENERAL

SUBJECT: PREVENTING THE MUTILATION OF AMERICAN CHILDREN

There is a radical ideological agenda being pushed throughout every aspect of American life—from TV programming and Hollywood film production to children's books and elementary school classrooms—that teaches children to deny biological reality. Gender ideology, masked as science, teaches that children should process adolescent stress and confusion as a case of mistaken identity and that the solution is not to root out and eliminate the underlying condition but to acquiesce in it permanently through life-altering chemical and surgical intervention. That ideology, pushed by far-left politicians, celebrities, politically captured academics, and legacy media, has infected an entire generation of children, who have in turn pushed transgenderism on their peers through social media and other means. Dissenting voices are bullied into silence, and "allies" are praised and rewarded. Tragic and absurd as it is that 1.4% of 13- to 17-year-olds now identify as transgender,[1] that is the predictable result of a coordinated, unchecked ideological attack on America's children.

The medical community, with its roots in hard science, is well-positioned to serve as a bulwark against this sociological disease. And indeed, parents who are desperate to help their confused, frustrated children have understandably turned to medical professionals for help. Unfortunately, those parents have been betrayed by politically captured profiteers at every step. These "professionals" have deployed junk science and false claims about the effects of so-called "gender-affirming care" to justify the barbaric practice of surgically and chemically maiming and sterilizing children. Between 2019 and 2023, an estimated 14,000 children received "treatment" for gender dysphoria, with more than 5,700 subjected to life-altering surgeries.[2] The practitioners who provided this so-called "care" profited while their patients were left permanently disfigured, scarred, and sterilized. Those children will struggle for the rest of their lives to overcome regret, and their parents will struggle equally to overcome the guilt of ruining their children's lives on the

---

[1] Azeen Ghorayshi, *Report Reveals Sharp Rise in Transgender Young People in the U.S.*, N.Y. Times (June 10, 2022), https://www.nytimes.com/2022/06/10/science/transgender-teenagers-national-survey.html.

[2] Rikki Schlott, *Over 5,700 American children had trans surgery between 2019 and 2023, medical group claims: 'Treated like guinea pigs*,' N.Y. Post (Oct. 8, 2024), https://nypost.com/2024/10/08/us-news/over-5700-americans-under-18-had-trans-surgery-from-2019-23/.

false and misleading advice of medical providers who told them that surgery or hormone replacement was the best solution to their problems.[3]

Consider the case of Chloe Cole, whose story, sadly, is not unique.[4] At just 11 years old, Chloe joined Instagram and was bombarded with "LGBT content and activism."[5] She "saw how trans people online got an overwhelming amount of support," and that "really spoke to [her] because, at the time," she was just a child and "didn't really have a lot of friends of [her] own."[6] She was especially vulnerable at that age because, like many young girls, Chloe felt that her "body didn't match beauty ideals," so she "started to wonder if there was something wrong with" her, even wondering whether she would "be better off as a boy."[7] By the age of 12, Chloe identified as transgender, and she "was fast-tracked through her entire transition—from blockers to a mastectomy—in just two years."[8] "The only pushback she . . . encountered came from the first endocrinologist she saw," but she bypassed that easily by going "to another doctor who gave her the prescription with no trouble."[9] Despite the "vitriol from the transgender activist community," Chloe has bravely shared her regret with the world at just 17 years old because she simply "can't let this happen to other kids."[10] Neither can I, and neither can President Trump.

The Biden administration bears enormous responsibility for the medical community's fraud and exploitation of parents and children who have fallen prey to radical gender ideology. President Biden personally advanced the agenda by hosting transgender activist influencers like Dylan Mulvaney at the White House,[11] opposing state-level bans on gender-affirming care for minors,[12] threatening legal action against Medicaid and Obamacare providers who fail to offer

---

[3] *See, e.g.*, Dr. Marc Siegel et al., *Detransitioning becomes growing choice among young people after gender-affirming surgery*, Fox News (Dec. 19, 2022), https://www.foxnews.com/health/detransitioning-becomes-growing-choice-young-people-gender-affirming-surgery.

[4] Chloe Cole, *Hearing on Gender Affirming Care before the Subcommittee on the Constitution and Limited Government of the H. Judiciary Comm.*, 118th Cong. (2023).

[5] *Rikki Schlott*, *'I literally lost organs:' Why detransitioned teens regret changing genders*, N.Y. Post (June 19, 2022), https://nypost.com/2022/06/18/detransitioned-teens-explain-why-they-regret-changing-genders/.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Emma Colton, *Biden legacy includes relentless push for transgender agenda*, Fox News (Dec. 8, 2024), https://www.foxnews.com/politics/biden-legacy-includes-relentless-push-transgender-agenda.

[12] Edie Heipel, *In interview with trans activist, Biden condemns states banning sex changes on kids*, (Oct. 24, 2022), Catholic News Agency, https://www.catholicnewsagency.com/news/252633/in-interview-with-trans-activist-biden-condemns-states-banning-sex-changes-on-kids.

such care,[13] and appointing Rachel Levine—a leading transgender activist who personally identifies as transgender—to serve as Assistant Secretary for Health. Under Levine, the Department of Health and Human Services promoted gender-reassignment surgeries and hormone replacement for the treatment of gender dysphoria in minors[14] and pressured the World Professional Association for Transgender Health ("WPATH") to eliminate age minimums for reassignment surgeries in its 2022 guidelines.[15] All the while, NIH-funded studies admitted that "little to no empirical data" supported the long-term safety of puberty blockers and hormones, let alone sex-reassignment surgery.[16] To address the lack of scientific support for his agenda, President Biden allocated more than $8 million of taxpayer funds for transgender hormone studies on mice.[17]

President Trump has put a stop to this by issuing his executive order "Protecting Children from Chemical and Surgical Mutilation," signed to halt the exploitation enabled by misguided Biden-era policies. Pursuant to the President's directive, I am issuing the following guidance to all Department of Justice employees to enforce rigorous protections and hold accountable those who prey on vulnerable children and their parents.

## I. Enforcement of Laws Outlawing Female Genital Mutilation

The Department of Justice will not sit idly by while doctors, motivated by ideology, profits, or both, exploit and mutilate our children. Under my watch, the Department will act decisively to protect our children and hold accountable those who mutilate them under the guise of care. I am putting medical practitioners, hospitals, and clinics on notice: In the United States, it is a felony to perform, attempt to perform, or conspire to perform female genital mutilation ("FGM") on any person under the age of 18.[18] That crime carries a maximum prison sentence of 10 years per count.[19] I am directing all U.S. Attorneys to investigate all suspected cases of FGM—under the

[13] Executive Order 14075, *Advancing Equality for Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Individuals*, 87 Fed. Reg. 37189 (June 15, 2022).

[14] Timothy Nerozzi, *Biden administration endorses transgender youth sex-change operations, 'top surgery,' hormone therapy*, Fox News, March 31, 2022, https://www.foxnews.com/politics/biden-administration-transgender-agenda-youth-sex-change-hormone-therapy.

[15] Azeen Ghorayshi, *Biden Officials Pushed to Remove Age Limits for Trans Surgery, Documents Show*, N.Y. Times (June 25, 2024), https://www.nytimes.com/2024/06/25/health/transgender-minors-surgeries.html.

[16] Patrick Hauf, *Biden administration funds studies on danger of transgender hormonal treatments even as it pushes them on kids*, Fox News, (Oct. 20, 2022), https://www.foxnews.com/politics/biden-funds-studies-dangers-transgender-hormone-treatments.

[17] The White House, March 5, 2025, https://www.whitehouse.gov/articles/2025/03/yes-biden-spent-millions-on-transgender-animal-experiments/.

[18] *See* 18 U.S.C. § 116(a)(1).

[19] *Id.* § 116(a).

banner of so-called "gender-affirming care" or otherwise—and to prosecute all FGM offenses to the fullest extent possible.

The Department will also ensure that victims and their families are able to report violations to federal law enforcement to expose violators and receive support. The Federal Bureau of Investigation, alongside federal, state, and local partners, will pursue every legitimate lead on possible FGM cases.

## II. Investigation of Violations of the Food, Drug and Cosmetic Act and False Claims Act

The Department of Justice will investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations. To that end:

- I am directing the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition." Even if otherwise truthful, the promotion of off-label uses of hormones—including through informal campaigns like those conducted by sales reps or under the guise of sponsored continuing medical education courses—run afoul of the FDA's prohibitions on misbranding and mislabeling.[20]

- I am also directing the Civil Division's Fraud Section to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation. Examples include but are not limited to physicians prescribing puberty blockers to a child for an illegitimate reason (*e.g.*, gender dysphoria) but reporting a legitimate purpose (*i.e.*, early onset puberty) to the Centers for Medicare & Medicaid Services, and hospitals performing surgical procedures to remove or modify a child's sex organs while billing Medicaid for an entirely different procedure. Falsely billing the government for the chemical or surgical mutilation of a child is a violation of the False Claims Act and is subject to treble damages and severe penalties.

- I am also notifying the public that the Department is eager to work with *qui tam* whistleblowers with knowledge of any such violations. The False Claims Act allows private citizens to file these actions on behalf of the government against those who have defrauded the government. In meritorious cases, the Department of Justice can intervene, and even if the Department takes over the case, the relator may receive a portion of the government's financial recovery. In 2024 alone, *qui tam* relators received a $344 million share of victories won by the Department. For more information about initiating a *qui tam* action, please visit the Department's website at

[20] *See* 21 U.S.C. §§ 321(m)-(n), 331, 352(a), (f); 21 C.F.R. §§ 201.100, 201.128, 202.1(l)(2).

https://www.justice.gov/archives/jm/criminal-resource-manual-932-provisions-handling-qui-tam-suits-filed-under-false-claims-act.

## III. Ending Reliance on Junk Science by the Department

Consistent with Section 3 of the President's Order, the Civil Division has already directed that Department employees shall not rely on the ideologically driven WPATH guidelines, and that they should withdraw all court filings that rely on WPATH's guidelines in any case in which the Department of Justice is actively involved, whether as a party, an amicus, or through the submission of a statement of interest. For the avoidance of doubt, I now expressly extend that direction to all Department employees. I further direct the Civil Rights Division to work with the Civil Division to identify and purge all Department policies, memoranda, and publications and court filings based on WPATH guidelines. WPATH has flouted basic standards for clinical guidelines, silenced its own evidence review team to bury doubts about the science WPATH promotes, muzzled dissenting members, and worked with the prior administration to push reckless policies—like doing away with age minimums for child surgeries.[21] That is not science; it is radical ideology that endangers children with untested theories, and it has no place in the Department's work. WPATH's guidelines are fundamentally flawed and unreliable, and the Department will not use them in any way that suggests otherwise.

## IV. Establish Federal and State Coalition Against Child Mutilation

Federal law enforcement must stand ready to assist states that prioritize children's health over ideology. Accordingly, the Department is launching the Attorney General's Coalition Against Child Mutilation. Through this Coalition, I will partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws banning female genital mutilation and other, related practices. The Department will support the state-level prosecution of medical professionals who violate state laws that protect children, such as Alabama's Vulnerable Child Compassion and Protection Act,[22] which makes it a felony for doctors to treat children with puberty blockers or hormones to affirm a gender identity inconsistent with biological sex.

## V. Promoting New Legislation Protecting Children

I have instructed the Office of Legislative Affairs ("OLA") to draft legislation creating a private right of action for children and the parents of children whose healthy body parts have been damaged by medical professionals through chemical and surgical mutilation. The proposed legislation will establish a long statute of limitations and retroactive liability, so that no one providing such "treatment" will escape liability. The Department of Justice will work with members of the House and Senate Judiciary Committees to bring this bill to President Trump as soon as possible. Further, I have instructed OLA to draft legislation amending 18 U.S.C. § 116 to enhance protections for children whose healthy body parts have been damaged by medical

---

[21] *See, e.g.*, Defs.' Mot., *Boe v. United States*, No. 2:22-cv-00184 (M.D. Ala. Jun. 26, 2024).

[22] Ala. Code § 26-26-1 (2022).

professionals practicing chemical and surgical mutilation. I will also work with state legislatures to encourage the passage of similar legislation at the state level.

* * *

Protecting America's children must be our top priority, whether from drug cartels, terrorists, or even our own medical community. Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind "gender-affirming care." Under my leadership, the Department of Justice will bring these practices to an end.

# Exhibit D

**U.S. Department of Justice**
Civil Division

*Office of the Assistant Attorney General* *Washington, DC 20044*

June 11, 2025

**MEMORANDUM**

**TO:** All Civil Division Employees

**FROM:** Brett A. Shumate
Assistant Attorney General

BRETT SHUMATE Digitally signed by BRETT SHUMATE Date: 2025.06.11 12:27:50 -04'00'

**SUBJECT:** Civil Division Enforcement Priorities

President Trump and Attorney General Bondi have directed the Civil Division to use its enforcement authorities to advance the Administration's policy objectives. This memorandum describes those policy objectives and directs Civil Division attorneys to prioritize investigations and enforcement actions advancing these priorities.

**1. Combatting Discriminatory Practices and Policies**

On January 21, 2025, President Trump issued Executive Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), which established "the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work." *Id.* § 2. To this end, the President "order[ed] all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.* As part of these efforts, Attorney General Bondi has directed that the Department align its "litigating positions with [the] requirement of equal dignity and respect." Memorandum from Attorney General, *Eliminating Internal Discriminatory Practices*, at 2 (Feb. 5, 2025).

Consistent with these directives, the Civil Division will use all available resources to pursue affirmative litigation combatting unlawful discriminatory practices in the private sector. In particular, the Civil Division is authorized to bring suit under the False Claims Act for treble damages and penalties against any person who knowingly submits or causes the submission of false claims to the government. 31 U.S.C. § 3729 *et seq*. This includes entities that receive federal funds but knowingly violate civil rights laws. In support of these efforts, the Deputy Attorney General recently announced the Civil Rights Fraud Initiative. The Civil Division is committed to advancing the Initiative and will aggressively investigate and, as appropriate, pursue False Claims Act violations against recipients of federal funds that knowingly violate civil rights laws. The Civil Division will work with the Civil Rights Division, relators, other whistleblowers, and federal agencies to advance these efforts.

**2. Ending Antisemitism**

On January 29, 2025, President Trump issued Executive Order 14,188, *Additional Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847 (Feb. 3, 2025), which established the "policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold accountable the perpetrators of unlawful anti-Semitic harassment and violence," *id.* § 2, and encouraged the "Attorney General … to employ appropriate civil-rights enforcement authorities … to combat anti-Semitism," *id.* § 3(c). The Executive Order also reaffirmed Executive Order 13,899, *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 16, 2019).

The Attorney General has established Joint Task Force October 7 ("JTF 10-7") and directed components to "prioritize seeking justice for victims of the October 7, 2023 terrorist attack in Israel" as well as "combatting antisemitic acts of terrorism and civil rights violations in the homeland." Memorandum from Attorney General, *Establishment of Joint Task Force October 7*, at 1 (Feb. 5, 2025). To assist these enforcement efforts, the Civil Division will prioritize investigations and enforcement actions against entities that make claims for federal funds but knowingly violate federal civil rights laws by participating in or allowing antisemitism.

**3. Protecting Women and Children**

The President has issued several Executive Orders protecting women and children. On January 20, the President issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025), which established the "policy of the United States to recognize two sexes, male and female." *Id.* § 2. On February 3, President Trump issued Executive Order 14,187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Feb. 3, 2025), which directed the Attorney General to, among other things, "prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation." *Id.* § 8(c).

Following these directives, Attorney General Bondi directed the Civil Division to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" Memorandum from Attorney General, *Preventing the Mutilation of American Children*, at 3-4 (April 22, 2025). The Attorney General also directed the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation." *Id.* at 4.

The Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with these directives. These efforts will include, but will not be limited to, possible violations of the Food,

Drug, and Cosmetic Act and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs. 31 U.S.C. § 301 *et seq*. In addition, the Civil Division will aggressively pursue claims under the False Claims Act against health care providers that bill the federal government for impermissible services. This includes, for example, providers that attempt to evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes.

**4. Ending Sanctuary Jurisdictions**

On President Trump's first day in office, he issued multiple directives to secure the southern border. *See* Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025); Executive Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). To ensure that States and local governments promote the enforcement of our nation's immigration laws, he also issued Executive Order 14,287, *Protecting American Communities from Criminal Aliens*, 90 Fed. Reg. 18761 (April 28, 2025). This built on the President's previous Executive Order 13,768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (January 25, 2017). Moreover, Attorney General Bondi has directed the Civil Division to "identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations" and "take legal action to challenge such laws, policies, or practices," where appropriate. Memorandum from Attorney General, *Sanctuary Jurisdiction Directive*, at 3 (Feb. 5, 2025). Consistent with this directive, the Civil Division shall prioritize affirmative litigation to invalidate any State or local laws preempted by Federal law.

**5. Prioritizing Denaturalization**

The Department of Justice may institute civil proceedings to revoke a person's United States citizenship if an individual either "illegally procured" naturalization or procured naturalization by "concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). The benefits of civil denaturalization include the government's ability to revoke the citizenship of individuals who engaged in the commission of war crimes, extrajudicial killings, or other serious human rights abuses; to remove naturalized criminals, gang members, or, indeed, any individuals convicted of crimes who pose an ongoing threat to the United States; and to prevent convicted terrorists from returning to U.S. soil or traveling internationally on a U.S. passport. At a fundamental level, it also supports the overall integrity of the naturalization program by ensuring that those who unlawfully procured citizenship, including those who obtained it through fraud or concealment of material information, do not maintain the benefits of the unlawful procurement.

The Civil Division shall prioritize and maximally pursue denaturalization proceedings in all cases permitted by law and supported by the evidence. To promote the pursuit of all viable denaturalization cases available under 8 U.S.C. § 1451 and maintain the integrity of the naturalization system while simultaneously ensuring an appropriate allocation of resources, the Civil Division has established the following categories of priorities for denaturalization cases:

1. Cases against individuals who pose a potential danger to national security, including those with a nexus to terrorism, espionage, or the unlawful export from the United States of sensitive goods, technology, or information raising national security concerns;

2. Cases against individuals who engaged in torture, war crimes, or other human rights violations;

3. Cases against individuals who further or furthered the unlawful enterprise of criminal gangs, transnational criminal organizations, and drug cartels;

4. Cases against individuals who committed felonies that were not disclosed during the naturalization process;

5. Cases against individuals who committed human trafficking, sex offenses, or violent crimes;

6. Cases against individuals who engaged in various forms of financial fraud against the United States (including Paycheck Protection Program ("PPP") loan fraud and Medicaid/Medicare fraud);

7. Cases against individuals who engaged in fraud against private individuals, funds, or corporations;

8. Cases against individuals who acquired naturalization through government corruption, fraud, or material misrepresentations, not otherwise addressed by another priority category;

9. Cases referred by a United States Attorney's Office or in connection with pending criminal charges, if those charges do not fit within one of the other priorities; and

10. Any other cases referred to the Civil Division that the Division determines to be sufficiently important to pursue.

These categories are intended to guide the Civil Division in prioritizing which cases to pursue; however, these categories do not limit the Civil Division from pursuing any particular case, nor are they listed in a particular order of importance. Further, the Civil Division retains the discretion to pursue cases outside of these categories as it determines appropriate. The assignment of denaturalization cases may be made across sections or units based on experience, subject-matter expertise, and the overall needs of the Civil Division.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARTER COE, by and through his parent and next friend, CAROLINE COE; et al., *on behalf of themselves and all similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-04641-JAV |

**DECLARATION OF CAROLINE COE**

I, Caroline Coe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Caroline Coe.

2. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and will testify competently to those facts if called as a witness.

3. I am a Plaintiff in this action. I am bringing claims on behalf of my child, Carter Coe, as his parent and next friend.

4. I offer this Declaration in support of Plaintiffs' Motions to Proceed Under a Pseudonym, for a Temporary Restraining Order, and for Class Certification.

5. I am the parent of a minor child, Carter Coe, who is transgender. We are residents of the Bronx, New York.

6. Caroline Coe and Carter Coe are pseudonyms.

7. I am submitting this declaration under pseudonyms for my child and I because I fear that disclosure of our identities would subject me and my family to a substantial risk of harm,

including harassment, violence, and retaliation, and would also reveal the identity of my child who is a minor.

8. As a family, we are aware that transgender people are subject to inordinate and disproportionate amounts of violence, harassment, and discrimination. I am also aware of targeted violence as a direct response to the provision of gender-affirming medical care to minors. Accordingly, I am concerned that making our identities public would endanger our safety and subject my family and I to violence and harassment.

9. In addition, I am concerned that public identification could expose my family and I to retaliation by the current administration. Based on media reports, I am aware that the current federal administration has targeted those who support transgender care or oppose the administration's priorities.

10. I have read the proposed class definition in the complaint. I am willing to act on and be named on behalf of Carter Coe as a class representative, and act on behalf of other persons in the class similarly situated to Carter Coe. If appointed, I will look out for the interests of all class members. I am not aware of any conflict I may have with any proposed class members.

11. Carter received gender-affirming medical care at NYU Langone Hospital within the time range between January 1, 2020 and May 5, 2026. That care included puberty blocking medications to treat gender dysphoria.

12. When we first established care at NYU, we did so because we expended significant time and energy looking for a medical provider with a specific background that we felt would better understand Carter's specific experience—we felt grateful to find such a provider at NYU Langone. We were relieved that Carter had someone we felt we could trust, and who could understand him and his experiences.

13. Throughout the process of establishing care at NYU, we disclosed a great deal of confidential medical and personal information, but we felt comfortable doing so because we knew this information was necessary as part of getting Carter the care he needed, and that we could trust that his medical information would be kept confidential.

14. Although NYU suspended their provision of gender-affirming medical care, we never imagined that Carter's confidential medical information might be released or revealed.

15. In May, we learned that NYU had received a grand jury subpoena from the U.S. Attorneys' Office in the Northern District of Texas and that Carter's and our identities, as well as Carter's private medical information, was subject to being disclosed.

16. I do not consent to any such disclosure.

17. The possibility that my child's private medical information might be released to the Department of Justice is terrifying. Our medical records contain an enormous amount of personal information—names, basic biographical details, medical histories, diagnoses, test results—about Carter and our family.

18. The efforts by the government to target doctors who provide gender-affirming care and patients seeking it, including this attempt to get at my family's confidential medical information, are extremely concerning to me as Carter's parent.

19. As a result of this targeting of the care and families like mine who receive it, including actions like the subpoena, I have had difficulty sleeping, and the stress is affecting my ability to do my job. I see that Carter is affected as well.

20. These actions targeting NYU Langone are also concerning because they punish my family for the choice we made to seek out a specific provider who we felt was appropriate for our child. The disclosure of our records threatens to destroy the atmosphere of trust that we built up

with that medical provider, which allowed us to have complex conversations and make difficult decisions as a family with full information.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on: May 31, 2026

By: Caroline Coe
Caroline Coe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARTER COE, by and through his parent and next friend, CAROLINE COE; et al., *on behalf of themselves and all similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE; et al.,<br><br>*Defendants*. | Case No. 1:26-cv-04641-JAV |

**DECLARATION OF RILEY ROE**

I, Riley Roe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Riley Roe.

2. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and will testify competently to those facts if called as a witness.

3. I am a Plaintiff in this action. I am bringing claims on behalf of my child, Reed Roe, as his parent and next friend.

4. I offer this Declaration in support of Plaintiffs' Motions to Proceed Under Pseudonym, for a Temporary Restraining Order, and for Class Certification.

5. I am the parent of a minor child, Reed Roe, who is transgender. I am a resident of Poughkeepsie, New York.

6. Riley Roe and Reed Roe are pseudonyms.

7. I am submitting this declaration under pseudonyms for my child and I because I fear that disclosure of our identities would subject me and my family to a substantial risk of harm,

including harassment, violence, and retaliation, as well as reveal the identity of my child who is a minor.

8. As a family, we are aware that transgender people are subject to inordinate and disproportionate amounts of violence, harassment, and discrimination. I am also aware of targeted violence as a direct response to the provision of gender-affirming medical care to minors. Accordingly, I am concerned that making our identities public would endanger our safety and subject my family and I to violence and harassment.

9. In addition, I am concerned that public identification could expose my family and me to retaliation by the current administration. Based on media reports, I am aware that the current federal administration has targeted those who support transgender care or oppose the administration's priorities.

10. I have read the proposed class definition in the complaint. I am willing to act on and be named on behalf of Reed Roe as a class representative, and act on behalf of other persons in the class similarly situated to Reed. If appointed, I will look out for the interests of all class members. I am not aware of any conflict I may have with any proposed class members.

11. My child received gender-affirming medical care at NYU Langone Hospital within the time range between January 1, 2020, and May 5, 2026. That care included puberty blockers and hormone therapy to treat gender dysphoria.

12. We first established care at NYU because finding appropriate care for Reed near our home upstate was presenting challenges. We wanted to find a provider that could provide more support and expertise around gender affirming medical care, and specifically hormone therapy. NYU looked like a great option because it had providers who were informed about the care that

Reed needed. We were grateful to find a fantastic provider who was compassionate, informative, responsive and caring, and was someone who we could trust with our child's care.

13. When we started care at NYU, our provider made a full request for all of Reed's pediatric records, and these were all sent to NYU. In the following visits, we shared an enormous amount of information with Reed's NYU provider to support his care. We trusted our provider with personal information because it was necessary for Reed to obtain medical care.

14. The records we disclosed to NYU contain a great amount of detail about our family. Some of the information we shared is about Reed's history of gender dysphoria, and other information is entirely unrelated. The records that exist on Reed's medical portal include years of medical care notes, test results, communications about gender affirming care options, routine medical records, and lists of all medications that Reed has taken.

15. After NYU discontinued the transgender health program, the threat of loss of care has been incredibly stressful. Even despite these challenges, we never imagined that NYU would disclose confidential patient records.

16. In May, I received a standard notice through NYU's MyChart portal that NYU had received a grand jury subpoena from the U.S. Attorney's Office in the Northern District of Texas and that Reed's private medical information was subject to being disclosed.

17. I do not consent to any such disclosure.

18. The fact that our information is now vulnerable and may be accessed by the government is extremely concerning, especially since the government has expressed such vitriol and disdain for transgender people.

19. It is absolutely wrong that the government is seeking my family's private medical information. They are not entitled to my child's name or confidential records. My family has a

right to medical privacy, and the government is not allowed to seek out confidential medical records without any justification.

20. Given this administration's targeting and intimidation of individuals who provide, receive, and support that care, I am concerned about what the government intends to do with my child's name. I am afraid about what may result from releasing my child's identity to an administration that is hostile to the transgender community. I fear that his name may go on a list of transgender people and that he will be investigated simply for receiving medical care. Reed shares these concerns and I see that the fear of getting dragged into an investigation is taking a considerable toll on his mental health.

21. I do my best to assure my child that I will prioritize getting him care. However, this administration's attempts to shut down gender-affirming care, including by seeking our information, make it harder for me to reassure my child. This causes me significant distress.

22. Without judicial intervention, my child's private medical information is at risk of being revealed.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on: May 31, 2026

By: Riley Roe
Riley Roe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARTER COE, by and through his parent and next friend, CAROLINE COE; et al., *on behalf of themselves and all similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; et al.,<br><br>*Defendants*. | Case No. 1:26-cv-04641-JAV |

**DECLARATION OF NORMAN NOE**

I, Norman Noe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Norman Noe.

2. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and will testify competently to those facts if called as a witness.

3. I am a Plaintiff in this action. I am bringing claims on behalf of my child, Nicole Noe, as her parent and next friend.

4. I offer this Declaration in support of Plaintiffs' Motions to Proceed Under a Pseudonym, for a Temporary Restraining Order, and for Class Certification.

5. I am the parent of a minor child, Nicole Noe, who is transgender. We are residents of Brooklyn, New York.

6. Norman Noe and Nicole Noe are pseudonyms.

7. I am submitting this declaration under pseudonyms for my child and I because I fear that disclosure of our identities would subject me and my family to a substantial risk of harm,

including harassment, violence, and retaliation, and would also reveal the identity of my child who is a minor.

8. As a family, we are aware that transgender people are subject to inordinate and disproportionate amounts of violence, harassment, and discrimination. I am also aware of targeted violence as a direct response to the provision of gender-affirming medical care to minors. Accordingly, I am concerned that making our identities public would endanger our safety and subject my family and I to violence and harassment.

9. In addition, I am concerned that public identification could expose my family and I to retaliation by the current administration. Based on media reports, I am aware that the current federal administration has targeted those who support transgender care or oppose the administration's priorities.

10. I have read the proposed class definition in the complaint. I am willing to act on and be named on behalf of Nicole Noe as a class representative, and act on behalf of other persons in the class similarly situated to Nicole Noe. If appointed, I will look out for the interests of all class members. I am not aware of any conflict I may have with any proposed class members.

11. My child received gender-affirming medical care at NYU Langone Hospital within the time range between January 1, 2020 and May 5, 2026. That care included puberty blocking medications as well as estrogen to treat gender dysphoria.

12. In May, I received a message from NYU Langone indicating to me that the hospital had received a grand jury subpoena from the U.S. Attorneys' Office in the Northern District of Texas and that Nicole's private medical information was subject to being disclosed.

13. I do not consent to any such disclosure.

14. Throughout the period that Nicole has been obtaining medical care at NYU, she has had to undergo many tests and assessments, including a full neurocognitive exam as part of the process of assessing her to initiate medical treatment. She has also had to undergo blood tests, and we have shared a great deal of her personal and sensitive medical information with her medical providers at NYU. All of this information was given to NYU on the understanding it would be kept confidential. Now, I am horrified at the possibility of this information being disclosed by the hospital.

15. We trust Nicole's medical providers with her care, and that trust allowed us to feel comfortable having open conversations with them about her and her care. But now, my trust in our ability as a family to have frank and open conversations with Nicole's doctors, without having to worry whether that information will be turned over or made public, is shaken.

16. I feel our privacy rights are being violated. If our private medical information is turned over, I am worried that it might end up being made public or revealed in some way, and I worry about vigilantism or harassment from those who oppose families like mine.

17. I also worry that the true goal of actions like the subpoena, seeking the information of families like mine, is to make families apprehensive about seeking out care or moving forward with treatment for fear of being targeted or having their private information turned over.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on: May 30 2026

By: Norman Noe
Norman Noe

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARTER COE, by and through his parent and next friend, CAROLINE COE; et al., *on behalf of themselves and all similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; et al.,<br><br>*Defendants*. | Case No. 1:26-cv-04641-JAV |

**DECLARATION OF KARL KOE**

I, Karl Koe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Karl Koe.

2. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and will testify competently to those facts if called as a witness.

3. I am a Plaintiff in this action.

4. I offer this Declaration in support of Plaintiffs' Motions to Proceed Under a Pseudonym, for a Temporary Restraining Order, and for Class Certification.

5. I am transgender. I live in New York, New York.

6. Karl Koe is a pseudonym.

7. I am submitting this declaration under a pseudonym because I fear that disclosure of my identity would subject me to a substantial risk of harm, including harassment, violence, and retaliation.

8. I am aware that transgender people are subject to inordinate and disproportionate amounts of violence, harassment, and discrimination. I am also aware of targeted violence as a direct response to the provision of gender-affirming medical care to minors. Accordingly, I am concerned that making my identity public would endanger our safety and subject my family and I to violence and harassment.

9. In addition, I am concerned that public identification could expose me to retaliation by the current administration. Based on media reports, I am aware that the current federal administration has targeted those who support transgender care or oppose the administration's priorities.

10. I have read the proposed class definition in the complaint. I am willing to act on behalf of other persons in the class similarly situated to me. If appointed, I will look out for the interests of all class members. I am not aware of any conflict I may have with any proposed class members.

11. I obtained gender-affirming chest masculinization surgery through NYU Langone Hospital, within the time range between January 1, 2020 and May 5, 2026. I also received testosterone to treat gender dysphoria, also within that time range, through Mount Sinai Health System.

12. In the process of obtaining that care, I had to divulge a significant amount of private, sensitive medical information, including by providing a letter of support from a mental health professional, which contained significant discussion of my medical history and other deeply private details. I knew these discussions were necessary as part of the process of assessing me and ensuring my readiness to obtain the care. I never thought that this private information might be revealed to the government.

13. I am aware that, in May, NYU Langone received a criminal subpoena from the U.S. District Court for the Northern District of Texas, and that some of the records related to the care that I received at NYU Langone appear to be within the scope of some of the subpoena's requests and is subject to disclosure.

14. I do not consent to any such disclosure.

15. The prospect of the government accessing this information worries me deeply. With escalating threats to gender-affirming medical care, it is hard enough to obtain it—I feel that this kind of effort seems intended to intimidate patients and make it even more difficult to obtain.

16. I not only worry about the status of the private medical information that I discussed with my providers related to gender dysphoria, but also about wholly unrelated information that now feels vulnerable to being revealed or disclosed to the government.

17. Worrying about how the government will handle my records is concerning enough, but I also worry about the consequences of unrelated medical information being leaked or unintentionally revealed. I am concerned about the embarrassment or social consequences of my private information being revealed to my professional and social networks.

18. It should not be legally permissible for my private medical information to be turned over. My medical care should be between me and my providers.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on: May 30, 2026

By: Karl Koe
Karl Koe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARTER COE, by and through his parent and next friend, CAROLINE COE; et al., *on behalf of themselves and all similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE; et al.,<br><br>*Defendants*. | Case No. 1:26-cv-04641-JAV |

**DECLARATION OF JAY DOE**

I, Jay Doe, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is Jay Doe.

2. I am over 18 years old, have personal knowledge of the facts set forth in this Declaration, and will testify competently to those facts if called as a witness.

3. I am a Plaintiff in this action.

4. I offer this Declaration in support of Plaintiffs' Motions to Proceed under Pseudonym, for a Temporary Restraining Order, and for Class Certification.

5. I am transgender. While I am presently a student at a foreign university, I am a resident of Manhattan, New York.

6. Jay Doe is a pseudonym.

7. I am submitting this declaration under a pseudonym because I fear disclosure of my identity would subject me to substantial risk of harm, including harassment, violence, and retaliation.

8. I am aware that transgender people are subject to inordinate and disproportionate amounts of violence, harassment, and discrimination. I am also aware of targeted violence as a direct response to the provision of gender-affirming medical care to minors. Accordingly, I am concerned that making my identity public would endanger my safety and subject my family and I to violence and harassment.

9. In addition, I am concerned that public identification could expose me to retaliation by the current administration. Based on media reports, I am aware that the current federal administration has targeted those who support transgender care or oppose the administration's priorities

10. I have read the proposed class definition in the complaint. I am willing to be named as a class representative, and act on behalf of other persons in the class similarly situated to myself. If appointed, I will look out for the interests of all class members. I am not aware of any conflict I may have with any proposed class members.

11. I received gender-affirming medical care at NYU Langone Hospital within the time range between January 1, 2020 and May 5, 2026. That care included birth control medication for menstrual suppression to treat gender dysphoria.

12. Over the course of several years, I received general pediatric care from a provider at NYU's gender clinic with the knowledge that I am transgender. When I first started receiving gender-affirming care at NYU, I underwent a slow and deliberate process of consultation with my doctor. I came to trust my provider a great deal and asked them many questions about gender affirming care. Through those conversations, we developed a treatment plan for my gender dysphoria.

13. This process involved extensive discussion of confidential medical information to my provider, all of which was done with the understanding that my information would be kept private. I trusted my provider with all aspects of my health information and to keep that information confidential.

14. The information I disclosed includes sensitive details about my physical health, mental health, and living circumstances. Some of the information has to do with my gender dysphoria, and other information is not related at all. I shared information about my family history, health conditions, and mental health status because I thought it was necessary to obtain medical care.

15. The records that are accessible on my patient portal include information about my past medical history and diagnoses, my family history, risk factors, test results, all the medications I took, and changes in my health and medications over the course of many years. My records refer to my gender dysphoria diagnosis, although many records are completely unrelated.

16. I never questioned whether I needed to be concerned about my medical information being kept in confidence.

17. In May, I received a message from NYU informing me that they had received a grand jury subpoena from the U.S. Attorneys' Office in the Northern District of Texas and that my private medical information was subject to being disclosed. My birth control medication for menstrual suppression was obtained within the time range of the subpoena.

18. I do not consent to any such disclosure.

19. I am extremely concerned about the possibility of this information being made available to the government. My personal medical records are nobody's business unless I tell them.

I do not trust this government with my medical information. It feels so invasive that the federal government is seeking my entire medical record without any justification.

20. The subpoena heightens my fear of being targeted for my gender identity and has limited my travel. I have traveled through Texas in the past for my career development and was considering traveling there for another career opportunity. However, I am terrified that the state issued a subpoena on behalf of the federal government, so I will not travel there for the time being even though it is important for my career plans.

21. The prospect of my records being released to the federal government also heightens my anxiety and makes me feel less safe.

22. The information that the government requested contains my entire medical history, including sensitive mental health assessments from when I was a child, and all of my past medical conditions completely unrelated to gender dysphoria. I have a right to privacy in my medical record and fear disclosure of so much personal and sensitive information.

23. Without judicial intervention, my private medical information is at risk of being revealed.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on: May 31, 2026

By: ______________________

Jay Doe

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CARTER COE, by and through his parent and next friend, CAROLINE COE; et al., *on behalf of themselves and all similarly situated*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF JUSTICE; et al.,

*Defendants*.

Case No. 1:26-cv-04641-JAV

**DECLARATION OF KAREN L. LOEWY**

I, Karen L. Loewy, hereby declare and state as follows:

1. I am Senior Counsel at Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal") and am one of the attorneys for the Plaintiffs in this action.

2. I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order.

3. The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

4. Filed as **Exhibit A** (Dkt. 1-1) to the Complaint (Dkt. 1) is a true and accurate copy of the grand jury subpoena received by NYU Langone Hospitals on May 7, 2026 and issued in the Northern District of Texas, with a return of compliance date of June 10, 2026. A copy of the subpoena was publicly posted by NYU Langone on May 11, 2026 on NYU Langone's website at https://nyulangone.org/public-notices/TYHPsubpoena.

5. Filed as **Exhibit B** (Dkt. 1-2) to the Complaint (Dkt. 1) is a true and accurate copy of the public notice posted by NYU Langone on May 11, 2026 on its website (https://nyulangone.org/public-notices/TYHPsubpoena) in relation to its receipt of the grand jury subpoena.

6. Filed as **Exhibit C** (Dkt. 1-3) to the Complaint (Dkt. 1) is a true and accurate copy of a memorandum issued by Attorney General Pamela Bondi to select component heads at the U.S. Department of Justice on April 22, 2025, with the subject title "Preventing the Mutilation of American Children."

7. Filed as **Exhibit D** (Dkt. 1-4) to the Complaint (Dkt. 1) is a true and accurate copy of a memorandum issued by Assistant Attorney General Brett A. Shumate to all employees in the Civil Division of the U.S. Department of Justice on June 11, 2025, with the subject title "Civil Division Enforcement Priorities."

8. Attached hereto as **Exhibit E** is a true and correct copy of Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8650, issued by President Trump on January 20, 2025.

9. Attached hereto as **Exhibit F** is a true and correct copy of Executive Order 14187, *Protecting Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, issued by President Trump on January 28, 2025.

10. Attached hereto as **Exhibit G** is a true and correct copy of civil subpoena no. 25-1431-032 sent to Rhode Island Hospital by the U.S. Department to Justice under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486), on July 3, 2025, which was filed as Exhibit 2 to the Emergency Motion to Quash filed by the Child Advocate for the State of Rhode Island on May 4, 2026 in *In Re:*

*Administrative Subpoena 25-1431-32 to RI Hospital*, No. 1:26-mc-00007, in the U.S. District Court for the District of Rhode Island.

11. Attached hereto as **Exhibit H** is a true and correct copy of excerpts of the transcript of the May 12, 2026 hearing before the U.S. District Court for the District of Rhode Island in relation in *In Re: Administrative Subpoena 25-1431-32 to RI Hospital*, No. 1:26-mc-00007.

12. Attached hereto as **Exhibit I** is a true and correct copy of the press release, titled *Attorney General Paxton Makes History by Securing a Landmark Healthcare Fraud Settlement that Creates the Nation's First-Ever Detransition Clinic and Secures $10 Million from Texas Children's Hospital for "Transitioning" Kids*, issued by the Office of the Texas Attorney General on May 15, 2026, and which is publicly on the website of the Office of the Texas Attorney General at https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-makes-history-securing-landmark-healthcare-fraud-settlement-creates-nations.

13. Attached hereto as **Exhibit J** is a true and correct copy of the press release, titled *Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic*, issued by the U.S. Department of Justice on May 15, 2026, and which is publicly available on DOJ's website at https://www.justice.gov/opa/pr/justice-department-secures-landmark-resolution-end-pediatric-gender-affirming-care-and.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2026

*<u>/s/ Karen L. Loewy</u>*
Karen L. Loewy

# Exhibit E

**Federal Register** / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents **8615**

# Presidential Documents

**Executive Order 14168 of January 20, 2025**

## Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of ''woman'' improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

**Sec. 2**. *Policy and Definitions.* It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) ''Sex'' shall refer to an individual's immutable biological classification as either male or female. ''Sex'' is not a synonym for and does not include the concept of ''gender identity.''

(b) ''Women'' or ''woman'' and ''girls'' or ''girl'' shall mean adult and juvenile human females, respectively.

(c) ''Men'' or ''man'' and ''boys'' or ''boy'' shall mean adult and juvenile human males, respectively.

(d) ''Female'' means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) ''Male'' means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) ''Gender ideology'' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.

Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) ''Gender identity'' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

**Sec. 3**. *Recognizing Women Are Biologically Distinct From Men.* (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms ''sex'', ''male'', ''female'', ''men'', ''women'', ''boys'' and ''girls'' the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term ''sex'' and not ''gender'' in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

**Sec. 4**. *Privacy in Intimate Spaces.* (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled ''Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs'' of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

**Sec. 5**. *Protecting Rights.* The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

**Sec. 6**. *Bill Text.* Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

**Sec. 7**. *Agency Implementation and Reporting.* (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) ''The White House Toolkit on Transgender Equality'';

(ii) the Department of Education's guidance documents including:

(A) ''2024 Title IX Regulations: Pointers for Implementation'' (July 2024);

(B) ''U.S. Department of Education Toolkit: Creating Inclusive and Nondiscriminatory School Environments for LGBTQI+ Students'';

(C) ''U.S. Department of Education Supporting LGBTQI+ Youth and Families in School'' (June 21, 2023);

(D) ''Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela'' (June 21, 2023);

(E) ''Supporting Intersex Students: A Resource for Students, Families, and Educators'' (October 2021);

(F) ''Supporting Transgender Youth in School'' (June 2021);

(G) ''Letter to Educators on Title IX's 49th Anniversary'' (June 23, 2021);

(H) ''Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families'' (June 2021);

(I) ''Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County'' (June 22, 2021);

(J) ''Education in a Pandemic: The Disparate Impacts of COVID–19 on America's Students'' (June 9, 2021); and

(K) ''Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS'' (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled ''Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972''; and

(iv) the Equal Employment Opportunity Commission's ''Enforcement Guidance on Harassment in the Workplace'' (April 29, 2024).

**Sec. 8**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02090
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

# Exhibit F

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



**Federal Register** / Vol. 90, No. 21 / Monday, February 3, 2025 / Presidential Documents **8771**

## Presidential Documents

**Executive Order 14187 of January 28, 2025**

### Protecting Children From Chemical and Surgical Mutilation

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Policy and Purpose.* Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end.

Countless children soon regret that they have been mutilated and begin to grasp the horrifying tragedy that they will never be able to conceive children of their own or nurture their children through breastfeeding. Moreover, these vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization.

Accordingly, it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called ''transition'' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures.

**Sec. 2**. *Definitions.* For the purposes of this order:

(a) The term ''child'' or ''children'' means an individual or individuals under 19 years of age.

(b) The term ''pediatric'' means relating to the medical care of a child.

(c) The phrase ''chemical and surgical mutilation'' means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as ''gender affirming care.''

**Sec. 3**. *Ending Reliance on Junk Science.* (a) The blatant harm done to children by chemical and surgical mutilation cloaks itself in medical necessity, spurred by guidance from the World Professional Association for Transgender Health (WPATH), which lacks scientific integrity. In light of the scientific concerns with the WPATH guidance:

(i) agencies shall rescind or amend all policies that rely on WPATH guidance, including WPATH's ''Standards of Care Version 8''; and

(ii) within 90 days of the date of this order, the Secretary of Health and Human Services (HHS) shall publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion.

(b) The Secretary of HHS, as appropriate and consistent with applicable law, shall use all available methods to increase the quality of data to guide practices for improving the health of minors with gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion, or who otherwise seek chemical or surgical mutilation.

**Sec. 4**. *Defunding Chemical and Surgical Mutilation.* The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children.

**Sec. 5**. *Additional Directives to the Secretary of HHS.* (a) The Secretary of HHS shall, consistent with applicable law, take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve the following laws, programs, issues, or documents:

(i) Medicare or Medicaid conditions of participation or conditions for coverage;

(ii) clinical-abuse or inappropriate-use assessments relevant to State Medicaid programs;

(iii) mandatory drug use reviews;

(iv) section 1557 of the Patient Protection and Affordable Care Act;

(v) quality, safety, and oversight memoranda;

(vi) essential health benefits requirements; and

(vii) the Eleventh Revision of the International Classification of Diseases and other federally funded manuals, including the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

(b) The Secretary of HHS shall promptly withdraw HHS's March 2, 2022, guidance document titled ''HHS Notice and Guidance on Gender Affirming Care, Civil Rights and Patient Privacy'' and, in consultation with the Attorney General, issue new guidance protecting whistleblowers who take action related to ensuring compliance with this order.

**Sec. 6**. *TRICARE.* The Department of Defense provides health insurance, through TRICARE, to nearly 2 million individuals under the age of 18. As appropriate and consistent with applicable law, the Secretary of Defense shall commence a rulemaking or sub-regulatory action to exclude chemical and surgical mutilation of children from TRICARE coverage and amend the TRICARE provider handbook to exclude chemical and surgical mutilation of children.

**Sec. 7**. *Requirements for Insurance Carriers.* The Director of the Office of Personnel Management, as appropriate and consistent with applicable law, shall:

(a) include provisions in the Federal Employee Health Benefits (FEHB) and Postal Service Health Benefits (PSHB) programs call letter for the 2026 Plan Year specifying that eligible carriers, including the Foreign Service Benefit Plan, will exclude coverage for pediatric transgender surgeries or hormone treatments; and

(b) negotiate to obtain appropriate corresponding reductions in FEHB and PSHB premiums.

**Sec. 8**. *Directives to the Department of Justice.* The Attorney General shall:

(a) review Department of Justice enforcement of section 116 of title 18, United States Code, and prioritize enforcement of protections against female genital mutilation;

(b) convene States' Attorneys General and other law enforcement officers to coordinate the enforcement of laws against female genital mutilation across all American States and Territories;

(c) prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation;

(d) in consultation with the Congress, work to draft, propose, and promote legislation to enact a private right of action for children and the parents of children whose healthy body parts have been damaged by medical professionals practicing chemical and surgical mutilation, which should include a lengthy statute of limitations; and

(e) prioritize investigations and take appropriate action to end child-abusive practices by so-called sanctuary States that facilitate stripping custody from parents who support the healthy development of their own children, including by considering the application of the Parental Kidnaping Prevention Act and recognized constitutional rights.

**Sec. 9**. *Enforcing Adequate Progress.* Within 60 days of the date of this order, the heads of agencies with responsibilities under this order shall submit a single, combined report to the Assistant to the President for Domestic Policy, detailing progress in implementing this order and a timeline for future action. The Assistant to the President for Domestic Policy shall regularly convene the heads of agencies with responsibilities under this order (or their designees) to coordinate and prepare for this submission.

**Sec. 10**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid, the remainder of this order and the application of any of its other provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 11**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 28, 2025.*

[FR Doc. 2025–02194
Filed 1–31–25; 8:45 am]
Billing code 3395–F4–P

# Exhibit G

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

## SUBPOENA DUCES TECUM

No. 25-1431-032

**To:** Rhode Island Hospital
593 Eddy Street
Providence, Rhode Island 02903

***YOU ARE HEREBY COMMANDED TO APPEAR BEFORE** Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:*

Please see Attachment A

***which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).***

***Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.***

**PLACE AND TIME FOR APPEARANCE:**

United States Department of Justice, Consumer Protection Branch, 450 Fifth Street NW, Washington, DC on Thursday, the 7th day of August, 2025, at ten o'clock a.m.

---

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

---

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486)

*IN TESTIMONY WHEREOF*

Brett A. Shumate, Assistant Attorney General, the undersigned official of the United States Department of Justice, has set his hand this 3rd day of July, 2025.

______________________________
*(signature)*

Case 1:26-mc-00641-EW Document 11-5 Filed 06/04/26 Page 3 of 28

## *RETURN OF SERVICE*

***I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of:***

***1. Personal delivery to an individual, to wit:***

______________________________
*(name)*

______________________________
*(title)*

______________________________
*(address)*

***2. Personal delivery to an address, to wit:***

______________________________
*(description of premises)*

______________________________

______________________________
*(address)*

______________________________

***3. Registered or certified mailing to:***

______________________________
*(name)*

______________________________

______________________________
*(address)*

*At ______ a.m. | p.m. on*

______________________________
*(date)*

______________________________
*(signature)*

______________________________
*(title)*

**UNITED STATES OF AMERICA**
**DEPARTMENT OF JUSTICE**

# SUBPOENA DUCES TECUM

*Upon contumacy or refusal to obey, this subpoena shall be enforced by order of the appropriate United States District Court.*

## ATTACHMENT A TO SUBPOENA TO:

RHODE ISLAND HOSPITAL
593 EDDY STREET
PROVIDENCE, RHODE ISLAND 02903

### I. DEFINITIONS

1. "You," "Your Company," and "the Company," means:

   a. Rhode Island Hospital, a Rhode Island nonprofit corporation, whose principal place of business is located at 593 Eddy Street, Providence, Rhode Island, without regard to any name under which it has done business;

   b. All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including but not limited to Hasbro Children's Hospital Gender and Sexual Health Program; and

   c. Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2. "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3. "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

   a. All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

   b. Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books,

Case 1:26-mc-00097-NAM Document 15-3 Filed 05/06/26 Page 5 of 28

articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c. Electronically stored data on magnetic or optical storage media as an “active” file or files (readily readable by one or more computer applications or forensics software), including metadata;

d. Any electronic files saved as a backup, including metadata;

e. Any deleted but recoverable electronic files, including metadata;

f. Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g. Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h. All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4. “Relevant Time Period” means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5. “Or” as well as “and” shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6. “Any” shall be construed to include the word “all” and the term “all” shall be construed to include the word “any.”

7. “Relate to” means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

8. “Communication” means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual

meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9. "Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10. "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11. "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12. "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1. You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

   a. If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

   b. If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

2. **<u>No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible</u>.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3. Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

   a. Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

   b. The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

   c. The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4. The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5. If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6. The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7. All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

8. If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

   a. The name and title of the author (and if different, the preparer and signatory);

b. The name(s) and title(s) of the individual(s) to whom the document was addressed;

c. The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

d. The date of the document;

e. The number of pages;

f. A brief description of the subject matter;

g. A statement of the specific basis on which privilege is claimed; and

h. The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1. Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2. All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3. All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

4. All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5. All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6. Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7. All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8. All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9. All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11. Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12. For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.,* uses not approved by the United States Food and Drug Administration) and potential risks.

14. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the “Production Specifications,” attached as ATTACHMENT B to this Subpoena.

Case 1:26-mc-00045-JAW Document 15-23 Filed 06/02/26 Page 10 of 27 PageID

## SUBPOENA ATTACHMENT B

**Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")**

---

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

### 1. Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

### 2. Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto. The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties. No alteration shall be made to file names or extensions for responsive native electronic files. If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction.. Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

a. **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

b. When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

i. All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)

ii. All TIFF image files shall be stored with the ".tif" extension.

iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

   1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

v. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | *¶ or Code 020* |
| *Text Qualifier* | *þ or Code 254* |
| *Newline* | *® or Code 174* |
| *Multi-value* | *; or Code 059* |
| *Nested values* | *\ or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

   þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:

*CaseName***LoadFiles**
*CaseName***Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
*CaseName***Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
*CaseName***Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

*CaseName***Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)
*CaseName***Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3. Required Metadata/Database Fields

A "✓" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other. If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.: e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

Case 1:26-cv-04541-AEM Document 15-3 Filed 05/04/26 Page 178 of 228



| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4. Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

b. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

d. All files should be globally de-duplicated with the following conditions:

i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.
ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.
iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.
iv. No customization of hashing may occur without prior express approval by the Government.
v. De-duplication must be done by document family, not by individual document.
vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

**5. Hidden Text**

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

**6. Embedded Files and File Links**

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

### 7. Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8. Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

a. The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.
b. If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9. Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

a. Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
b. The first document in the collection represents the parent document and all other documents will represent the children.
c. All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
d. All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10. Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below.

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

**11. Production of E-mail Repositories**

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

**12. Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items**

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

**13. Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies**

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participa nts | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timesta mp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication ; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

**14. Production of Social Media**

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

**15. Production of Structured Data**

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

**16. Production of Photographs with Native File or Digitized ESI**

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

**17. Production of Images from which Text Cannot be OCR Converted**

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

**18. Production of Translated Text with Non-English Language ESI or Documents**

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format. The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

**19. Production of Audio File Transcripts**

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production. The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#. The parties shall meet and confer regarding any required audio file redactions.

**20. Production of ESI from Non-PC or Non-Windows-based Systems**

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

**21. Production of Native Files (When Applicable Pursuant to These Specifications)**

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

a. AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
b. GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

c. Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

**22. Bates Number Convention**

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

| | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

**23. Media Formats for Storage and Delivery of Production Data**

Electronic documents and data shall be delivered on any of the following media:

a. CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
b. External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
c. Government approved File Transfer Protocol (FTP) technologies.
d. Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
e. Media should be labeled with the case name, production date, Bates range, and producing party.

