# No. 26-1886

## In the United States Court of Appeals for the Second Circuit

CARTER COE, by and through his parent and next friend Caroline Coe; REED ROE, by and through his parent and next friend Riley Roe; NICOLE NOE, by and through her parent and next friend Norman Noe; KARL KOE; and JAY DOE, each on behalf of themselves and all similarly situated,
*Plaintiffs-Appellees*,

v.

TODD BLANCHE, United States Attorney General, in his official capacity; UNITED STATES DEPARTMENT OF JUSTICE,
*Defendants-Appellants*,
NYU LANGONE HEALTH SYSTEM; NYU LANGONE HOSPITALS; NYU GROSSMAN SCHOOL OF MEDICINE, a division of New York University,
*Defendants*.

On Appeal from the United States District Court for the Southern District of New York, No. 1:26-cv-04641-KPF, Hon. Katherine Polk Failla

## PLAINTIFFS-APPELLEES' RESPONSE BRIEF

Chase B. Strangio
Shana Knizhnik
**American Civil Liberties Union Foundation**
125 Broad Street, Floor 18
New York, New York 10004
(212) 549-2500
cstrangio@aclu.org
sknizhnik@aclu.org

Omar Gonzalez-Pagan
Karen L. Loewy
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org
*Additional counsel on inside cover.*

*Counsel for Plaintiffs-Appellees*

Robert Hodgson
Gabriella Larios
Anya Weinstock
**New York Civil Liberties Union Foundation**
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300

Elizabeth Gill
Adrienne Spiegel
**American Civil Liberties Union Foundation**
425 California Street, Suite 700
San Francisco, California 94104
(415) 343-0779

Nora Huppert
**Lambda Legal Defense and Education Fund, Inc.**
3656 N. Halsted St.
Chicago, Illinois 60613
(312) 605-3233

A.D. Sean Lewis
**Lambda Legal Defense and Education Fund, Inc.**
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
(213) 382-7600

Joshua S. Margolin
**Selendy Gay PLLC**
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

STATEMENT OF THE CASE .......... 3

I. Factual Background .......... 3

A. The Administration Targets Transgender People .......... 3

B. DOJ Issues Administrative Subpoenas to Healthcare Institutions. .......... 6

C. Stymied in Its Civil Investigations, DOJ Issues Grand Jury Subpoenas. .......... 9

II. Procedural History .......... 14

SUMMARY OF THE ARGUMENT .......... 17

ARGUMENT .......... 19

I. Plaintiffs Are Likely to Succeed on the Merits. .......... 19

A. The District Court Did Not Abuse Its Discretion In Assuming Jurisdiction Over Plaintiffs Claims. .......... 19

B. Plaintiffs Are Likely to Succeed on Their Fifth Amendment Informational Privacy Claim. .......... 31

C. Plaintiffs Are Likely to Succeed on Their Fourth Amendment Claim. .......... 49

II. Absent an Injunction, Plaintiffs Will Be Irreparably Harmed. .......... 54

III. The Equities and the Public Interest Favor Plaintiffs. .......... 55

IV. The Injunction Properly Applies to NYU. .......... 57

CONCLUSION .......... 61

CERTIFICATE OF COMPLIANCE .......... 63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2025 UPMC Subpoena*,
No. 25-mc-01069, 2026 WL 570419 (W.D. Pa. Mar. 2, 2026) .........................49

*A.H. by & through Hester v. French*,
985 F.3d 165 (2d Cir. 2021) ......................................................................55

*Abouammo v. United States*,
146 S. Ct. 1571 (2026)...............................................................................26

*In re Administrative Subpoena 25-1431-032*,
No. 26-MC-00006-O, ECF 17 (N.D. Tex. May 12, 2026)................................22

*In re: Administrative Subpoena 25-1431-032 to Rhode Island Hosp.*,
836 F.Supp.3d 459 (D.R.I. 2026) .......................................................26, 39

*In re Administrative Subpoena No. 25-1431-019*,
800 F.Supp.3d 229 (D. Mass. 2025)...............................................................8

*In re Administrative Subpoena No. 25-1431-030*,
No. 25-MC-00063,
2026 WL 33398 (D. Colo. Jan. 5, 2026) ........................................................8

*Airbnb, Inc. v. City of New York*,
373 F.Supp.3d 467 (S.D.N.Y. 2019) ............................................................54

*Alpha Medical Clinic v. Anderson*,
280 Kan. 903 (2006) ..................................................................................38

*American Academy of Pediatrics v. Uthmeier*,
180 F.4th 1022 (7th Cir. 2026) ....................................................................30

*American Association of Physicians for Human Rights, Inc. v. National Institutes of Health*,
795 F.Supp.3d 678 (D. Md. 2025)..................................................................5

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015)..............................................................................18, 27

*Arroyo González v. Rosselló Nevares*,
305 F.Supp.3d 327 (D.P.R. 2018) ....................................................................33, 42

*Blair v. United States*,
250 U.S. 273 (1919)............................................................................................37

*Boyd v. United States*,
116 U.S. 616 (1886).......................................................................................36, 50

*Carpenter v. United States*,
585 U.S. 296 (2018)....................................................................................*passim*

*Chanko v. American Broadcasting Companies Inc.*,
49 N.E.3d 1171 (N.Y. 2016)..............................................................................59

*Chatrie v. United States*,
609 U.S. 605 (2026)...................................................................19, 50, 51, 53

*In re Children's National Hospital*,
No. 25-CV-03780, 2026 WL 160792 (D. Md. Jan. 21, 2026) ...............39, 45, 48

*Church of Scientology of California v. United States*,
506 U.S. 9 (1992)...............................................................................................55

*Cisco Systems, Inc. v. Doe I*,
146 S. Ct. 1882 (2026)........................................................................................29

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013)............................................................................................30

*In re Copley Press, Inc.*,
518 F.3d 1022 (9th Cir. 2008) ............................................................................54

*Coronel v. Decker*,
449 F.Supp.3d 274 (S.D.N.Y. 2020) ..................................................................56

*Correctional Services Corp. v. Malesko*,
534 U.S. 61 (2001)..............................................................................17, 20, 30

*De Beers Consolidated Mines, Ltd. v. United States*,
325 U.S. 212 (1945)............................................................................................58

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022)....................................................................................34

*Doe v. Broderick*,
225 F.3d 440 (4th Cir. 2000) ...........................................................................52

*Doe v. City of New York*,
15 F.3d 264 (2d Cir. 1994) ...............................................................................32

*Doe v. Harris*,
696 F.2d 109 (D.C. Cir. 1982)..........................................................................21

*Douglas Oil Co. v. Petrol Stops Northwest*,
441 U.S. 211 (1979)....................................................................................22

*Douglas v. Dobbs*,
419 F.3d 1097 (10th Cir. 2005) ........................................................................52

*Dow Jones & Co. v. Harrods Ltd.*,
346 F.3d 357 (2d Cir. 2003) ......................................................................22, 23

*Doctors for American v. Office of Personnel Management*,
793 F.Supp.3d 112 (D.D.C. 2025)......................................................................5

*Endocrine Society v. FTC*,
832 F.Supp.3d 1 (D.D.C. 2026)..........................................................................5

*FBI v. Fikre*,
601 U.S. 234 (2024)....................................................................................31

*Ferguson v. City of Charleston*,
532 U.S. 67 (2001)................................................................................16, 52

*Forschner Group, Inc. v. Arrow Trading Co.*,
124 F.3d 402 (2d Cir. 1997) ......................................................................57, 58

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010)....................................................................................20

*In re Grand Jury Investigation in New York Cnty.*,
779 N.E.2d 173 (N.Y. 2002)...................................................................39, 59, 60

*In re Grand Jury Proceedings*,
801 F.2d 1164 (9th Cir. 1986) ....................................................................46, 47

*In re Grand Jury Subpoena Served Upon Doe*,
781 F.2d 238 (2d Cir. 1986) ........................................................................36, 37

*Hale v. Henkel*,
201 U.S. 43 (1906)..............................................................................................49

*Hancock v. County of Rensselaer*,
882 F.3d 58 (2d Cir. 2018) ...........................................................................*passim*

*Holland v. Florida*,
560 U.S. 631 (2010)............................................................................................31

*In re Horowitz*,
482 F.2d 72 (2d Cir. 1973) ..................................................................................49

*Jaffee v. Redmond*,
518 U.S. 1 (1996).................................................................................................35

*Juric v. Bergstraesser*,
44 A.D.3d 1186 (N.Y. App. Div. 3d Dep't 2007) ..............................................60

*Katz v. United States*,
389 U.S. 347 (1967)............................................................................................50

*Kerns v. Bader*,
663 F.3d 1173 (10th Cir. 2011) ..........................................................................52

*Kingdom v. Trump*,
No. 25-CV-691, 2026 WL 2690647 (D.D.C. Aug. 26, 2026),.............................5

*Lackey v. Stinnie*,
604 U.S. 192 (2025)............................................................................................25

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016).................................................................................55

*Make the Road New York. v. Pompeo*,
475 F.Supp.3d 232 (S.D.N.Y. 2020) ..................................................................55

*Mazzocchi v. Windsor Owners Corp.*,
204 F.Supp.3d 583 (S.D.N.Y. 2016) .................................................................42

*In re Meta Pixel Healthcare Litig.*,
647 F.Supp.3d 778 (N.D. Cal. 2022)..................................................................54

*Mitchell v. Cuomo*,
748 F.2d 804 (2d Cir. 1984) ..............................................................................56

*National Institutes of Health v. American Public Health Association*,
145 S. Ct. 2658 (2025)........................................................................................24

*New York Times Co. v. Gonzales*,
382 F.Supp.2d 457 (S.D.N.Y. 2005) ......................................................22, 23, 25

*New York Times Co. v. Gonzales*,
459 F.3d 160 (2d Cir. 2006) ..........................................................................*passim*

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) ................................................................................55

*O'Connor v. Pierson*,
426 F.3d 187 (2d Cir. 2005) ...........................................................2, 32, 40, 41

*Olmstead v. United States*,
277 U.S. 438 (1928)...........................................................................................34

*Oregon v. Gonzales*,
546 U.S. 243 (2006)...........................................................................................49

*Oregon v. Kennedy*,
831 F.Supp.3d 1048 (D. Or. 2026) ......................................................................5

*PFLAG, Inc. v. Trump*,
769 F.Supp.3d 405 (D. Md. 2025),......................................................................4

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999) ..........................................................................*passim*

*QueerDoc, PLLC v. United States Department of Justice*,
187 F.4th 1112 (9th Cir. 2026) ...............................................................7, 47, 48

*Rodgers v. Rensselaer County Sheriff's Department*,
No. 14-CV-01162, 2015 WL 4404788 (N.D.N.Y. July 17, 2015)......................40

*Schwenk v. Kavanaugh*,
4 F.Supp.2d 110 (N.D.N.Y. 1998).....................................................................40

*See v. City of Seattle*, 387 U.S. 541 (1967)..........................................................49

*Sheehan v. Purolator Courier Corp.*,
676 F.2d 877 (2d Cir. 1981) ...........................................................25, 58

*Siemens Energy, Inc. v. Petroleos de Venezuela, S.A.*,
82 F.4th 144 (2d Cir. 2023) ..........................................................................34

*Sierra Club v. United States Army Corps of Engineers*,
732 F.2d 253 (2d Cir. 1984) ..........................................................................58

*Smith v. Maryland*,
442 U.S. 735 (1979)........................................................................................51

*Sterling v. Borough of Minersville*,
232 F.3d 190 (3d Cir. 2000) ..........................................................................36

*Texas v. Bruck*,
No. EF2025-2536, slip op.
(N.Y. Sup. Ct., Ulster Cnty. Oct. 31, 2025) ......................................................44

*In re Subpoena Duces Tecum*,
228 F.3d 341 (4th Cir. 2000) .........................................................................47

*In re Subpoena Duces Tecum No. 25-1431-016*,
No. 25-mc-00041, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025)..............7, 49

*In re: Subpoena No. 25-1431-014*,
810 F.Supp.3d 555 (E.D. Pa. 2025)..................................................41, 43, 45, 54

*Tucson Woman's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) .........................................................................41

*United States v. Beaufils*,
160 F.4th 1147 (11th Cir. 2025) .....................................................................47