**24. Virus Protection and Security for Delivery of Production Data**

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

**25. Privilege Logs**

a. The name and title of the author (and if different, the preparer and signatory);
b. The name(s) and title(s) of the individual(s) to whom the document was addressed;
c. The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
d. The date of the document;
e. The number of pages;
f. A brief description of the subject matter;
g. A statement of the specific basis on which privilege is claimed; and
h. The paragraph or subparagraph of the Subpoena to which it is responsive.

**26. Compliance and Adherence to Generally Accepted Technical Standards**

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

**27. Read Me Text File**

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

**28. Exception Report**

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

**29. Transmittal Letter to Accompany Deliverables**

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * 26-MC-07-MSM
In Re: Administrative Subpoena *
25-1431-032 to Rhode Island * MAY 12, 2026
Hospital *
* Courtroom 1
* PROVIDENCE, RI
* * * * * * * * * * * * * * * *

BEFORE THE HONORABLE MARY S. McELROY

DISTRICT JUDGE

(Motion to Quash)

**APPEARANCES:**

FOR THE PETITIONERS:
Child Advocate for the State of Rhode Island — KEVIN LOVE HUBBARD, ESQ.
DeLuca, Weizenbaum, Barry & Revens
199 North Main Street
Providence, RI 02903

Rhode Island Hospital — ERIC G. OLSHAN, ESQ.
McGuireWoods LLP
260 Forbes Ave. Ste 1800
Pittsburgh, PA 15222-3142

FOR THE RESPONDENT:
United States of America — BRANTLEY T. MAYERS
JORDAN C. CAMPBELL
DOJ-Civ
950 Pennsylvania Avenue NW
Washington, D.C. 20503

Court Reporter: — Denise P. Veitch, RPR
One Exchange Terrace
Providence, RI 02903

12 MAY 2026 -- 2:00 P.M.

THE COURT: Good afternoon. Thank you for accommodating us with the change of court.

(Discussion off the record)

THE COURT: We are on the record in a miscellaneous petition and we've moved courtrooms because we seem to have a lot of *amici* and other interested parties. The case number for us is 26-MC-007, and it's an In Re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital.

So will counsel identify themselves for the record.

MR. LOVE HUBBARD: Good afternoon, your Honor. Kevin Love Hubbard on behalf of the Child Advocate for the State of Rhode Island.

MS. ROMERO: Good afternoon. Amy Romero for the Office of the Child Advocate for the State of Rhode Island.

MS. LABINGER: Lynette Labinger for the Office of Child Advocate.

MS. NAKASIAN: Good afternoon, your Honor. Stacey Nakasian on behalf of Rhode Island Hospital.

MR. OLSHAN: Good afternoon, your Honor. Eric Olshan on behalf of Rhode Island Hospital.

THE COURT: Okay.

MR. MAYERS: Good afternoon, your Honor. Brantley Mayers as counsel to the Assistant Attorney General Subdivision.

THE COURT: Okay.

MR. CAMPBELL: Good afternoon, your Honor. Jordan Campbell on behalf of the Government.

THE COURT: Okay. Now, I spoke to -- let me back up. This was begun by the Child Advocate's motion to quash the administrative subpoena that the Department of Justice issued to Rhode Island Hospital. The Department of Justice responded, and Rhode Island Hospital moved to intervene here. So they filed their papers on the weekend, I think Saturday, the motion to intervene and the brief that went along with it.

So the options today are to argue both petitions or stay the compliance with the subpoena unless and until Rhode Island Hospital has an opportunity to -- I'm sorry, the Department of Justice has an opportunity to respond to Rhode Island Hospital's motions and then have another hearing, or, decide it on the papers. So I think I'll go with the Government selection. We can't -- the compliance with the subpoena needs to be stayed in order to give you more time, if you seek the time. Are you seeking more time?

MR. MAYERS: No, your Honor. We're fine to

Seattle Children's, QueerDoc, Colorado Children's, that was all under -- pardon me?

THE COURT: Los Angeles, maybe?

MR. OLSHAN: I believe the Los Angeles action, CHLA, was pursued by patients.

THE COURT: Correct. Okay.

MR. OLSHAN: But my point is this is happening in parallel and so as we're negotiating and deciding next steps, again reacting to the conduct of the Government. Again, they have not brought up the most sensitive category, and as the Court knows from our briefing, the Government voluntarily agreed to limitations from at least three subpoenaed entities.

THE COURT: And there's nothing in the record that indicates that they gave that information to the Texas judge. In fact, there's an argument that there was a misrepresentation to the Texas judge; isn't that correct?

MR. OLSHAN: I am not aware of anything in the record in the Northern District of Texas that indicates they told that court that they had agreed to limitations as to deidentified records, no, your Honor.

THE COURT: Okay. And I think they're saying the deidentified records in their response in Texas they say, and actually Lisa Hsiao says in her

because you didn't tell the Texas court about the anonymized data that you agreed to there, or other places. So that's another falsehood or arguably leading filing in Texas.

MR. MAYERS: I disagree, your Honor, but --

THE COURT: Based on what?

MR. MAYERS: Your Honor pointed to a provision of the Hsiao Declaration that says the patient records, generally the patient records, --

THE COURT: Uh'huh.

MR. MAYERS: -- are important or essential to the investigation.

THE COURT: So you're saying that anonymized data is fine; you don't need the actual identifiable data. Is that what you're saying?

MR. MAYERS: Your Honor, it has been our practice to the extent that I'm aware of offering anonymized data request or an anonymized data production to recipients.

THE COURT: When did you offer that to Rhode Island Hospital?

MR. MAYERS: I was informed that we -- to the best of my recollection I was informed that we had, but I can't confirm that or confirm the date of that.

THE COURT: Can you confirm who would have made

that offer?

MR. MAYERS: Who would have made that offer would be a member of I believe either the Enforcement and Affirmative Litigation Branch or a member of our team in Northern District of Texas.

THE COURT: Okay.

MR. MAYERS: I believe the offer in this case, if one was made, and I can't confirm that without double-checking would be --

THE COURT: Can you double-check with co-counsel? I think he's running this case generally; right?

(Counsel confer)

MR. MAYERS: Your Honor, it would have been David Gunn, --

THE COURT: When?

MR. MAYERS: -- who was the trial attorney in the case. He's in Washington, D.C.

And to be clear, if Rhode Island Hospital were to come to us and say would you be willing to go and asked the court for, you know, anonymized records, that would be fine with us.

THE COURT: But you -- oh, so you'll do that now?

MR. MAYERS: Yes, your Honor, we would still

take -- if they agree to produce anonymized records, patient records, we would take those.

THE COURT: And that wouldn't be a violation of the Texas judge's order?

MR. MAYERS: We would go to Judge O'Connor and say the parties have discussed in the light of your Honor's order and we would take anonymized.

THE COURT: But when I asked you before if you could agree to an extension of that judge's order you said no because it was court order; didn't you?

MR. MAYERS: Your Honor, I believe we said that we could not guarantee how Judge O'Connor would rule on such order and that we were not in a place to request such an order at this time.

THE COURT: But then you can't make that representation to Rhode Island Hospital of whether anonymized data would work.

MR. MAYERS: We could make the representation that we would agree to go to the court and say that we have discussed and that pursuant to our approach in the other investigations we would accept anonymized patient data.

THE COURT: I'm going to ask counsel for Rhode Island Hospital to address when and if that was stated, and I'm going to ask for an affidavit from Mr. Gunn by

speaks to the relevancy of the request. And also I've outlined to your Honor two theories, one being that Rhode Island Hospital possesses, could possess evidence relevant to potential misconduct by pharmaceutical companies and (2) Rhode Island Hospital could have engaged in a conspiracy with said pharmaceutical companies.

THE COURT: Right.

MR. MAYERS: So we think that each subpoena requests --

THE COURT: Well, that doesn't get you to 11 through 15, but we'll address that later.

MR. MAYERS: I'm happy to address it --

THE COURT: How do you get to 11 through 15?

MR. MAYERS: Well, your Honor, you know, as we've discussed --

THE COURT: And why can't it be deidentified, as I think HSS requires under the CFR HSS rules say that in order to get that information or give that information, Rhode Island Hospital's responsible for deidentifying that data and you're responsible for saying why it can't be deidentified.

MR. MAYERS: So if Rhode Island Hospital takes the position that they will produce deidentified patient information to the extent it is possible for us

to carry out our investigation, we would accept those records

THE COURT: And did you tell the Texas judge that?

MR. MAYERS: We didn't tell the Texas judge one way or the other.

THE COURT: And did you tell the Texas judge essentially that you needed the information, without disclosing to the Texas judge that you had agreed to deidentified information in several other places?

MR. MAYERS: We told the Texas judge that patient records, and again I can quote from -- I want to be sure I'm precise here.

(Judge confers with Clerk)

MR. MAYERS: So we said, your Honor, just referring to patient records generally.

THE COURT: Where is this?

MR. MAYERS: This is, I believe your Honor quoted earlier in paragraph 44 of the initial Hsiao Declaration.

THE COURT: Okay.

MR. MAYERS: So we say, patient records: Generally without this information we cannot fully determine the scope of violations, identify patterns, or assess whether conduct was taken with intent to

and let madam court reporter...

THE COURT: Yes, we have some replies too from the other side, and I have questions for you too.

MR. MAYERS: Yes, so your Honor, I would be happy to answer those questions now.

THE COURT: Okay. Let me make sure I have them. I think you already answered who or what entities can be held liable for misbranding; is that correct?

MR. MAYERS: Yes, I have.

THE COURT: And you don't need -- we're agreed you don't need patient's name, Social Security number, home address to investigate billing fraud or off-label promotion or misbranding; correct?

MR. MAYERS: We think that that information would assist in our investigation.

THE COURT: I'm asking if you need it.

MR. MAYERS: Again, it would assist. Is it absolute every circumstance? As we've discussed we have accepted anonymized data in other cases, in other interactions requested of other subpoena recipients, so we would say that we're willing to accept that, we have been so far; that it is not -- that the information you read off is not necessarily irrelevant to our investigation.

THE COURT: But you agreed to not -- to forego

# Exhibit I

**May 15, 2026 | Press Release**

# Attorney General Paxton Makes History by Securing a Landmark Healthcare Fraud Settlement that Creates the Nation's First-Ever Detransition Clinic and Secures $10 Million from Texas Children's Hospital for "Transitioning" Kids

Attorney General Ken Paxton secured a historic settlement with Texas Children's Hospital ("Texas Children's") that compels the creation of the country's first-ever Detransition Clinic; requires the hospital to pay $10 million for billing Texas Medicaid for

unallowable and illegal 'gender-transition' interventions, including by using false diagnosis codes; and compels the termination and revocation of privileges of multiple physicians.

After a years-long investigation by the Healthcare Program Enforcement Division, Attorney General Paxton has negotiated a historic settlement that will help protect Texans. Under the terms of this landmark agreement, Texas Children's will establish the first-ever multidisciplinary clinic designed to provide medical care to patients who were subjected to "gender-transition" procedures. This Detransition Clinic will help patients reverse the damage caused by ideologically-motivated physicians who harmed patients by performing dangerous medical interventions for the purpose of "transitioning" them. For the first five years, all services provided through the Detransition Clinic will be funded by Texas Children's and be free of charge to patients.

As part of the settlement, Texas Children's has also agreed to fire, permanently and irrevocably terminate all existing privileges, and never again hire or credential five woke doctors who performed harmful medical interventions on Texans. As part of the settlement, Texas Children's agrees not to provide "gender-transition" services; will implement a host of compliance and ethics measures; and the hospital will amend its bylaws to trigger automatic relinquishment of privileges for any physician who violates Texas's prohibition on medical interventions to "transition" kids. Attorney General Paxton secured this historic settlement in coordination with President Trump's Department of Justice.

"Today is a monumental day in the fight to stop the radical transgender movement. This historic settlement reflects an institutional and fundamental cultural shift away from radical 'gender' ideology. In addition to helping establish the first-ever Detransition Clinic and securing millions, this settlement will ensure that the deranged child mutilators who hurt our kids are fired and held accountable," said Attorney General Paxton. "I applaud Texas Children's Hospital for changing course and

committing to being a part of the solution by agreeing to form a first-of-its kind Detransition Clinic that will help provide free care to those who have been victimized by twisted, morally bankrupt transgender ideology. Under my watch, I will investigate and bring the full force of the law against any Texas hospital that abuses children with harmful medical interventions to 'transition' kids."

Back to Top

# Exhibit J

**Office of Public Affairs**
U.S. Department of Justice

PRESS RELEASE

# Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic

Friday, May 15, 2026

**For Immediate Release**

Office of Public Affairs

## Texas Children's Hospital agrees to pay millions and establish first-ever detransition clinic to provide care for victims

WASHINGTON – Today, the Department of Justice announced the first resolution secured under the Department's ongoing national investigation into violations of federal law in connection with the provision of sex-rejecting procedures on minors (often euphemistically called "gender-affirming care"). Texas Children's Hospital (TCH) has entered into agreements with the Department and the Texas Attorney General that include commitments to not perform such procedures on children, which include the administration of puberty blockers and cross-sex hormones. TCH has also agreed to collectively pay over $10 million in damages and civil penalties and to dedicate millions to the provision of medical care to children harmed by the provision of such procedures (*i.e.*, "detransitioners").

"The Justice Department will use every weapon at its disposal to end the destructive and discredited practice of so-called 'gender-affirming care' for children," said Acting Attorney

General Todd Blanche. "Today's resolution protects vulnerable children, holds providers accountable, and ensures those harmed receive the care they need."

Under the terms of the agreements, which the Department of Justice reached in coordination with Texas Attorney General Ken Paxton, TCH will pay $10 million to resolve allegations that it submitted false billings to public and private payors to secure insurance coverage for pediatric sex-rejecting procedures. The Department alleges this conduct violated the Federal Food, Drug, and Cosmetic Act, the False Claims Act, and federal fraud and conspiracy laws. Critically, in addition to terminating these services, TCH has committed to establishing the first-of-its-kind clinic dedicated to restorative care for detransitioners.

In connection with the settlements, the United States acknowledged that TCH took significant steps entitling it to credit for cooperation with the Department in its investigation. At all times during the investigation, TCH remained cooperative, proactive, and solution-driven, as highlighted by its multi-million-dollar commitment to providing care to the victims who most need it.

"The Department of Justice is committed to protecting America's children," said Associate Attorney General Stanley Woodward. "Today's resolution furthers that commitment and puts providers of so-called 'gender affirming care' on notice that this Department will vigorously enforce federal law where children are put at risk."

"I am grateful that Texas Children's wants to be part of the solution and no longer the problem," said Brett A. Shumate, Assistant Attorney General for the Civil Division. "Its commitment to providing detransitioner care is emblematic of just that. While the Department is satisfied with the resolution announced today, our division will continue to work tirelessly to protect America's children and hold accountable pharmaceutical companies and medical providers who have taken advantage of vulnerable children under the guise of 'care.'"

These matters and the investigations into sex-rejecting procedures on minors are being led by the Justice Department's Civil Division Enforcement and Affirmative Litigation Branch and Commercial Litigation Branch, Fraud Section.

*The claims resolved by the United States in the settlements are allegations only and there has been no determination of liability. Both entities have denied all allegations.*

*Updated May 15, 2026*

---

**Components**

Office of the Attorney General | Civil Division | Office of the Associate Attorney General

Press Release Number: 26-506

# Related Content

PRESS RELEASE

### New Jersey Rioter at Delaney Hall Charged for Kicking and Biting ICE Officers

A New Jersey man was arrested yesterday and charged with assaulting federal officers and causing bodily injury.

May 29, 2026

PRESS RELEASE

### Justice Department Office of Legal Counsel Concludes Immigrant Welfare Eligibility Rules Apply to FCC Lifeline Program

WASHINGTON – Today, the Department of Justice released an opinion for the Federal Communications Commission (FCC) which addresses the relationship between the Personal Responsibility and Work Opportunity Reconciliation Act of...

May 29, 2026

PRESS RELEASE

### Justice Department Sues States for Denying Undercover License Plates to Federal Law Enforcement

On Wednesday, the Department of Justice filed lawsuits against Maine, Washington, Oregon, and Massachusetts challenging their unconstitutional policies denying confidential license plates to federal agents. This comes after each...

May 28, 2026

**Office of Public Affairs**

U.S. Department of Justice

LAMBDA LEGAL

June 4, 2026

**VIA ECF**

The Honorable Jeannette A. Vargas
United States District Court
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *Coe, et al. v. Blanche, et al.*, No. 1:26-CV-04641-JAV
**Joint Letter Motion to Extend Briefing Deadlines and Adjourn Court Conference Scheduled for June 10, 2026**

Dear Judge Vargas,

We represent Plaintiffs in the above-captioned matter. Pursuant to Local Civil Rule 7.1(e) and Rule 3.E of the Court's Individual Rules and Practices in Civil Cases, we write jointly on behalf of all the parties regarding this Court's Order of June 3, 2026. ECF 18.

Counsel for Plaintiffs, the DOJ Defendants, and the NYU Defendants have met and conferred regarding the briefing schedule for Plaintiffs' request for a temporary restraining order, ECF 8; the deadline for the production of the information and records at issue in this case, which was set for June 10 at 9:00am, *see* ECF 1, Compl. Ex. A (NYU Subpoena) at 1; and the June 10 Conference, as per the Court's June 3 Order.

In order to allow for more orderly briefing and accommodate conflicting deadlines for counsel of the various parties, the parties have met and conferred and jointly stipulate to the following:

> Recognizing that it is the government's position that it cannot confirm any details related to any possible grand jury subpoenas, *see* Fed. R. Crim. P. 6(e), the parties hereby stipulate as follows:
>
> No healthcare institution located in New York City, including NYU Langone Hospitals, shall be required to produce or disclose any material covered by the lawsuit (i.e., identifying and sensitive health information) to the U.S. Department of Justice, or any component thereof, before June 24, 2026. This includes the NYU Defendants pursuant to the Subpoena. The United States will not obtain any such documents or materials prior to June 24, 2026.
>
> In light of the foregoing, the NYU Langone defendants likewise stipulate that they will not produce any materials covered by the lawsuit to the U.S. Department of Justice, or any component thereof, prior to June 24, 2026.

Based on the above stipulation, the parties jointly request that the Court modify the current briefing and hearing schedule with regards to Plaintiffs' motion for a temporary restraining order, as follows:

| | Original Deadline | Proposed Deadline |
|---|---|---|
| Defendants' response brief to Plaintiffs' motion for TRO | June 5, 2026, by noon | June 15, 2026, by noon |
| Plaintiffs' reply brief | June 6, 2026 | June 18, 2026 |
| Joint response to the Court's June 3, 2026 Order, ECF 18 | June 9, 2026, by noon | June 18, 2026 |
| Hearing on TRO motion and Conference to address matters pursuant to June 3, 2026 Order | June 10, 2026, at 2:30pm | June 22, 2026 (and in any event prior to June 24, 2026) |

As reflected above, and in light of the above stipulation and proposal, the parties respectfully request that the Court adjourn the June 10, 2026 conference date, and propose that said conference, along with any hearing on Plaintiffs' TRO motion, occur on June 22, 2026, or on any other date prior to June 24, 2026 that is acceptable to the Court.

No previous requests for extensions or adjournment have been made by any party.

We thank the Court for considering this joint request.

Sincerely,

*<u>/s/ Omar Gonzalez-Pagan</u>*
Omar Gonzalez-Pagan
Karen L. Loewy
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org

Gabriella Larios
Robert Hodgson
Anya Weinstock
**New York Civil Liberties Union Foundation**
125 Broad Street, 19th Floor
New York, New York 10004
Telephone: 212-607-3300
rhodgson@nyclu.org
glarios@nyclu.org
aweinstock@nyclu.org

Chase B. Strangio
**American Civil Liberties Union Foundation**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
cstrangio@aclu.org

**Copied via email:**

**For DOJ Defendants:**

Jay Clayton (Jay.Clayton@usdoj.gov)
Sean Buckley (Sean.Buckley@usdoj.gov)
Jordan C. Campbell (Jordan.C.Campbell@usdoj.gov)
Scott B. Dahlquist (Scott.B.Dahlquist@usdoj.gov)
David L. Gunn (David.L.Gunn@usdoj.gov)
Brantley T. Mayers (Brantley.T.Mayers@usdoj.gov)
Ethan Womble (Ethan.Womble@usdoj.gov)
Steven R. Scott (Steven.R.Scott@usdoj.gov)
Patrick Runkle (Patrick.R.Runkle@usdoj.gov)
Ross Goldstein (Ross.Goldstein@usdoj.gov)
Sarah E. Welch (Sarah.E.Welch@usdoj.gov)

**For NYU Defendants:**

Zachary A. Cunha (zcunha@nixonpeabody.com)
Lindsay Maleson (lmaleson@nixonpeabody.com)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARTER COE, by and through his parent and next friend, CAROLINE COE; REED ROE, by and through his parent and next friend, RILEY ROE; NICOLE NOE, by and through her parent, NORMAN NOE; KARL KOE; and JAY DOE, *on behalf of themselves and all similarly situated*,

*Plaintiffs*,

-v.-

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; U.S. DEPARTMENT OF JUSTICE; NYU LANGONE HEALTH SYSTEM; NYU LANGONE HOSPITALS; and NYU GROSSMAN SCHOOL OF MEDICINE, A DIVISION OF NEW YORK UNIVERSITY,

*Defendants*.

**Case No.: 1:26-Civ.-04641-JAV**

**DECLARATION OF ZACHARY A. CUNHA**

ZACHARY A. CUNHA, an attorney duly admitted to practice before this Court, declares, under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the following statements are true and correct:

1. I am a partner at the law firm Nixon Peabody LLP, attorneys for NYU Langone Health System, NYU Grossman School of Medicine, and NYU Langone Hospitals (collectively, "NYU Langone" or "NYULH"), and, as such, I am familiar with the matters set forth herein.

2. I submit this declaration to place relevant information in the record in connection with NYULH's response to Plaintiffs' motion to Plaintiffs' Motion for a Temporary Restraining Order ("TRO") in this action (ECF No. 8).

3. On or about May 7, 2026, the United States Department of Justice ("DOJ") served NYULH with a Grand Jury Subpoena out of the Northern District of Texas, commanding NYULH

to appear and produce documents before a grand jury on June 10, 2026. (the "GJ Subpoena") A true and correct copy of the GJ Subpoena is annexed to the Complaint in this action (ECF No. 1) as Exhibit A.

4. Since receipt of the GJ Subpoena, NYULH has engaged in multiple discussions with DOJ regarding the scope and content of information sought pursuant to the GJ Subpoena. In the course of those discussions, DOJ has agreed that it would accept records containing identifiable patient information, including medical and billing records, in a redacted format, with each record to be labeled with an individual code number created by, and known only to, NYULH and its counsel in lieu of the redacted patient identifiers, subject to possible requests to "un-mask" or "un-redact" such records at a future stage of DOJ's investigation.[1]

5. Also in the course of these discussions, NYULH has negotiated a reservation of right with DOJ, under which NYULH reserves its right to oppose any requests to "un-mask" or "un-redact" the records, if made in the future, and DOJ reserves its right to press them, with both parties having the ability to seek judicial determination of the issue before the court with supervisory authority over the grand jury's investigation.

[1] As discussed in the accompanying Memorandum of Law, the GJ subpoena followed a since-withdrawn administrative subpoena issued on or about June 11, 2025 by the former Consumer Protection Branch of DOJ's Civil Division in Washington, D.C., under the authority of Section 248 of the Health Insurance Portability and Accountability Act of 1996, 18 U.S.C. § 3486, (Subpoena Duces Tecum No. 25-1431-015 to NYU Langone Hospitals (hereinafter, the "HIPAA Subpoena")). A true and correct copy of the HIPAA Subpoena is annexed hereto as Exhibit A. NYULH conferred with DOJ at least fifteen (15) times regarding the HIPAA subpoena prior to its withdrawal, and made seven (7) rolling productions in response to the HIPAA Subpoena over the course of approximately ten (10) months, none of these included patient records or other patient information.

6. As of this writing, NYULH has not produced any patient records or information to DOJ, in response to either the GJ Subpoena or otherwise, in connection with this investigation.

Dated: June 15, 2026
New York, New York

Respectfully submitted,

**NIXON PEABODY LLP**

By: _*/s/ Zachary A. Cunha*___________

Zachary A. Cunha (ZC 5946)
55 West 46th Street
New York, New York 10036
Tel.: (212) 940-3000
zcunha@nixonpeabody.com

# EXHIBIT A

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

## SUBPOENA DUCES TECUM

No. 25-1431-015

**To:** NYU Langone Hospitals
530 First Avenue, HCC-15
New York, New York 10016

***YOU ARE HEREBY COMMANDED TO APPEAR BEFORE Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:***

Please see Attachment A

***which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).***

***Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.***

**PLACE AND TIME FOR APPEARANCE:**

U.S. Department of Justice, Consumer Protection Branch, 450 Fifth St., NW, Washington, D.C.
on Wednesday, the 9th day of July, 2025, at ten o'clock a.m.

---

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

---

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486)

*IN TESTIMONY WHEREOF*

Brett A. Shumate, Assistant Attorney General, the undersigned official of the United States Department of Justice, has set his hand this 11th day June, 2025.

BRETT SHUMATE

Digitally signed by BRETT SHUMATE
Date: 2025.06.11 12:07:03 -04'00'

*(signature)*

## *RETURN OF SERVICE*

***I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of:***

1. ***Personal delivery to an individual, to wit:***

*(name)*

*(title)*

*(address)*

2. ***Personal delivery to an address, to wit:***

*(description of premises)*

*(address)*

3. ***Registered or certified mailing to:***

*(name)*

*(address)*

*At ______ a.m. | p.m. on*

*(date)*

*(signature)*

*(title)*

## UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

# SUBPOENA DUCES TECUM

***Upon contumacy or refusal to obey, this subpoena shall be enforced by order of the appropriate United States District Court.***

# ATTACHMENT A TO SUBPOENA TO:

NYU LANGONE HOSPITALS
530 FIRST AVENUE, HCC-15
NEW YORK, NEW YORK 10016

## I. DEFINITIONS

1. "You," "Your Company," "the Company," and "Hassenfeld" means:

a. NYU Langone Hospitals, a New York nonprofit corporation, whose principal place of business is located at 430 East 34th Street, New York, New York, without regard to any name under which it has done business;

b. All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, the Transgender Youth Health Program at Hassenfeld Children's Hospital at NYU Langone; and

c. Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2. "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3. "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

a. All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

b. Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c. Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d. Any electronic files saved as a backup, including metadata;

e. Any deleted but recoverable electronic files, including metadata;

f. Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g. Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h. All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4. "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5. "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6. "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7. "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

8. “Communication” means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9. “Gender-related care” means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10. “Puberty blockers” means any gonadotropin-releasing hormone (“GnRH”) agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11. “Hormones” includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as “gender affirming hormone therapy” (“GAHT”) or transgender hormone therapy used to induce cross-sex characteristics.

12. “Minor” means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1. You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

   a. If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the “Custodian,” as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

   b. If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

2. **<u>No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible</u>.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3. Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

   a. Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

   b. The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

   c. The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4. The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5. If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6. The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7. All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

8. If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

a. The name and title of the author (and if different, the preparer and signatory);

b. The name(s) and title(s) of the individual(s) to whom the document was addressed;

c. The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

d. The date of the document;

e. The number of pages;

f. A brief description of the subject matter;

g. A statement of the specific basis on which privilege is claimed; and

h. The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1. Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories: (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2. All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3. All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

4. All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5. All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6. Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7. All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8. All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9. All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10. All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11. Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12. For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13. All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.,* uses not

approved by the United States Food and Drug Administration) and potential risks.