*United States v. Dionisio*,
410 U.S. 1 (1973)....37

*United States v. Doe*,
457 F.2d 895 (2d Cir. 1972)....37

*United States v. Griffiths*,
47 F.3d 74 (2d Cir. 1995)....21

*United States v. Hayes*,
794 F.2d 1348 (9th Cir. 1986)....47

*United States v. Jones*,
565 U.S. 400 (2012)....51

*United States v. Miller*,
425 U.S. 435 (1976)....51

*United States v. Westinghouse Electric Corp.*,
638 F.2d 570 (3d Cir. 1980)....41

*Wagner v. Taylor*,
836 F.2d 566 (D.C. Cir. 1987)....25

*Washington v. Glucksberg*,
521 U.S. 702 (1977)....36

*Webster v. Doe*,
486 U.S. 592 (1988)....29

*Whalen v. Roe*,
429 U.S. 589 (1977)....31, 34, 46

*Whitman-Walker Clinic, Inc. v. United States Department of Health & Human Services*,
485 F.Supp.3d 1 (D.D.C. 2020)....43

*World Professional Association for Transgender Health v. FTC*,
No. 26-532, 2026 WL 1999008 (D.D.C. July 10, 2026)....30

*Yang v. Kosinski*,
960 F.3d 119 (2d Cir. 2020)....55

*Z.A. v. Blanche*,
837 F.Supp.3d 1036 (N.D. Cal. 2026), ........................................................*passim*

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)...............................................................................29

**Statutes**

28 U.S.C. § 2072 .......................................................................28, 29

2 Rev. Stat. of N.Y., pt. III, ch. VII, tit. III, § 73 (1st ed. 1828)..............................35

Crime Victims' Rights Act, 18 U.S.C. § 3771 ......................................................10

N.Y. Exec. L. § 837-x (2025) ...................................................................11, 28, 60

N.Y. Gen. Bus. L. § 394-I(10) (2026) .................................................................60

**Other Authorities**

*AG Paxton Declares So-Called Sex-Change Procedures on Children and Prescription of Puberty Blockers to be "Child Abuse" Under Texas Law*, Att'y Gen. of Texas, Press Release (Feb. 21, 2022), .......................44

CPLR 4504..........................................................................................59, 60

Daniel W. Shuman, *The Origins of the Physician-Patient Privilege and Professional Secret*, 39 SW L.J. 661 (1985) ..............................................35

Declaratory Judgment Act ...................................................................*passim*

Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) .................................................4

Exec. Order No. 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) .....................................4

Fed. R. Civ. P. 65 ..................................................................................57

Fed. R. Crim. P. 6................................................................................*passim*

Fed. R. Crim. P. 17.............................................................................21, 28

John C. Moskop, et al., *From Hippocrates to HIPAA: privacy and confidentiality in emergency medicine – Part I: conceptual, moral, and legal foundations*, 45 Annals of Emergency Med. 53 (2005) .....................35

Kristie L. Seelman et al., *Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults*, 2 Transgender Health 17–28 (2017), https://tinyurl.com/3bmfanjx..........................................43

Louis D. Brandeis & Samuel D. Warren, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890).....................................................................34

Medical Soc'y of N.Y., *A System of Medical Ethics* 21 (1823) ..............................35

Miles Wilkinson, *Codification and the Origins of Physician-Patient Privilege*, 32 J. Pol'y Hist. 78 (2020) ................................................35

NYU, *NYU Langone Statement on Settlement with DOJ* (Sept. 2026), (visited Oct. 20, 2026) ....................................................................13

Richard H. Fallon, Jr., *Constitutional Remedies: In One Era and Out the Other*, 136 Harv. L. Rev. 1300 (2023)..........................................27

Scott Skinner-Thompson, *Outing Privacy*, 110 Nw. U. L. Rev. 159 (2015)..............................................................................................36

Settlement Agreement, *In re Children's Hosp. of Los Angeles Subpoena*, No. 25-CV-11183, ECF No. 25-1 (C.D. Cal. Jan. 22, 2026) ....................................................................................................45

Thomas R. Lee, *Preliminary Injunctions and the Status Quo*, 58 Wash. & Lee L. Rev. 109 (2001)...............................................................25

United States Department of Justice, Justice Manual § 9-11.121 ...........................26

United States Department of Justice, Press Release No. 26-1022, *Justice Department Secures Agreement with Mount Sinai to End Pediatric 'Gender Affirming Care'* (Sept. 4, 2026).....................................12, 56

United States Department of Justice, Press Release No. 26-1080, *DOJ Secures Agreements with NYU and UPMC to End Pediatric 'Gender-Affirming Care'* (Sept. 18, 2026) ............................................12, 13, 56

United States Department of Justice, Press Release No. 26-611, *Justice Department Secures Resolution with Cleveland Clinic to End Pediatric "Gender-Affirming Care"* (June 5, 2026),....................................8

United States Department of Justice, Press Release No. 26-894, *Justice Department Secures Agreement with Connecticut Children's to End Pediatric "Gender-Affirming Care"* (Aug. 5, 2026),.....................................................................................8

The White House, *President Trump is Delivering on His Commitment to Protect Our Kids* (Feb. 3, 2025).....................................................................4

The White House, *Supreme Court Bolsters President Trump's Push to Eliminate Transgender Insanity* (June 30, 2026), ..........................................2, 43

## INTRODUCTION

In issuing the preliminary injunction protecting Plaintiffs' established Fourth and Fifth Amendment privacy rights, the District Court squarely applied binding precedents from this Court and the Supreme Court. This Court should affirm.

Plaintiffs are transgender young people and their parents whose doctors lawfully and with their parents' informed consent provided them gender-affirming medical care ("GAMC") at New York City healthcare institutions between January 2020 and May 2026 while they were minors. Since May 2025, the federal government has sought Plaintiffs' identifying and highly personal medical information in ever-shifting ways, with different entities within the Department of Justice ("DOJ") issuing serial demands in different judicial *fora* under the guise of disparate and fluctuating legal theories.

But the resulting infringement of Plaintiffs' privacy rights cannot be justified. DOJ has failed to advance any reason it needs patient-identifying information for investigations into purported misbehavior by providers and drug manufacturers. Its actions in resolving demands to other providers confirm DOJ does not actually need the information and that the demands lack any legitimate basis. Instead, DOJ's

demands appear to be just one of the Administration's levers to effectuate its goal to "end" GAMC, as part of its "push" to "eliminate transgender insanity."[1]

Accordingly, on July 6, 2026, the District Court preliminarily enjoined DOJ from "[s]eeking, receiving, using, retaining, or disseminating any identifying or sensitive health information of Plaintiffs and members of the Class" during the pendency of this case, having found it necessary "to maintain the *status quo* and prevent irreparable harm." JA216–17. In doing so, the District Court did not quash any subpoena, nor stop DOJ from investigating purported healthcare offenses. Rather, the court granted limited relief preserving the *status quo* and safeguarding Plaintiffs' constitutionally protected identifying and sensitive health information.

Relying on this Court's binding precedent in *New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006), and its inherent equitable authority, the District Court appropriately found jurisdiction over Plaintiffs' claims. JA257–60. The court determined that Plaintiffs were likely to succeed on their Fifth Amendment informational privacy claim regarding their medical records and transgender status under *Hancock v. County of Rensselaer*, 882 F.3d 58 (2d Cir. 2018); *O'Connor v. Pierson*, 426 F.3d 187 (2d Cir. 2005); and *Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999). JA262–66. And, following the Supreme Court's

[1] The White House, *Supreme Court Bolsters President Trump's Push to Eliminate Transgender Insanity* (June 30, 2026), https://perma.cc/484A-4MDN.

analysis in *Carpenter v. United States*, 585 U.S. 296 (2018), the court deemed Plaintiffs likely to succeed on their Fourth Amendment claim to security in these records. JA268–70. The District Court also found that the other preliminary injunction factors weighed in Plaintiffs' favor. JA272–73. If the government obtained Plaintiffs' information, that genie could not be put back in the bottle, causing Plaintiffs serious irreparable harm. Harm to the government, by contrast, would be *de minimis*.

The government now appeals the preliminary injunction. But its characterization of Plaintiffs' claims bears little resemblance to the case Plaintiffs have brought. While DOJ characterizes Plaintiffs' effort as a motion to quash a grand jury subpoena by another name, quashal has never been the relief Plaintiffs seek. As in *Gonzales*, Plaintiffs simply seek to clarify and protect their constitutional rights. Because the District Court properly entered preliminary injunctive relief to do just that, this Court should affirm.

## STATEMENT OF THE CASE

### I. Factual Background

#### A. The Administration Targets Transgender People.

On his first day back in office, the President issued an executive order announcing that it was now "the policy of the United States to recognize two sexes, male and female," such that any individual with an "internal and subjective sense

of self" that differs from their assigned sex at birth makes a "false claim." Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615, § 2 (Jan. 20, 2025). Among other things, the order barred federal funds from being "used to promote gender ideology" and directed agencies to remove mention of transgender people from "statements, policies, regulations, forms, communications, or other internal and external messages." *Id.* § 3.

The next week, the President targeted transgender young people's medical care, describing it as "a stain" that "must end." Exec. Order No. 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, § 1 (Jan. 28, 2025). The order announced as "the policy of the United States" to "not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another." *Id*. "[M]edical institutions across the United States that receive federal funding [] stopped providing gender-affirming medical care for patients younger than nineteen as a result of [] the Executive Orders." *PFLAG, Inc. v. Trump*, 769 F.Supp.3d 405, 418 (D. Md. 2025), *appeal docketed*, No. 25-1279 (4th Cir. Mar. 24, 2025). The White House championed this result, stating it was "having its intended effect."[2]

---

[2] The White House, *President Trump is Delivering on His Commitment to Protect Our Kids* (Feb. 3, 2025), https://perma.cc/9AKX-57BS.

Federal agencies, including subagencies across the Department of Health and Human Services ("HHS") and DOJ, took immediate action to implement these orders. JA31–35.[3] In December 2025, HHS issued directives seeking to end GAMC for minors regardless of the source of funding and wrote to medical organizations requesting that they change their medical guidelines under threat of being "aggressively pursue[d]" by HHS with "all authority under the law." JA33. The HHS Secretary also issued a public declaration purporting to establish that GAMC for minors is *per se* below the standard of care. JA32. A district court vacated the declaration, holding it "exceeded Defendants' statutory authority," and "impeded [States'] rights to regulate the medical profession." *Oregon v. Kennedy*, 831 F.Supp.3d 1048, 1078–79 (D. Or. 2026).

[3] Many of these have been enjoined. *See*, *e.g.*, *Kingdom v. Trump*, No. 25-CV-691, 2026 WL 2690647, at *2 (D.D.C. Aug. 26, 2026) (policy cutting off GAMC for incarcerated persons), *stay denied*, No. 26-5236, 2026 WL 2997915 (D.C. Cir. Sept. 18, 2026), *stay denied*, No. 26A416, 2026 WL 3147418 (U.S. Oct. 21, 2026); *Endocrine Soc'y v. FTC*, 832 F.Supp.3d 1, 7 (D.D.C. 2026) (FTC subpoena to medical organization based on its recognition of transgender people and support of GAMC); *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Institutes of Health*, 795 F.Supp.3d 678, 683 (D. Md. 2025) (policies prohibiting NIH funding for research related to "transgender issues"); *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F.Supp.3d 112, 124 (D.D.C. 2025) (removal of information referencing transgender people).

### B. DOJ Issues Administrative Subpoenas to Healthcare Institutions.

In furtherance of these EOs, DOJ announced a civil enforcement priority to investigate parties involved in providing GAMC. In April 2025, the Attorney General issued a memorandum outlining this priority, describing transgender identity as "tragic," "absurd," and a "sociological disease," and GAMC as "barbaric." JA84. The memorandum directed the Civil Division's Consumer Protection Branch to investigate supposed violations of the Food, Drug, and Cosmetic Act (FDCA) by manufacturers and distributors related to "false claims about the on- or off-label uses of puberty blockers, sex hormones, or any other drug" used for GAMC. JA87. And it directed the Civil Division's Fraud Section to investigate supposed violations of the False Claims Act arising from Medicaid claims relating to GAMC. JA87.

Rank and file complied. In July 2025, DOJ issued over 20 administrative subpoenas to healthcare institutions whose care for minor patients included GAMC. JA36. The subpoenas sought, *inter alia*, documents containing patient-identifying and sensitive health information. *Id.* Some healthcare institutions or patient families moved to quash the subpoenas, JA37; others engaged in settlement negotiations, JA50–51.