14. All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15. All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

## SUBPOENA ATTACHMENT B

### Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

---

### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

#### 1. Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

#### 2. Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto. The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties. No alteration shall be made to file names or extensions for responsive native electronic files. If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction.. Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

a. **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

b. When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

Group IV (2D Compression). When producing in *color*, paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

i. All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)
ii. All TIFF image files shall be stored with the ".tif" extension.
iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.
    1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.
iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.
v. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | *¶ or Code 020* |
| *Text Qualifier* | *þ or Code 254* |
| *Newline* | *® or Code 174* |
| *Multi-value* | *; or Code 059* |
| *Nested values* | *\ or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

   þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:

*CaseName***LoadFiles**
*CaseName***Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
*CaseName***Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
*CaseName***Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

*CaseName***Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)
*CaseName***Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3. Required Metadata/Database Fields

A "✓" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other. If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.: e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4. Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.
b. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.
c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.
d. All files should be globally de-duplicated with the following conditions:

i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.
ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.
iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.
iv. No customization of hashing may occur without prior express approval by the Government.
v. De-duplication must be done by document family, not by individual document.
vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

**5. Hidden Text**

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

**6. Embedded Files and File Links**

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

### 7. Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8. Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

a. The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.
b. If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9. Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

a. Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
b. The first document in the collection represents the parent document and all other documents will represent the children.
c. All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
d. All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10. Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below.

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11. Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12. Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13. Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participa nts | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timesta mp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Chats** | **MMS** | **SMS** | **Email** | **Instant Message** | **Voicemail** | **Recordings** | **Notes** | **Calendar** |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14. Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15. Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16. Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17. Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18. Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format. The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19. Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production. The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#. The parties shall meet and confer regarding any required audio file redactions.

### 20. Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21. Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

a. AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
b. GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

c. Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

**22. Bates Number Convention**

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

| | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

**23. Media Formats for Storage and Delivery of Production Data**

Electronic documents and data shall be delivered on any of the following media:

a. CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
b. External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
c. Government approved File Transfer Protocol (FTP) technologies.
d. Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
e. Media should be labeled with the case name, production date, Bates range, and producing party.

**24. Virus Protection and Security for Delivery of Production Data**

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

**25. Privilege Logs**

a. The name and title of the author (and if different, the preparer and signatory);
b. The name(s) and title(s) of the individual(s) to whom the document was addressed;
c. The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
d. The date of the document;
e. The number of pages;
f. A brief description of the subject matter;
g. A statement of the specific basis on which privilege is claimed; and
h. The paragraph or subparagraph of the Subpoena to which it is responsive.

**26. Compliance and Adherence to Generally Accepted Technical Standards**

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

**27. Read Me Text File**

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

**28. Exception Report**

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

**29. Transmittal Letter to Accompany Deliverables**

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

June 23, 2026

**VIA ECF**

The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
Thurgood Marshall
United States Courthouse
40 Foley Square, Room 2103
New York, NY 10007

Re: *Coe, et al. v. Blanche, et al.*, No. 1:26-CV-04641
Joint Letter Regarding Updated Stipulation

Dear Judge Failla,

Consistent with the parties' representations at the June 23, 2026 temporary restraining order hearing, the parties jointly stipulate to the following:

> Recognizing that it is the government's position that it cannot confirm any details related to any possible grand jury subpoenas, *see* Fed. R. Crim. P. 6(e), the parties hereby stipulate as follows:
>
> No healthcare institution located in New York City, including NYU Langone Hospitals, shall be required to produce or disclose any material covered by the lawsuit (i.e., identifying and sensitive health information) to the U.S. Department of Justice, or any component thereof, before **12:00 noon Eastern time** on June 24, 2026. This includes the NYU Defendants pursuant to the Subpoena. The United States will not obtain any such documents or materials prior to **12:00 noon Eastern time on** June 24, 2026.
>
> In light of the foregoing, the NYU Langone defendants likewise stipulate that they will not produce any materials covered by the lawsuit to the U.S. Department of Justice, or any component thereof, prior to **12:00 noon Eastern time on** June 24, 2026.

Sincerely,

*<u>/s/ Omar Gonzalez-Pagan</u>*
Omar Gonzalez-Pagan
Karen L. Loewy
Lambda Legal Defense
and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org

Gabriella Larios
Robert Hodgson
Anya Weinstock
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
Telephone: 212-607-3300
glarios@nyclu.org
rhodgson@nyclu.org
aweinstock@nyclu.org

Chase B. Strangio
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, New York 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
cstrangio@aclu.org

*Counsel for Plaintiffs*

**NIXON PEABODY LLP**

By:
_/s/ Zachary A. Cunha___________
Zachary A. Cunha (ZC 5946)
55 West 46th Street
New York, New York 10036
Tel.: (212) 940-3000
zcunha@nixonpeabody.com

*Attorneys for Defendants*
*NYU Langone Health System*
*NYU Langone Hospitals and*
*NYU Grossman School of Medicine*

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

SARAH WELCH
Senior Counsel to the Assistant Attorney General

JOHN BAILEY
BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation Branch

SHIMENG ZHANG
LUKE MILLER
EUGENE O'HALLORAN
Attorneys

United States Department of Justice
Civil Division
950 Pennsylvania Ave.
Washington, DC 20044
Tel: 202-514-6993
John.Bailey@usdoj.gov

*Counsel for Federal Defendants*

SEAN BUCKLEY
Deputy United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CARTER COE, by and through his parent and next friend, CAROLINE COE; et al., *on behalf of themselves and all similarly situated*,

*Plaintiffs*,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; et al.,

*Defendants*.

26 Civ. 4641 (KPF)

**TEMPORARY RESTRAINING ORDER AND PROVISIONAL CLASS CERTIFICATION**

Pursuant to Fed. R. Civ. P. 65, and having reviewed Plaintiff's Proposed Order to Show Cause for a Temporary Restraining Order and Provisional Class Certification, Plaintiff's supporting Memoranda of Law with attached declarations and exhibits, and any response thereto, and having otherwise been fully advised, the Court finds there is good cause to GRANT the emergency motion of Plaintiffs for a temporary restraining order and provisional class certification and HEREBY ORDERS and ADJUDGES as follows:

1) Plaintiffs Motion for Temporary Restraining Order and Provisional Class Certification are GRANTED because Plaintiffs have demonstrated that they will suffer irreparable harm if the Court does not issue relief; that they are substantially likely to prevail on their claims that DOJ Defendants'[1] actions demanding identifying and sensitive health

[1] As used herein, the term "DOJ Defendants" means Todd Blanche, in his official capacity as Acting Attorney General of the United States, and the United States Department of Justice.

information of Plaintiffs and the Class run afoul of constitutional protections for their informational privacy and against unreasonable searches and seizures and that NYU Defendants'[2] compelled disclosure of Plaintiffs' and the NYU Subclass's identifying and sensitive health information would constitute a breach of physician-patient confidentiality under New York law; that the balance of equities and public interest tip in favor of a temporary restraining order; and that preliminary relief is an appropriate and necessary remedy. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In addition, Plaintiffs have sufficiently provisionally demonstrated that the proposed Class and NYU Subclass adhere to the Federal Rules of Civil Procedure, and such classes are hereby provisionally certified.

2) Preliminary relief is appropriate on a class-wide basis for the following Class and NYU Subclass:

   a. **The Class:** All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at a healthcare institution located in New York City, including NYU Langone Hospitals (and any other NYU entity) and Mount Sinai Health System.

---

[2] As used herein, the term "NYU Defendants" means NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a Division of New York University.

b. **The NYU Subclass:** All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at NYU Langone Hospitals or any other NYU entity.

3) DOJ Defendants, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are RESTRAINED and ENJOINED from:

a. Seeking, receiving, using, retaining, or disseminating any identifying or sensitive health information of Plaintiffs and members of the Class through the Subpoenas at issue or substantially similar administrative or grand jury subpoenas as part of the U.S Department of Justice's claimed investigations into health care offenses related to gender-affirming medical care.

4) NYU Defendants, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are RESTRAINED and ENJOINED from:

a. disclosing or producing any identifying or sensitive health information of Plaintiffs and members of the NYU Subclass to the DOJ Defendants in response to the Subpoena at issue or any substantially similar administrative or grand

jury subpoenas as part of the U.S. Department of Justice's claimed investigations into healthcare offenses related to gender-affirming medical care.

5) It is further ORDERED that the security requirement is hereby waived because Defendants will not suffer any costs from the preliminary injunction, plaintiffs are suing the government to vindicate constitutional rights, and imposing a security requirement would pose a hardship for Plaintiffs. *See* Fed. R. Civ. P. 65(c); *see also Pharm. Soc. of State of New York, Inc. v. New York State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995); *Widakuswara v. Lake*, 773 F. Supp. 3d 46 (S.D.N.Y. 2025).

**IT IS SO ORDERED.**

Dated: June 24, 2026
New York, New York

Katherine Polk Failla

Hon. Katherine Polk Failla
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CARTER COE, *by and through his parent and next friend*, CAROLINE COE; REED ROE, *by and through his parent and next friend*, RILEY ROE; NICOLE NOE, *by and through his parent and next friend*, NORMAN NOE; KARL KOE, *on behalf of themselves and all similarly situated*; and JAY DOE, *on behalf of themselves and all similarly situated*,

Plaintiffs,

-v.-

TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*; U.S. DEPARTMENT OF JUSTICE; NYU LANGONE HEALTH SYSTEM; NYU LANGONE HOSPITALS; and NYU GROSSMAN SCHOOL OF MEDICINE, *a division of New York University*,

Defendants.

26 Civ. 4641 (KPF)

**PRELIMINARY INJUNCTION ORDER
AND EXTENSION OF PROVISIONAL CLASS CERTIFICATION**

Pending before the Court is Plaintiffs' request for a preliminary injunction and extension of provisional class certification, and the parties' joint request to adjudicate that request on the existing record and the already-submitted briefing by the parties and *amici*. (Dkt. #66). To obtain a preliminary injunction, a movant must demonstrate: (i) that he is likely to succeed on the merits; (ii) that he is likely to suffer irreparable harm in the absence of preliminary relief; (iii) that the balance of equities tips in his favor; and (iv) that an injunction is in the public interest. *See New York* v. *U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-

59 (2d Cir. 2020). The Court considered these same factors when it evaluated Plaintiffs' request for entry of a temporary restraining order. On June 14, 2026, the Court issued a temporary restraining order and provisional class certification. (Dkt. #65).

Upon a renewed review of the whole record, including the parties' submissions regarding Plaintiffs' Proposed Order to Show Cause for a Temporary Restraining Order and Provisional Class Certification and the parties' arguments during the hearing held on June 23, 2026, and having otherwise been fully advised, the Court finds, for all the reasons described on the record in its oral decision on June 24, 2026, there is good cause to GRANT the preliminary injunction and extend provisional class certification, and HEREBY ORDERS and ADJUDGES as follows:

i. Plaintiffs' Motion for a Preliminary Injunction is GRANTED because Plaintiffs have demonstrated that they will suffer irreparable harm if the Court does not issue relief; that they are substantially likely to prevail on their claims that DOJ Defendants'[1] actions demanding identifying and sensitive health information of Plaintiffs and the Class run afoul of constitutional protections for their informational privacy and against unreasonable searches and seizures; that NYU

[1] As used herein, the term "DOJ Defendants" means Todd Blanche, in his official capacity as Acting Attorney General of the United States, and the United States Department of Justice.

Defendants'[2] compelled disclosure of Plaintiffs' and the NYU Subclass's identifying and sensitive health information should be enjoined to maintain the *status quo* and prevent irreparable harm; that the balance of equities and public interest tip in favor of a temporary restraining order; and that preliminary relief is an appropriate and necessary remedy. *See Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In addition, Plaintiffs have sufficiently demonstrated on a provisional basis that the proposed Class and NYU Subclass adhere to the Federal Rules of Civil Procedure, and such classes continue to be provisionally certified.

ii. Preliminary relief is appropriate on a class-wide basis for the following Class and NYU Subclass:

a. **The Class:** All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at a healthcare

[2] As used herein, the term "NYU Defendants" means NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a division of New York University.

institution located in New York City, including NYU Langone Hospitals (and any other NYU entity) and Mount Sinai Health System.

b. **The NYU Subclass:** All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at NYU Langone Hospitals or any other NYU entity.

iii. DOJ Defendants, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are RESTRAINED and ENJOINED from:

a. Seeking, receiving, using, retaining, or disseminating any identifying or sensitive health information of Plaintiffs and members of the Class through the Subpoenas at issue or substantially similar administrative or grand jury subpoenas as part of the U.S Department of Justice's claimed

investigations into health care offenses related to gender-affirming medical care.

iv. NYU Defendants, their officers, agents, successors, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, are RESTRAINED and ENJOINED from:

a. Disclosing or producing any identifying or sensitive health information of Plaintiffs and members of the NYU Subclass to the DOJ Defendants in response to the Subpoena at issue or any substantially similar administrative or grand jury subpoenas as part of the U.S. Department of Justice's claimed investigations into healthcare offenses related to gender-affirming medical care.

v. It is further ORDERED that the security requirement is hereby waived because Defendants will not suffer any costs from the preliminary injunction, Plaintiffs are suing the Government to vindicate constitutional rights, and imposing a security requirement would pose a hardship for Plaintiffs. *See* Fed. R. Civ. P. 65(c); *see also Pharm. Soc. of State of N.Y., Inc.* v. *N.Y. State Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995); *Widakuswara* v. *Lake*, 773 F. Supp. 3d 46 (S.D.N.Y. 2025).

In addition, the deadline for NYU Defendants to respond to Plaintiffs' Complaint is hereby ADJOURNED to **August 10, 2026**.

The Clerk of Court is directed to terminate the pending motion at docket entry 68.

SO ORDERED.

Dated: July 6, 2026
New York, New York

Katherine Polk Failla

KATHERINE POLK FAILLA
United States District Judge

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CARTER COE, BY AND THROUGH HIS PARENT AND NEXT FRIEND, CAROLINE COE, et al.,

Plaintiffs,

v.

TODD BLANCHE, et al.,

Defendants

Case No. 1:26-cv-04641-KPF

**DEFENDANTS' NOTICE OF APPEAL**

**PLEASE TAKE NOTICE** that Todd Blanche and the Department of Justice hereby appeal to the United States Court of Appeals for the Second Circuit from the district court's order granting the motion for preliminary injunction, Dkt. 71.

RESPECTFULLY SUBMITTED, this 10th day of July, 2026.

BRETT A. SHUMATE
Assistant Attorney General

JORDAN CAMPBELL
Deputy Assistant Attorney General
SARAH WELCH
Senior Counsel to the Assistant Attorney General
JOHN BAILEY
BRANTLEY MAYERS
Counsel to the Assistant Attorney General

LISA K. HSIAO
Acting Director

*<u>/s/ Eugene O'Halloran</u>*
LUKE MILLER
EUGENE O'HALLORAN
SHIMENG ZHANG
Trial Attorneys
U.S. Department of Justice
Civil Division
eugene.o'halloran2@usdoj.gov

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I certify that, on July 10, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States District Court for the Southern District of New York on the following:

Robert Hodgson
Gabriella Larios
Anya Weinstock
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
Telephone: 212-607-3300
rhodgson@nyclu.org
glarios@nyclu.org

Chase B. Strangio
Shana Knizhnik
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, New York 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
cstrangio@aclu.org
sknizhnik@aclu.org

Elizabeth Gill
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, California 94104
Telephone: 415-343-0779
egill@aclu.org

Zachary A. Cunha
Nixon Peabody LLP
One Citizens Plaza, Suite 500

Omar Gonzalez-Pagan
Karen L. Loewy
Lambda Legal Defense and Education Fund
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org

Nora Huppert
Lambda Legal Defense and Education Fund
3656 N. Halsted Street
Chicago, Illinois 60613
Telephone: 312-605-3233
Facsimile: 855-535-2236
nhuppert@lambdalegal.org

A.D. Sean Lewis
Lambda Legal Defense and Education Fund
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
Telephone: 213-382-7600
Facsimile: 855-535-2236
alewis@lambdalegal.org

Lindsay Maleson
Nixon Peabody LLP
275 Broadhollow Road
Suite 300
Melville, NY 11747
516-832-7627
Fax: 877-683-1633

Providence, RI 02903
401-454-1025
Fax: 401-454-1030
Email: zcunha@nixonpeabody.com

Email: lmaleson@nixonpeabody.com

Timothy Sini
Nixon Peabody LLP
275 Broadhollow Road
Melville, NY 11747
516-832-7655
Fax: 516-832-7555
Email: tsini@nixonpeabody.com

Dated this 10th day of July, 2026.

*/s/Eugene O'Halloran*
Eugene O'Halloran

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CARTER COE, *et al*,

Plaintiffs,

v. 26 Civ. 4641 (KPF)

TODD BLANCHE, *et al*,

Defendants. Argument

------------------------------x

New York, N.Y.
June 23, 2026
2:40 p.m.

Before:

HON. KATHERINE POLK FAILLA,

District Judge

APPEARANCES

LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
Attorneys for Plaintiffs
BY: OMAR GONZALEZ-PAGAN
-and-
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
BY: CHASE STRANGIO
SHANA KNIZHNIK
-and-
NEW YORK CIVIL LIBERTIES UNION
BY: ROBERT A. HODGSON

U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
Attorneys for Government Defendants
BY: LUKE MILLER
SARAH WELCH

NIXON PEABODY LLP
Attorneys for NYU Defendants
BY: TIMOTHY SINI
ZACHARY A. CUNHA
LINDSAY MALESON





(Case called)

THE DEPUTY CLERK: Counsel, please state your name for the record, beginning with plaintiff.

MR. STRANGIO: Good afternoon, your Honor.

Chase Strangio, on behalf of the plaintiffs and the proposed class.

THE COURT: Sir, are you able to stand?

MR. STRANGIO: Of course.

THE COURT: I'm asking this of all of the oralists simply because there are monitors that block my view of some of you. Thank you.

MR. STRANGIO: Of course.

MR. GONZALEZ-PAGAN: Good afternoon, your Honor.

Omar Gonzalez-Pagan, on behalf of the plaintiffs and the proposed class.

THE COURT: Thank you.

MR. HODGSON: Good afternoon, your Honor.

Robert Hodgson from the New York Civil Liberties Union Foundation, also on behalf of the plaintiffs.

MS. KNIZHNIK: Good afternoon, your Honor. Shana Knizhnik, on behalf of plaintiffs and the proposed class.

THE COURT: Thank you so much.

MR. MILLER: Hello, your Honor.

Luke Miller, behalf of defendants Todd Blanche and the Department of Justice.





THE COURT: All right. Thank you.

MS. WELCH: Good afternoon, your Honor.

Sarah Welch from the Department of Justice as well.

MR. SINI: Good afternoon, your Honor.

Timothy Sini with Nixon Peabody, for the NYU defendants.

THE COURT: Mr. Sini, do you expect to be speaking a lot this afternoon?

MR. SINI: Mr. Cunha will be taking the lead.

THE COURT: All right. I'm not sure I have many questions for NYU, but I understand that you're there. Thank you.

Mr. Cunha.

MR. CUNHA: Good afternoon, your Honor.

Zachary Cunha, also from Nixon Peabody, also on behalf of the NYU defendants.

THE COURT: Thank you so much.

MS. MALESON: Good afternoon, your Honor.

Lindsay Maleson, also from Nixon Peabody, for the NYU defendants.

THE COURT: Okay. Thank you.

Because I know that you have ECF access and have looked at it, you are aware that this case was reassigned to me approximately 25 and one half hours ago. I have read all of the papers, I've read the majority of the cases, and I've done





some independent research, but I'm sure you will be as understanding as you are capable of being.

It was my understanding that when this was before Judge Vargas, the parties had stipulated to extending the deadline for the production of documents or the information and materials at issue from June 10th to June 24th, presumably at 9 a.m.

There was discussion in the plaintiffs' submission of yesterday about some discussion about possibly extending the deadline, but I wasn't going to be told until 6 p.m. and, therefore, I could not make any -- I couldn't guarantee anything. It would be my hope that the parties would agree to extend the deadline until approximately noon tomorrow so that I can render a decision before then.

Is that acceptable to my friends at the front table?

MR. STRANGIO: It is, your Honor. Thank you.

THE COURT: Thank you.

Is it acceptable to my friends at the back table?

MR. MILLER: Yes, your Honor.

MR. CUNHA: No objection from NYU, your Honor.

THE COURT: Thank you so much.

There's nothing wrong with NYU. I'm sorry, just my focus was elsewhere.

All right. I also did understand that Mr. Strangio and Mr. Gonzalez-Pagan wanted to split oral argument; is that

correct?

MR. STRANGIO: That is correct, your Honor.

THE COURT: And, sir, may I just have the pronunciation of your last name again.

MR. STRANGIO: Strangio.

THE COURT: Strangio. I beg your pardon. Excuse me.

I will allow that.

There was discussion as well about a briefing schedule for the contemplated motion for preliminary injunction. Perhaps that's something you want to discuss after we have the questions today. But was there agreement between the parties on such a schedule? Last I saw there was disagreement.

MR. STRANGIO: Your Honor, there was disagreement.

THE COURT: And there remains disagreement.

MR. STRANGIO: I believe so. I think we may revisit the topic after your Honor's decision on the temporary restraining order, but as of now there remains disagreement.

THE COURT: Thank you so much. All right.

Mr. Strangio, I think I begin with you.

MR. STRANGIO: Yes.

THE COURT: Was there an opening statement you wish to make to me? It wasn't may plan to do that, but if you've prepared one, I'll let you speak.

MR. STRANGIO: Whatever is best for your Honor. Happy to answer your questions.





THE COURT: Thank you. I have several.

Sir, to what extent are plaintiffs' arguments for a temporary restraining order predicated on a finding that the government is somehow acting in bad faith either by issuing the executive orders, by pivoting from administrative subpoenas to grand jury subpoenas, or things similar. I suppose, more fundamentally, are you asking me or am I obligated to make a finding about the *bona fides* of the government's investigation or the executive orders in order to resolve your motion?

MR. STRANGIO: So, your Honor, I am prepared to speak on the question of jurisdiction, so I'll answer that question with respect to the Court's jurisdiction to adjudicate these claims; and I'll let may colleague Mr. Gonzalez-Pagan answer that question on the merits.

The answer on jurisdiction is no. This Court has jurisdiction to adjudicate plaintiffs' claims. Plaintiffs, consistent with Second Circuit precedent, come seeking relief from this Court in the jurisdiction where they received the medical care at issue, where the records were generated and are currently maintained, in order to prevent the imminent and ongoing violation of their Fifth and Fourth Amendment rights and rights under state law.

Under *New York Times v. Gonzales*, this Court has jurisdiction to adjudicate the claims, notwithstanding a grand jury investigation elsewhere. And that precedent instructs





that the Court considers the *Dow Jones* factors for determining whether to exercise jurisdiction, and jurisdiction would be proper considering those factors.

I do think that the Justice Department's conduct and the history and context provide additional urgency for this Court to exercise jurisdiction in this case. But on the question of whether this Court has jurisdiction, it is not necessary to make a finding that the actions of the Justice Department are improper.

THE COURT: Mr. Gonzalez-Pagan.

MR. GONZALEZ-PAGAN: Thank you, your Honor.

In response to the questions to the Court's question, a finding of improper purpose or of bad faith is not unnecessary for plaintiffs to prevail on either their Fifth or Fourth Amendment claims. Certainly, given the bad faith and improper purpose that we believe is present in light of the language utilized in the gender order, the Bondi memo, which is Exhibit C to the complaint, and the like, that is indicative of the fact that these demands for information, both through administrative and grand jury subpoena to NYU, certainly violate the informational privacy rights of our plaintiffs and are unreasonable. An improper purpose would constitute a violation of the Fourth Amendment by rendering the request or demands for this information to be unreasonable.

That said, we believe that plaintiffs can't prevail





without that finding. That is because under the Fifth Amendment, the balancing of interests really pertains to the interests in preserving the confidentiality and the interest of the government obtaining the information. And here, the government has not presented really any information or interest as to why it needs this information. But we do know, certainly under Second Circuit precedent, that both the sensitive health information at issue here, as well as plaintiffs' transgender status, is of the utmost fundamental protections under the informational privacy right under the Fifth Amendment.

THE COURT: I'm going to have you pause right there a moment. I do have other questions, but I think I'm going to skip ahead to something that your answer just sort of brought into sharper focus.

You say to me they haven't demonstrated why they need this information, why they need it with such granularity, why they need the identities of the patients and, at times, their parents. But there is something to be said for the government's argument that Rule 6(e) and the secrecy that normally adheres in grand jury investigations pertains here.

I'm sure you saw in the opposition that they still don't even acknowledge the NYU subpoena that was issued that we've seen that suggests -- they are not saying it's invalid, but they still can't, they believe, consistent with their obligations under Rule 6(e), acknowledge it.

So one of the problems I'm having here, putting aside the jurisdictional hurdle, is the idea that I'm being asked to make determinations and to balance factors based on information I don't have and they won't provide — and, indeed, they believe they can't provide. So while you've spoken to me about the administrative subpoenas and what the focus of those subpoenas were, the folks at the back table are not committing that that's the -- that the investigations are coextensive or that they even are looking at the same parties.

So when you say to me, They haven't met their burden, the problem I have is how can I impose upon them that burden when they have an obligation on their own to keep this information shielded from disclosure?

MR. GONZALEZ-PAGAN: So, your Honor, a couple of answers to that.

First and foremost is the fact that we need not ignore the context of all that is occurring and that is part of the record here. The request at issue for the grand jury subpoena to NYU is the same requests that were included in the administrative subpoenas to NYU, as well as to other hospitals, including Rhode Island Hospital. Two of those administrative subpoenas that went to NYU and Rhode Island Hospital are part of the record here. Requests 11, 12, and 13 of the administrative subpoenas are identical — virtually identical — to requests 12, 13, and 14 of the grand jury subpoena.





The purpose here of the so-called investigations is that they are purportedly investigating offenses, healthcare offenses --

THE COURT: But, sir — and I don't mean to interrupt you, but here I am doing that. How do I know that? I know you've told me what the administrative subpoenas were focused on, and that appears to be the FDCA, focused on violations of that act. But the subpoena that I saw for NYU did not recite on its cover page, as old versions of the subpoena used to, the statutes that were being investigated. I have no knowledge as to what the criminal investigation is, or do I?

MR. GONZALEZ-PAGAN: Well, we do, your Honor. We know because the Bondi memo specifies the strategy that the government will use to achieve its purpose, including the use of the FDCA and healthcare offenses, to try to coerce hospitals into ending gender-affirming medical care. We know because the government has repeatedly represented before the issuance of the administrative subpoenas, after they transferred the administrative subpoenas, that the purposes were the same and consistent and consonant with the Bondi memo and the Shumate memo.

THE COURT: That's as to the administrative subpoenas.

MR. GONZALEZ-PAGAN: Correct.