While Plaintiffs were unaware of it at the time, DOJ served one such administrative subpoena on NYU Langone Hospitals in June 2025. JA176–77,

JA180. It demanded "[d]ocuments sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy"; "documents relating to the clinical indications, diagnoses, or assessments that formed the basis" for prescribing the treatment; and for each patient, "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization." JA187. NYU negotiated with DOJ, conferring at least fifteen times and making seven rolling productions, none of which included patient information. JA177. On May 6, 2026, DOJ withdrew the administrative subpoena. ECF 43 at 6; Gov't Br. 16–17.

Nearly every court to consider a motion to quash or limit these subpoenas granted quashal or limited DOJ's ability to obtain identifying and sensitive health information. JA37 (citing cases).[4] One court noted that the government's motive in issuing the subpoenas "was to pressure hospitals into ending gender-related care for minors." *In re Subpoena Duces Tecum No. 25-1431-016*, No. 25-mc-00041, 2025 WL 3562151, at *11 (W.D. Wash. Sept. 3, 2025). Another observed that the administrative subpoena's "true purpose" was to interfere with "Massachusetts' right to protect [GAMC] within its borders, to harass and intimidate [the hospital]

[4] The only court to date that held quashal improper, *QueerDoc, PLLC v. U.S. Dep't of Just.*, 187 F.4th 1112, 1148 (9th Cir. 2026), remained concerned about patient privacy. *See* Argument, § I(B)(3)(e), *infra*.

to stop providing such care, and to dissuade patients from seeking such care." *In re Admin. Subpoena No. 25-1431-019*, 800 F.Supp.3d 229, 239 (D. Mass. 2025). Another found the "government's aim is not actually to investigate FDCA violations, but to use the FDCA as a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations.'" *In re Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026).

DOJ's statements about settlements it reached confirm that the central aim for these demands is ending the lawful provision of GAMC for minors. In announcing DOJ's agreement with Texas Children's Hospital, the Attorney General stated, "The Justice Department will use every weapon at its disposal to end the destructive and discredited practice of so-called 'gender-affirming care' for children." JA169–70. Under the agreement, the hospital committed to not providing GAMC. JA169. DOJ reported that its agreements with Connecticut Children's and the Cleveland Clinic include the same commitment.[5] Notably, none of these announcements mention commitments to change billing practices, prescription

[5] U.S. Dep't of Justice, Press Release No. 26-894, *Justice Department Secures Agreement with Connecticut Children's to End Pediatric "Gender-Affirming Care"* (Aug. 5, 2026), https://perma.cc/D4MX-8TD8; U.S. Dep't of Justice, Press Release No. 26-611, *Justice Department Secures Resolution with Cleveland Clinic to End Pediatric "Gender-Affirming Care"* (June 5, 2026), https://perma.cc/7MPN-4AQK.

procedures, or audits. Instead, they uniformly include a commitment to cease providing GAMC to minors *in toto*.

These settlements and DOJ's representations also reveal that DOJ does not need patient-identifying information or sensitive health information to conduct its investigations. *See*, *e.g.*, JA50–51 (allowing redaction of patient-identifying information in settlement with Children's Hospital of Los Angeles). DOJ has confirmed as much in litigation. In a hearing regarding its administrative subpoena to Rhode Island Hospital, DOJ represented, "[I]t has been our practice to the extent that I'm aware of offering anonymized data request or an anonymized data production to recipients. … [W]e have accepted anonymized data in other cases, in other interactions requested of other subpoena recipients, so we would say that we're willing to accept that." JA158, JA163. DOJ's subpoenas nonetheless continue to demand identifying information.

### C. Stymied in Its Civil Investigations, DOJ Issues Grand Jury Subpoenas.

Facing uniform orders by courts rejecting these administrative subpoenas as overbroad or motivated by an improper purpose, DOJ turned to its criminal division. On May 7, 2026, the day after DOJ withdrew the administrative subpoena to NYU, the U.S. Attorney's Office for the Northern District of Texas served a grand jury subpoena on NYU seeking the same information. JA44, JA69–80. Shortly thereafter, Plaintiffs learned that Mount Sinai Health System also received some

form of subpoena but had no confirmation whether it was an administrative or grand jury subpoena. JA227.

DOJ has revealed limited information about the grand jury proceedings giving rise to the NYU subpoena. The subpoena itself is little help; it does not note the alleged criminal violation, nor the nature of the investigation, or its target. *See* JA239; *see generally* JA69–80. DOJ disclosed that the proceedings are under the "oversight" of "Judge O'Connor in the Northern District of Texas." JA239. And DOJ initially represented that it "cannot commit" that "none of the patients whose records are being sought will be prosecuted." JA240. And although DOJ stated that it "views the plaintiffs and anyone else who is in a similar situation as generally as the victims in this circumstance," when the District Court asked DOJ about the protections mandated by the Crime Victims' Rights Act, 18 U.S.C. § 3771, DOJ provided no answer. JA240.

Mirroring the administrative subpoena, the grand jury subpoena directs NYU to produce seventeen broad categories of records spanning a six-year period from January 1, 2020, through May 5, 2026. JA71–75. It commands production of "[d]ocuments sufficient to identify each patient who underwent Sex-Rejecting Procedures." JA74. For each patient, it demands all "documents relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers or

hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each patient … from initial consultation to the most recent treatment provided." JA74–75. The subpoena reaches patients' parents, too, requiring production of "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified." JA75.

Notwithstanding DOJ's practice in similar cases of accepting anonymized information, the subpoena includes a "HIPAA Statement" that "DOJ has considered the predicate requirements of 45 C.F.R. § 164.512 (f)(1(ii)(C)(1)-(3) [sic]," and it "represents that … [d]e-identified information could not reasonably be used in its stead." JA76. DOJ has acknowledged the limits of its ability to safeguard this private information, confirming to the District Court that "there's nothing to prevent widespread dissemination in the law enforcement community of the information [it] seek[s]." JA240.

Four days after receiving the subpoena, pursuant to New York State's Shield Law, N.Y. Exec. L. § 837-x, NYU posted the subpoena on its website. JA82. Had NYU not done so, the subpoena would have remained unknown to Plaintiffs. JA46.

When patients and their families learned of the potential disclosure of their records to the federal government, many were terrified. JA97, JA102, JA104–05, JA108, JA112. Their medical records "contain an enormous amount of personal information," JA97—including diagnoses, medical histories, neurocognitive

exams, blood tests, lists of medications taken, living circumstances—that they confided to their medical providers "on the understanding it would be kept confidential." JA105; *see also* JA101, JA111.

In September 2026, DOJ issued two press releases announcing it had reached settlement agreements with NYU and Mount Sinai concerning the provision of GAMC.[6] The settlement agreements have been neither publicly released nor produced to Plaintiffs' counsel. Plaintiffs are not a party to the agreements. Like prior settlements, DOJ's announcements reflect that they include commitments to cease providing GAMC to minors and note that the government is "working tirelessly to reach agreements with hospitals to end so-called 'gender affirming care' for minors." *Id*.

The settlement agreements do not alter the force and effect of the District Court's preliminary injunction in constraining DOJ's ability to demand Plaintiffs' identifying and sensitive medical information. While NYU announced that the settlement "remov[ed] the threat that NYU Langone would have to provide the confidential information previously demanded about patients under 18 who

[6] U.S. Dep't of Justice, Press Release No. 26-1080, *DOJ Secures Agreements with NYU and UPMC to End Pediatric 'Gender-Affirming Care'* (Sept. 18, 2026), https://perma.cc/9YR9-ERR6; U.S. Dep't of Justice, Press Release No. 26-1022, *Justice Department Secures Agreement with Mount Sinai to End Pediatric 'Gender Affirming Care'* (Sept. 4, 2026), https://perma.cc/T9JE-HWHN.

received gender-affirming care at our institution,"[7] the preliminary injunction foreclosed any other result. If the District Court's preliminary injunction were vacated, it is unclear that the agreement forbids DOJ from collecting such information or whether it would prevent renegotiation and new terms or subsequent demands by the government for the same information.

DOJ's release, moreover, announced that its "efforts and investigations into other providers are ongoing," and it "will continue to pursue these cases across the country."[8] DOJ remains free to target the same institutions under different statutes or theories of liability, and to target different medical providers, insurers, or institutions in ways that implicate the same private patient information.

The government, through the FTC, has issued new demands for information regarding GAMC from several New York hospitals, including NYU and Mount Sinai, during the pendency of this case. *See FTC v. Mt. Sinai Hosp. Grp., Inc.*, No. 26-mc-00532 (S.D.N.Y. Oct. 27, 2026), Dkt. 1, 1-1, 14-2, 14-3. Although the FTC characterized the subpoenas as requesting no patient-identifying information, FTC Dkt. 1 at 2, Mount Sinai interpreted the demands as "fairly broad in nature and implicat[ing] patient records," FTC Dkt. 1-1 at 26. During negotiations, the FTC

---

[7] NYU, *NYU Langone Statement on Settlement with DOJ* (Sept. 2026), https://perma.cc/MX4D-HCFN (visited Oct. 20, 2026).

[8] DOJ, Release No. 26-1080, *supra* note 6.

expressly piggy-backed off DOJ's prior subpoenas. The FTC told Mount Sinai, it "agrees to accept Mt. Sinai's prior production to the Department of Justice in response to Request No. 2." FTC Dkt. 1-1 at 25.

**II. Procedural History**

Plaintiffs are minors, their parents, and young adults who received GAMC in New York City between January 1, 2020, and May 5, 2026. JA95–112. They filed this lawsuit on June 2, 2026. JA21. Plaintiffs proposed a class of all individuals who received GAMC at a healthcare institution in New York City while they were under eighteen, between January 1, 2020, and May 5, 2026; and a subclass of all who received that GAMC at NYU Langone Hospitals or any other NYU entity. JA54. The complaint seeks to enjoin the government from demanding and NYU from providing class members' identifying and sensitive health information as a violation of Fourth and Fifth Amendment privacy guarantees. JA65.

On June 2, 2026, Plaintiffs moved for a temporary restraining order ("TRO"), which was heard on June 23, 2026. JA223. The next day, the court issued a TRO and an oral opinion. JA244. The court held that Plaintiffs had shown a likelihood of success on the merits on both their Fourth and Fifth Amendment claims; that they would suffer irreparable harm in the absence of injunctive relief; and that the balance of equities and public interest weighed in Plaintiffs' favor. The court granted class-wide relief to Plaintiffs' proposed class and subclass. JA273. The

parties agreed to have the court treat the TRO briefing and argument as applicable to Plaintiffs' request for a preliminary injunction. ECF 66–67.

On July 6, 2026, the District Court issued a preliminary injunction "for all the reasons described on the record in its oral decision on June 24, 2026." JA215.

The court established that it had jurisdiction because of *New York Times Co. v. Gonzales*, 459 F.3d 160, and the court's inherent equity power to maintain the *status quo*. JA258.

Regarding Plaintiffs' Fifth Amendment claim, the court recognized Plaintiffs' two distinct informational privacy rights—medical information and information relating to transgender status, JA262—as "among the most personal and sensitive" information, "warranting the strongest constitutional protection." JA264. The government's "ill-defined" interest in the information does not outweigh Plaintiffs' interest in privacy, as the district judge could not "conceive of a crime that would require the breadth of disclosure sought in the subpoena, identifying and sensitive medical information for an entire class of people for a six-year period." JA265. Importantly, the court noted, "[E]ven were the government to articulate a cognizable and legitimate interest in the information it seeks, it would not overcome plaintiffs' strong privacy interest" in light of *Hancock*, 882 F.3d 58. JA265. By "expressly targeting members of a particular and uniquely vulnerable

group," the subpoena "both shocks the conscience and rises to the level of the most egregious official conduct." JA265–66.

The District Court found Plaintiffs likely to succeed on their Fourth Amendment claim "in light of [i] the government's acknowledgement that plaintiffs have an objectively reasonable expectation of privacy in this information, [ii] the statutory enshrinement of these privacy rights, and [iii] cases such as" *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), and *Carpenter*, 585 U.S. 296. JA270. The court was not "satisfied that NYU could adequately anonymize the health records to protect plaintiffs' privacy rights … given the voluminous nature of the records and the ubiquity of personal identifying information therein." JA268. The court deemed the reasoning of *Carpenter*, 585 U.S. at 311, directly applicable given that the records sought—"six years of aggregated treatment history, diagnoses, family information, and intimate personal detail—[] precisely the kinds of privacies of life contemplated in *Carpenter*." JA269.