And we know because, temporally, the grand jury subpoena at issue here was -- there was an administrative





subpoena at issue here. It was withdrawn while the hospital and DOJ were still in negotiations, and information which was not known to plaintiffs until the pleadings in this case. And then it was withdrawn and immediately reissued as a grand jury subpoena to the same entity and asking for the same information.

Not only that, your Honor, but the government asserts that they cannot reveal this information at all. But we know that they can. In the context of ascertaining the reasonableness of a subpoena, of a grand jury subpoena, a court may require the government — and the government may provide — the general subject matter of said subpoena in order to ascertain the reasonableness of that subpoena.

And not only that --

THE COURT: To a court other than the district of issuance?

MR. GONZALEZ-PAGAN: Well, certainly -- yes. And, in fact, Rule 6(e), the exceptions allow for -- in connection with another judicial proceeding, for the government to — if they need to disclose this information — go to the court supervising the grand jury subpoena, petition for the opportunity to actually provide that information to the other court; and, in fact, that petition gets transferred. This is F of -- subdivision F of Rule 6(e), transfer that petition to the court requesting the information.





THE COURT: We know that they can and we know the process that they would use to do it. But if they elect not to engage in that process, are you suggesting that I am to hold that against them or to find some sort of adverse inference because they refuse to do something they were not obligated to do?

MR. GONZALEZ-PAGAN: I don't think it's an adverse inference, your Honor, so much as they have an opportunity to present their case and they decide not to. At the end of the day, it's a balancing of the interest.

The information sought here is of the utmost private confidential nature; it pertains to our plaintiffs' transgender status which the Second Circuit has recognized is incredibly personal and fundamental and actually beyond debate as to it's excruciatingly private in nature. And the sensitive health information likewise is incredibly private. Not only that, it is incredibly broad.

The information at issue here seeks a full disclosure of the medical health information that NYU possesses with regards to our plaintiffs and the proposed members of the class; information that contains discussions of familial history, of mental health history, their problems in school, their development, socio-development and psychological development, as well as whatever other medical conditions that they may have or experience beyond gender dysphoria. It seeks

a full picture of plaintiffs' lives, and it does so in a way that is incredibly intrusive and unnecessary.

At the end of the day, your Honor, the government has repeatedly shown that it doesn't need this information; it had, in fact, conceded as much.

THE COURT: It conceded as much with respect to the administrative subpoenas; correct?

MR. GONZALEZ-PAGAN: Correct. But --

THE COURT: And you're saying that there -- I mean, we can acknowledge that there's a difference between a civil administrative matter and a criminal matter; correct?

MR. GONZALEZ-PAGAN: We can acknowledge that the vehicle is distinct, your Honor. But the purpose and the actor is still the same.

(Indiscernible crosstalk)

THE COURT: Excuse me, sir.

Do I know that? Do I know that -- because in their opposition, the government is saying to me, Don't assume that this is coextensive with the administrative subpoenas. Don't assume. You don't know who the targets are. And that's, in fact, the reason why this shouldn't be in front of you, Failla, because you are not the person -- this should be in the Northern District of Texas.

We'll get to that momentarily.

Because you're suggesting to me that in this civil





context, that I am basically -- I can force the government's hand to disclose information about the grand jury subpoena or the grand jury investigation; or, if they don't do that, then I can make whatever conclusions I draw from that in order to say that NYU doesn't have to comply with the subpoena.

There are many things that concern me on both sides. I don't want to suggest to you that this is easy for one side or the other. But the idea that I can inject myself into a criminal investigation — if that's indeed what I'm doing — by saying to the government, You either have to tell me — *in camera*, if you want — tell me *in camera*, consistent with Rule 6(e), get your permission from the Northern District of Texas, and tell me what this is about; or I am going to make a finding under the Declaratory Judgment Act that NYU doesn't have to comply with these subpoenas.

MR. GONZALEZ-PAGAN: Your Honor, we agree that these are anomalous circumstances.

THE COURT: Of course.

MR. GONZALEZ-PAGAN: I think we all know that this is in some ways pretty novel. But it is because of the conduct of the government that it is novel.

Your Honor, the government's absence of -- the absence of a proffer of information or justification cannot be used against plaintiffs to infringe upon their constitutional rights. Really, here what we have is the weaponizing of the





grand jury in at least the circumstance of the subpoena to NYU. And we would again proffer and just reframe that the relief that we're requesting is broader and pertains to all of these demands as it pertains to people that obtain care in New York City, both whether through a grand jury subpoena or an administrative subpoena.

But we are not seeking to intervene or quash the investigation. We are seeking to protect limited information specific to our plaintiffs, information that the government has repeatedly said in relation to the same investigations, or at least similar investigations based on requests to other entities that are virtually identical, that they don't need.

In the context of Children's Hospital of Los Angeles, your Honor, they actually withdrew the request and agreed to redacted information with regards to responses to any other request. And they have represented in court multiple times that they don't need identifying information.

And certainly they don't tell us here why. And it cannot be, your Honor, that in the seeking of a criminal offense, the government can use the grand jury to obtain the medical records of every citizen and say, We're just investigating. We don't even have to tell you what we're investigating. We can just request the medical records of every person in New York state and not provide a reason. And we may do so in Texas as opposed to in New York.





THE COURT: Well, I think the government's response is that you are -- your clients could go to Texas and challenge this, could they not?

MR. GONZALEZ-PAGAN: Your Honor, I don't think that is entirely clear.

THE COURT: Please tell me why it's not.

MR. GONZALEZ-PAGAN: Well, typically, it would be a recipient of the grand jury who would have the standing and the ability to file a motion to quash based on Rule 17.

THE COURT: Yes.

MR. GONZALEZ-PAGAN: But, here, the relief that we seek is much broader, and we're not seeking to limit or quash that particular one subpoena. We are seeking to actually protect the information of our clients being sought through serial and multiple means, including administrative and grand jury subpoenas. The grand jury subpoena to NYU is but one part of the many tools that the government is trying to use to coerce hospitals into ending the provision of gender-affirming medical care and to target transgender people, as they have for their executive orders and memoranda calling this care to be barbaric, and representing in the executive orders that people who are transgender have a false claim or a false belief in who they are.

This all animates this actions. And it is actually -- we cannot divorce this one singular part from the totality and

evaluate it in a vacuum. And I think that actually informs why it is that we're here in front of the Court.

We also don't know if other grand jury subpoenas have been issued to other hospitals. We know that Mt. Sinai has received a subpoena; we don't know the nature of that subpoena. And so, in that sense, we're very much in the same place that the plaintiffs in *New York Times v. Gonzales* were. And there, the Court said that in those circumstances, it was appropriate to exercise jurisdiction. And I think Mr. Strangio can speak to this more specifically. I'm delving a little bit away from my area.

THE COURT: We'll hold off on that for now.

If the government were to commit to seeking only anonymized information responsive to these subpoenas, no identities and no possibility of later coming back and seeking identities, would you agree?

MR. GONZALEZ-PAGAN: Your Honor, we're happy to consider that. We believe that we --

THE COURT: I understand that that's not what was offered.

MR. GONZALEZ-PAGAN: It hasn't been offered. And certainly even to NYU, to the extent that there has been some sort of negotiation, it has been to provide some redacted information without -- with preservation of the ability to unmask and identify.





THE COURT: Of course.

And is it your view that -- well, let's say we had that. You're saying that the possibility that later on down the road they can seek to deanonymize, if that's even a word, this information, that gives you Article III standing to come here and complain about it.

MR. GONZALEZ-PAGAN: Absolutely, your Honor.

We think that here, at the end of the day, the information being sought is of such granularity and individualized that it is virtually impossible to truly deidentify. The Court in the Western District of Pennsylvania for that very reason actually refused to allow for the deidentified production of records. This is in the *In re UPMC Subpoena* matter, your Honor. And it is from March 2nd of this year.

THE COURT: I read it, sir. Thank you.

MR. GONZALEZ-PAGAN: So that is instructive, I believe, here. But, here, again, it is virtually impossible to deidentify. And the injury to the informational privacy right is still present.

The government doesn't have the power or ability to actually collect such private information of its citizens without a showing as to why and the balancing of interest necessary here. Typically, when medical information is provided, it is limited information for a limited purpose,





whether it's for public health monitoring or the like, and it is typically not a wholesale provision of somebody's whole medical records that discuss everything, from whether they had a cold to whether they had depression or anxiety because they were being bullied in school, to whether they actually have this stress with regards to how they are perceived in light of their gender identity, such a stress that requires a provision of gender-affirming medical care. It seeks a broad picture of these people regardless of whether their name can be attached to it.

THE COURT: Well, then that suggests that even if the government were to commit to receiving only anonymized information and never seeking to deanonymize that information, you'd still think that it is so granular and specific that your clients could be identified and, therefore, you wouldn't consent to it. That's what I think I'm understanding you to argue now.

MR. GONZALEZ-PAGAN: That's correct, your Honor.

And we would posit and agree that certainly it is a balancing test. And the desire for privacy may lessen if there is anonymization versus there isn't. But I think ultimately we think there will still be an injury, an injury of a constitutional nature, and one that we believe have standing to seek to protect.

At the end of the day, we want to protect our clients'





identities. There is no reason for the government to be compiling a list of people who are transgender in this country, let alone transgender young people that are vulnerable and that feel — rightfully so — that they're under attack by this government that has expressed such hostility.

Second and apart from that, your Honor, there are concerns about how the government would use this data even if it were to be anonymized or deidentified. The government has the ability to share this information with some of its partners that it routinely is partnering right now in attacking people who advocate for gender-affirming medical care or, like it just did, by filing a case with the Texas Attorney General against one of the organizations that provides clinical guidance for this care in Texas.

And it actually has partnered repeatedly with this other entities that have similarly expressed hostility towards transgendered people, including the Texas Attorney General, who has expressed that he considers this care to be child abuse. And that is not that dissimilar from how this administration has expressed its own sentiments with regards to this care — care, mind you, that is incredibly important for these people, essential and necessary, but that is also legally protected in the state of New York.

THE COURT: I just want to understand why I should be concerned about the uses to which the information could be put.

I suppose that's because in your Fifth Amendment analysis, there's a discussion of the safeguards, and that is one of the factors, if there are safeguards. And you are going to tell me there are no safeguards here.

But, as well, your problem predates what they are going to do with it. Your problem is their ability to seek that information in the first instance.

And I want to hear a little bit more about something you said a few moments ago, which is the idea that you're not actually really trying to move to quash per se. What you're trying to do is to prevent the disclosure — whether through administrative subpoena or grand jury subpoena or some threat against NYU, that they will lose funding if they don't do something, you're trying to prevent the disclosure of your clients' information. Do I understand that correctly?

MR. GONZALEZ-PAGAN: That is exactly it, your Honor. We're seeking that protection for all members of the proposed class, as well as the members of the NYU subclass. So it pertains to all transgender young persons that obtained care from 2020 to 2026 at any healthcare institution in New York City.

And what we're seeking to protect is the ability for them to preserve the confidentiality and their informational privacy as to their identities which would reveal their transgender status in connection with this care, as well as





just their sensitive health information, all that is contained within these records.

THE COURT: I want to go back, please, to where this should be taking place.

MR. GONZALEZ-PAGAN: If I may, your Honor, pass the ball.

THE COURT: Okay. Mr. Strangio, yes. He's desperately seeking to speak to me, and now he can.

Sir, thank you very much and welcome back.

I really would like to understand this, because I'll say the same thing to the government. I am not an activist judge, and I take very seriously the lanes in which I can legitimately operate. And so I want to understand why it is appropriate for me to be considering this rather than the Northern District of Texas.

If you said to me, for example, that there's some quirk of law that would prevent the individuals whose medical records are subject to the subpoena from moving to quash in Texas, I would listen to you. But I just would like to understand — and I want to be clear, to say to me -- well, in a quiet moment, sir, you might acknowledge that there's a bit of forum shopping going on; but then you'll tell me it's sort of reciprocal forum shopping, because they should never have brought the investigation in Texas in the first instance. But here we are.





So let me understand, please, why this isn't impermissible forum shopping and why you can't go to Texas.

Thank you.

MR. STRANGIO: Your Honor, I'll start where Mr. Gonzalez-Pagan ended, which is that the relief that the plaintiffs are seeking, young New Yorkers whose identifying information has been serially demanded by the government, is to prevent this serial demand from violating their constitutional and state law rights. And the fact that there is one grand jury subpoena that we know about does not make the only or even the better remedy a motion to quash. And I think in that sense, this is very similar to the circumstances in *New York Times v. Gonzales*, where the Second Circuit affirmed this Court's exercise of jurisdiction in a case, where, as I'm sure you're aware, *The New York Times* sought --

THE COURT: I did read the case, sir, yes. Thank you.

MR. STRANGIO: Much like *The New York Times*. In that case, many members of the class don't know if a subpoena has been served on their healthcare provider and, therefore, cannot seek relief through a motion to quash because they wouldn't know where to file such a motion.

And, in essence, what the government is asking of the plaintiff class members is to be forced into a guessing game of whack-a-mole across the country through jurisdictions to which they have no connection and where they could, as we've alluded





to, seek investigation and possibly arrest. That is sort of the threshold precedential reason the Court can exercise its jurisdiction. And then I think what *Gonzales* tells us is that the Court then balances the factors that *Dow Jones* lays out for whether or not the exercise of jurisdiction is proper.

And I think given the fact that there is not a singular subpoena that can be quashed, that the class can identify and protect its interests by quashing, the factors weigh in favor of this Court's exercise of jurisdiction. There's no better or more effective remedy. They're subject to the ongoing legal uncertainty, as are the hospitals and the government, in terms of to what extent is this information constitutionally protected; and that weighs in favor of a singular relief from this Court in the jurisdictions where the plaintiffs both reside and received the medical care.

THE COURT: Well, I think that's the point you're about to make to me because, of course, naturally, I appreciate very much your whack-a-mole analogy, sir, and your suggestion that you've been able to beat back the informational requests that you're aware of, but you can't fight the stuff you don't know about. You may not be lucky enough to have an institution publish or make folks aware of the existence of the subpoena.

So this I get.

Please understand that, from my perspective, the issue is I might agree with you, but then why -- how is it that I get

to be the decider of this in the first instance? I mean, there are obviously layers above me.

I guess what you're saying is, Well, Failla, this is all happening in New York City; that's why our class is limited to New York City. The individuals have sought care here, they've received care here, they've given the most private of their medical information here. And, therefore, it is here that preservation of the privacy inherent in that information should be decided. Is that the argument?

MR. STRANGIO: That is a substantial part of the argument, that here is where jurisdiction should lie for the reasons that we've discussed and the reasons that your Honor has helpfully just outlined.

And I think, coming back to your Honor's question about is this being used in such a way to fence for procedural fencing or otherwise improper purposes. And I would submit the answer from plaintiffs' side is absolutely not.

When plaintiffs became aware of the grand jury subpoena, knowing the full context of everything that had been going on, the serial demand for this information and the new awareness that their information was now the subject of potentially multiple demands across New York City healthcare institutions, they came to the jurisdiction where they could seek relief on behalf of the full class of New York City patients whose information was now subject to this serial





demand.

I think what's interesting or perhaps instructive here too is plaintiffs, until the filing of this lawsuit, did not know about the administrative subpoena to NYU, which had been part of negotiations between the hospital and the Justice Department for the better part of a year, which I think highlights the equities of assuming jurisdiction here for nonrecipients who may not know that their information is being bargained over until it is too late. And I think that's also what *New York Times v. Gonzales* instructs in terms of this Court's ability to exercise its jurisdiction.

THE COURT: All right. But *Gonzales* only gets you so far, right, because *Gonzales*, you win the battle and lose the war. They find jurisdiction, but then find that the privilege doesn't pertain or doesn't protect the disclosure of the information. Is that not correct? It's telephone service provider records.

MR. STRANGIO: Yes, correct.

At the end of the day, this Court deciding to assume jurisdiction does not answer the merits question; those are distinct challenges that I will grant you.

The other thing I would just sort of offer, your Honor, is we're here on a temporary restraining order --

THE COURT: Yes.

MR. STRANGIO: -- to maintain the status quo in a very





fast-moving set of circumstances in which lots of information is being learned as we are moving forward to try to protect our individual clients' rights and the members of the proposed class. So this Court has broad equitable authority to maintain the status quo, while some of these questions about to what degree, if at all, can anonymization happen.

So we would urge that the Court assume jurisdiction, maintain the status quo in this emergency posture so that tomorrow, this hundreds — if not thousands — of young New Yorkers are all of a sudden unable to protect against the seizure and disclosure of their most personal information.

THE COURT: In *Gonzales*, the Second Circuit said that the existence of Rule 17(c), the ability to move to quash a subpoena, does not preclude per se a declaratory judgment. I am quoting from the decision at page 166. I'm not sure that I will call that a ringing endorsement of a court this Court's jurisdiction to evaluate a collateral challenge to a grand jury subpoena issued by another court.

I'm also not sure that *Gonzales* really got to the issue of whether I have the authority to issue the injunctive relief that you seek. So let me understand how I can read naturally or extrapolate naturally from *Gonzales* these two points.

MR. STRANGIO: So first, your Honor, I would not characterize what the plaintiffs have brought here as a





collateral attack on a grand jury proceeding. And, again, the relief is about the serial demand for the information, in violation of their rights. And I know that the defendants make a lot out of the fact that the Court was only considering the declaratory relief part of *The New York Times* claim in that case. But I think for two central reasons that doesn't change this Court's ability to resolve the case here.

The first is it did not figure into the Court's analysis. The fact that it was a declaratory judgment as opposed to an injunction was not the reason that the Court found jurisdiction balancing the *Dow Jones* factors.

And I think, more importantly, we're currently in this emergency posture. And ultimately, this Court could still decide that declaratory relief is the most appropriate way to resolve this, balancing the *Dow Jones* factors. But the ability to resolve this case in that manner on the merits would necessitate, we submit, this Court's exercise of its broad jurisdiction to maintain the status quo in the interim because of the irreparable harm that would flow to the individual plaintiffs and the proposed class members if the government was able tomorrow to go and access all of this information from all of the health providers in New York City that it seeks to demand it from.

THE COURT: One moment, please. Thank you.

If there's anything else you want to say about my

jurisdiction, I'll hear from you.

I do want to pivot now to the class relief that is being sought.

MR. STRANGIO: I think, unless your Honor has other questions on jurisdiction, I will also answer questions on the class relief.

THE COURT: Okay. Then let's move to that, please.

You're asking me to certify a class and a subclass. The subclass seems easy, given that it is the entity that your named plaintiffs have obtained medical services from. I'm not sure — and I don't want to understand — why it is appropriate for me to certify a class that includes other healthcare institutions located in New York City.

We don't know that any other institutions, with the possible exception of Mt. Sinai, has received such a subpoena. And so it is interesting. You would say that that actually counsels in favor of granting the relief, and I just want to understand why.

If, for example — and I'm just picking a name here — New York Presbyterian were to receive a subpoena, wouldn't they have gone through the same process as NYU? Wouldn't there be folks who see that the hospital at which they received gender-affirming care services has received such a subpoena, and they could bring a lawsuit similar to this one?

I want to understand why I need to extend to certify





provisionally — the government thinks I can't — a class that extends to folks who did not -- who received gender-affirming care places other than NYU.

MR. STRANGIO: So a few responses, your Honor.

First, I do want to clarify that the named proposed class representative, Karl Koe, on complaint paragraph 17, has received care from both Mt. Sinai and NYU; and is therefore representing both entities in that regard.

And I think the reason this Court should certify the class provisionally, of course, that we propose is because of what we had been discussing. It is very possible that those subpoenas are out there. The New York Shield Law is open to interpretation. It requires a 30-day notice about when information may be disclosed. It's possible that those negotiations are ongoing and reaching some sort of resolution where the plaintiffs would not know about it, as evidenced by, for example, the administrative subpoena that was the subject of the negotiations between NYU and the Justice Department, at no point during that period of time were the plaintiffs notified in a manner comparable to the notice in the grand jury subpoena context.

So I think the reason is because of the necessary -- because the ways in which the government is using both grand jury and other forms of secrecy to shield plaintiffs from the ability to vindicate their rights — and they are, in fact,





nonrecipients of these subpoenas — the broader relief on behalf of the full class should be provisionally extended, your Honor, is what we would suggest.

THE COURT: One moment.

MR. STRANGIO: Your Honor, if I could just supplemental one additional point on that.

THE COURT: You may.

MR. STRANGIO: Additionally, because what the proposed class is challenging is the serial demand for the information that violates their rights. The injury to the full proposed class is the same.

THE COURT: You've anticipated my next question, so I guess I won't ask it.

MR. STRANGIO: I will thank Mr. Gonzalez-Pagan for that.

THE COURT: What do you consider to be the metes and bounds of the plaintiffs' right to informational privacy under the Fifth Amendment? And if that's your colleague's, I'll let you hand the baton back. Thank you.

MR. STRANGIO: Thank you, your Honor.

MR. GONZALEZ-PAGAN: I'm sorry, your Honor. May you repeat the question?

THE COURT: Yes. I want to understand what you consider -- sort of, how I should conceive of or define your client's right to informational privacy in this setting. And





then the next question is, to what degree, if at all, should that right yield in the face of a criminal investigation?

Because, remember, we began this discussion with my asking how much I needed to discredit the government's investigation in order to accept your legal arguments. You suggested to me that I didn't, and it was appropriate for context, but it wasn't dispositive of any issue. And if that's the case, I've got to say, I'm not sure I've really seen cases engaging with the interplay of an individual's right to informational privacy and the existence of a valid grand jury subpoena.

MR. GONZALEZ-PAGAN: Yes, your Honor.

So the right, at the end of the day, has been already defined, at least as to the scope of the information by the Second Circuit. And here we have two variants of this information.

We have, in the first instance, they are seeking the identities of the plaintiffs and members of the proposed class — that is request number 12 of the subpoena. And in doing so, they are seeking to pair that with people who are — and this is limited to people who have obtained gender-affirming medical care. And only transgender people obtain gender-affirming medical care to treat gender dysphoria, as the Supreme Court in *Skrmetti* has already recognized.

So it seeks the identities of our plaintiffs' — and,

therefore, the disclosure to the government and the collection by the government of our plaintiffs and members of the proposed class — transgender status. I can hardly think of any interest that the government can have for actually collecting that information, certainly in a dragnet, broad way of all people to have obtained this care.

Second is the sensitive health information. And here it is medical information. The Second Circuit has repeatedly recognized that medical information is covered by the right to informational privacy, the right to confidentiality. And here, as we've discussed already a couple of times, that information is broad encompassing; it's not just whether somebody received X medication or received X diagnosis. It is actually the full history, the familial history, psychosocial history, developmental history, medical history, all other conditions that our plaintiffs might have experienced or been diagnosed with, as well as any other assessments that they may have received. All of that is encompassed by the medical records that are being sought here by the defendants. So that is on the one side the information that is being sought to be protected.

And then, as it pertains to the government and whether the use of a criminal investigation in the context of the one grand jury subpoena that we know about — and, again, I'll posit that our challenge is broader than this one subpoena alone —





the information is being sought. And, your Honor, I cannot think of a single example in which the government has sought all of the medical information of a particular group of people, targeting a particular group of people, and required their identities and information. This is an unprecedented case because these are unprecedented actions by the federal government.

And there are certainly instances in which some medical information can be and is sought in the grand jury subpoena context or in any healthcare investigation context. But usually the government seeks to do so in a targeted, noninvasive, nonintrusive way; in fact, HIPAA requires that. And the government here hasn't done so.

In fact, there's no evidence that the government is seeking to obtain this information for sampling or aggregate data to the extent that it needs any patient information at all. And we know that it doesn't need it because of its conduct in relation to the broader context of this actions and investigations, where it has already disclaimed its need for this records or agreed to severely redacted forms of this information.

So here, your Honor, ultimately, the information is being sought of a third party — us, our plaintiffs — and it is targeted information of these plaintiffs that is being sought by the subpoena to the healthcare institutions, including the





grand jury subpoenas to NYU. And that is information that is being sought to be protected, nothing more, nothing less.

THE COURT: In your own analysis of the applicable law for the Fifth Amendment, you acknowledge that for actions of the executive, the inquiry that I am tasked with is determining whether it is so arbitrary as to shock the conscience. Is that not correct?

MR. GONZALEZ-PAGAN: That is correct, your Honor.

THE COURT: And would you consider that to be a threshold issue before I even start balancing the factors?

MR. GONZALEZ-PAGAN: No, your Honor. The balancing test answers whether it shocks the conscience. And, in fact, in *Hancock*, the Second Circuit explained that even under that test, the Court engages in a balancing of the interests. And the stronger the interest in the preservation of confidentiality, the stronger the interest by the government in obtaining the information must be.

In any event, I believe --

THE COURT: Well, I guess my concern, sir, is when I think of conscience-shocking behavior, I think of, you know, *Rochin* and stomach pumping and things of that nature. You want me to determine by use of a multifactor balancing test that the government's seeking of this information from one identified group is sufficiently arbitrary to shock the conscience.

MR. GONZALEZ-PAGAN: That's correct, your Honor. And





that's what the Second Circuit has instructed in *Hancock* and *O'Connor* as to how to apply the test.

But, your Honor, I think the words of the New York Court of Appeals in the *Chanko* case — which we do cite in our briefs — with regards to the New York state law claim really speak to this. The disclosure of a patient's sensitive health information that they have disclosed and discussed with their doctors, in the words of the Court, "naturally shocks our sense of decency and propriety."

Your Honor, the fact that we cannot come up with a single example in which the government has ever sought to attain the information of a particular group of people — certainly a minority -- vulnerable, minority group of people — and this broad encompassing set of information should shock the conference. I believe it certainly shocks mine.

And the disclosure of such intimate personal information that is so critical for the preservation of everybody's health, the only way that we can have a healthy populous and, indeed, ensure public health is to ensure and promote trust between patients and their doctors; to allow for truly honest and disclosure of information that is necessary to address our health needs and prevent public health from being worsened.

By doing this in this manner, the government is actually endangering that very incredibly important public

interest, an interest that the state of New York has sought to preserve by enacting the New York Shield Law to protective care at issue here.

THE COURT: Is the government correct that there is no court decision out there that has allowed informational privacy protection to be used to limit the scope of or compliance with a grand jury subpoena? That may be because no one has ever tried this before. I have found no precedent to aid me in this analysis, sir.

MR. GONZALEZ-PAGAN: I agree, your Honor. I agree that we cannot point to a precedent that would neatly resolve this case. And so your Honor is presented with some questions of first impression. But that is because it is such an unprecedented action by the government.

THE COURT: I don't wish to repeat myself, but I'm about to repeat myself: How is it that I get to make these determinations and evaluate these factors in a situation where I have not been made privy to the specifics of the grand jury investigation? You're asking me to intuit from context, it seems.

MR. GONZALEZ-PAGAN: Well, I would argue that it's a little bit more than context.

THE COURT: Okay.

MR. GONZALEZ-PAGAN: I would argue that it's the government's own words and own actions.





THE COURT: Is that not context?

MR. GONZALEZ-PAGAN: Well, it is further than context; it is their admissions, it is their actual --

THE COURT: I see.