The court found that Plaintiffs satisfied the other factors for preliminary injunctive relief, having demonstrated irreparable harm absent relief from both the imminent violation of their constitutional rights and the widespread emotional harm and destruction of trust in medical care from the disclosure of "the most intimate details about plaintiffs' medical histories and personal lives" to the government. JA271. The court noted the government's lack of assurances "that even the patients

would not be prosecuted," JA272, and concluded that the public interest and the balance of equities weighed in Plaintiffs' favor, JA272.

On July 10, 2026, the government noticed an appeal and sought to stay the preliminary injunction pending appeal. ECF 80, 81. The District Court and this Court denied the motions. ECF 83; Dkt. 53.

## SUMMARY OF THE ARGUMENT

Following binding Second Circuit precedent, the District Court properly exercised jurisdiction over Plaintiffs' claims. *New York Times Co. v. Gonzales* establishes that when a party files suit in its home district to clarify its constitutional rights, the district court has jurisdiction over those claims under the Declaratory Judgment Act ("DJA"), even if one of the threats to the party's constitutional rights comes from a grand jury proceeding in another district. 459 F.3d at 165–67. Thus, the District Court properly exercised jurisdiction over Plaintiffs' claims for declaratory relief and acted within its authority to preserve the *status quo*.

The District Court's jurisdiction also flowed, independently, from its inherent equitable authority to prevent the government from acting unconstitutionally. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). DOJ failed to raise any arguments concerning the court's inherent equitable authority before the District Court and has therefore waived those arguments, which in any event fail. The court's equitable powers inhere unless Congress has demonstrated an "intent to

foreclose" them. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015). The Federal Rules of Criminal Procedure reveal no such intent. Even if they did, it would not divest the court of equitable authority over Plaintiffs' claims here because Plaintiffs are not challenging a single criminal proceeding but rather seek to protect their constitutional rights against the government's serial attempted incursions.

Plaintiffs are likely to succeed on their Fifth Amendment informational privacy claim. Plaintiffs have shown that DOJ's actions threaten their firmly established rights to privacy in medical information and in transgender status. *See Hancock*, 882 F.3d at 66–67; *Powell*, 175 F.3d at 111–12. The strength of Plaintiffs' interest in both privacy rights far outweighs the government's interest in collecting their information. The government has failed to present any account of its need for this information. By contrast, Plaintiffs have shown the intimacy and sensitivity of the information, the potential harms that would flow from disclosure, and the absence of adequate safeguards.

Plaintiffs are likely to succeed on their Fourth Amendment claim. As the District Court found, the Supreme Court's reasoning in *Carpenter*, 585 U.S. 296, compels the conclusion that Plaintiffs retained a reasonable and legitimate expectation of privacy in six years' worth of sensitive and identifying medical records even though the records were held by their medical providers. JA268–69.

*Chatrie v. United States*, 609 U.S. 605 (2026), bolsters this conclusion. DOJ has cited no authority to support reversal.

Finally, Plaintiffs have shown they will suffer irreparable harm absent injunctive relief. The government has presented no compelling countervailing interest. Violations of constitutional rights always inflict irreparable harm. Disclosure of records here would inflict immense emotional harm and social stigma on Plaintiffs and would jeopardize trust in medical care broadly. Once suffered, these harms could not be undone.

# ARGUMENT

## I. Plaintiffs Are Likely to Succeed on the Merits.

### A. The District Court Did Not Abuse Its Discretion In Assuming Jurisdiction Over Plaintiffs Claims.

The District Court's preliminary injunction was proper. Under this Court's binding precedent, a grand jury proceeding in another jurisdiction does not divest a court of authority to entertain an action seeking to clarify a party's constitutional rights under the DJA. *See Gonzales*, 459 F.3d at 166. DOJ wrongly attempts to recast Plaintiffs' action as a collateral attack on a grand jury proceeding. Gov't Br. 18–32. But it is not. Plaintiffs do not seek quashal of a single grand jury subpoena; rather, Plaintiffs seek to protect their constitutional rights against the government's multi-pronged, recurrent, and unprecedented campaign to seize lists of young transgender patients and their highly sensitive medical records *en masse* through

both grand jury and administrative subpoenas. Given this ever-shifting threat to Plaintiffs' interests, the District Court did not abuse its discretion in assuming jurisdiction under *Gonzales* and exercising its equitable authority to preliminarily maintain the *status quo*. Moreover, independent of *Gonzales*, the District Court properly exercised its equitable authority to prevent DOJ from "acting unconstitutionally." *Malesko*, 534 U.S. at 74; *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Plaintiffs require such relief against DOJ to avoid playing a "game of whack-a-mole … blindfolded," where "they must constantly uncover and counter DOJ's ever shifting tactics." JA250; *Z.A. v. Blanche*, 837 F.Supp.3d 1036, 1065 (N.D. Cal. 2026), *appeal docketed*, No. 26-4388 (9th Cir. July 10, 2026).

**1. The Declaratory Judgment Act Confers Jurisdiction.**

The District Court did not abuse its discretion in concluding that it had jurisdiction over Plaintiffs' claims under the DJA and this Court's decision in *Gonzales*. JA257-58. In *Gonzales*, the New York Times sued the government, seeking a declaration that the First Amendment barred enforcement of grand jury subpoenas convened in other jurisdictions seeking reporters' telephone records from third-party phone companies. 459 F.3d at 163. Though this Court rejected the Times's claims on the merits, it affirmed the district court's exercise of jurisdiction under the DJA. *Id*. at 167. Here, the District Court applied *Gonzales* and concluded

that its power to "issue equitable relief is especially important given the insufficiency of Rule 17(c) in the unique circumstances of this case." JA260. For all the reasons outlined by this Court in *Gonzales* and the District Court, that exercise of jurisdiction was not an abuse of discretion; the government's arguments to the contrary fail.

There is no "special statutory proceeding precluding a declaratory judgment action" when parties seek relief from the government's investigatory demand for information in violation of the Constitution. *Gonzales*, 459 F.3d at 166. Though DOJ repeatedly invokes Federal Rule of Criminal Procedure 17 to defend its position, *see generally* Gov't Br., this Court has already held that Rule 17 does not "render[] declaratory relief inappropriate" even where a grand jury investigation is ongoing in another jurisdiction. *Id.*; *cf. Doe v. Harris*, 696 F.2d 109, 114 (D.C. Cir. 1982) (plaintiff could seek declaratory relief regarding subpoenas to third-party and future subpoenas by any U.S. Attorney's Office).

Nor does Federal Rule of Criminal Procedure 6(e) limit relief under the DJA. First, DOJ did not raise this argument below, and it is therefore waived. *See United States v. Griffiths*, 47 F.3d 74, 77 (2d Cir. 1995). Though DOJ invoked Rule 6 in its argument on the merits, it never argued that the Rule divested the court of jurisdiction. Second, the same argument was rejected in *Gonzales*. *See* Defs.' Br., *New York Times Co. v. Ashcroft*, 2005 WL 1266200 (S.D.N.Y. Jan. 3, 2005)

(making the Rule 6(e) argument); *Gonzales*, 382 F.Supp.2d at 513 (denying dismissal of DJA action). Third, while DOJ urges that "Rule 6(e) generally prohibits government attorneys from disclosing matters occurring before the grand jury," it admits that it can do so with "authorization from the supervising court." Gov't Br. 31–32. That admission is fatal. *Cf. Z.A.*, 837 F.Supp.3d at 1073. Far from precluding proceedings in other districts, Rule 6(e) envisions disclosure in a "judicial proceeding in another district." Fed. R. Crim. P. 6(e)(3)(G).[9]

The District Court likewise did not abuse its discretion in balancing the other factors impacting jurisdiction under the DJA in this circuit. *See Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. 2003); *Gonzales*, 459 F.3d at 167. The same arguments raised here were raised and rejected in *Gonzales*. There, DOJ unsuccessfully argued that the exercise of jurisdiction by a federal district court in New York "would unreasonably encroach upon the authority of the district court under whose auspices the subpoenas are issued," Defs.' Br., *Gonzales*, 2005 WL

[9] *Douglas Oil Co. v. Petrol Stops Northwest* is not contrary. 441 U.S. 211, 225 (1979). That the "supervisory court" should "participate" does not exclude another district court from doing so. *Id*. DOJ made no effort to seek permission from the Northern District of Texas even though that court had previously granted such permission. *In re Admin. Subpoena 25-1431-032*, No. 26-MC-00006-O, ECF 17 at 2 (N.D. Tex. May 12, 2026) (describing prior grant of permission "to disclose to the Rhode Island court that there is a legitimate investigation pending in this district, and responsive documents are due"). DOJ cannot transform its own refusal to use Rule 6(e)'s disclosure mechanism into proof that Plaintiffs' constitutional claims are categorically unavailable, particularly given *Gonzales* rejected such arguments.

1266200, and "lead to wide-scale disruption of grand jury investigations," *Gonzales*, 382 F.Supp.2d at 480. Those arguments were insufficient to divest the court of jurisdiction in *Gonzales* and are similarly insufficient here.

The remainder of DOJ's arguments, Gov't Br. 31–34, suggest that a motion to quash in Texas would be a "better or more effective remedy." *Gonzales*, 459 F.3d at 167 (citing *Dow Jones*, 346 F.3d at 359–60). It would not. First, as discussed *supra*, DOJ has seemingly shifted tactics again, announcing settlements with both NYU and Mount Sinai that purportedly resolve investigations into those institutions. A quashal would therefore not be available, nor could it protect Plaintiffs from future subpoenas as part of investigations into third parties such as medical associations or sister hospitals. Second, Plaintiffs received medical treatment at multiple healthcare institutions in New York City, *e.g.*, JA24–25, and DOJ refuses to confirm whether such institutions have received, been threatened with, or complied with subpoenas, and whether such subpoenas are administrative or grand jury. *Gonzales*, 459 F.3d at 167. A motion to quash in the Northern District of Texas "would not have any effect on other grand jury or civil administrative subpoenas seeking the same information from NYU and other healthcare institutions in New York City, especially when … plaintiffs have no way of learning of the existence of any subpoena." JA260; *see also Z.A.*, 837 F.Supp.3d at 1065.

Plaintiffs do not seek to "end-run" around a foreclosed remedy by broadening it, as DOJ contends, Gov't Br. 38. Rather, Plaintiffs seek relief from inexplicable and unusual demands for the same information, from the same institutions, through multiple mechanisms. The District Court emphasized the return date on the NYU grand jury subpoena because that date necessitated relief the day after the TRO hearing, thus evidencing the imminence of the harm, not an attempt to "functionally quash or modify" the subpoena. *Id*. The District Court's injunction did not invalidate any specific subpoena—which remained in place and could be enforced for demands outside the injunction's scope. That feature of the injunction distinguishes Justice Barrett's concurrence in *National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658, 2660 (2025). There, a district court had jurisdiction to vacate agency guidance under the APA but lacked jurisdiction to reinstate grants terminated under that guidance. *Id*. at 2661. But here, the District Court had jurisdiction to declare and enforce Plaintiffs' rights and explicitly did not quash any subpoena.

DOJ's only real attempt to engage with *Gonzales* is to argue that the analysis there was "specific to declaratory judgments." Gov't Br. 35. But neither this Court's nor the district court's analysis in *Gonzales* was so confined. In *Gonzales*, the parties had "agreed to maintain the status quo with respect to the records sought" for the duration of the briefing on the dispositive motions, obviating the need for

emergency relief. *New York Times Co. v. Gonzales*, 382 F.Supp.2d 457, 465 (S.D.N.Y. 2005).