MR. GONZALEZ-PAGAN: -- their actual express admission and explicit purpose with regards to this investigations, as in furtherance of the purpose to end gender-affirming medical care. We know that from the Bondi memo; we know that from the Shumate memo; we know that from the representations to other courts. I believe we made out the Court -- made available to the Court an excerpt of a transcript in the Rhode Island Hospital TRO hearing. We know that from their representation to other courts. And we've pointed the Court to both pleadings, as well as decisions in which that is contained.

So that's one part.

And again, your Honor, I would say that the government can disclose the general nature of their investigation. The grand jury subpoena, for what it's worth, it exists. We know it exists. It is actually part of the record. It has been actually attached. It was publicized by NYU. And, to their credit, they informed us, and this is what allowed us to be here in court.

But the government can seek -- I don't believe that Rule 6 prevents the government from actually disclosing the nature of their general investigations and actions here. But





even if it did, they could seek authorization to provide to the Court, that information *in camera*, at a minimum, and they have not done so. And, ultimately, the government is the one that has the burden to show why they need this information.

Taking a step back, the grand jury, as it is envisioned in our Bill of Rights and in our Constitution, was actually adopted to protect the people from the government. And here we have the complete opposite: The weaponization of a grand jury to further both an improper purpose, but also to target a group of people and violate their constitutional rights.

As the Supreme Court has repeatedly noted, constitutional limits do apply to the grand jury. And while there's no direct precedent as to whether the informational privacy right has been decided in the context of a grand jury investigation, it is a constitutional right as recognized by the Second Circuit. And we posit that it's one that equally applies in the context of the grand jury.

And I would say that at least the Supreme Court has pronounced multiple times that the limits of the Fifth Amendment do apply to the grand jury.

THE COURT: The government also seeks to distinguish the cases on which you rely by saying that those concerned the disclosure or the misuse of information that had been obtained, that had been lawfully obtained, rather than the authority to





obtain that information in the first instance. You might believe that that's a distinction without a difference, but I would like you to engage with their argument.

MR. GONZALEZ-PAGAN: Certainly, your Honor.

I believe in our reply we actually lay it out in a little bit cleaner manner.

The informational privacy right prevents the government from doing two things: From collecting information, private protected information from its citizens that it doesn't have a right to, and then from disclosing or compelling the forcible disclosure of that information. Both are at issue here. The government seeks to collect this information, as well as compel NYU and other healthcare institutions to disclose this incredibly important, sensitive health information of our clients. So the answer is that it's both. It prevents disclosure, as well as collection of information.

Your Honor, I would also add that the rights that we have embodied in our Constitution are rights against the government. And so inherently the government is prevented from collecting the most intimate private aspects of our lives.

What the government is suggesting in their opposition is that the government can seek whatever information they want. And because they are using a grand jury, they do not have to abide by the limits of our Constitution.

THE COURT: I would hope that's not what they are

suggesting. I thought what they were suggesting is that if there is a grand jury investigation, that certain of the restrictions that you're identifying are things that simply might not apply. And then to the extent there were constitutional problems or potential infirmities with what they were seeking, that you could go to the situs of the investigation, the place where the grand jury subpoenas emanated from, and go contest them there.

I appreciate how your colleague has already explained to me why that's not a thing that you wish to do, but I want you to be careful in making absolute statements here where I'm not sure I have a record to back it up.

MR. GONZALEZ-PAGAN: 100 percent, your Honor. Totally understand.

But the government is suggesting that they can deploy a grand jury to collect information, and that -- any information from any person. And that the fact that they have to use a grand jury is more than sufficient protection in and by itself; and that, therefore, the constitutional protections embodied in the Fifth Amendment with regards to informational privacy, which this circuit has recognized, do not apply or even prevent that disclosure and collection of information.

I just do not think that the government's use of a grand jury subpoena — because the actor here, at the end of the day, is the Department of Justice. The government's use of a





grand jury subpoena to attain this information that it has already sought to attain through other means, been shut down, and because they've been shut down, they are now seeking the same — virtually identical — request, information for a grand jury subpoena to, in essence, fence us, procedurally fence us, from being able to protect the rights of our clients and the members of the proposed class.

THE COURT: Sir, in your Fourth Amendment arguments it seems to me that the issue is really a question of how broadly I can interpret *Carpenter*. Because there was, in fact, a disclosure of this information to third parties. And we have to talk about whether your clients retain a legitimate expectation of privacy of this information despite its disclosure.

I am fully aware of the *Carpenter* decision. What I will note is that there have been subsequent decisions in this circuit that to me seem to suggest that *Carpenter* is limited. For example, there is a decision in *United States v. Harry* from 2025, a Second Circuit decision that I believe declined to extend *Carpenter* to pole camera, a stationary pole camera footage, even though one could make the argument that a stationary pole camera might capture actions in the same way that cell site location information does.

I believe Judge Karas last year in a case called *Rinaldi v. Sylvester* found that the *Carpenter* theory of sort of





a residual expectation of privacy did not apply to license plate readers, even thought that might show where someone was in the same way that cell site location information was.

I haven't seen a situation where medical history information has been analyzed using the *Carpenter* method. And I'm not sure — and I'm being very transparent with you. I'm not sure *Carpenter* works for that information.

My understanding of *Carpenter* is that the disclosure of cell site information reveals such detailed granular information about someone's movements as to basically be surveilling that person. And I'm not sure that medical history is analogous to that. That's not to say that you can argue to me that there should be something like *Carpenter* for medical information — not sure I buy it. But what I'm trying to say is what I've seen since *Carpenter* are judicial decisions limiting the scope of *Carpenter*. Perhaps you're asking me to expand the scope, perhaps you're asking me to fit this case comfortably within that scope, perhaps you're asking for something else. But I wanted to communicate to you the concerns I had about the Fourth Amendment argument.

MR. GONZALEZ-PAGAN: Certainly. Thank you, your Honor.

With regards to *Carpenter*, as well as the reasonable expectation of privacy, at the end of the day, the question of whether the information sought here is one in which there is an





objective reasonable expectation of privacy, *Carpenter* only informs the broader point that just because there's a disclosure to a third party involved, that that reasonable expectation of privacy is not necessarily lost. In that context, it pertain to the GPS data, cell site location data pertaining to persons, and that would reveal all aspects of their lives in many ways.

Here, the information at issue, there's a reasonable expectation of privacy because, as informed, as we know, informed by the Fifth Amendment, it is information that is already of a constitution -- protected by a constitutional right, the informational right to privacy. But it is also one in which we know that federal law and state law recognize an incredibly important interest in protecting the privacy of this information.

We know that from New York Shield Law, we know that from HIPAA, we know that from the CPLR, both the physician-patient privilege, 4504, as well as the psychotherapist-patient privilege, 4507. And we know that from New York Shield Law, which, in fact, your Honor, very emphatically says that even when there is to be disclosure of this information, for example, in the context of an out-of-state investigation of deidentified data, even in those circumstances, which must meet a stringent showing for that information, it requires the consent of the patient for that

disclosure.

And we know that here, because the information also is of its very intimate nature. We talked a little bit about the nature of the doctor-patient relationship; the nature of all the discussions that are had between patients and their providers with regards to their health, their growth, their development, their familial history, their instances of bullying, abuse, neglect, whatever it may be that they may have experienced, trauma, all of those are things that can be encompassed in these medical records. They paint a full picture.

And here, the government is seeking six years worth of that data for the plaintiffs and members of the class, to obtain a full picture of plaintiffs and members of the class, just like the provision of the cell site data did in *Carpenter*.

I agree, your Honor, *Carpenter* doesn't necessarily answer the question here; but I think the analysis in *Carpenter* helps inform this Court's analysis into, one, the fact that there is indeed a reasonable expectation of privacy and that, therefore, the fact that the information is possessed by a third party — in this case NYU or other healthcare institutions — doesn't diminish that reasonable expectation. And secondly, because the breadth of what is sought, just like in *Carpenter*, seeks to paint a whole picture of a person's lives and intimate details.





Your Honor, I would also add two parts to this, which is, both in *Carpenter* and *Jones*, the Court, in discussing why there was a reasonable expectation of privacy, noted that even doctors' visits would be disclosed through the cell site location data. The Supreme Court indeed viewed that that information is private and would be disclosed through the obtaining of that data, that that is why it found that in *Carpenter* -- in part, it's a small part, but in part why it found that in *Carpenter* there was a reasonable expectation of privacy with regards to the data.

THE COURT: I don't think the back table can seriously dispute that there is an objectively reasonable expectation of privacy in the data. I think it's really just a question of whether the disclosure of the data to a medical provider results in the waiver of that protection or the loss of that protection.

So we have *Carpenter*. *Carpenter* suggests that there are at least some categories of information that demand a residual retention of Fourth Amendment protections or reasonable expectation of privacy.

I'm trying to figure out where I have that other than *Carpenter*. What I mean to say is where there is disclosure and yet it's not a loss of the protection. I mean, you think about the attorney-client privilege context, right, people are not their own attorneys. It is extremely important to have those





communications. If you disclose to someone you believe to be assisting you in obtaining legal advice, the information remains privileged. So there's analogy to be found there in the sense that someone is obligated to disclose very private information in order to get a remedy, be that legal or, in this case, medical. I understand that.

I'm just not sure that I read *Carpenter* — which seems to be focused on a different path — to say that there is information that is so fundamentally private, and yet needs to be disclosed, that its disclosure doesn't amount to a loss of the reasonable expectation of privacy. That's what I'm trying to find.

MR. GONZALEZ-PAGAN: Well, your Honor, I apologize, I will blank for a second on the case name, but I can find it somewhere in this folders.

But we have cited and we've -- in our briefs one of the cases involving the Fourth Amendment in which disclosure of the urine test by the hospital to the government would violate the Fourth Amendment. That in itself is medical information obtained and disclosed to a doctor.

And here, likewise, this is information that is in the possession of the healthcare provider of information that has been disclosed to them in the context of medical treatment, in the context of healthcare. I believe there are analogies also to be had with regards to blood draws, for example, as well.





Your Honor, I'm being pointed to *Ferguson v. City of Charleston* is the case that I'm referring to.

So we would argue, of course, that that is a limited set of information that was being sought there. And it is a specific test that was being compelled the disclosure of.

THE COURT: Please slow down for court reporter and judge. Can you just repeat what you've just said. Thank you.

MR. GONZALEZ-PAGAN: I apologize.

We would posit that the disclosure there, while limited in terms of the test that was being sought to be disclosed or that was being requested by the government, that is still medical information, healthcare information, in the possession of a healthcare provider and for which the Fourth Amendment's protections applied.

THE COURT: What then would be the limiting principle that I could use if I were either to analogize *Carpenter* to these facts or to find -- either to extend *Carpenter* naturally or to find something *Carpenter*-like that would apply to medical information of this type?

MR. GONZALEZ-PAGAN: I think that when the information being sought seeks both the identities and broad-encompassing nature of all medical records pertaining to a person as opposed to, say, for example, a limited targeted request, that that is a limiting principle. And I think that's part of what animated *Carpenter*, is that there was a broad request that would have

been revealing of the entire history and life of the person. And equally here, it is seeking all the healthcare records of this patients in relation to both gender-affirming medical care and other treatment. And it seeks that information for six years. It actually -- and mind you, these are transgender young persons. Six years, for some of them, half, if not a third of their lives. It is actually seeking a full picture of the people that we represent.

THE COURT: Thank you very much.

MR. GONZALEZ-PAGAN: Thank you, your Honor.

THE COURT: Madam Reporter, do you wish to take a break before I turn to defendants?

Thank you very much. I'll be back in five minutes.

(Recess)

THE COURT: Mr. Miller, am I questioning you, sir?

MR. MILLER: Yes. That's correct, your Honor.

THE COURT: Thank you.

As the court reporter noted, the audibility in this courtroom is suspect, so I'll ask you to bring the microphone close to you. It is not you; it is us, sir.

Sir, just following on one of the statements or arguments made by your adversaries, once again, I have no interest in interfering with a legitimate grand jury investigation. But I will note that the optics here are noteworthy and not necessarily great for the government.





The executive orders do contain language that some people might consider inflammatory; and I'm not sure that there are facts to match the language of the executive orders. They are executive orders and not statutes. There are the series of administrative subpoenas that seem to be either pared down dramatically or rejected by a number of courts — and sometimes on the basis that there is no legitimate investigative purpose.

So NYU is in negotiations with the government over one of these subpoenas. It gets pulled, and the next day there's a grand jury subpoena.

My concern, sir — and I want not to have this concern — is to cloak discredited subpoenas with the garb and the secrecy of the grand jury process, how does that address the fundamental problems that have been identified by so many courts?

MR. MILLER: Thank you, your Honor.

And just I would like to -- before I answer your Honor's question, I would just like to make a note just for the record. I know your Honor is already aware, but just for the record, I'm restricted by grand jury secrecy according to Rule 6(e).

THE COURT: I understand, sir.

MR. MILLER: I'm not at liberty to confirm or deny the existence of the grand jury subpoenas — alleged grand jury subpoenas, rather; nor am I at liberty to discuss the contents





of the alleged grand jury subpoenas.

THE COURT: Fair enough. Although, if I were to say that NYU didn't have to abide by it unless it were acknowledged -- the point is they believe that a subpoena was issued to them for this information. And there's been no suggestion from the government that somebody else fabricated a subpoena to mess with NYU.

I am fully aware of your 6(e) obligations, sir; and I will let you operate within them. But I have something that looks suspiciously like a grand jury subpoena. And both you and plaintiffs' counsel have proceeded on the assumption that that is an actual grand jury subpoena, and we will continue to do that.

MR. MILLER: Well, respectfully, your Honor, I think I would clarify. I don't know if necessarily the department is proceeding on the assumption that it is a legitimate grand jury subpoena as much as it is that plaintiffs have created this bizarre posture in which the defendant — at least the department — feels obligated to sort of present something that looks sort of akin to a defense of a grand jury subpoena that, again, may or may not exist, but limited by Rule 6(e), because obviously we can't discuss whether those alleged subpoenas even exist in the first place.

THE COURT: Some day you're going to read this transcript and realize how ridiculous everything you said just





sounded.

I understand your obligations, sir. If you knew my background, you would understand that I understand those obligations and my point remains.

The arguments that you are making to me in your submission sound like someone is, at least for purposes of this litigation, acknowledging that it is a grand jury subpoena. So I accept your proviso at the beginning that you can neither confirm nor deny the grand jury subpoena, or whether there are any others, or whether there's an investigation. But we have to somehow respond to the issues identified by plaintiffs, and we're going to do that this afternoon.

So with that in mind, go ahead.

MR. MILLER: I think I would say, your Honor, that, again, the way that I couch it — and I understand your Honor's point. And I would also like to address that this is awkward for me as well to, like, try and feel obligated to balance these obligations to answer your Honor's questions with candor, while also remaining within the strictures of the rules placed on me.

But I think that underscores the strength of the government's position in this posture because it is awkward; and the reason that it's awkward is because the Federal Rules of Criminal Procedure, particularly 17 and 6, contemplate that when there is a challenge to a grand jury subpoena, it's to be

done in the court in which the grand jury subpoena originates, which in this case allegedly, as according to plaintiffs' briefing, occurs in the Northern District of Texas. And so that's the government's position, that to the extent that plaintiffs would like to challenge a subpoena, the Northern District of Texas would be the proper forum to do so.

THE COURT: And yet we have the *Gonzales* decision.

Now, sir, I'm pretty good with Second Circuit law; I'm less good with the law of other circuits. So I don't know if there are analogues to the *Gonzales* decision in other circuits, but I do know that the *Gonzales* decision exists here. And it says specifically that a motion to quash under Rule 17(c) would not offer the same relief as a declaratory action under the circumstances of this case.

Here, there are similarities in the circumstances. The plaintiffs are not the targets of the subpoena; the plaintiffs do not know if the subpoenas have been issued to other healthcare institutions in New York City, and whether their identifying and sensitive information has already been disclosed.

So at least here — and this is the law that governs what I do — Rule 17(c) is not the exclusive mechanism for challenging grand jury subpoenas.

MR. MILLER: That's not the understanding of the government, your Honor.





THE COURT: Okay.

MR. MILLER: At least as far as challenging this alleged grand jury subpoena. I would like to clarify. I'm not speaking necessarily broadly.

THE COURT: Sure. Okay.

MR. MILLER: Yes.

THE COURT: Well, are you arguing that -- you're not arguing I should disregard *Gonzales*; you're arguing that *Gonzales* is factually inapplicable here, or that legally it is cabined in by something else?

MR. MILLER: Well, I would say in regards to *Gonzales*, your Honor, there's two points of clarification that I would make on *Gonzales*.

The first is that, as your Honor is aware, the movant in *Gonzales* sought only a declaratory judgment rather than an injunction, which the *City of Rome* case, which is in our briefing and also a Second Circuit case, describes as, quote, milder and less formidable than a preliminary injunction. And we think that's an important distinction to make.

And in addition, *Gonzales* also notes that --

THE COURT: But if I just issued declaratory relief, I mean, this is when -- this is when I think plaintiffs' counsel has -- there's some traction to the argument that I've got to be able to do something on the injunctive side to preserve my ability to issue meaningful declaratory relief at some point.





You think that's not the case?

MR. MILLER: Do you mind rephrasing that question, please.

THE COURT: I'll try and be more coherent this time, sir.

The point is you're saying to me, Look, Failla, *Gonzales* only gets you part of the way because, at most — and we're not even suggesting you can have this — *Gonzales* would give you the ability to issue some form of declaratory relief. And yet, in order for that relief to be meaningful in this circumstances, I would have to have the ability, at least on a temporary provisional emergency basis, to issue some form of injunctive relief while I sort out the declaratory relief. Otherwise, sir, if I let this go forward and it turns out I would be finding for the plaintiffs on the declaratory relief, the cat's out of the bag, the horse is out of the barn, whatever metaphor you'd like to use. That's the concern I have.

MR. MILLER: I think I would say also, your Honor, I understand; your point is well-taken.

THE COURT: No, tell me why I'm wrong.

MR. MILLER: I think Rule 17 dictates, at least in this case, that the proper mechanism is through the Northern District of Texas. Now, Rule 17 says this Court is the one to properly adjudicate when there is a challenge to a subpoena;





and that naturally raises the follow-up question, which court. And if you look at 17(a), it's the court with the seal on the subpoena. So I think, you know, at least --

THE COURT: And yet *Gonzales* was a subpoena issued from the Northern District of Illinois. It still was challenged here because they weren't sure where the subpoenas were being issued to. They knew that they were being issued to telephone service providers. They reached out to telephone service -- *The New York Times* being the "they" here, reached out to telephone service providers and asked/begged if they could please get advanced notice if a subpoena sought their records. And the telephone service provider said no. And that's why we have the *Gonzales* decision. I don't know how that's any different from what's going on here.

MR. MILLER: Well, I think in *Gonzales*, the Court necessarily mentioned that there was no conclusion that a grand jury subpoena existed. There was a threat of a grand jury subpoena, but not necessarily a grand jury subpoena itself. And I think that that is an important distinction from this case, your Honor, allegedly.

THE COURT: What does the "allegedly" modify, sir? If we were diagramming sentences, I was about to lose it.

Go ahead.

MR. MILLER: I don't mean to present to the Court that there is a subpoena in this case.

THE COURT: Yes, of course.

MR. MILLER: Or that there is not.

THE COURT: Let's try and find a way for you and I to speak so that there's a standing understanding that you're neither confirming nor denying the existence of the subpoena.

MR. MILLER: Understood, your Honor.

THE COURT: I need to figure out what to do if there is a subpoena. So let me please understand again, what you consider to be the significance or not of the threat of a subpoena in *Gonzales*, it would seem to me to be here, there is -- NYU put it on a website; so it's more than a threat. I would have thought that the concerns in *Gonzales* would be even in sharper relief here.

Is it your belief that because it was only the threat of a subpoena that 17(c) was not an option and that's why we have the ability to go to the Southern District of New York in *Gonzales* for that relief?

MR. MILLER: I think the answer to your question is that -- if I may collect myself quickly, your Honor.

THE COURT: Of course.

MR. MILLER: I think it's an important point that in this case the plaintiffs seek preliminary injunctive relief. And that's also a necessary distinguishing point from *Gonzales*, because obviously, to my understanding, to the department's understanding, there is no such thing as preliminary injunctive





relief. And that's why *Gonzales* is distinguishable, is because they weren't seeking a preliminary injunctive relief in *Gonzales*, just a declaratory judgment, which is a judgment, necessarily a final judgment by the Court and not a preliminary action.

THE COURT: Could you please engage with your adversary's argument that one of the problems here is that they don't even know where to look to try and beat back efforts to disclose their most sensitive of information. Now, again, that's the argument they are making; you may find that this information is not so sensitive.

But the concern is this whack-a-mole argument that the plaintiffs have advanced — their words, not mine — that is that they tried to resist, but then they didn't even find out until the grand jury subpoena, allegedly, that there was an administrative subpoena that they weren't even a party to, where their rights could have been, in theory, compromised or violated without their knowledge.

What they are saying is the reason they are here with me now is because they don't know -- they are being buffeted by many different forces. They don't even know where these forces are coming from, but they need to get out there and protect their information. This, to them, is the only way that they can do that.

You're saying to me there's 17(c). 17(c) works if you





know about the subpoena, and it doesn't work if you don't. And it doesn't sound like any of these subpoenas — alleged subpoenas — are going to the patients.

MR. MILLER: I would say in response, your Honor, that the drafters of Rule 17 and also of Rule 6 and any other applicable rule of criminal procedure takes into account circumstances such as this, right. There's grand jury secrecy that exists for a reason. There are protocols that need to be followed in every grand jury proceeding. And the government intends to follow those in every grand jury proceeding.

THE COURT: Okay. I'll talk to you more on jurisdiction. I appreciate your view. Your view is I just don't have it. *Gonzales* doesn't give it to me. There are significant factual distinctions that you believe render *Gonzales* inapplicable or at least unable to give me the ability to consider this here. That's fine.

Please understand that I -- and I hope you saw this in my questioning of your adversaries. I am concerned about grand jury secrecy. I am concerned -- I would assume even plaintiffs' counsel doesn't want to interfere with an ongoing criminal investigation. That's not what we're here for. They are just saying they believe their information is entitled to privacy, and they just want to be able to defend that.

I'm now pivoting, sir, to the issue of class action treatment. You've suggested to me it's not appropriate here.





And I think, as I understand it, that your argument is that even if there was sort of a hint of this in the *AARP* decision, the preliminary or provisional certification of a class — in that case it was a class of detainees, and it was based on the possibility of irreparable harm caused by constitutional violations.

Am I understanding you to suggest that the *Trump v. CASA* decision from later that year sort of retreats from that position or something else?

You know what? Let me ask you a better question:

Please harmonize the *AARP* decision and the *CASA* decision and let me know, in light of those decisions, what you believe my ability is to certify a class for a provisional remedy. Thanks.

MR. MILLER: I think the *CASA* decision clarifies the *AARP* decision, where the *AARP* decision, if I'm recalling correctly, was -- the decision was made, by and large, if not strictly, to preserve the Supreme Court's jurisdiction in that case. And then in the *CASA* decision, it was quite a bit more of the central issue of the case.

Now, the provisional certification of a putative class that the plaintiffs request bears a lot of resemblance to the nationwide injunction that *CASA* obviously disclaimed, largely because unsuccessful plaintiffs can keep suing, while unsuccessful defendants need only lose once. And that's kind

of the final say.

THE COURT: But both *CASA* and *AARP* acknowledged the possibility that rights could still be vindicated on a classwide basis. The decision from Judge McMahon in *American Council of Learned Societies v. McDonald* from last year finds that *CASA* did not seem to remove the possibility of classwide relief. I'm just a little bit concerned about -- I appreciate what you're saying, and no one -- if we can't do a nationwide injunction, we can't do a nationwide injunction. That's fine. I thought both of these Supreme Court decisions left open the possibility that a class action could be certified and that relief could be vindicated on a classwide basis.

And I appreciate your point, which is that you can keep trying until you fail, but the issue is they still have to meet the criteria for certifying a class action. And so it's not as though someone can just haphazardly come in and seek classwide relief without actually making an effort to comply with Rule 23. So I don't know that the concerns that you have or that the Supreme Court has had about nationwide injunctions exist to the same degree if you have the hurdle, the procedural hurdle, of a class action.

MR. MILLER: And I will note also, I have a citation, your Honor, I don't have it necessarily in front of me, but I believe it was in *CASA*, where they were discussing how Rule 23 oftentimes can be circumvented in just the situation that





you're describing. And if I'm misquoting, I apologize, and we're happy to supplement the record. But I will in review that that was the case.

Now, another thing that I would also say is, you know, your point is well-taken that they would, you know, properly have to go through checking all of the boxes of Rule 23. But I think, you know, if a plaintiff or putative class is determined enough to do so, then they will be willing to do so and continue filing cases, continue adjusting the size and scope of their class, continue adjusting the description to their class and the arguments that they make.

THE COURT: Of course. But don't you then have to trust the judiciary knows Rule 23, and we'll certify the appropriate class and not certify the inappropriate class; and if the district court, heaven forbid, gets it wrong, that the Court of Appeals or the Supreme Court will say that they've gotten it wrong?

I mean, I appreciate your concerns about, sort of, litigation strategy, the Machiavellian approach to litigation. But here what we're talking about is still a situation where a judge who has no interest in the case is going to have to decide whether they've adequately pleaded it or proven it or not.

MR. MILLER: I think there's also a consideration of equity, your Honor, from the defendants' side of having to fend





off, you know, several — who knows how many — you know, putative class actions that may be raised against them. That's also an important consideration.

THE COURT: Absolutely. But I would have thought the converse would also be a concern, sir. Do you really want to have 50-individual-named-plaintiff actions alleging the same thing because you're only allowing injunctive relief for each individual? That may not bother the department. Speaking as the judge who would be presiding over some of them, I might be concerned about going that way.

There are equity arguments I think that can be made on either side, sir. And so I would think it would be easier to attempt to proceed on a classwide basis and be told that you can't than to say *ab initio* that you can't proceed on a classwide basis and make everybody file individual plaintiff actions. But tell me why I'm wrong.

MR. MILLER: Yes, I understand that point, your Honor.

And I will say, you know, the judiciary, at least in theory, as Congress views it, is equipped enough to handle all of those cases. Each of those district courts is competent to handle individual cases that are brought. And I think the other side of that coin is that it allows the district courts to be more familiar with the individual facts of each individual plaintiff, weighing in favor and against them.

THE COURT: All right. Just to your point about *CASA*,





sir, my thoughtful law clerk was looking for the issue that you raised, and perhaps someone on your team will find it as well. But the actual reference to circumvention was in the context of a universal injunction. And the statement was that universal injunctions circumvent Rule 23's procedural protections and allow courts to create *de facto* class actions at will. Why bother with a Rule 23 class action when the quick fix of a universal injunction is on the table?

If that's the quote that you're remembering — and it may not be, sir — that would suggest that what the Court was saying was that class actions are good. Universal injunctions are bad. And not that class actions are an end-run around the proscription of universal injunctions in *CASA*. But, of course, if you find other things, you'll certainly let me know.

Please continue, sir.

MR. MILLER: Sure.

I was also going to add — I think maybe I did a poor job of explaining, but we are not necessarily squaring off the idea that these, like, classes can be certified writ large post *CASA*. We are just asserting that they need to make a Rule 23 showing to obtain class right relief; and we're just kind of emphasizing that point, even in the case of preliminary classwide relief.