Even if *Gonzales* did limit ultimate relief to a declaratory judgment, that would not abrogate the court's equitable power to maintain the *status quo* pending resolution of the underlying claims. *See Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884 (2d Cir. 1981); *Wagner v. Taylor*, 836 F.2d 566, 571 (D.C. Cir. 1987) ("If the courts are to be divested of that inherent equitable power to maintain the status quo … there must be clear evidence of a congressional intent to do so"). DOJ never contested the court's general equitable authority to maintain the *status quo* and therefore waived any such argument. In any event, DOJ's arguments fail. For purposes of applying *Gonzales*, the question is not whether there is an "equitable history or tradition recognizing freestanding constitutional causes of action to enjoin grand jury process," Gov't Br. 37, but whether there is such a history or tradition of permitting courts to maintain the *status quo*. *Gonzales*, 382 F.Supp.2d at 465. There is. *See* Thomas R. Lee, *Preliminary Injunctions and the Status Quo*, 58 Wash. & Lee L. Rev. 109, 126 (2001) (noting Eighteenth Century Chancery decision in which an interlocutory injunction was deemed "proper to stay [defendants] from doing an act, which if it turned out they had no right to do, would be irreparable"); *see also Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) ("[t]he purpose of a preliminary

injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held").

Ultimately, the case for jurisdiction here is even clearer than in *Gonzales*. The investigation in *Gonzales* was longstanding, and the New York Times was aware of both its location and contours. *Gonzales*, 382 F.Supp.2d at 466–69. Here, DOJ suddenly and without explanation changed the forum of its investigation "in favor of" what one court characterized as "a distant forum that DOJ deems friendly to its political positions." *In re: Admin. Subpoena 25-1431-032 to Rhode Island Hosp*., 836 F.Supp.3d 459, 463 (D.R.I. 2026); *see also* JA251 (noting DOJ's "effort[] to recast discredited civil administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction"). Prior to the unexplained change of venue, the locus of the purported investigations was Washington, D.C., along with the jurisdictions where target hospitals are located. *Id*. at *3; Defs.' Br., *Z.A. v. Lucile Salter Packard Child.'s Hosp.*, No. 26-cv-04998 (N.D. Cal. June 3, 2026), ECF 31, at 3–6. To the extent what Plaintiffs seek is anomalous, it is only because DOJ's actions are.[10]

[10] DOJ has disregarded limits imposed by precedent and DOJ policy on the scope of grand jury investigations. *See Abouammo v. United States*, 146 S. Ct. 1571 (2026) (venue lies where "proscribed conduct" occurs); U.S. Dep't of Justice, Justice Manual § 9-11.121 ("A case should not be presented to a grand jury in a district unless venue for the offense lies in that district.").

### 2. The Federal Rules Do Not Divest The Court of Its Equitable Authority to Enjoin Unconstitutional Actions of Federal Officials.

Even absent *Gonzales* and the DJA, Plaintiffs properly invoked the District Court's inherent equitable authority to issue relief against federal officials. DOJ failed to raise before the District Court any of the arguments it now presents regarding the limitations on equitable claims; such arguments are therefore waived. These arguments in any event mischaracterize Plaintiffs' claim as an attempt to "disable grand jury process issued by a sister federal court." Gov't Br. 28. But this case is not about one grand jury subpoena, but rather serial subpoenas of varied and ever-shifting provenances. Plaintiffs' equitable cause of action is thus not a "mere proxy for a motion to quash" a grand jury subpoena, but rather seeks to prevent the Administration from violating the rights of transgender patients and their families multiple times over. *Z.A.*, 837 F.Supp.3d at 1065.

"The ability to sue to enjoin unconstitutional actions by … federal officers … reflects a long history of judicial review of illegal executive action." *Armstrong*, 575 U.S. at 327; *see* Richard H. Fallon, Jr., *Constitutional Remedies: In One Era and Out the Other*, 136 Harv. L. Rev. 1300, 1311 (2023) ("[T]he Founding generation presupposed a background scheme of common law and equitable remedies through which the Constitution could be enforced and rights vindicated."). Such equitable remedies remain unless Congress has demonstrated an "intent to foreclose" them. *Armstrong*, 575 U.S. at 328.

The only "intent to foreclose" relief that DOJ points to is the Federal Rules of Criminal Procedure, but they neither preclude Plaintiffs' equitable claims nor supplant constitutional rights. While DOJ urges that "[F]ederal Rules have the force of statute," Gov't Br. 36 (quotation marks omitted), the Rules Enabling Act explicitly cabins their effect. 28 U.S.C. § 2072(b). Federal Rules "shall not abridge, enlarge or modify any substantive right." *Id.* Interpreting Rule 17 to displace Plaintiffs' claims for equitable relief would "abridge" and "modify" Plaintiffs' Fourth and Fifth Amendment rights by preserving the right only in grand jury proceedings of which Plaintiffs happen to receive notice, as they did here because of New York's Shield Law. On this interpretation of Rule 17 and Rule 6, the scope of Plaintiffs' Fourth and Fifth Amendment rights would be contingent on notice requirements, to the extent they are provided by a state. Section 2072(b) prohibits that result. This Court's warning in *Gonzales* regarding the relationship between the Federal Rules and declaratory relief applies with equal force here: interpreting the rule as DOJ requests "would establish a precedent potentially" allowing "a substantial number of federal rules of criminal and civil procedure" to foreclose equitable relief and "thereby severely limit the availability of" equitable relief against federal officers. *Gonzales*, 459 F.3d at 166.

While § 2072(b) alone disposes of this issue, DOJ's argument would also raise a "serious constitutional question" by "deny[ing] any judicial forum for a

colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988). A single "motion to quash could not enjoin" the full scope of DOJ's efforts to violate Plaintiffs' constitutional rights, especially given the shifting nature and originating forums of DOJ's tactics; "equitable relief can." *Z.A.*, 837 F.Supp.3d at 1065. Courts will not infer an intention to "preclude judicial review" of Plaintiffs' broader constitutional claim unless Congress's "intent to do so … is clear." *Webster*, 486 U.S. at 603. The Rules Enabling Act shows Congress's contrary intent: that no Federal Rule "abridge" or "modify any substantive right," 28 U.S.C. § 2072(b), much less create the "serious constitutional question" that would arise here, *Webster*, 486 U.S. at 603.

DOJ urges that, "if Congress has created 'an alternative remedial structure,' then 'that alone' precludes the creation of a cause of action." Gov't Br. 36 (quoting *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1891 (2026)). That fails twice over. First, DOJ continues to attack a straw man. Congress did not create an alternative structure for the relief Plaintiffs seek as it is not tantamount to a motion to quash. Second, *Cisco* and the precedent on which it relied dealt with damages actions, not equitable actions. *See Cisco*, 146 S. Ct. at 1891 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017)). The Supreme Court explicitly distinguishes between the "*Bivens* remedy" for damages and "injunctive relief," which "has long been recognized as

the proper means for preventing [agencies] from acting unconstitutionally." *Malesko*, 534 U.S. at 74.

DOJ's remaining citations involve inapposite antisuit injunctions barring a lawsuit in another state. *See Am. Acad. of Pediatrics v. Uthmeier*, 180 F.4th 1022 (7th Cir. 2026); *World Prof'l Ass'n for Transgender Health v. FTC*, No. 26-532, 2026 WL 1999008 (D.D.C. July 10, 2026). There is no separate legal action here that would make the injunction comparable to an antisuit injunction. DOJ is free to enforce subpoenas against New York City hospitals to the extent they cover requests beyond patient identities and sensitive health records.

Finally, Plaintiffs have standing to challenge DOJ's ongoing and serial demand for their identifying and sensitive health information from New York City hospitals. Plaintiffs' injury is not speculative: DOJ sought their information once through administrative subpoenas, withdrew those subpoenas after courts rejected materially similar demands, and immediately sought the same information through grand jury subpoenas. JA176–80. Seemingly every time a court limits what DOJ can demand, or Plaintiffs learn about the threat to their information, DOJ changes tactics. The threat to Plaintiffs' constitutional rights is nothing like the "speculative chain of possibilities" that the Court addressed in *Clapper v. Amnesty International USA*, where the plaintiffs "assumed" but had not confirmed that they had been the subject of government surveillance. 568 U.S. 398, 411–14 (2013). Plaintiffs are

aware of DOJ's multiple attempts to collect their sensitive information and have confirmed that DOJ continues to shift tactics to demand it. DOJ's withdrawal of any specific subpoena is irrelevant both because a defendant's "voluntary cessation of a challenged practice" does not defeat jurisdiction, *FBI v. Fikre*, 601 U.S. 234, 241 (2024), and because DOJ continues to make the same demands through multiple means.

That DOJ has abused the subpoena process in novel ways does not deprive courts of equitable power to address a pattern of conduct that includes such abuse. "The 'flexibility' inherent in 'equitable procedure' enables courts 'to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct … particular injustices.'" *Holland v. Florida*, 560 U.S. 631, 650 (2010).

Absent relief of the kind ordered by the District Court, DOJ could continue to make a demand and then withdraw it in favor of a different coercive mechanism before Plaintiffs could ever obtain relief. Such an abuse of the judicial process should not be rewarded.

### B. Plaintiffs Are Likely to Succeed on Their Fifth Amendment Informational Privacy Claim.

#### 1. DOJ's Serial Information Demands Implicate the Right to Informational Privacy as to Plaintiffs' Medical Information and Transgender Status.

The right to informational privacy "categorically protects privacy in certain types of personal information." *Hancock*, 882 F.3d at 66–67; *see also Whalen v.*

*Roe*, 429 U.S. 589, 599–600 (1977); *O'Connor*, 426 F.3d at 201. Here, "two distinct informational privacy rights" are at issue: "medical information" and "information relating to one's transgender status." JA262. DOJ's serial subpoenas seek to collect and compel the disclosure of this information in dragnet fashion, notwithstanding that it is "among the most personal and sensitive a medical provider can hold and squarely within the class of intimate material, warranting the strongest constitutional protection." JA263–64.

In its brief, DOJ concedes, as it must, that under this Court's precedents, the information sought by DOJ's subpoenas—whether administrative or through a grand jury—is constitutionally protected by the right to informational privacy. Gov't Br. 36. Indeed, this Court has deemed the interest in maintaining confidentiality in one's medical information to be "not just presumptively reasonable," but "fundamental." *Hancock*, 882 F.3d at 67; *see also O'Connor*, 426 F.3d at 201 ("[m]edical information in general … is information of the most intimate kind" such that plaintiff "had a protected privacy right in [his] medical records"); *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994) (holding the constitutional right to privacy encompasses personal medical information because "few matters … are quite so personal … and … of which one would prefer to maintain greater control over"). This Court has likewise described as "beyond debate" that "for persons who wish to preserve privacy in the matter," a person's

transgender status is "excruciatingly private." *Powell*, 175 F.3d at 111; *see also Arroyo González v. Rosselló Nevares*, 305 F.Supp.3d 327, 333 (D.P.R. 2018).

Yet DOJ newly asserts on appeal that neither history nor tradition supports the recognition of these well-established rights *in this case*. *See* Gov't Br. 38–39. In DOJ's telling, the fundamental right to privacy in one's medical records, recognized in *Hancock* and other cases, and transgender status, recognized in *Powell*, are too general to apply to the present case. Gov't Br. 45–47. The government misapprehends Plaintiffs' asserted privacy interest as a "new" fundamental interest in "privacy before a grand jury." Gov't Br. 44–50. But in doing so, the government confuses the recognition of a right with its *application* in a particular context. Here, Plaintiffs simply invoke their firmly established fundamental right to privacy in medical records and transgender status as against the government's serial incursions. In any event, DOJ has forfeited any argument that the informational privacy rights recognized by this Court in *Hancock*, its progeny, and in *Powell* are not rooted in this nation's history or tradition by failing to raise it before the District Court.[11] *See* Gov't Opp'n to Mot. for Temporary Restraining Order, ECF 46 at 13–

[11] There, DOJ made no arguments based in history and tradition. Instead, DOJ argued only that *Hancock*'s balancing test did not apply to the grand jury context, and that Plaintiffs' expectation of privacy was not reasonable.

17; *see Siemens Energy, Inc. v. Petroleos de Venezuela, S.A.*, 82 F.4th 144, 160 (2d Cir. 2023).

Even if this argument were properly before this Court, it would fail. Not only do this Court's binding precedents recognize the right to informational privacy in one's medical information and transgender status, but the confidentiality of such information is supported by history and tradition. For example, the Supreme Court recently reaffirmed "the right to shield information from disclosure," citing the Court's description of that right from half a century ago. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 219 (2022) (citing *Whalen*, 429 U.S. at 599–600). The cited passage of *Whalen* in turn invokes Justice Brandeis's influential 1928 dissent in *Olmstead v. United States*, 277 U.S. 438 (1928), in which the Justice "characterized 'the right to be let alone' as 'the right most valued by civilized men.'" *Whalen*, 429 U.S. at 599–600 & n.25 (citing *Olmstead*, 277 U.S. at 478 (Brandeis, J., dissenting)). The right to shield one's private information from disclosure thus has deep roots in this country's legal history. *See*, *e.g.*, Louis D. Brandeis & Samuel D. Warren, *The Right to Privacy*, 4 Harv. L. Rev. 193, 193–220 (1890).