THE COURT: All right. And I did see in your briefing, you not only sort of challenged the use of a class

action, you say even if you can use a class action, the requirements are not met here.

MR. MILLER: Correct. That's correct, your Honor.

THE COURT: Okay. I understand that.

Some of those arguments were a little stronger than others; though I do remember -- with respect. Because there was an argument that maybe there are people who want to give their information. I very much agree with the plaintiffs' reply that what we're trying to do, what they are trying to do, what I'm being asked to do, is to not obligate someone to turn over information. If I were to grant the injunctive relief plaintiffs seek — a decision I'm not making at the moment — nothing would prevent a member of the class from voluntarily disclosing that information for any reason. But, okay, let's not make that the fulcrum on which this argument rests.

Let's please then talk, sir, about the fifth -- I'm moving from jurisdiction and class action to the actual issues. Because for me, the interesting question at this moment is whether plaintiffs have demonstrated a likelihood of success on — and this is my focus at the moment — the Fifth or Fourth Amendment issues.

So let's please talk about the Fifth Amendment issue.

I think you sort of describe it in a very sort of black-and-white way as sort of the contrast between informational privacy, which you're not saying it doesn't





exist, but you're saying it must give way in the face of Rule 6(e) or a grand jury subpoena. Have I misunderstood that?

MR. MILLER: Well, I think I will say as a preliminary matter, to the extent that at least the Supreme Court has discussed informational privacy right in the context of the Fifth Amendment, to my recollection, there has not been an explicit patent recognition that has been spelled out in plain detail.

Now, we admit in our briefing also that the Supreme Court in some cases seems to maybe assume that such a right exists. But, yes, we also recognize and emphasize that in the grand jury context, there are several cases that stress that there is a diminished reasonable expectation of privacy largely due to the grand jury secrecy rules.

THE COURT: And now we're right back in the problem that bedeviled me at the beginning of this argument: Can't force you — wouldn't force you — to disclose the grand jury -- the nature of the investigation. But how am I supposed to do this balancing if I don't even know what I'm balancing it against?

MR. MILLER: And, again, this is a difficult question for your Honor to respond to because this is properly in front of Judge O'Connor in the Northern District of Texas.

THE COURT: Judge O'Connor the only judge in the Northern District of Texas, or is that the judge who signed off





on the subpoena?

MR. MILLER: Allegedly, your Honor, the Northern District of Texas.

THE COURT: Yes, of course. The alleged signatory of the alleged subpoena, yes.

MR. MILLER: Correct, your Honor.

THE COURT: Okay. Interesting.

I'm sorry. In olden days, I issued subpoenas by -- I could sign on behalf of the U.S. Attorney a grand jury subpoena. I don't recall -- they were countersigned by the Clerk of Court. I don't recall having to get a judge in the district to sign off on them.

MR. MILLER: I may be have misspoken; I may be have -- was like referring to Judge O'Connor's oversight or whoever the judge is, referring to the alleged subpoena in the Northern District of Texas.

THE COURT: We're going to be stuck speaking in hypothetical terms, sir, and I will. But, again, I am trying to understand how it has already progressed to the stage of being before a single judge. If you can give me ways in which that could happen, and the answer is maybe you can't, but I -- again, when I -- in the old days, when I issued grand jury subpoenas, number one, they were cited an actual criminal violation on the face of the subpoena. So the folks who received them had a sense of what it is that was being





investigated.

It astounds me — but, again, not my lane — that right now you can issue a subpoena without telling anybody what the nature of the investigation is. So either -- I don't think 6(e) got amended in this way in the last couple of years to make -- to require -- to not include this information. But I also didn't understand that grand jury subpoenas were countersigned or placed under the jurisdiction of a judge.

MR. MILLER: I don't recall the text of the rule, your Honor, and then procedurally how that works.

THE COURT: Okay. Then let's not.

But please understand the difficulty I have, sir. And telling me that it's because the case is not properly before me is not an answer. I understand that's your basic answer. I need to find a different answer, which is, I'm being asked to consider extremely weighty issues. And I've got nothing on the other side from the government. You're telling me that Judge O'Connor would have all of the answers to all of this. I would think not.

MR. MILLER: Well, I think the Northern District of Texas would be the proper forum to challenge those for plaintiffs.

THE COURT: And then we go right back to the issue raised by your adversaries a few moments ago, which is, they didn't know, for example, about the administrative subpoena

until the grand jury subpoena came out. There's nothing to suggest to them that they know the totality of districts from which these subpoenas are emanating. So telling them to go to these courts, where they don't even know where the subpoenas are and fight them, is a bit illusory, no?

MR. MILLER: Well, I think that's what's contemplated by the Federal Rules of Criminal Procedure, that, you know, to the extent that -- well, first of all, as a preliminary matter, grand jury secrecy, in some circumstances, the government acknowledge, may prevent people whose information is being subpoenaed by third parties, they may not be aware of those and that's contemplated by the rules.

And secondarily, when those parties become aware that that information might be disclosed, then it's Rule 17 that provides the proper forum to challenge.

THE COURT: One of the other arguments you make in the Fifth Amendment context is that I can have some comfort in Rule 6(e) itself. Because there is a question -- if I am able to think about these issues, there is a question about what safeguards are in place to prevent information from being disclosed improperly. I can't imagine, for example, that you could commit to me today that you would not bring a criminal -- that DOJ would not bring a criminal charge against any of the patients whose information is being sought.

MR. MILLER: What's your question, your Honor?





THE COURT: I'll say it again. Yes.

You can't even disclose the existence of the investigation, and I get that. But, by extension, you cannot commit to today that none of the patients whose records are being sought will be prosecuted.

MR. MILLER: That's correct, your Honor.

THE COURT: Right.

And you can't commit that the parents of the minor patients won't be prosecuted based on the information that's being sought by the subpoenas.

MR. MILLER: Well, I would say, your Honor, like -- sorry. Do you mind if I convene with my co-counsel, your Honor?

THE COURT: Yes, of course.

(Counsel conferred)

MR. MILLER: No patients will be prosecuted, your Honor. I may have backtracked. I'm sorry.

THE COURT: No patients in your alleged investigation will be allegedly -- no, and again, please -- I hope you figured out after the last two and a half hours, I'm not trying to trick you here, sir. I want to have the most complete record I can to make the best decision I can, even if that decision is to deny injunctive relief and let this case go to Texas.

The point is the folks at the front table are worried,





and they've presented a parade of horribles to me as to what the government — this government — could do with that information. I don't know that you're not going after patients; I don't know that you're not going after their parents; I don't know that you're not going after the hospitals. You can't, understandably, even acknowledge the existence of the investigation.

So the problem is Rule 6(e), which has salutary purposes, also complicates my ability to discern any safeguards here because, number one, you can't commit — although maybe you just did — to not prosecuting a group of people; and number two, you can't commit to not sharing this information because I'm fully aware of 6(e) orders and how they can be shared with state and local law enforcement authorities. So there's nothing to prevent widespread dissemination in the law enforcement community of the information that you seek.

MR. MILLER: That's correct, your Honor.

And I will say it is -- acknowledging that it's difficult in this context. But to refer your Honor to the briefing on the balancing test on pages 9 and 10 of our brief, I think that will shed some light into this. But also just acknowledging that the government views the plaintiffs and anyone else who is in a similar situation as generally as the victims in this circumstance.

THE COURT: There's a whole Crime Victim Rights Act





that would protect them, no? Why would you have to do this? I mean, there is something from an atmospheric perspective that suggests that what the government is doing is rounding up an entire group of people, identifying them, listing them, finding out the most personal information about them, and giving them no reason to have any comfort that they are not going to be ostracized or somehow harmed. There are episodes of this in our history. They are bad episodes.

You might not be able to, but other people, the objective observer who's not involved and is not employed by either side, might look at this and see it as a rounding up of people for all bad purposes. And I don't -- and that's why I'm looking for safeguards. I have none.

MR. MILLER: Well, again, I would refer your Honor to the procedural safeguards of the secrecy of the grand jury process. In addition, the government also -- I would just like to say for clarity's sake, the government takes the secrecy of everything in the grand jury process with extreme care. And we understand the fears of the plaintiffs and those similarly situated that --

THE COURT: But, for example, with respect -- was there not an agreement reached with an organization in Texas that does detransitioning?

MR. MILLER: That's correct your Honor.

THE COURT: Right. Well, I mean, if that's where

everything is going to be pushed, folks who are transgender could have a legitimate concern that they are going to be forced into something they don't wish to do. Because right now many of them cannot get the care they used to because hospitals have, for various reasons, decided not to offer that care. So if the only care they have is care to detransition, that might cause them concern as well, no?

MR. MILLER: I understand, your Honor. And at the risk of sounding repetitive --

THE COURT: That's why we have to go to the Northern District of Texas.

MR. MILLER: Correct, your Honor.

THE COURT: Yes. Okay. Well, today -- maybe some day. But today you're here, so I understand that.

If there are other Fifth Amendment issues you'd like to raise, I will certainly hear from you.

I would like to pivot to the Fourth, please.

MR. MILLER: Okay.

THE COURT: All right. Do you at least acknowledge as a matter of first principles that the patients have an objectively reasonable expectation of privacy in their medical information?

MR. MILLER: Broadly speaking, yes.

THE COURT: Okay. Well, what about their -- what about the matching of their identity to the information? That





was a terrible question, so I'm going to ask it better.

One of the subpoena requests is for identities of individuals who've received gender-affirming care. There is another request of information about the specifics of the care that they have received. It would not be difficult to match up the individual to the care they received. And indeed your adversaries are arguing that even if I anonymize the production of data, one might be able to discern who received this.

So what I'm saying is if that -- do you acknowledge an expectation of privacy in that combination of information?

MR. MILLER: Generally, I would say the answer is yes, your Honor. I will say with the caveat that, of course, in the grand jury context there are several courts that have held that the reasonable expectation of privacy is diminished.

THE COURT: To me, your strongest argument in the Fourth Amendment is the disclosure to the hospitals, and that's why we've had the discussions we've had about *Carpenter*.

I know and you know that *Carpenter* dealt with cell site location information, and that a lot of the decisions post *Carpenter* have really focused on analogues to that type of information. You heard me discuss several of those with your adversary.

I think plaintiffs are asking me to reason from *Carpenter* a broader legal principle, which is that the third-party doctrine is not categorical.





Could you respond to that, please, sir.

MR. MILLER: Well, I would say to the extent that they request that your Honor would extend *Carpenter* and move forward from *Carpenter*, I think *Carpenter* itself strictly forbids that. The citation 585 U.S. 316, *Carpenter* itself strictly limits it to the cell site location information. So to the extent, again, that my opponents on the other side would request that your Honor extend *Carpenter*, *Carpenter* itself does not contemplate as much.

THE COURT: But does that suggest that forever more courts are limited to finding this residual protection in cell site location information and nothing analogous? I appreciate, sir, that the decision wasn't designed to provide a test for future analyses where one could say, Ah, *Carpenter* admits of this category of information as well. But am I really forbidden from extrapolating from *Carpenter*? The answer may be yes.

MR. MILLER: I think for now I would say that is the standard. Now, your Honor also mentioned when you were questioning my opponents on the other side those cases that declined to extend *Carpenter*. And I think those are the appropriate mechanism through which to look -- to analyze whether *Carpenter* may be extended.

Now, I think, to your point also, your Honor, that you mentioned when you were questioning my opponents, was the





healthcare information that is allegedly at stake in this case is certainly very different than the cell site location information. And I think that is a good point. And I think it would take several steps, several courts, and several years of precedent before it would be appropriate to extend it this far, and the reasoning would have to logically follow.

THE COURT: I understand that. And my thoughtful law clerk is helping us both out by providing the information -- the quote from page 316. And it says: Our decision today is a narrow one. We do not express a view on matters not before us. And I won't read the whole thing in because I'll keep you here all afternoon.

It appears that the Supreme Court is doing what the Supreme Court does, to the consternation of district judges everywhere, which is deciding the case on the facts before it and not offering broad-based analytical structures for courts to use on a going-forward basis. I don't think I would read the language that you're citing to me as proscribing or even expressing a view on techniques outside of cell site location information. Would you agree with that?

MR. MILLER: I think that's a fair characterization, your Honor, again, with the caveat that, you know, for example, the cases that you mentioned I think appropriately assessed -- they also, you know -- those probably would have been a lot shorter opinions if they had just been able to -- you know, to

cite *Carpenter* and say case closed. I think I would then agree.

THE COURT: Okay. Fair enough.

And that's exactly why I was asking your adversaries about those questions, because the cases that I saw, generally speaking, have kept -- have not expanded *Carpenter* to other forms of electronic monitoring or electronic surveillance for the reasons that they've given. And I appreciate that you agree with that assessment. And perhaps the final word has not yet been written on what *Carpenter* or what this residual protection would apply to, but you would argue it would not apply here, which I understand.

Sir, those were the questions that I had for you.

If there were responses to questions that you heard your adversaries give and you thought to yourself, I wish to be heard on those things, now would be a great time for you to tell me about that.

MR. MILLER: If I may just take a look at my notes, your Honor.

THE COURT: Of course. And you may also please consult with your colleague while I figure out what to ask NYU.

(Counsel conferred)

MR. MILLER: Are you ready for me, your Honor?

THE COURT: I am, sir. Thank you.

MR. MILLER: The only last point that I would just





like to emphasize is on page 9 of our brief, where we cite *United States v. Calandra*, for the quote that a witness -- excuse me, quote: "A witness has no right of privacy before the grand jury, which is entitled to 'responses that might prove embarrassing or result from an unwelcomed disclosure of his personal affairs.'"

Now, with that being said, as your Honor is well aware, grand juries routinely subpoena sensitive information. And I think to be overly concerned in any given case would undercut the reason for, you know, the secrecy rules that are in place to begin with. So that's my final point of emphasis, your Honor.

THE COURT: Thank you so much.

MR. MILLER: Thank you.

THE COURT: Mr. Cunha.

MR. CUNHA: Your Honor.

THE COURT: When I began working on this case a scant 27 hours ago, I was really focused on the plaintiffs and on the government. And it seemed to me from reading your submission that what you were arguing was basically that you were an interpleader. You did not want to run afoul of federal authorities, you did not want to run afoul of state or local authorities, and you were hoping for guidance from the Court.

As a result of that, that's really why I didn't focus on questions because, I mean, sure, I'd love your -- no, I'm





being glib, and that's my great failing in life. I really do care about people's views on the very weighty legal issues that I have before me, because my only concern is getting it right. But I didn't know if I should pose those questions to you because, for example, you found yourself caught between two poles here.

So if you have a view as to, for example, my jurisdiction or the concerns that you might have with responding to the subpoena or the Fourth and Fifth Amendment issues that NYU feels have been implicated ought to be vindicated, terrific, I'd love to hear from you. But I didn't have specific questions precisely because of the manner in which your arguments presented themselves.

MR. CUNHA: Your Honor, I appreciate that. And I think the Court has correctly construed NYU's position here betwixt in between the compulsion of a federal grand jury subpoena and the institution's candid recognition of the privacy interests and the heartfelt concerns that the plaintiff and putative plaintiff class have raised.

The only thing I would add just as a factual matter, your Honor, is that to this date, NYU has not produced any patient information. We have been at pains both to negotiate additional protections in terms of not providing identifiable information in the first instance, as well as a reservation of right such that that issue, if the government at some future





time seeks to unmask patient information, that can be contested.

We have also undertaken a considerable effort to attempt to redact and deidentify to the greatest extent practicable. I want to be very clear that in the age of artificial intelligence and multiple points of data that are inherent in a complex medical record, that I cannot stand here and tell the Court with complete absolute philosophical certainty — nor within the scope of the HIPAA statute itself, which speaks to particular categories of redaction — that we can guarantee anonymization. But what I can say is that NYU has endeavored valiantly, and intends to continue to do so, to make every effort to redact and remove identifying information with respect to the individual patients should it be compelled to respond to the grand jury subpoena.

THE COURT: If it turns out I agree with the government, are you ready to produce tomorrow?

MR. CUNHA: We are ready to produce some patient records tomorrow, and thereafter on a rolling basis to do so consistent with that redaction effort that I identified, your Honor. And I'm happy to lay out additional details regarding what that redaction effort entails if that's useful to the Court.

THE COURT: I'm not sure it is.

I guess what I'd like to know in sort of a CliffsNotes

version is the current status of negotiations with the government. The understanding that you had was that you could produce anonymized information with the possibility that they could come back and ask for it to be deanonymized or re-identified or whatever adjective you'd like to use for it.

MR. CUNHA: That's exactly correct, your Honor.

THE COURT: I see.

And I'll just ask, because I've seen some strange things as a judge. The redactions are such that no one would be able to get behind the metadata or -- that absent volitional activity on the part of NYU, no one could deanonymize the data. You get my idea.

MR. CUNHA: I do, your Honor.

THE COURT: Right. Because I've seen people -- you'd be shocked at the redactions I've seen, including things that I myself with my lack of computer knowledge could remove from Adobe. So I just want to understand -- like, people are very worried about this information getting out there. How comfortable can they be that folks' identities would be anonymized?

MR. CUNHA: So I want to be clear, your Honor. I don't mean to sound cavalier about this.

THE COURT: Not at all.

MR. CUNHA: I don't believe that the problem would be that the searchable PDF identifies the text that's behind the





blacked-out block. I think the problem would be, in a complex medical record that is dealing with somebody's transitional process in the course of gender-affirming care, there may be any number of references to situational circumstances, familial dynamics, prior psychological treatment and otherwise. And so even if — and we certainly are undertaking to redact names, identifiers, names of parents, numbers that associate with government records or medical records, etc. Even taking all of those things as a given, what I'm saying to the Court is that represents a very significant, very time and labor-intensive effort that is made in good faith to attempt to anonymize. But I can't stand here and make a representation to the Court that that is potentially bulletproof.

THE COURT: I understand, sir.

Are there other things you'd like me to know?

MR. CUNHA: There are not, your Honor. Unless the Court has any other questions, we rest on our papers.

THE COURT: Thank you so much.

Mr. Strangio, the briefest of replies.

MR. STRANGIO: I think that we are all set.

Thank you, your Honor.

THE COURT: All right. Thank you, everyone.

Just one moment, please.

(Pause)

THE COURT: Friends, as it stands right now, I have a





10 a.m. arraignment that cannot be moved. What I propose is an 11 a.m. oral decision. I won't make you come back here. We'll give you a number to call into. My deputy will circulate it to you. And I will be working from now until then on the decision.

So with that, I'll let you go.

Let me thank you all for your argument. Everybody came well-prepared. And I really do appreciate it. And I also appreciate the grace that you extended me by not requiring me to have it yesterday. So thank you for that. And I'll give an answer as soon as I can.

Take care, everyone.

Oh, and also I'm thanking the amicus folks. I've gotten two. If there were others, I'm sorry, then I forgot about you, but I did get two. So thank you.

* * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CARTER COE, *et al*,

Plaintiffs,

v. 26 Civ. 4641 (KPF)

TODD BLANCHE, *et al*,

Defendants. Teleconference Decision

------------------------------x

New York, N.Y.
June 24, 2026
11:05 a.m.

Before:

HON. KATHERINE POLK FAILLA,

District Judge

APPEARANCES

LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
Attorneys for Plaintiffs
BY: OMAR GONZALEZ-PAGAN
-and-
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
BY: CHASE STRANGIO

U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
Attorneys for Government Defendants
BY: LUKE MILLER
SARAH WELCH

NIXON PEABODY LLP
Attorneys for NYU Defendants
BY: TIMOTHY SINI
ZACHARY A. CUNHA
LINDSAY MALESON

(Teleconference)

(Case called)

THE DEPUTY CLERK: Counsel, please state your name for the record, beginning with plaintiffs.

MR. STRANGIO: Good morning, your Honor.

This is Chase Strangio, on behalf of plaintiffs. And with me on the line is Omar Gonzalez-Pagan, also on behalf of plaintiffs.

THE COURT: Good morning. And thank you to both of you.

Are you able to hear me, Mr. Strangio?

MR. STRANGIO: I am, your Honor. Thank you very much.

THE COURT: Thank you so much.

All right. Representing the DOJ defendants, please.

MR. MILLER: Good morning, your Honor.

This is Luke Miller and Sarah Welch, on behalf of the DOJ defendants.

THE COURT: Good morning. And thank you to both of you for appearing.

And representing the NYU defendants, please.

MR. CUNHA: Good morning, your Honor.

Zachary Cunha, on behalf of the NYU defendants. And I'm joined by my colleagues Timothy Sini and Lindsay Maleson.

THE COURT: Okay. Thank you all very much.

And so as I mentioned yesterday, I thought that the

most efficient thing to do today was to give you an oral decision as soon as I could get it together, and I will do that now. I'm going to remind you, those of you who are listening, that there can be no recording and no rebroadcasting of this decision.

Additionally, let me note that I had asked for folks' indulgence until noon today. But it's now 11:10, and I cannot guarantee that I will be done with my decision — because it is quite lengthy — at the noon hour. So I'm going to understand that the agreement or at least the -- yes, the agreement between the parties not to require the production of materials exists for the length of this oral decision and the time it takes me to post an order that regards that decision. So you'll have to tell me if you disagree with that, and no one is disagreeing with that.

All right. I want to be very clear that, again, this was a very serious case, very well-argued. I still think it is the most efficient use of everyone's time for me to give an oral decision, and I'm going to do that now. But it is a rather lengthy decision. And I'm going to ask you please to mute yourselves, to be comfortable, and to listen as I read this decision into the record.

Let me begin my decision by thanking those of you who are on this call and those of you who have assisted those on the call for the work that you've done in this case and, in

particular, on this motion for a temporary restraining order. I'm fully aware that there were teams of attorneys and support staff behind the scenes. I want them to know that their work on this matter on a very short schedule did not go unnoticed.

I also want to extend my thanks to the four oralists who were willing to give me nearly three hours of their time yesterday.

My experience has been that oral argument does not always aid me in arriving at a decision. But yesterday's oral argument was helpful in clarifying several points, and let me speak to those points now.

To begin, I now have a clearer picture of the information as to which plaintiffs are resisting disclosure. That information comprises both their identities as transgender persons, and the very detailed sensitive records of the gender-affirming care that they have received. And considering that information in its totality is significant. After all, as plaintiffs' counsel noted, the records sought are unusually detailed and include — and I'm quoting from page 11 of the transcript — discussions of familial history, of mental health history, their problems in school, their psychological development, as well as whatever other medical conditions that they may have or experienced beyond gender dysphoria.

Counsel also correctly noted that these materials were sought for a period of six years, which for many of the minor

plaintiffs represents a substantial percentage of their lives. The importance of protection of this information — and indeed ultimately of temporary injunctive relief — is clear when one considers the context in which the information was sought.

The complaint details the backstory to this litigation at paragraphs 41 through 115, and the Court will not repeat all of that information here. It suffices to note, however, that in the first few days of the current administration, multiple executive orders were issued that sought to identify, to demonize, and ultimately to eradicate an entire population of transgender people.

Pursuant to that policy, DOJ issued a flurry of civil administrative subpoenas to healthcare institutions that courts quashed or severely limited. And in doing so, these courts found, among other things, that the subpoenas were pretextual; that they were — and I quote from one decision — a smoke screen for the government's true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless investigations. This particular court decision is quoted in paragraph 79 of the complaint.

But undeterred by its disastrous showing in the courts, DOJ decided to issue nearly identical document requests in the form of grand jury subpoenas emanating from the Northern District of Texas, on which more later. The need for protection of plaintiffs' identifying and sensitive medical

information is further underscored by statements of counsel for NYU Langone, who noted that while the facility was expending significant time and resources to implement redactions to plaintiffs' medical records, with the specter of a later government request for deanonymization always in the background — and now I'm quoting from counsel — in an age of artificial intelligence and multiple points of data that are inherent in a complex medical record, counsel could not guarantee anonymization. This exchange is at pages 74 and 75 of the transcript.

Separately, plaintiffs' counsel aided me in understanding the specifics of the relief sought and why this action cannot simply be dismissed as a motion to quash or an end-run around Rule 17(c). Whether by accident or by design, the administration's policies *vis-à-vis* transgender persons embody a concerted effort to obtain deeply private information about an entire class of individuals without their knowledge or consent.

After the issuance of the executive orders and the Bondi and Shumate memoranda, DOJ attorneys on both the civil and criminal sides issued expansive document requests to third parties without prior notice to the individuals whose information was being sought. It is only the fortuity of NYU's interpretation of the New York Shield Law that allowed plaintiffs in this case to seek redress for claimed

constitutional violations caused by the grand jury subpoena. And then, only then, did they learn of a completely different administrative subpoena that could have resulted in the turnover of this sensitive information without any opportunity for petition or redress.

This record makes plain the cold comfort of telling plaintiffs to pursue their claims under Federal Rule of Criminal Procedure 17(c). They wouldn't even know where to begin.

In extrapolating from the metaphor offered by plaintiffs' counsel, protecting plaintiffs' constitutional rights in this environment is worse than a game of whack-a-mole; it's being forced to play the game blindfolded. And this is precisely the factual scenario for which the *Gonzales* case was designed.

Finally, I had the opportunity to examine the parties' positions concerning the interplay between Rule 6(e) and analogous grand jury secrecy requirements, and plaintiffs' constitutional rights. Now, many in the gallery yesterday chuckled at Mr. Miller's invocation of the term "allegedly." But I appreciate the seriousness with which any government attorney takes his or her grand jury secrecy obligations. The fact remains, however, that the government was not perfectly consistent in its reticence about the grand jury investigation, since counsel pointedly referenced Northern District of Texas

Judge O'Connor as currently having some undefined role in the government's criminal investigation, and later volunteered that no patients would be prosecuted — this is the transcript at page 66 — and that the government, in fact, viewed these individuals as victims.

But, more fundamentally, this Court will not blind itself to reality. And, in this case, reality is the timeline of DOJ's efforts and, in particular, its efforts to recast discredited civil administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction in order to minimize judicial review of constitutional infirmities.

Let me end my introductory comments with this observation: There was precious little on which the parties agreed yesterday, but one point of agreement was on the uniqueness of the facts of this case. Of course, the parties want me to draw different conclusions from that fact, but I agree with you that the facts of this case are unique. And the conclusions the Court reaches on this motion might not be transferable to other cases.

Ultimately, at this early stage, on this record, and given the paramount importance of preserving the privacy of the underlying identification and medical information, I am provisionally certifying a class in accordance with plaintiffs' request and granting plaintiffs' application for a temporary restraining order to enjoin DOJ from seeking sensitive health

and identification information regarding class members.

Let me speak to the parties. And I'll speak about them very summarily, because folks have read the complaint in this case. But the plaintiffs and the similarly situated members of the proposed class are minors, their parents, and young adults who received gender-affirming care in New York City.

There are two sets of defendants here: Defendant Blanche is the Acting Attorney General of the United States. Defendant United States Department of Justice is a federal executive agency, and I will refer to them as the DOJ defendants. Defendants NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine are medical care providers and corporations organized under the laws of New York with their principal place of business in Manhattan. I will refer to them as the NYU defendants.