So, too, in the history and traditions of medical ethics and practice. It is well-established that "pledges to protect patient privacy and confidentiality have been

standard features of medical oaths and codes of ethics since antiquity."[12] As far back as two centuries ago, New York evidence law forbade any doctor from "disclos[ing] any information which he may have acquired in attending any patient." 2 Rev. Stat. of N.Y., pt. III, ch. VII, tit. III, § 73 (1st ed. 1828). Contemporary medical guides expounded on doctors' confidentiality obligations, "which admit[] of no disclosures except in cases of treason or murder."[13] And "[b]etween 1828 and 1870, seventeen states or territories enacted statutory guarantees of medical confidentiality."[14] Today most states do the same.[15] "It is of no consequence that recognition of the privilege in the vast majority of States is the product of legislative action rather than judicial decision." *Jaffee v. Redmond*, 518 U.S. 1, 13–15 (1996) (holding "that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure … [b]ecause we agree with the judgment of the state legislatures" that such a privilege

---

[12] John C. Moskop, et al., *From Hippocrates to HIPAA: privacy and confidentiality in emergency medicine – Part I: conceptual, moral, and legal foundations*, 45 Annals of Emergency Med. 53, 53–59 (2005).

[13] Medical Soc'y of N.Y., *A System of Medical Ethics* 21 (1823).

[14] Miles Wilkinson, *Codification and the Origins of Physician-Patient Privilege*, 32 J. Pol'y Hist. 78, 92 (2020).

[15] Daniel W. Shuman, *The Origins of the Physician-Patient Privilege and Professional Secret*, 39 SW L.J. 661, 677 (1985).

serves the public good);[16] *cf. Washington v. Glucksberg*, 521 U.S. 702, 715–16 (1977) (reviewing 19th-century state statutes to identify "deeply rooted" legal tradition).

As for Plaintiffs' right to informational privacy in their transgender status, the Supreme Court has long recognized that the Constitution protects against "all invasions on the part of the government and its employes of … the privacies of life." *Boyd v. United States*, 116 U.S. 616, 630 (1886). These privacies include transgender status. *See Powell*, 175 F.3d at 111; *cf. Doe*, 15 F.3d at 266–67 (right to privacy in HIV status); *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) ("It is difficult to imagine a more private matter than one's sexuality and a less likely probability that the government would have a legitimate interest in disclosure of sexual identity."); *see also* Scott Skinner-Thompson, *Outing Privacy*, 110 Nw. U. L. Rev. 159, 206–08 (2015).

**2. The Right to Informational Privacy Applies in the Subpoena Context.**

DOJ argues that the right to informational privacy does not apply in the grand jury subpoena context. Gov't Br. 55–60. But Plaintiffs "do not seek to quash a particular grand jury subpoena." *Z.A.*, 837 F.Supp.3d at 1065. Rather, Plaintiffs

[16] There is no dispute that the records sought include records relating to mental health treatment as well as confidential communications between providers and patients made during diagnosis or treatment.

"challenge DOJ's broader campaign" to obtain their identifying and sensitive health information, including through administrative and grand jury subpoenas. *Id*. "Given DOJ's persistence in pursuing transgender minors' patient data, there is little reason to think that the grand jury subpoena will be DOJ's last such effort." *Id.*

Regardless, DOJ may not use a grand jury subpoena as "some talisman that dissolves all constitutional protections." *United States v. Dionisio*, 410 U.S. 1, 11 (1973). Indeed, "grand juries must operate within the limits of … the Fifth [Amendment]." *Gonzales*, 459 F.3d at 172 (quotation omitted). When a grand jury "overstep[s] bounds of propriety either at its own or the prosecutor's instance, and conduct[s] an investigation so sweeping in scope and undiscriminating in character as to offend other basic constitutional precepts[,] … courts are not without power to act." *United States v. Doe*, 457 F.2d 895, 899 (2d Cir. 1972). The grand jury's power to compel documents and testimony is "subject to mitigation" when it implicates the Fifth Amendment. *Blair v. United States*, 250 U.S. 273, 281 (1919). "[S]ome confidential matters are shielded from considerations of policy," *id.*, and when a grand jury subpoena infringes a constitutionally protected interest, a preliminary showing can be warranted before allowing its enforcement. *See In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 244 (2d Cir. 1986) (en banc).

The application of the long-recognized right to informational privacy in the context of administrative and grand jury subpoenas is not novel. More than two decades ago, the Kansas Supreme Court considered a challenge to the Kansas Attorney General's service of subpoenas seeking "the entire, unredacted patient files" of persons who had obtained reproductive care at two clinics. *See Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 905 (2006). The court held that the subpoenas implicated "the right to maintain the privacy of certain information" under the U.S. Constitution, noting that "[t]he type of information sought by the State here could hardly be more sensitive, or the potential harm to patient privacy posed by disclosure more substantial." *Id.* at 919, 922. As such, the court held that the trial court erred in not "evaluat[ing] the inquisition and subpoenas" by "weighing of [the parties'] competing interests, including the type of information requested, the potential harm in disclosure, the adequacy of safeguards to prevent unauthorized disclosure, the need for access, and statutory mandates or public policy consideration." *Id.* at 921, 924.

Similarly, the New York Court of Appeals has applied New York's physician-patient privilege in a case involving a state grand jury subpoena, noting that "[p]atients should not fear that merely by obtaining emergency medical care they may lose the confidentiality of their medical records and their physicians' medical determinations" and that "[a] contrary result would discourage critical

emergency care, intrude on patients' confidential medical relationships and undermine patients' reasonable expectations of privacy." *In re Grand Jury Investigation in New York Cnty.*, 779 N.E.2d 173, 177 (N.Y. 2002).

Indeed, the District Court in this case is not alone in finding that DOJ's broad serial requests for medical records, whether through administrative or grand jury subpoenas, implicate transgender patients' right to informational privacy. *See*, *e.g.*, *Z.A.*, 837 F.Supp.3d at 1068–75; *In re Admin. Subpoena 25-1431-032*, 836 F.Supp.3d at 472–73; *In re Children's Nat'l Hosp.*, No. 25-CV-03780, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026).

#### 3. The Factors for Evaluating Informational Privacy Claims Weigh Strongly in Favor of Protecting Plaintiffs.

In evaluating Plaintiffs' informational privacy claim, the District Court properly focused on whether Plaintiffs' "interest in privacy outweighs the government's interest in breaching it." JA262 (quoting *Hancock*, 882 F.3d at 65). Courts "apply a balancing test to the government's *collection* or publication" of all private personal information that is constitutionally protected. *Hancock*, 882 F.3d

at 68 (emphasis added).[17] When the challenged action is by the executive branch, the court "ask[s] whether the action was so 'arbitrary' as to 'shock the conscience.'" *Id.* at 66. The focus of the inquiry is "on the *government's* interests in the information contained in the records and the manner in which those interests might be achieved." *Id.* at 68. "The stronger the individual interest, the more compelling the government actor's reasons must be." *Id.*

DOJ takes issue with the application of this balancing test, arguing that the District Court abused its discretion because, despite the District Court's extensive assessment of the circumstances surrounding the government's serial subpoenas, JA247–250, JA262–265, Rule 6(e) prevented the government from providing a fulsome explanation of the government's interests. Gov't Br. 49–50. Yet Rule 6 imposed no such constraint, as it expressly allows disclosure in a "judicial proceeding in another district." *See* Argument, § I(A)(1), *supra*; *Z.A.*, 837 F.Supp.3d at 1073 ("It is within DOJ's authority to petition the Texas court for authorization to disclose grand jury matters in connection with this proceeding.").

---

[17] "Although confidentiality is often addressed in the context of unauthorized *disclosure* of medical information, it has been construed to protect against other types of intrusions as well." *Rodgers v. Rensselaer Cnty. Sheriff's Dep't*, No. 14-CV-01162, 2015 WL 4404788, at *6 (N.D.N.Y. July 17, 2015); *see, e.g.*, *O'Connor*, 426 F.3d at 201 (improper demand that employee release his medical records); *Schwenk v. Kavanaugh*, 4 F.Supp.2d 110, 115 (N.D.N.Y. 1998) (prosecutor's improper possession of medical files).

The District Court did not abuse its discretion by failing to consider evidence the government could have presented but chose not to.

Turning to the balancing test required by *Hancock* and *O'Connor*, the relevant factors weigh strongly in favor of protecting transgender patients' identities and health information from disclosure to the government. *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (outlining factors); *see also United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 578 (3d Cir. 1980); *see also Hancock*, 882 F.3d at 65–69 (balancing interests).

*a) The Subpoenas Seek Extremely Intimate and Sensitive Information.*

DOJ does not dispute the District Court's conclusion that the information sought is "among the most personal and sensitive a medical provider can hold and squarely within the class of intimate material, warranting the strongest constitutional protection." JA264. "These records … often involve intimate disclosures about discomfort with specific body parts, sexual history, past trauma, interfamily dynamics, use of self-harm or other negative coping mechanisms … such as disordered eating, and experiences of harassment and bullying," as well as "the diagnoses, clinical reasoning, and informed-consent discussions underlying treatment decisions." *In re: Subpoena No. 25-1431-014*, 810 F.Supp.3d 555, 595, 597 (E.D. Pa. 2025) (discussing the sensitivity of records of patients receiving GAMC); *see also* JA97; JA101; JA105; JA107; JA111; JA263–64. Indeed, DOJ

"acknowledged" that Plaintiffs "have an objectively reasonable expectation of privacy in the sensitive medical records that the government's subpoena seeks." JA267. And as this Court has observed, "[t]he strength of a privacy interest *is* relevant to the due process inquiry, but only in service of determining how strong the government's interest must be in order to override it." *Hancock*, 882 F.3d at 67. Given the extreme sensitivity of the information here, the government's interest must be particularly strong.

*b) The Potential for Harm from the Nonconsensual Collection and Disclosure of This Information Is Substantial.*

DOJ also does not dispute that disclosure to the government of Plaintiffs' identifying and sensitive health information "would risk all manner of irreparable harm, including by inflicting deep emotional harm, destroying trust in medical care, and spreading damage to families, peers, and others." JA271. Indeed, it is well-settled that "[disclosure] … exposes transgender individuals to a substantial risk of stigma, discrimination, intimidation, violence, and danger." *Arroyo González*, 305 F.Supp.3d at 333; *see also Powell*, 175 F.3d at 111–12. So does disclosure of mental health. *See Mazzocchi v. Windsor Owners Corp.*, 204 F.Supp.3d 583, 604 (S.D.N.Y. 2016) (noting "societal stigma associated with receiving mental healthcare").

In addition, the disclosure may harm Plaintiffs by eroding the provider-patient relationship and dissuading people from seeking needed healthcare. The "interest in medical privacy derives not just from a desire to keep one's medical

conditions to oneself but also from the collectively enjoyed benefit of being able to expect confidentiality from those we depend on to care for the most intimate aspects of our lives." *Hancock*, 882 F.3d at 67. Awareness of DOJ's subpoenas and the information sought has already "heightened fears of surveillance and exposure among patients and families." *In re Subpoena No. 25-1431-014*, 810 F.Supp.3d at 598; *see also* JA96–98, JA105, JA108. As a result, some "will likely develop increasingly acute conditions on account of their delaying necessary care or refraining from transparent communication with providers out of fear of discrimination." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 60–61 (D.D.C. 2020).[18]

Moreover, because DOJ and the Administration have expressed unrelenting hostility towards transgender people and GAMC, disclosure of the identifying information DOJ seeks raises serious questions about how it will be used. Defendants have boasted about their efforts "to eliminate transgender insanity."[19] DOJ's only response is that it could return any records disclosed. Gov't Br. 64. But the government's knowledge of patient identity and information, and its potential

---

[18] *Cf.* Kristie L. Seelman et al., *Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults*, 2 Transgender Health 17–28 (2017), https://tinyurl.com/3bmfanjx.

[19] The White House, *Supreme Court Bolsters President Trump's Push to Eliminate Transgender Insanity* (June 30, 2026), https://perma.cc/484A-4MDN.

transmission of that information to other government entities, could not be undone by returning the documents that contained the information.