In terms of factual background, as I mentioned, I will summarize as best I can the very extensive discussions that are in the complaint.

Through a series of executive orders and federal agency actions, this administration has carried out a systematic campaign to attack and dehumanize transgender people, as shown in complaint paragraphs 41 through 88.

On January 20th of 2025, President Trump issued Executive Order 14168, the Gender EO, to declare a national

policy of recognizing only two birth-assigned sexes. And on January 28th, 2025, he issued Executive Order No. 14187, the Denial of Care EO, to put an end to gender-affirming medical care for minors.

As one of several federal agencies tasked with implementing the EOs, DOJ has explored numerous legal avenues for limiting or ending the provision of gender-affirming medical care. At first, DOJ issued civil administrative subpoenas under HIPAA to more than 20 healthcare institutions across the country seeking information about patients receiving gender-affirming medical care. Before April 30th of 2026, every court to have considered motions regarding these subpoenas had granted the motions to quash or limit the subpoenas. And, in several cases, DOJ had represented that anonymized data without patient-identifying information would be sufficient for purposes of those investigations.

Shifting tactics, on April 30th, 2026, DOJ filed a motion to enforce an administrative subpoena in the Northern District of Texas, which promptly granted the motion. And having found a jurisdiction — indeed the only jurisdiction — that was receptive to its arguments, DOJ strategized to concentrate legal actions related to gender-affirming medical care in the Northern District of Texas.

The administration's anti-transgender policies and DOJ's legal actions have directly impacted healthcare

institutions in the New York City area, including the NYU defendants. These defendants had established and maintained a transgender youth health program through which they have provided gender-affirming medical and psychosocial services for transgender youth. They stopped providing these services in February 2026, in response to declarations and proposed rules by the administration that threatened their federal funding.

On May 7, 2026, NYU Langone Hospitals was among several health institutions in New York City to receive a grand jury subpoena from the United States Attorney's Office for the Northern District of Texas, seeking the identifying and detailed sensitive health information of all transgender persons who received medical care as treatment for their gender dysphoria while they were minors, as well as the identity of their parents, from January 1st of 2020 through May 5th of 2026.

The subpoena directed the NYU defendants to provide the requested records by 9 a.m. on June 10th, 2026. Although it was issued by a grand jury in the Northern District of Texas, it curiously requested that the information be made available to a special agent in the Kansas City field office of the FDA Office of Criminal Investigations.

On May 11th, 2026, pursuant to New York state's Shield Law, the NYU defendants made public that they had received the subpoena through a public notice on their website, and they

sent virtually identical notices to affected patients, including plaintiffs and members of the proposed class, through an online portal known as MyChart.

On June 2nd of 2026, plaintiffs filed a complaint, as well as an emergency application for a TRO and provisional class certification, along with the supporting papers in this district. The case was originally assigned to Judge Vargas. The complaint alleges three counts: Violation of the Fifth Amendment due process clause's right to informational privacy against DOJ defendants; violation of the Fourth Amendment's protection against unreasonable and oppressive governmental intrusions on individual privacy against DOJ defendants; and breach of physician-patient confidentiality under New York Civil Practice Law and Rules Section 4504(a) against the NYU defendants.

Plaintiffs seek a declaration that the subpoena's request for the identifying and sensitive health information of plaintiffs and members of the proposed class violates their rights to privacy under the Fifth Amendment, and to be free from unreasonable searches and seizures under the Fourth Amendment.

They seek a declaration that any disclosure by the NYU defendants constitutes a breach of physician-patient confidentiality under New York law; they seek preliminary and permanent injunctive relief, preventing the DOJ defendants from

seeking, receiving, using, retaining, or disseminating any identifying or sensitive health information; they seek preliminary and permanent injunctive relief preventing the NYU defendants from disclosing or producing any identifying or sensitive health information; they seek class certification, a waiver of the requirement for the posting of a bond, and an award of attorneys' fees and costs to plaintiffs.

In terms of class certification, the plaintiffs have identified a class and a subclass under Federal Rule of Civil Procedure 23(b)(2). The class is defined at paragraphs 147 and 148 of the complaint, and I won't repeat them here.

On June 4th, 2026, the parties jointly stipulated to an extension of the deadline for the production of information and records until June 24th. And then yesterday that was extended until today at noon, and now it extends until after this decision is issued and the order filed.

There was then filing from the parties on both the plaintiffs' motion for a TRO and the motion for a provisional class certification. Judge Vargas granted two motions for leave to file amicus briefs, one by several states, and another by the City of New York.

Over the weekend, Judge Vargas understood that she had a conflict. She adjourned the hearing. The case was then reassigned to me. And I scheduled the TRO hearing to take place, as it did, yesterday.

I know the parties are aware of the standards for a temporary restraining order, and I'm therefore going to refer to them as briefly as I can.

A preliminary injunction should issue only where a plaintiff demonstrates a likelihood of success on the merits and a threat of irreparable harm absent relief. Courts also consider whether equity tips in the plaintiffs' favor; whether the public interest favors an injunction; and where, as here, the government is a party to the lawsuit, the equity and public interest factors merge.

One case for these propositions is *New York v. United States Department of Homeland Security*, 969 F.3d 42 (2d Cir. 2020).

That's all I'm going to say about the requirements for a temporary restraining order. I really don't think the parties have dispute about them.

The bigger issue is, of course, the antecedent issue of my jurisdiction to even consider plaintiffs' challenges. And that was the focus of yesterday's oral argument. Ultimately, this Court concludes that it has jurisdiction to evaluate plaintiffs' claims arising from the grand jury subpoena and to issue the requested relief.

Much discussion took place yesterday over the Second Circuit's 2006 decision in *New York Times Company v. Gonzales*, 459 F.3d 160. In that case, the Second Circuit suggested that

a district court in this circuit may properly exercise jurisdiction over claims arising from a grand jury subpoena, including one issued by another court in a different jurisdiction, by relying on its discretion to issue declaratory relief under the Declaratory Judgment Act. That the Federal Rules of Criminal Procedure provide mechanisms to directly challenge the subpoena, including the filing of a motion to quash under Rule 17(c) in the district court overseeing the grand jury proceedings, does not preclude per se a declaratory judgment by the district court adjudicating the collateral civil challenge.

Indeed, the Second Circuit reasoned — and I'm now quoting from the decision at page 166 — Were we to adopt the government's theory and treat a motion to quash under Rule 17(c) as a special statutory proceeding, we would establish a precedent potentially qualifying a substantial number of federal rules of criminal and civil procedure as special statutory proceedings, and thereby severely limit the availability of declaratory relief.

In addition, the Second Circuit has separately recognized that a district court is entitled to use its inherent equity power to award temporary injunctive relief in appropriate circumstances in order to maintain the status quo, such as over claims pending before an administrative agency. Cases for this proposition include *Sheehan v. Purolator Courier*

*Corp.*, 676 F.2d 877 (2d Cir. 1981), and *FTC v. Dean Foods Company*, 384 U.S. 597 (1966).

Let me acknowledge — and I will — that *Gonzales* may not be directly on point. Nonetheless, I am convinced that the Second Circuit's decision on the merits of the reporters' privilege in that case reflects its understanding that it and, by extension, the district court that adjudicated the merits and issued the summary judgment in the first phase of that case, had jurisdiction to evaluate a collateral challenge to a grand jury subpoena issued by a different jurisdiction and, therefore, the equitable power to issue the appropriate relief should the court agree with the merits of that collateral challenge.

To be sure, *Gonzales* discusses only declaratory relief, and that was mentioned by counsel for DOJ defendants yesterday. But as plaintiffs point out, the underlying complaint in *Gonzales* also sought injunctive relief. Nothing about the Second Circuit's decision in *Gonzales* limited the exercise of jurisdiction to the type of relief sought.

In any event, the very language of the Declaratory Judgment Act indicates that the prevailing party in a declaratory judgment may seek further relief in the form of damages or an injunction, meaning that the availability of declaratory relief does not preclude this Court's authority to issue an injunction based on the same considerations. One case

for that proposition, I cite *Horn & Hardart Company v. National Rail Passenger Corp.*, 843 F.2d 546 (D.C. Cir. 1988).

Here, I observe that my jurisdiction to decide the collateral challenge and issue equitable relief is especially important given the insufficiency of Rule 17(c) in the unique circumstances of this case.

Plaintiffs seek to protect highly sensitive and comprehensive personal information about their transgender status, as well as detailed medical history from a concerted serial effort by this administration to identify and target a marginalized group.

The filing of a Rule 17(c) motion to quash the NYU subpoena in the Northern District of Texas would not have any effect on other grand jury or civil administrative subpoenas seeking the same information from NYU and other healthcare institutions in New York City, especially when, as we found out, plaintiffs have no way of learning of the existence of any subpoena. Like the aforementioned game of whack-a-mole, the government may simply switch their strategy and go after plaintiffs' private information under the guise of a different investigation.

Now, the Second Circuit addressed an analogous issue in *Gonzales*, and found there that a motion to quash under Rule 17(c) would not offer plaintiffs the same relief where — and I quote — It is unknown whether subpoenas have been issued, and

if so, whether the subpoenaed entities have already complied. Only an order enjoining the government from seeking plaintiffs' identifying and sensitive personal information is sufficiently protective of plaintiffs' privacy interests and enough to afford complete relief to plaintiffs in this case.

Separately, I have determined that I have subject matter jurisdiction over the case, and that plaintiffs have established standing to sue. I have subject matter jurisdiction under 28 U.S.C., Section 1331, because plaintiffs raise constitutional issues that invoke federal question jurisdiction. I also have subject matter jurisdiction under 28 U.S.C., Section 1346, as a civil action against the United States founded upon the Constitution, an act of Congress, or an executive regulation; as well as under 28 U.S.C., Section 1361, as an action to compel an officer or agency to perform a duty owed to plaintiffs. And I have supplemental subject matter jurisdiction over plaintiffs' state law claims under 28 U.S.C., Section 1367(a).

Turning now to the issue of standing, I find that plaintiffs satisfy all three elements: Injury, causation, and redressability for Article III standing. For one case on that proposition, I cite *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992). In particular, plaintiffs here face an imminent risk that their identifying and sensitive health information will be disclosed today because of the subpoena. In the

Supreme Court's case of *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, the Supreme Court there found that a certainly impending injury satisfies the imminence requirement for establishing an injury-in-fact.

So moving away from the jurisdictional issues to the framework for resolving a TRO, I begin with the question of likelihood of success. And I'll turn first to plaintiffs' arguments under the Fifth Amendment.

To determine whether a constitutional violation has occurred, the Court must first identify the rights at stake. One case for this is *Hancock v. County of Rensselaer*, 882 F.3d 58 (2d Cir. 2018).

The plaintiffs here are identifying two distinct informational privacy rights: First, medical information; and second, information relating to one's transgender status. And in the Second Circuit's decision of *Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999), the circuit described it is beyond debate that for persons who wish to preserve privacy in the matter, transgender status is excruciatingly private. Plaintiffs have thus successfully identified a constitutional privacy right.

So in this setting, the constitutional violation occurs when the individual's interest in privacy outweighs the government's interest in breaching it, quoting again from *Hancock*. And where the government is acting in an executive

capacity, courts consider whether the action was so arbitrary as to shock the conscience. *Hancock* speaks to this, and it in turn cites *O'Connor v. Pierson*, 426 F.3d 187 (2d Cir. 2005).

*O'Connor* goes on to note that mere irrationality is not enough. Only the most egregious official conduct will subject the government to liability for a substantive due process violation based on executive action. A court applying a shocks-the-conscience test must always examine the Executive Branch's interest in breaching that privacy; and the stronger the individual interest, the more compelling the government actor's reasons must be.

Again, and for the next few passages, I am quoting from the *Hancock* decision: Courts apply a balancing test to the government's collection or publication of private personal information that is constitutionally protected. And here, the focus of the inquiry is on the government's interest in the information contained in the records and the manner in which those interests might be achieved, as well as the strength of the individual interest in privacy, and that adjusts how closely courts must scrutinize the government's offered justifications.

Here, I find that the balancing test favors plaintiffs' privacy interests.

First, the scope of information sought by the government here, which includes medical assessments, diagnoses,

informed consent records, and revelation of plaintiffs' transgender status, is significant. This level of detail places the information among the most personal and sensitive a medical provider can hold and squarely within the class of intimate material, warranting the strongest constitutional protection. I'm quoting here from a decision of the Eastern District of Pennsylvania*: In re: Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555.

As discussed above, the Court finds that even the provision of anonymized data would lead to the same result.

Second, the problem is compounded by the absence of adequate safeguards to prevent further disclosure of plaintiffs' private information. As I mentioned, I am sensitive to the requirements of Rule 6(e); and yet that rule contains numerous exceptions permitting enter and intra governmental dissemination of this information. And this absence of meaningful protection favors plaintiffs' privacy interests. Indeed, the government concedes to having worked with officials in Texas, where gender-affirming medical care for minors is banned, to establish detransition clinics. These were discussed at page 67 of the transcript.

Turning to the countervailing government interest, I note that the strength of plaintiffs' interest in privacy, which is significant here, adjusts how closely I must scrutinize the government's offered justifications.

I recognize and respect the government's interest in carrying out criminal investigations using the grand jury's subpoena power. I also reject plaintiffs' attempt to seek what amounts to be an adverse inference based merely on the government's invocation of Rule 6(e). That said, the context surrounding this subpoena, including the various statements made by executive officers, the recent spate of similar and failed administrative subpoenas, the timeline that is before me, leaves me at pains to understand the precise nature of the government's interest and how any legitimate government interest would be served by the disclosure now sought.

Put someone differently, because I cannot conceive of a crime that would require the breadth of disclosure sought in the subpoena, identifying and sensitive medical information for an entire class of people for a six-year period, I have to find that the government's interest does not outweigh the plaintiffs' interest in privacy. I also note that even were the government to articulate a cognizable and legitimate interest in the information it seeks, it would not overcome plaintiffs' strong privacy interest. That's made clear by the Second Circuit's *Hancock* decision.

In sum, the individual's interest in privacy outweighs the government's interest in breaching it. The enormous scope of information sought and the absence of necessary guardrails outweighs the ill-defined government's interest. The subpoena,

expressly targeting members of a particular and uniquely vulnerable group, both shocks the conscience and rises to the level of the most egregious official conduct under the *O'Connor* case.

I turn now to the parties' arguments under the Fourth Amendment.

Once again, I know that the parties are aware of the standards, but the Fourth Amendment's protections apply to the grand jury, which is without power to invade a legitimate privacy interest protected by the Fourth Amendment. The *Calandra* decision, *United States v. Calandra*, 414 U.S. 338 (1974), is at issue here — it is discussed by the parties yesterday; as well, the case of *Trump v. Vance,* 480 F. Supp. 3d 460, a Southern District of New York decision that was affirmed by the Second Circuit in 977 F.3d 198.

Demands for information through a *subpoena duces tecum* may constitute a search forbidden by the Fourth Amendment if the terms are unreasonable. That's recognized in the Second Circuit's 1973 decision in *In Re: Horowitz,* 482 F.2d 72. It is quoting *Hale v. Henkel*, 201 U.S. 43 (1906). Whether a particular intrusion is reasonable is measured in objective terms by examining the totality of the circumstances. I'm quoting here from *Ohio v. Robinette*, 519 U.S. 33 (1996).

And this requires balancing the need to search against the invasion which the search entails. Quoting here from *New*

*Jersey v. T.L.O.*, 469 U.S. 325 (1985); and later on, a contextualized reasonableness analysis seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the government. Quoting here from *Caldarola v. County of Westchester*, 343 F.3d 570 (2d Cir. 2003).

Whether such an intrusion is reasonable depends on the context, including the nature, purposes, and scope of the inquiry. There are many cases for this proposition. One is *Oklahoma Press Publishing Company v. Walling*, 327 U.S. 186. A subpoena that is irrelevant, abusive or harassing, overly vague or excessively broad is unreasonable. Quoting here from the Fourth Circuit's 2007 decision in *In Re: Grand Jury, John Doe No. G.J.2005-2,* 478 F.3d 581.

Plaintiffs allege — returning to this case — that the government's subpoena constitutes an unjustifiable intrusion into their reasonable expectation of privacy under the Fourth Amendment. And I find that on this record the claim is likely to succeed. Specifically, I find that plaintiffs and members of the proposed class and NYU subclass have an objectively reasonable expectation of privacy in the sensitive medical records that the government's subpoena seeks.

During oral argument, the government acknowledged this point explicitly at pages 68 and 69 of the transcript. And federal and state law, including HIPAA and New York's Shield

Law enshrine this privacy right. And that's discussed at the plaintiffs' brief at page 20.

Further, in an analogous context, the Supreme Court has recognized that the patients have an objectively reasonable expectation of privacy in their medical records, even where held by a hospital. In *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), the Court held that where the government conducts a warrantless search of such records, the plaintiffs do not consent to that search, and the government's primary purpose is to generate evidence for law enforcement purposes, the plaintiffs have an objectively reasonable expectation of privacy in their medical records, and the government must get a warrant to search the information.

Such is the case here.

Plaintiffs' disclosure of their sensitive health information to their physicians does not constitute a waiver of their privacy rights, and the government's subpoena does not overcome those privacy rights. Nor, for that matter, am I satisfied that NYU could adequately anonymize the health records to protect plaintiffs' privacy rights. As NYU's counsel acknowledged during oral argument, given the voluminous nature of the records and the ubiquity of personal identifying information therein, it is impossible to guarantee anonymization of plaintiffs' identities.

Finally, I'm persuaded by plaintiffs' argument that

the reasoning in *United States v. Carpenter*, 585 U.S. 296 (2018), applies to this case. *Carpenter* held that an individual maintains a reasonable expectation of privacy in his cell site location information — even though such information is held by a third party — because the information provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations. I am quoting from page 311 of that decision. And as the Supreme Court explained on that same page, such location records hold for many Americans the privacies of life.

Now, I acknowledge that lower courts have declined to extend *Carpenter* in technological contexts beyond the collection of cell site location information. Nonetheless, I find *Carpenter*'s reasoning directly applicable to the unique circumstances here.

The records that the government's subpoena seeks — six years of aggregated treatment history, diagnoses, family information, and intimate personal detail — are precisely the kinds of privacies of life contemplated in *Carpenter*. Of course, in *Carpenter* — and the government noted this yesterday — the Supreme Court was careful to recognize the unique nature of cell phone location records. But as counsel repeatedly emphasized at oral argument — both sides said this — the government's subpoena in this case is also unique, the

facts of this case are also unique, and the subpoena seeks information that would allow the government to compile a sweeping profile of plaintiffs.

So in light of the government's acknowledgment that plaintiffs have an objectively reasonable expectation of privacy in this information, the statutory enshrinement of these privacy rights, and cases such as *Ferguson* and *Carpenter*, I find that plaintiffs have shown that they are likely to succeed in demonstrating a Fourth Amendment violation.

On the New York CPLR Section 4504 claim, it's not clear to me that plaintiffs will be likely to succeed on those merits, in particular because I think that state privilege law might not govern where a federal criminal subpoena compels disclosure. So while I am finding a likelihood of success on the Fourth and Fifth Amendment claims, I am not finding one on the state law claims.

I turn now to the other TRO factors.

The plaintiffs have amply demonstrated the threat of irreparable harm absent relief. They have shown that they're threatened with imminent violation of their constitutional rights in the absence of preliminary relief. That's a quote from the case of *Airbnb, Incorporated v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019). And that showing suffices for purpose of a TRO, as the Second Circuit recognized in *Mitchell v. Cuomo,* 748 F.2d 804 (2d Cir. 1984).

Specifically, plaintiffs in this case sought gender-affirming treatment under a reasonable assumption of absolute privacy. If not enjoined, the subpoena would allow the government to obtain and disclose the most intimate details about plaintiffs' medical histories and personal lives — in particular, their transgender status. It would risk all manner of irreparable harm, including by inflicting deep emotional harm, destroying trust in medical care, and spreading damage to families, peers, and others. I'm quoting from *In re: Subpoena No. 25-1431-014,* the Eastern District of Pennsylvania decision reported at 810 F. Supp. 3d 555.

The injuries that I've just identified inhere in — and, indeed, appear to be the purpose of — the government's acquisition of plaintiffs' identifying and sensitive information, they are not limited to the possibility of public disclosure, even if the latter would exacerbate the harm.

The government, for its part, insists that the secrecy of grand jury proceedings renders concerns about the use and disclosure of patient information, a remote, speculative possibility. But it could offer the Court few assurances at yesterday's hearing that the requested records would not be used to harm plaintiffs.

For example, there was no promise that the records would not be used to prosecute the parents of the patients or the doctors who facilitated treatment. And there was some back

and forth as to whether the minor plaintiffs would themselves face prosecution. I'm hard-pressed for reasons to rely on the government's representations that even the patients would not be prosecuted, especially given the inability to comment on any aspect of the alleged investigation or the subpoena.

Turning now to the balance of equities and the public interest. They are analyzed together because, as I mentioned, the government is a party to the case. They weigh in favor of relief.

In the Southern District decision of *Coronel v. Decker*, 449 F. Supp. 3d 274 (S.D.N.Y. 2020), the Court found that where a grievous constitutional violation is alleged, the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld.

Here, the acquisition and disclosure of plaintiffs' identifying and sensitive personal information raise serious constitutional issues, especially the irreversible revelation of their highly intimate information to the government. The equities thus weigh in favor of temporarily protecting plaintiffs from such disclosure while these legal issues are worked out.

So having determined that plaintiffs are likely to succeed on the merits of their Fifth and Fourth Amendment claims, that they've sufficiently demonstrated irreparable harm, and that the balance of equities and public interest tip

in their favor, I find that plaintiffs are entitled to preliminary injunctive relief.

The next and, I believe, final question before me is the scope of that relief. And on that question, I provisionally certify plaintiffs' proposed class and NYU subclass, and grant classwide declaratory and injunctive relief.

Let me begin.

It is well-established that certain circumstances give rise to the need for prompt injunctive relief for a named plaintiff or on behalf of a class, and that the court may conditionally certify the class or otherwise award a broad preliminary injunction without a formal class ruling under its general equity powers. I'm quoting from the Southern District 2012 decision in *Strouchler v. Shah*, 891 F. Supp. 2d 504.

Last year in *AARP v. Trump*, 605 U.S. 91, the Supreme Court confirmed that courts may issue temporary relief to a putative class, recognizing that exigent circumstances may impose practical constraints, and that preliminary relief is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a civil trial on the merits. I'm quoting from pages 96 and 98 of that decision. And, the Supreme Court reasoned, the purpose of such relief is merely to preserve the relative positions of the parties pending further proceedings. This is from page 96.

In this Court's estimation, the Supreme Court's slightly more recent decision in *Trump v. CASA Inc.*, 606 U.S. 831, does not change or does not modify the district court's authority to issue provisional class certification and to grant classwide temporary relief.

As Judge McMahon in this district explained in *American Council of Learned Societies v. McDonald,* 792 F. Supp. 3d 448, *CASA* counsels us — and I'm quoting from her — that limited preliminary relief for a purported but still defined class of individuals is not the type of relief prohibiting the enforcement of a law or policy against anyone to which the decision in *CASA* applied.

Indeed, preliminary injunctive relief that relates solely to the pleaded classes is not broader than necessary to provide complete relief to each plaintiff with standing to sue.

At oral argument, the government may have misperceived the Supreme Court's obvious disfavor of universal or nationwide injunctions, and what is believed to be that particular procedural posture's circumvention of Rule 23's procedural protections in *CASA* to disallow any preliminary classwide relief.

Let me try that again.

I do think that the government overstated or misunderstood what the Supreme Court was complaining about in *CASA*. And in my mind, they were complaining about the

nationwide injunction and not about class action. Because in *CASA*, the Supreme Court specifically condemned universal injunctions as a class action workaround at page 850 of the decision. And they even asked the rhetorical question: Why bother with a Rule 23 class action when the quick fix of a universal injunction is on the table?

The government agreed that the plaintiffs need to make a Rule 23 showing to obtain classwide relief, and that is what plaintiffs have tried to do in this case. My role as a district judge is to evaluate whether they had made a sufficient showing to satisfy the requirements of Rule 23 and warrant preliminary classwide relief.

And, ultimately, I find that they have made such a showing on a preliminary basis. The proposed class and NYU subclass are likely to satisfy the Rule 23(a) requirements of numerosity, with well over 40 minor patients who sought gender-affirming medical care at NYU Langone alone; commonality, including common injuries arising from the imminent disclosure of identifying and sensitive health information; typicality, as plaintiffs' claims are typical of the proposed class and NYU subclass, especially given that the claims arise from the same course of conduct; and adequacy where there is no fundamental conflict between the named plaintiffs and other members of the putative classes — class and subclass; and where plaintiffs can't fairly and adequately

protect the interests of the class and subclass.

In addition, plaintiffs' proposed class and NYU subclass appear to meet the Second Circuit's additional requirement of ascertainability, because membership can be clearly and objectively ascertained based on information regarding specific, defined forms of medical care received during a discrete time period from healthcare entities within a discrete geographic location. The ascertainability requirement is discussed in cases including *In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017).

Let me also note that plaintiffs' proposed class and subclass very likely satisfy Rule 23(b)(2). And central to a (b)(2) class — and I'll quote here — The indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to the all of the class members or as to none of them. The quote here is from *Wal-Mart Stores Incorporated v. Dukes,* 564 U.S. 338 (2011).

Here, I find that provisional certification under 23(b)(2) is particularly suitable because defendants' conduct applies generally to the class members and would injure the class members in the same way, and because plaintiffs seek a uniform remedy to enjoin what they have described as defendants' unlawful conduct.

In conclusion, the Court is granting plaintiffs'

application for a TRO, and their motion for provisional certification of the class and the NYU subclass.

Let me talk to the parties now about housekeeping measures going forward.

Given the 14-day timeline of the TRO, it is my intention to set Wednesday, July 8th, as the date of the preliminary injunction hearing. But I did want the parties to speak about that.

For example, if the parties need more time because of discovery or need less time or have decided that they have given me all of their best arguments and there is no reason for an additional hearing, I want to know. But I did want to give everyone a chance to sit with this decision and think about what options make the most sense for your clients.

So what I will ask is if I could have a letter by the end of the day on Friday, joint letter from the parties, telling me what their pleasure is with respect to additional discovery or motion practice or briefing. And I will endorse it if it is reasonable.

I am also terminating the motion that is pending at docket entry 16 because it's been resolved by this decision.

To my friends at the plaintiffs' table, that is my decision. Is there anything I have neglected to do, Mr. Strangio?

MR. STRANGIO: No, your Honor. We thank the Court for

the thorough decision and expedited resolution of the TRO. And we will get that letter to the Court by the end of the day on Friday.

THE COURT: I thank you so much.

Mr. Miller, from the DOJ's perspective, is there anything I've forgotten to do?

MR. MILLER: Nothing further, your Honor. Thank you.

THE COURT: I thank you so much.

All right. And Mr. Cunha, last, but never least, sir, is there anything that you would like me to do that I have failed to do?

MR. CUNHA: Much appreciated. No, your Honor.

THE COURT: All right. With that, I know you have better things to do than listen to me read another decision, so I will let you go with my deep thanks. And I look forward to hearing from you all on Friday.

Take care, everyone. Thank you.

* * *