*c) There Are No Sufficiently Adequate Safeguards.*

While DOJ invokes grand jury secrecy (*see*, *e.g.*, Gov't Br. 10, 52–53), "[i]t is of little solace to transgender minors that the only officials with access to their medical records are those working to terminate gender-affirming care based on clear hostility to 'transgenderism' (i.e., the existence of transgender people)." *Z.A.*, 837 F.Supp.3d at 1071; *see also* JA101–02; JA111–12. DOJ does not dispute "the absence of adequate safeguards to prevent further disclosure of plaintiffs' private information." JA264. Rule 6(e) "contains numerous exceptions permitting [i]nter and intra governmental dissemination of this information," JA264, which could allow "disclosure of provisional class members' health information to a large number of … officials." *Z.A.*, 837 F.Supp.3d at 1072; *see also* JA165–67; JA169–70.[20] Acknowledging these exceptions, DOJ represented that it is "correct" that "there's nothing to prevent widespread dissemination in the law enforcement community of the information [it] seek[s]." JA240.

---

[20] The Texas Attorney General deemed GAMC to be child abuse and tried to go after New York residents for care provided to Texans in New York. *See AG Paxton Declares So-Called Sex-Change Procedures on Children and Prescription of Puberty Blockers to be "Child Abuse" Under Texas Law*, Att'y Gen. of Texas, Press Release (Feb. 21, 2022), https://perma.cc/Z67Z-A5RR; Decision Order and Judgment, *Texas v. Bruck*, No. EF2025-2536, slip op. (N.Y. Sup. Ct., Ulster Cnty. Oct. 31, 2025), Dkt. No. 75, https://perma.cc/K7NL-94VX.

*d) DOJ Has No Need for the Identifying and Sensitive Health Information of Plaintiffs and Class Members.*

DOJ has tied the subpoena to its investigations of purported healthcare offenses under the FDCA and billing practices. Gov't Br. 1. But "it is utterly unclear … why the … production of adolescent patient records, including patient names, dates of birth, social security numbers, parent information, clinical indications, diagnoses, and parent authorization forms" are necessary for such investigations. *In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *see also In re: Subpoena No. 25-1431-014*, 810 F.Supp.3d at 604. The District Court could not "conceive of a crime that would require the breadth of disclosure sought in the subpoena, identifying and sensitive medical information for an entire class of people for a six-year period." JA265.

DOJ describes FDCA violations as depending on the intentions of "drug manufacturers and distributors" when they ship "drugs in interstate commerce." Gov't Br. 15. But DOJ does not even attempt to explain how Plaintiffs' identifying and sensitive health information can shed light on such violations. "As other courts have ably explained, that information has no discernible relevance to any federal healthcare offense or other fraudulent billing or insurance-claim practices." *Z.A.*, 837 F.Supp.3d at 1074 (collecting cases).

Tellingly, DOJ has *disclaimed* the need for this information in multiple cases. *See*, *e.g.*, Settlement Agreement, *In re Children's Hosp. of Los Angeles Subpoena*,

No. 25-CV-11183, ECF No. 25-1 (C.D. Cal. Jan. 22, 2026); *see also* Statement of the Case, § I(B), *supra*. In others, "DOJ had represented that anonymized data without patient-identifying information would be sufficient for purposes of those investigations." JA253; *see also*, *e.g.*, JA161–62.

That DOJ may *sometimes* obtain access to *some* medical records in the context of its investigations does not justify its attempts to seek Plaintiffs' identifying and sensitive health information here. *See* JA265 (noting the facts "leave[] [the court] at pains to understand the precise nature of the government's interest and how any legitimate government interest would be served by the disclosure now sought"). The District Court did not abuse its discretion in making this finding, particularly given "DOJ's efforts … to recast discredited civil administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction in order to minimize judicial review of constitutional infirmities." JA251.

DOJ's reliance on the Ninth Circuit's holding in *In re Grand Jury Proceedings*, 801 F.2d 1164 (9th Cir. 1986), is misplaced. That case acknowledges that, per *Whalen*, courts consider "the right to privacy" against the government's interest in the information. *Id.* at 1169. That the government's interest outweighed the invasion of privacy resulted from facts specific to that case, where a doctor had prescribed "large quantities" of "illegal" steroids to "many professional athletes" in

violation of federal and state law. *Id.* at 1166, 1169. Here, Plaintiffs' right to informational privacy in their identifying and sensitive health information, and in their transgender status, far outweighs any interest the government could have in obtaining the information.

Likewise, the other cases DOJ cites are compatible with the District Court's holding. In *United States v. Beaufils*, 160 F.4th 1147 (11th Cir. 2025), the records were limited in time (one year) and in nature (a single telehealth provider) and did not target a particular patient population; in *In re Subpoena Duces Tecum*, 228 F.3d 341, 350–51 (4th Cir. 2000), the government had offered that the *administrative* subpoena recipient could "retain patient files and claim-processing files," *id.* at 351, and the court emphasized "[t]he value of constraining governmental power … in the judicial supervision of subpoenas," *id.* at 349; and *United States v. Hayes*, 794 F.2d 1348 (9th Cir. 1986), involved a search *warrant*, following a probable cause finding, that "limited [the government's] seizure to documents dealing with the distribution of controlled substances," *id.* at 1356.

Nor is *QueerDoc* of any aid to the government.[21] In *QueerDoc*, a divided panel reversed the *full quashal* of an administrative subpoena that had been based

---

[21] The Ninth Circuit is presently considering a petition for rehearing *en banc* in *QueerDoc*. *See QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 25-7384 (9th Cir.), Dkts. 76, 77, 87.

on a finding of improper purpose. 187 F.4th at 1148. The panel majority took pains to note that "the *district court may entertain any objections* specific to DOJ's requests for patient medical records if [the provider] argues that compliance with these requests would raise *concerns about patient privacy*," and that "[t]he district court and the parties should also consider whether protective orders or other devices should be used to ameliorate any concerns about privacy." *Id.* (emphases added).

*e) No Statute, Public Policy, Or Public Interest Militate Towards Collection and Disclosure of the Information at Issue.*

Finally, DOJ asserts no lawful public policy or recognizable public interest militating toward disclosure of this information other than a generalized interest against burdening grand jury investigations. "But … this policy does not authorize 'fishing expeditions' or demands for records for which there is not a reasonable possibility of relevance to the existence of an indictable offense." *Z.A.*, 837 F.Supp.3d at 1075. DOJ's serial demands are part of the Administration's efforts "to identify, to demonize, and ultimately to eradicate an entire population of transgender people," JA248 (citing executive orders), and to "terminate" GAMC. *In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *8. These purposes are neither legitimate uses of administrative or grand jury subpoenas nor

sufficient to justify the sweeping and unguarded intrusion on Plaintiffs' privacy rights. [22]

### C. Plaintiffs Are Likely to Succeed on Their Fourth Amendment Claim.

DOJ's argument that Plaintiffs are unlikely to succeed on their Fourth Amendment claim fails. The District Court did not rule that the Fourth Amendment "prohibit[s] subpoenas for medical records." Gov't Br. 46. Rather, it applied the settled principle that "a *subpoena duces tecum* may constitute a search forbidden by the Fourth Amendment … if its terms [are] 'unreasonable.'" *In re Horowitz*, 482 F.2d 72, 75 (2d Cir. 1973) (Friendly, J.) (quoting *Hale v. Henkel,* 201 U.S. 43, 76 (1906)). The court then applied that "flexible standard" to the facts, *See v. City of Seattle*, 387 U.S. 541, 545 (1967), balancing "the intrusion on privacy caused by law enforcement against the justification asserted for it by the government," and correctly concluded that the government's demands for Plaintiffs' identifying and sensitive health information "constitute[] an unjustifiable intrusion into their reasonable expectation of privacy under the Fourth Amendment." JA267.

The District Court properly applied the reasoning in *Carpenter*, 585 U.S. 296, to the "unique circumstances" of this case, finding that Plaintiffs retained a

[22] Notably, states, not the federal government, are the primary regulators of medical practice. *See Oregon v. Gonzales*, 546 U.S. 243, 275 (2006); *In re 2025 UPMC Subpoena*, No. 25-mc-01069, 2026 WL 570419, at *2 (W.D. Pa. Mar. 2, 2026).

reasonable and legitimate expectation of privacy in the six years' worth of sensitive and identifying medical records sought by DOJ "even though such information is held by a third party." JA269. The District Court correctly found "*Carpenter*'s reasoning directly applicable" where the government seeks "six years of aggregated treatment history, diagnoses, family information, and intimate personal detail"—"information that would allow the government to compile a sweeping profile of plaintiffs." JA269–70.

Not long after the District Court issued the TRO, the Supreme Court reaffirmed that reasoning in *Chatrie*, explaining that "the Fourth Amendment protects people, not places," 609 U.S. at 620 (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)), and clarifying that "[w]hether an expectation of privacy counts as legitimate is less the result of any fixed set of rules than of 'guideposts' stretching back to the Fourth Amendment's beginnings." *Id.* at 621. At its core, the Court explained, the Fourth Amendment has always "sought to secure the 'privacies of life' against the exercise of 'arbitrary power,'" *id.* (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)), protecting "Americans' long-held conviction that no government official should have free access to the most closely kept aspects of their lives." *Id.*

Both *Chatrie* and *Carpenter* "confronted the challenge of adhering to those principles in the face of new technologies," *id.*, but their reasoning was not limited

to such advancements. Rather, the court emphasized that a primary "axis" making protected information "qualitatively different" is that its "nature" is "incomparably 'revealing,'" as compared to the "limited types of personal information" implicated by information like "telephone numbers and bank records." *Id.* at 634 (quoting *Carpenter*, 585 U.S. at 309; citing *Smith v. Maryland*, 442 U.S. 735 (1979), *United States v. Miller*, 425 U.S. 435 (1976)). The *Chatrie* court highlighted the invasiveness of tracking visits to "indisputably private" *medical* locations, including "the psychiatrist, the plastic surgeon, the abortion clinic, [and] the AIDS treatment center," *id.* at 629 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012)), and rejected the argument that "[a] single stop at a doctor's office" would "reveal little about the details of [someone's] personal life," *id.* (quoting Brief for United States), because even such "short-term monitoring" can reveal "a wealth of detail about [their] familial, political, professional, religious, and sexual associations," *id.* (quoting *Jones*, 565 U.S. at 415). Here, a failure to enjoin DOJ would allow it "to obtain and disclose intimate details about plaintiffs' medical histories and personal lives," which DOJ "offer[s] … few assurances … would not be used to harm plaintiffs," including potential prosecutions of "the parents of the patients" or even "the minor plaintiffs … themselves." JA271–72.

DOJ argues that neither *Chatrie* nor *Carpenter* "disturbs the application of the third-party doctrine to medical and billing records," Gov't Br. 49, but points to

no Supreme Court or Second Circuit precedent to support its claim that such records "fall squarely within" the third-party doctrine. No such precedent exists. The District Court properly analogized these demands to the program in *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), where the use of medical records, the "primary purpose" of which was "to generate evidence for law enforcement purposes," violated the Fourth Amendment. JA268. Other circuits have rejected the same argument DOJ makes here—that medical records categorically fall outside the ambit of the Fourth Amendment's protections, regardless of their substantive or temporal breadth—because such records may "contain intimate and private details that people do not wish to have disclosed, expect will remain private, and, as a result, believe are entitled to some measure of protection from unfettered access by government officials." *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000).[23] DOJ also fails entirely to contend with its admission to the District Court "that plaintiffs

[23] DOJ's reference to *Kerns v. Bader*, 663 F.3d 1173, 1185 (10th Cir. 2011), is not to the contrary, as it pertained to whether a law enforcement officer "violated *clearly established law*" by seeking a shooting suspect's medical records without a warrant. *Kerns v. Bader*, 663 F.3d 1173, 1184 (10th Cir. 2011) (emphasis added). The conclusion that qualified immunity applied to the damages claims against the officer neither "foreclose[d] the possibility of a Fourth Amendment violation" arising from an otherwise unreasonable search of medical records, *id.* at 1185 n.2 (alteration removed), nor disturbed the Tenth Circuit's prior holding that patients have "a privacy interest in medical records held by a third party medical services provider." *Id.* (citing *Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005)). Here, Plaintiffs seek prospective injunctive relief only, so qualified immunity for past damages is not at issue.

have an objectively reasonable expectation of privacy in this information." JA267, JA241.

DOJ's arguments that cell-site and geofence location data are protected because they are "generated continuously and automatically," Gov't Br. 50,[24] and that "medical and billing records" are used in generic "healthcare-related prosecutions," *id.* at 42, are unavailing. Under their theory, the Fourth Amendment would protect Plaintiffs if DOJ had sought a geofence warrant capturing every visit to a particular GAMC provider but offers zero protection from the equivalent of recording all doctor-patient communications at that office over the course of six years. That cannot be. The District Court correctly found Plaintiffs' "objectively reasonable expectation of privacy," JA267, in the information covering "a period of six years, which for many of the minor plaintiffs represents a substantial percentage of their lives," JA247–48, outweighed DOJ's complete failure to articulate "how any legitimate government interest would be served by the disclosure," JA265. DOJ has not demonstrated a likelihood of success on appeal as to Plaintiffs' Fourth Amendment claim.

---

[24] DOJ argues that the records sought in *Chatrie* were "detailed" enough to create an "all-encompassing record of the individual's movements," Gov't Br. 50 (quotation omitted), but omits that the geofence warrant at issue applied to cell phone users within a particular location for "only two hours." *Chatrie*, 609 U.S. at 638.

## II. Absent an Injunction, Plaintiffs Will Be Irreparably Harmed.

Plaintiffs have demonstrated they will suffer irreparable harm absent injunctive relief. JA271-72. "The disclosure of private, confidential information is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." *Airbnb, Inc. v. City of New York*, 373 F.Supp.3d 467, 499 (S.D.N.Y. 2019) (quotation omitted). This is especially true where disclosure is imminent and cannot be undone. *In re Meta Pixel Healthcare Litig.*, 647 F.Supp.3d 778, 802 (N.D. Cal. 2022); *Z.A.*, 837 F.Supp.3d at 1075–76; *cf. In re Copley Press, Inc.*, 518 F.3d 1022, 1025 (9th Cir. 2008) ("Once information is published, it cannot be made secret again.").

As the District Court explained, "If not enjoined, the subpoena would allow the government to obtain and disclose the most intimate details about plaintiffs' medical histories and personal lives." JA271. Because the records sought are "for a period of six years," and Plaintiffs are minors, the records cover "a substantial percentage of their lives." JA247–48. Disclosure "would strip patients of control over their most personal information, expose intimate details about their bodies and lives, and risk public outing and lasting stigma," which "would inflict deep emotional harm, destroy trust in medical care, and spread the damage to families, peers, and many others." *In re: Subpoena No. 25-1431-014*, 810 F.Supp.3d at 599.

The government's assurance that "records disclosed … could be returned" does not mitigate the harm. Gov't Br. 55. Following disclosure, "it is … too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy that occur[s]." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992). Moreover, these disclosures "inflict[] deep emotional harm, destroy[] trust in medical care, and spread[] damage to families, peers, and others." JA271; *see, e.g.*, JA96–98, JA101–02, JA111–12. Furthermore, the infringement of constitutional rights is itself irreparable harm. *See A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021).

## III. The Equities and the Public Interest Favor Plaintiffs.

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences" of issuing an injunction. *Yang v. Kosinski*, 960 F.3d 119, 135–36 (2d Cir. 2020) (quotation omitted). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020). The District Court properly concluded that these factors overwhelmingly favor Plaintiffs.

There is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Make the Rd. N.Y. v. Pompeo*, 475 F.Supp.3d 232, 269 (S.D.N.Y. 2020).

The public interest is "best served by ensuring the constitutional rights of persons are upheld." *Coronel v. Decker*, 449 F.Supp.3d 274, 287 (S.D.N.Y. 2020) (quotation omitted). Plaintiffs' constitutional rights to privacy are at stake and at risk of being imminently infringed.

A preliminary injunction preventing DOJ from obtaining the information it seeks does not impose comparable harm. Any delay in accessing records is an administrative concern that cannot overcome the constitutional harms Plaintiffs face. *See Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984) (in conflict between "state's financial and administrative concerns" and "risk of substantial constitutional harm to plaintiffs … the balance of hardships tips decidedly in plaintiffs' favor"). The government's professed concern with "delay" in accessing records, moreover, is at odds with its actions and public statements, which suggest it does not have a genuine interest in obtaining records to investigate healthcare offenses. The government has publicly stated that through these investigations, it is "working tirelessly to reach agreements with hospitals to end so-called 'gender affirming care' for minors."[25] It has also celebrated "hospital systems" for having "agreed to cease harming minors under the guise of 'gender-affirming care'" and touted its ability to "secure resolutions to end [GAMC]."[26]

---

[25] DOJ, Release No. 26-1080, *supra* note 6.

[26] DOJ, Release No. 26-1022, *supra* note 6.

In multiple cases, DOJ has abandoned its requests for identifying and sensitive health information, either reaching a settlement that does not require it or representing that it has no need for it. *See* Statement of the Case, § I(B), Argument, § I(B)(3)(d), *supra*; JA253; *see also*, *e.g.*, ECF 15-4, at 124:23–125:2. Given the lack of harm to the government, both the equities and public interest support the District Court granting the preliminary injunction.

## IV. The Injunction Properly Applies to NYU.

The District Court properly exercised its discretion to enjoin NYU from disclosing the NYU Subclass's information. JA218. DOJ asserts that, in the absence of a holding that Plaintiffs were likely to succeed on their state-law claims against NYU, the District Court "failed to 'state the reasons why' it issued an injunction running against" NYU as required by Rule 65. Gov't Br. 51. But the court plainly stated its reasons: to "maintain the status quo and prevent irreparable harm" that would flow from "NYU Defendants' compelled disclosure of … the NYU Subclass's identifying and sensitive health information." JA215–16, JA242. These reasons are sufficient to justify the order.

Once the prerequisites of a preliminary injunction are met, a court may issue an injunction that binds "the parties," Fed. R. Civ. P. 65(d)(2)(A), and a "district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct," *Forschner Grp., Inc. v. Arrow Trading*

*Co.*, 124 F.3d 402, 406 (2d Cir. 1997), and "maintain the status quo," *Sheehan*, 676 F.2d at 881. This Court "will not disturb … the relief granted unless there has been an abuse of discretion." *Forschner*, 124 F.3d at 406. There has been no abuse of discretion. NYU is a party subject to the Court's jurisdiction, with live claims against it, and DOJ does not dispute—because it cannot—that the injunction's provisions binding NYU serve to maintain the *status quo* for all parties "until there can be a hearing on the merits." *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984). The inquiry can end there.[27]

The Court can also affirm on the alternative ground that Plaintiffs are likely to succeed on their state-law claims against NYU. DOJ does not address these claims' merits—instead discussing constitutional claims against NYU that Plaintiffs did not bring. *See* Gov't Br. 52. And DOJ has never disputed that state law generally prohibits doctors from disclosing patient medical records, only ever arguing that "state law cannot preempt federal law." ECF 46 at 13. But Plaintiffs do not assert

---

[27] *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212 (1945), does not suggest otherwise. *See* Gov't Br. 52. It stands for the unremarkable proposition that a preliminary injunction may not be used to freeze assets unrelated to an underlying action as "security" in anticipation of a possible post-judgment contempt finding, where the district court has no jurisdiction in the underlying matter to "enter a money judgment" and the complaint does not seek it. *De Beers*, 325 U.S. at 220 ("intermediate relief" was not "of the same character as that which may be granted finally"). By contrast, Plaintiffs assert live claims against DOJ and NYU seeking to protect their information; an order preventing disclosure is precisely the relief that "may be granted finally."

otherwise, and only submit that, if they succeed on their argument that federal law constrains DOJ, New York state law would bind NYU in the absence of a valid federal-law obligation to the contrary.

Accordingly, NYU's disclosure of Plaintiffs' identifying and sensitive health information would constitute a "breach of physician-patient confidentiality." *Chanko v. Am. Broad. Companies Inc.*, 49 N.E.3d 1171, 1176 (N.Y. 2016). This "well established" cause of action prohibits institutional medical providers from violating the statutory privilege established by N.Y. CPLR 4504(a), which generally shields from nonconsensual disclosure "any information … acquired in attending a patient in a professional capacity." *See id.* at 1175–77; *see also In re Grand Jury Investigation in N.Y Cnty.*, 779 N.E.2d 173, 176–77 (N.Y. 2002) (CPLR 4504(a) precluded hospital from producing medical records concerning specific diagnoses).

Here, the undisputed record establishes each element of the claim: "(1) the existence of a physician-patient relationship; (2) the physician's acquisition of information relating to the patient's treatment or diagnosis; (3) the disclosure of such confidential information to a person not connected with the patient's medical treatment, in a manner that allows the patient to be identified; [and] (4) lack of consent for that disclosure." *Chanko*, 49 N.E.3d at 1176; *see* JA24–25, JA51–56; JA95–112. And disclosure of Plaintiffs' voluminous records would plainly "discourage … care," "intrude on" physician-patient relationships, and

"undermine" particularly strong "expectations of privacy" for vulnerable minor plaintiffs. *In re Grand Jury Investigation in N.Y Cnty.*, 779 N.E.2d at 177.

New York has also passed a series of statutes that specifically designate "[g]ender-affirming care" as a "legally protected health activity." N.Y. Exec. L. § 837-x (2025). These laws, which explicitly incorporate the existing protections of all other New York confidentiality provisions, *see id.* § 837-x(2)(d); N.Y. Gen. Bus. L. § 394-I(10) (2026), must be read alongside CPLR 4504(a) to reflect the strongest possible public interest in protecting Plaintiffs' privacy expectations in privileged records regarding GAMC.

While the statutory privilege of CPLR 4504(a) is not absolute, NYU's obligations are not susceptible to any exception to the privilege. Courts may consider a "[j]ustification or excuse" for disclosure, depending on "a showing of circumstances and competing interests which support the need to disclose." *Juric v. Bergstraesser*, 44 A.D.3d 1186, 1188 (N.Y. App. Div. 3d Dep't 2007) (citations omitted). But such "affirmative defense[s]" are narrowly construed and include vastly different scenarios—for example, disclosing a record that threatens imminent danger to a patient's spouse. *Id.* As Plaintiffs' identifying and sensitive health information is squarely within "the realm[] of medical diagnosis and treatment," *In re Grand Jury Investigation in N.Y. Cnty.*, 779 N.E.2d at 176, and permitting DOJ

to obtain this information would infringe Plaintiffs' constitutional rights, the information lies at the heart of the statutory privilege's protections.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

Dated this 20th day of November 2026.

Respectfully submitted,

*/s/ Joshua S. Margolin*

Joshua S. Margolin
**Selendy Gay PLLC**
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000
jmargolin@selendygay.com

Omar Gonzalez-Pagan
Karen L. Loewy
**Lambda Legal Defense and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org
kloewy@lambdalegal.org

Nora Huppert
**Lambda Legal Defense and Education Fund, Inc.**
3656 N. Halsted St.
Chicago, Illinois 60613
Telephone: 312-605-3233
Facsimile: 855-535-2236
nhuppert@lambdalegal.org

Robert Hodgson
Gabriella Larios
Anya Weinstock
**New York Civil Liberties Union Foundation**
125 Broad Street, 19th Floor
New York, New York 10004
Telephone: 212-607-3300
rhodgson@nyclu.org
glarios@nyclu.org
aweinstock@nyclu.org

Chase B. Strangio
Shana Knizhnik
**American Civil Liberties Union Foundation**
125 Broad Street, Floor 18
New York, New York 10004
Telephone: 212-549-2500
Facsimile: 212-549-2650
cstrangio@aclu.org
sknizhnik@aclu.org

Elizabeth Gill
Adrienne Spiegel

**American Civil Liberties Union Foundation**
425 California Street, Suite 700
San Francisco, California 94104
Telephone: 415-343-0779
egill@aclu.org
a.spiegel@aclu.org

A.D. Sean Lewis
**Lambda Legal Defense and Education Fund, Inc.**
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
Telephone: 213-382-7600
Facsimile: 855-535-2236
alewis@lambdalegal.org

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that the foregoing complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B) and L.R. 32.1(a)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,986 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in 14-point Times New Roman font, a proportionally spaced typeface, using Microsoft Word.

Date: November 20, 2026

*/s/ Joshua S. Margolin*
Joshua S. Margolin